IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., :
J-SQUARED TECHNOLOGIES (OREGON) :
INC., :
 :
       Plaintiffs, :    C.A. No. 04-960-SLR
 :
   v. :
 :    JURY TRIAL DEMANDED
MOTOROLA, INC., :
 :    **PUBLIC VERSION**
       Defendant. :

## PLAINTIFFS' MOTION TO COMPEL

Pursuant to Federal Civil Rules 26, 33, 34 and 37, Plaintiffs J-Squared Technologies, Inc. ("JST") and J-Squared Technologies (Oregon), Inc. ("JSO") (collectively, "Plaintiffs") present this motion to compel responses to interrogatories and requests for production of documents (the "Motion"). In support of this Motion, Plaintiffs state as follows:

1.    Plaintiffs are entitled to an order compelling Motorola, Inc. ("Motorola") to fully respond to numerous interrogatories and document requests (the "Discovery Requests"). The Discovery Requests call for the production of information speaking directly to the facts that serve as the basis for the claims and defenses asserted in this litigation. The information sought is clearly relevant and/or likely to lead to the discovery of admissible evidence. Moreover, the information sought is not otherwise protected from discovery – Motorola's claims to the contrary notwithstanding.

2.    Despite Plaintiffs' good faith attempts to resolve this discovery dispute amicably, Motorola continues to withhold a mountain of discoverable information. The deficiencies in Motorola's production are two-fold. First, Motorola has failed to collect and produce responsive documents that certainly exist. Motorola has not adequately substantiated it efforts to compile these documents nor adequately explained the mysterious disappearance of numerous highly

relevant documents. The gapping holes in Motorola's production are simply inexplicable. Second, Motorola has improperly withheld documents based upon farcical claims of privilege. In this connection, Motorola's two privilege logs contain 105 pages with approximately 640 separate entries. In total, Motorola is claiming one form of privilege or another to over 3,600 pages of documents. A close look at these logs, in light of the theories of recovery and the defenses asserted in this dispute, highlights that Motorola is improperly withholding discoverable information, and for obvious reasons.

## **FACTS**

3.     Plaintiffs each maintain four identical theories of recovery: breach of contract, promissory estoppel, negligent misrepresentation and breach of the implied covenant of good faith and fair dealing.

4.     On June 29, 2005, Motorola served its initial disclosures accompanied by preliminary document production and the first of two privilege logs.

5.     On July 7, 2005, Plaintiffs served its initial disclosures and initial document production together with their first set of interrogatories and requests for production. (D.I. 29, attached as Exhibit A).

6.     After several agreed-to extensions, Motorola finally served its responses to the Plaintiffs' discovery requests and produced some additional documentation on September 15, 2005. (D.I. 30, attached as Exhibit B). Of particular importance to the issues present herein is Motorola's identification of the grounds for termination and/or non-renewal of all the manufacturer's representatives' Agreements on February 26, 2004: "Motorola reviewed the progress of the manufacturers' representatives program and determined that it was not performing as well as anticipated. In particular, the majority of the representatives were not meeting their contractual performance requirements." (Exhibit B at Interrogatory No. 3).

2

7.    On September 22, 2005, Plaintiffs delivered their first deficiency letter to Motorola addressing the documents identified in the first privilege log. (Attached as Exhibit C). On October 20, 2005, Plaintiffs delivered their second deficiency letter addressing new issues that surfaced when preparing for the first series of fact depositions. (Attached as Exhibit D).

8.    On October 21, 2005, Motorola responded to the first deficiency letter and produced certain documents that were previously withheld from production. (Attached as Exhibit E). On October 28, 2005, Motorola responded to the second deficiency letter and provided supplemental responses to interrogatories. (Attached as Exhibit F). In the October 28 letter, Motorola identified January 7, 2004 as the date it first claimed that the work product doctrine attached. Accordingly, Motorola admits that it did not anticipate litigation until at the earliest January 7, 2004, and the veracity of this assertion is still very much at issue.

9.    On November 11, 2005, Plaintiffs delivered their third deficiency letter. (Attached as Exhibit G). This letter came at a time when the Plaintiffs were deposing Motorola's fact witnesses and attempting to schedule the depositions of Motorola's management level decision makers. On November 17, 2005, Motorola responded to the third deficiency letter and produced 6,000 email documents, all of which originated from a single, lower-level employee. (Attached as Exhibit H). Shortly thereafter, Motorola delivered its 73-page supplemental privilege log.

10.    In the third deficiency letter, Plaintiff raised a number of issues, new and old, including Motorola's failure to produce any email correspondence whatsoever for the period April through December 2003, nor any emails originating from Motorola's management level employees and other decision makers important to the litigation, including Wendy Vittori, Kevin Parslow, Paul Holt, Tom Nallen, Nina Guibor and Larry Terry. Tellingly, Motorola was able to produce over 6,000 emails from a lower level employee, who is a non-critical witness in the

3

litigation, but not one email originating from the balance of the above-listed, mostly management level, employees.

11.     Pursuant to D. Del. LR 7.1.1, Plaintiffs provided a draft copy of its Motion to Compel to Defendant, identifying the documents and information sought under the Motion. The documents and information requested below remain in controversy following Plaintiffs' four separate attempts to negotiate their production.

## ARGUMENT

12.     Plaintiffs are entitled to the information contained in the documents wrongfully withheld by Motorola for four main reasons. First, Motorola has simply failed to diligently search for documents known to have existed and has failed to adequately explain the tremendous holes in its production. Second, the requisite "anticipation of litigation"[1] requirement for application of the work product doctrine was lacking until Motorola received communications from its manufacturer's representatives disagreeing with the manner in which their Agreements were terminated. As such, documents (and all factual information contained therein) that existed before this time is properly discoverable. Third, Plaintiffs are entitled to discover the facts conveyed in all internal and external communications as any applicable privilege does not shelter from disclosure factual information just because it may or may not have been reviewed by a lawyer. Finally, Plaintiffs are entitled to discover information concerning performance, contract interpretation and commission payments as Motorola has placed these matters at issue with its defense strategy in this matter.

---

[1] Plaintiffs cannot be entirely certain when Defendant alleges the decision was made to terminate the Agreements or by whom because Defendant has refused to produce emails originating from its management-level decision makers. *See infra* pp. 8-9.

WILM1\33179\1 153371.000

A.    Applicable Law

13.    In diversity cases, such as this, the Court will look to state law on questions of attorney-client privilege and federal precedent on issues surrounding the work product doctrine. *United Coal Co. v. Powell Const. Co.*, 839 F.2d 958, 965-66 (3d Cir. 1988). Anticipating that a choice of law issue surrounding Plaintiffs' tort claims might arise, the Court, *sua sponte*, determined that it would apply the parties' contractual choice of law of Arizona law to ensure uniform adjudication of Plaintiffs' claims. *J-Squared Tech. Inc. v. Motorola, Inc.*, 364 F. Supp. 2d 449, 452 n.8 (D. Del. 2005). In addition to citation of Arizona law, Plaintiffs will address the attorney-client privilege under other jurisdictions' jurisprudence in recognition of the fact that the parties' interaction in this matter crossed over more than four states and two countries.[2] The additional jurisdictions include: Texas, Massachusetts, California and Canada.

B.    Attorney-Client Privilege

14.    Under Arizona law, the party seeking to invoke the attorney-client privilege has "the burden of proving to a reasonable certainty that the elements of the privilege exist." *Roehrs v. Minnesota Life Ins. Co.*, 228 F.R.D. 642, 645 (D. Ariz. 2005) (citing *Clarke v. American Commerce Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992). "Because the privilege 'impedes full and free discovery of the truth,' the privilege is strictly construed." *Roehrs*, 228 F.R.D. at 645 (quoting *Roman Catholic Diocese v. Superior Court*, 62 P.2d 970, 975 (Ariz. 2003)).

---

[2] A federal court sitting in diversity will apply the forum state's choice of law provisions when assessing matters of substantive law or privilege. *Burnett v. Ghassem Vakili, M.D., P.A.*, 685 F. Supp. 430, 431 (D. Del. 1988) (citing *Samuelson v. Susen*, 576 F.2d 546, 549 (3d Cir. 1978). Delaware courts look to the Restatement (Second) of Conflict of Laws for guidance in choice of law disputes. Given an action in tort, Delaware state courts look at the following factors: (i) the place where the injury occurred; (ii) the place where the conduct causing the injury occurred; (iii) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (iv) the place where the relationship, if any, between the parties is centered. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991) (citing Restatement (Second) of Conflicts § 145).

5

15.    Not all communications with a lawyer are privileged.  In order for the privilege to attach, the communication must be made "to or by the lawyer for the purpose of securing or giving legal advice, must be made in confidence, and must be treated as confidential." *Id.* at 646. The privilege protects communications between the lawyer and client, but it does not extend to underlying facts which are not part of the communication of legal advice between the lawyer and client. *See Ulibarri v. Superior Court*, 909 P.2d 449, 452 (Ariz. App. 1995); *accord Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981) (underlying facts not subject to privilege); *Blum v. Spectrum Restaurant Group - Employees Group Life and Supplemental Life Plan*, 2003 WL 367059, at *2 n.1 (E.D. Tex. 2003) (holding that the "attorney-client privilege does not protect underlying facts"); *Amarin Plastics, Inc. v. Maryland Cup Corp.*, 116 F.R.D. 36, 41 (D. Mass. 1987) (citing *Upjohn*); *2,022 Ranch, L.L.C. v. Superior Court*, 7 Cal. Rptr. 3d 197, 214-15 (Cal. App. 2003) (holding that when "the communication is divisible into a purely factual, or nonlegal, component and a legal one, courts will generally require disclosure of the factual component"); *Dusik v. Newton*, (1983), 48 B.C.L.R. 111, 38 C.P.C. 87, 1 D.L.R. (4th) 568 (C.A.) (recognizing that under Canada's solicitor-client privilege, facts that exist independent of a communication will be ordered to be disclosed).

16.    The privilege may also be waived if the party places the facts or the substance of the counsel at issue in the litigation.  Under Arizona law, attorney-client privilege is impliedly waived when: "(1) assertion of the privilege was a result of some affirmative act, such as filing suit (or raising an affirmative defense), by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." *Roehrs*, 228 F.R.D. at 646 (citing *State Farm Mut. Auto. Ins. Co. v. Lee*, 13 P.3d

1169, 1173 (Ariz. 2000)); *Ulibarri*, 909 P.2d at 452; *accord In re Geothermal Resources Intern., Inc.*, 93 F.3d 648, 653 (9th Cir. 1996) (same, applying California law).

C.    Work-Product Doctrine

17.    The work product doctrine only applies to documents. *In re Perrigo Co.*, 128 F.3d 430, 437 (6th Cir. 1997). The doctrine does not apply to facts known or gathered relating to the litigation, as those are discoverable. *See In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003). Furthermore, "[t]he party asserting work product protection has the burden of demonstrating that the disputed documents were prepared by or for the party or its attorney and prepared in anticipation of litigation or for trial." *Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 203 F.R.D. 159, 163 (D. Del. 2001). The party will not meet this burden by merely asserting that the materials were prepared "in connection with" the subject matter of the dispute. *Kopacz v. Delaware River and Bay Authority*, 2005 WL 2086747, at *1 (D. Del. Aug. 25, 2005) (citing *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 139 (3d Cir. 2000)). As a corollary to the proponent's burden, documents prepared in the ordinary course of business are not immune from discovery under the work product doctrine. *Kopacz*, 2005 WL 2086747, at *1.

18.    Despite the presence or assistance of a lawyer, a party is entitled to "discover relevant facts known or available to the other party, even though such facts are contained in documents that are not discoverable." *United States v. Dentsply Intern., Inc.*, 187 F.R.D. 152, 156 (D. Del. 1999) (citing *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 595 (3d Cir. 1984)).

19.    If the proponent of the work product doctrine succeeds in satisfying its burden and the document properly falls within the scope of the doctrine, the moving party may nonetheless obtain discovery of the factual information upon "a showing that the party – has substantial need of the materials in the preparation of the party's case and that the party is unable

7

without undue hardship to obtain the substantial equivalent of the materials by other means."
*Kopacz*, 2005 WL 2086747, at *1 (citing Fed. R. Civ. 26(b)(3)).

## REQUESTED DOCUMENTS AND INFORMATION

A.    Emails Originating from Motorola's Management and Decision Makers

20.    Motorola steadfastly refuses to produce any email correspondence from its management-level and decision-maker employees, including: Wendy Vittori, Kevin Parslow, Paul Holt, Tom Nallen, Nina Guibor and Larry Terry.

21.    Beginning in early 2003, Wendy Vittori became the General Manager of Motorola. At about the same time, Kevin Parslow (the Director of Worldwide Sales for MCG) directed that no more manufacturer's representative Agreements were to be executed. This is evidenced not from the production of an email emanating from Mr. Parslow – because Motorola has not produced any – but because the moratorium is referenced in the e-mails of Mr. Parslow's subordinates, which have been produced. (Exhibit S)  In deposition testimony, Paul Holt (the Director of North American Sales) confirmed that when Ms. Vittori appeared,        [redacted] [redacted]    including the manufacturer's representative Agreements. (Exhibit T).

22.    Additionally, there has been no production of emails from other important witnesses. Tom Nallen (the controller for the sales group at MCG) and Nina Guibor (finance and receivables) were individuals in Motorola's finance department who worked to provide factual information to Vittori, Parslow and Holt. Larry Terry was a business development manager who solicited the Plaintiffs' participation in Motorola's sales model. Despite the clear connection these individuals have with the facts underlying this action, Motorola has not produced <u>even a single email</u> originating from any of them.

8

23.     Motorola claims that Ms. Vittori has no responsive documents whatsoever. (Exhibit H at p.4).  A proposition that can only be described as puzzling given her position with the company.  It also claims that Mr. Parslow left the company in April 2004 and that when he left, he retained his computer "but thereafter deleted the Motorola files and no longer has the computer." (Exhibit H at p.3).  Motorola continues to hold steadfast on this position despite Mr. Parslow's admission in deposition testimony that he sent and received numerous emails during the relevant time period and that they would certainly be retrievable from Motorola's servers. (Exhibit U).  Mr. Holt left the company in October 2004, but shortly prior to his departure he apparently started to use a different computer.  (Exhibit H at p.4).  Plaintiffs are expected to believe, despite common sense and the clear admissions to the contrary, that because Mr. Parslow and Mr. Holt left Motorola, Motorola cannot produce emails known to have been generated from these critical witnesses, and which are directly related to this action.  Same story with Ms. Guibor.  She left the company in March 2004 and her data was transferred to others in her department.  (Exhibit H at p.4).  However, Plaintiffs have not been provided with any emails specifically originating from her account.  Finally, Motorola has also failed to produce any emails that originate from Mr. Terry's account, even though he continues to work at Motorola. The failure to produce any emails from Mr. Terry is unbelievable, considering that he was a principal contact with Plaintiffs during the negotiation of the Agreements.

24.     Plaintiffs believe these emails exist and can be produced.   In response to Plaintiff's letter inquiry addressing the lack of email production in advance of Dennis Robinson's deposition, Motorola was able to produce 6,000 documents not previously produced, all originating from Mr. Robinson's account.  Not surprisingly, this production – but for a few proverbial straws in the haystack – was not on point with the litigation.  What the production did

demonstrate, however, was that if Motorola truly wants to retrieve historical communications during the relevant periods, it can.

25.    Should the requested emails be lost or destroyed, Plaintiffs request that Motorola provide an identification of the cause(s) for their absence sufficient to permit an informed decision to be made concerning a potential motion for spoliation.

B.    <u>Email Correspondence From April through December 2003</u>

26.    By at least December 2003, Motorola began a calculated, covert plan to terminate all the manufacturer's representative Agreements.[3] This followed upper management's April 2003 moratorium on all new manufacturer's representative Agreements. Despite this moratorium, Motorola executed the JSO Agreement in May 2003. There is a conspicuous absence of email traffic between April and December 2003. Despite executing four new manufacturer's representative Agreement during this time, there is no email traffic discussing the April 2003 Parslow decision or how or why Motorola decided to continue to execute Agreements following that decision. Motorola contends that it has already produced some 3,000 pages of documents generated during this time period. (Exhibit H at p.3). Even if this is so, which is in dispute, Plaintiffs are entitled to discover the balance of this information, which is known to exist.

C.    <u>Performance Metrics Materials</u>

27.    Plaintiffs requested that it be provided with Motorola's performance metrics that would account for: (i) performance under the Agreements (Motorola's "master sheet" of performance and "Optix" program); (ii) commissions payable or owed under the Agreements and (iii) total point of sale numbers for the territories covered by the Agreements. (*See* Exhibit A at

---

[3] This affirmative maneuvering was the final phase of Motorola's long-held strategy of merely utilizing the manufacturer's representatives as a stop-gap measure.

Request Nos. 5 and 9). Plaintiffs obtained sworn testimony that these materials exist, however, Motorola refuses to undertake production.

28.    The Optix program provided Motorola with real-time information as to the manufacturer's representatives' performance under the Agreements as supervised and input by the business development managers when the manufacturer's representatives achieved the goals set forth in the Agreement. (Machernis dep. at pp. 135-40 (Exhibit V); Parslow dep. at pp. 91-97 (Exhibit U)). The master sheet of performance metrics was created in November or December 2003 to track the manufacturer's representatives' performance under the Agreements. (Machernis dep. at pp. 224-32 (Exhibit V); Crawford dep. at pp. 211-12 (Exhibit W)). Motorola would also have an accounting of all commission payments made under the Agreements.

29.    The fact that Motorola refuses to disclose this information is inexplicable. Motorola's principal defense to this action is the allegation that the JSO Agreement was terminated for non-performance and the JST Agreement was not renewed because the entire business model did not prove to be profitable. Given this defense, Motorola should be compelled to produce these documents and/or identify the information contained in its Optix operating program.

30.    Plaintiffs are not aware if this information is part of the 105 pages of privilege log. Nevertheless, any claim of work product would be unavailing as this information was compiled in the ordinary course of business and was created well before even Motorola's tenuous assertion of the anticipation of litigation arising as of January 7, 2004. According the materials and information must be produced.

D.    Interrogatory Responses

31.    Motorola refuses to respond to interrogatories directed towards communications and representations made at a December 2003 discussion between the parties and refuses to

substantiate Motorola's revenue figures for the four quarters surrounding its decision to terminate the Agreements. (Exhibits A and B at Interrogatories 7 and 9, respectively). There is no good basis for this refusal.

32.     Motorola refuses to answer Interrogatory No. 7 because it refers to a December 2003 meeting when in fact the parties only had discussions in December 2003, and no meetings. (Exhibit F at p.1). This objection is without merit. Motorola should be compelled to fully respond to this interrogatory.

33.     In response to Interrogatory No. 9, which inquires as to Motorola's quarterly revenue for the four quarters surrounding its decision to terminate the Agreements (with an associated request for production directed to the production of this same information), Motorola simply identified the revenue figures and produced its Securities and Exchange Commission quarterly reports. However, Motorola added the caveat that the revenue figures may be inflated due to a merger that transpired during this time frame. Plaintiffs require a further substantiation of the revenue figures. Plaintiffs intend to prove that Motorola never had a *bona fide* corporate strategy to maintain a long-term relationship with its manufacturer's representatives and planned to terminate them (as they did) when the business cycle began its rebound following the bust of the dot com bubble. This information is a component of this theory and claim and therefore should be identified.

E.     Spreadsheets Conveying Factual Information (Exhibit I)

34.     As part of its privilege logs, Motorola identified approximately twenty-seven (27) spreadsheets that potentially convey factual information concerning Plaintiffs' performance and/or status under their respective Agreements. (Attached as Exhibit I). Motorola claims immunity from production under the work product doctrine. As identified above, the work

12

product doctrine does not apply to facts known or gathered relating to the litigation as those are discoverable. *See In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003).

35.    While many of the spreadsheets are not dated, they were attached to email correspondence that pre-dated Motorola's unlawful termination of the Agreement; therefore, the requisite "anticipation of litigation" is lacking. Moreover, Motorola has impliedly waived any privilege that may have attached to these documents by placing JSO's performance at issue with its affirmative defense that JSO failed to perform under the Agreement and contention that the business model was not profitable.

36.    For these reasons, Plaintiffs are entitled to the production of Motorola's factual spreadsheets.

F.    Pre-Termination Internal Motorola Communications Concerning Manufacturer's Representatives' Performance (Exhibit J)

37.    Motorola identifies at least eighteen (18) documents that convey facts concerning the manufacturer's representatives' performance appraisals that pre-date Motorola's termination of the Agreements. (Attached as Exhibit J). Motorola claims attorney-client privilege based on the fact that certain in-house attorneys or contract department employees received the emails. Moreover, Motorola claims immunity under the work product doctrine because certain analyses may have been copied to or requested by in-house counsel.

38.    Plaintiffs are entitled to this information because it conveys factual information concerning the manufacturer's representatives' performance under the Agreements and does not encompass the proffer of legal advice or opinions. Moreover, all the communications in this category pre-date Motorola's unlawful termination of the Agreement, therefore, the requisite "anticipation of litigation" is lacking. Finally, just as with the factual information contained in the spreadsheets, Motorola has impliedly waived any privilege that may have attached to these

13

documents by placing JSO's performance at issue with its affirmative defense of JSO's failure to perform under the Agreement.

39.    For these reasons, Plaintiffs are entitled to the production of Motorola's pre-termination, internal communications concerning the manufacturer's representatives' performance.

G.    Pre-Termination Internal Motorola Communications (Exhibit K)

40.    Motorola identifies at least forty-three (43) internal documents that indicate a general discussion of the manufacturer's representative sales model and agreement provisions, all prior to Motorola's termination of the Agreements.  (Attached as Exhibit K).  Motorola claims attorney-client privilege based on the fact that certain in-house attorneys received the emails.  Additionally, Motorola claims immunity under the work product doctrine because certain emails may have been copied to or requested by in-house counsel.

41.    Plaintiffs are entitled to this information because all indications point to the conclusion that the emails are nothing more than routine business discussions addressing the manufacturer's representative sales model and agreement parameters.  As with the two previous categories, all communications in this category pre-date Motorola's termination of the Agreement, therefore, the requisite "anticipation of litigation" is lacking.

42.    For these reasons, Plaintiffs are entitled to the production of Motorola's pre-termination, internal communications concerning the manufacturer's representatives' status within Motorola's sales model strategy.

H.    Pre-Termination Communications with Outside Counsel (Exhibit L)

43.    Plaintiffs seek to compel the production of thirty-one (31) emails between Motorola and its outside counsel that were delivered prior to its termination of the Agreements.  Motorola claims attorney-client privilege as a basis for withholding the emails.

14

44.    Given Motorola's purported basis for terminating all the Agreements in February 2004 (namely, that it "reviewed the progress of the manufacturers' representatives program and determined that it was not performing as well as anticipated"), it cannot now be heard to claim that these pre-termination communications related anything other than factual information concerning performance and profitability. (Exhibit B at Interrogatory No. 3).

45.    Problematic is the fact that Motorola's interrogatory response as to the basis for termination of the Agreements does not match the deposition testimony given to date.  It is readily apparent from the testimony of Motorola's own employees that it frustrated the manufacturer's representatives' ability and contractual right to cure any performance deficiencies. (Kolasa dep. at pp. 128-31 (Exhibit R); Crawford dep. at pp. 204-08 (Exhibit W)).

46.    The two positions Motorola advances are mutually exclusive.  If it truly terminated the Agreements for purely performance issues, then the majority of the pre-termination communications with outside counsel focus on the factual predicate of non-performance.  These facts are discoverable in spite of the fact that they were communicated to a lawyer. *Upjohn Co.*, 449 U.S. at 395 (underlying facts are not protected); *Ulibarri*, 909 P.2d at 452 (same); *Roehrs*, 228 F.R.D. at 646 (waiver of attorney-client privilege through placing the factual matter at issue in litigation).  If, however, the non-performance basis for termination was a pretext for terminating all nine (9) manufacturer's representatives' Agreements on the very same day, then Motorola must withdraw its defense of non-performance.  Nonetheless, Plaintiffs would still be entitled to the facts disclosed in the pre-termination emails to outside counsel as those facts would address the amount and extent of damages recoverable for Motorola's willful breach of contract.

15

I.    Draft Termination Letters (Exhibit M)

47.    Plaintiff seeks to compel the production of seventeen (17) draft termination notices directed to Plaintiffs and/or other manufacturer's representatives. Motorola claims that the draft termination letters are immune from production under the work product doctrine. Plaintiffs are entitled to receive copies of the draft termination letters as the requisite "anticipation of litigation" is lacking as of the date these draft termination letters were written (which necessarily must be prior to the February 26, 2004 termination notices). Again, if there truly were non-performance or expiration issues that precipitated the termination of all nine (9) Agreements on the very same date, then Motorola could not have anticipated any litigation resulting from its terminations for cause under the terms of the Agreements.

J.    Communications Concerning Commissions Payable from Raytheon Canada (Exhibit N)

48.    Plaintiffs have learned through discovery that Motorola failed to pay all commissions that were properly owed under the Agreements during the time the Agreements were in place. Raytheon Canada is an account from which JST was owed commission payments from the inception of the Agreement to its end. All Raytheon Canada orders were fulfilled through Motorola's distributor Avnet, Inc. and shipped to Raytheon's United States broker somewhere in New York. For this reason, Raytheon Canada sales were not reported in Canada and therefore JST was not paid until this discrepancy was discovered sometime in 2004. JST believes that it was not properly or completely compensated for the Raytheon Canada account.

49.    The six emails identified in Exhibit N should be produced to the extent they convey factual information as to the commissions owed and/or paid under the JST Agreement. The fact that outside counsel received a portion of these emails does not shield from discovery the underlying facts.

16

K.    Communications Concerning Commissions Payable (Exhibits O and P)

50.    Plaintiffs seek the production of seventeen (17) emails concerning the payment of commissions under the Agreements.   The subject emails encompass two (2) internal emails (Exhibit O) and fifteen (15) emails with outside counsel (Exhibit P).   As with the Raytheon Canada issue, there are questions as to whether Plaintiffs were fully compensated for their work under the Agreements.   The facts communicated in these emails are subject to disclosure irrespective of the fact that the emails may have been directed or copied to a lawyer.

L.    Miscellaneous Communications (Exhibit Q)

51.    There are seven (7) miscellaneous emails that Plaintiff seeks to discover as the subject matter of those emails are placed at issue in this litigation by Motorola's defense strategy. To the extent there is an opinion work product, those portions may be redacted with the balance of the facts being produced.

WHEREFORE, Plaintiffs respectfully request that their motion to compel be granted and that Motorola be compelled to produce the documents and information requested above within ten (10) days of the Court's order.

Dated: February 22, 2006

Sean J. Bellew (#4072)
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE  19801

Of Counsel:                              Telephone:  (302) 295-2000
Kevin F. Berry                           Facsimile:  (302) 295-2013
Cozen O'Connor                             *Attorneys for Plaintiffs*
1900 Market Street
Philadelphia, PA  19103
Telephone:  (215) 665-2000
Facsimile:  (215) 665-2013

17