IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., a )
Canadian corporation, and J-SQUARE )
TECHNOLOGIES (OREGON) INC., an )
Oregon corporation, )
                    Plaintiffs, )
              v. )      C.A. No. 04-CV-960-SLR
MOTOROLA, INC., a Delaware )
corporation. )
              Defendant. )

## MOTOROLA'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL

**I.     INTRODUCTION**

       For seventeen pages, Plaintiffs' motion rattles off accusations and allegations about Motorola's discovery responses that are demonstrably, objectively false. Motorola will respond to each of Plaintiffs' contentions, but we ask that the Court consider, at the outset, a few points:

       1.     Plaintiffs did not meaningfully attempt to confer with Motorola prior to filing their motion. The motion contains an extensive list of demands and complaints, yet was given in draft form to Motorola with a deadline to respond in a little over two business days. (*See* Exhibit 1). When Motorola asked for two additional days (from a Wednesday to a Friday) to respond due to counsel being out of town, Plaintiffs responded that they would be "prejudiced" by the delay and filed the motion. (*See* Exhibit 2).

       2.     Much of Plaintiffs' motion is dependent upon a frivolous legal argument. Plaintiffs demand that Motorola produce documents that are privileged – documents that were prepared at counsel's request and sent from the client to counsel – because "Motorola has impliedly waived any privilege that may have attached to these

documents by placing JSO's performance at issue with its affirmative defense that JSO failed to perform under the Agreement." (D.I. 76 at 13). As an initial matter, Motorola did not plead JSO's failure to perform as an affirmative defense. (*See* D.I. 21 ¶93). That is just a misstatement by Plaintiffs. As to the legal point, defending a contract termination (what this case is about) on the ground that the terminated party did not meet its contractual performance metrics does not – in Delaware, Arizona, or anywhere else – "impliedly waive" the attorney-client privilege as to a client's communications with counsel about the performance issues.

3.      Plaintiffs complain about a "conspicuous absence of email traffic between April and December 2003." (D.I. 76 at 10). Plaintiffs go so far as to claim that Motorola has failed "to produce any email correspondence whatsoever for the period April through December 2003." (*Id*. at 3 (emphasis in original)). But Motorola produced approximately 3,681 pages of documents, almost all email, from that time period. Moreover, Plaintiffs have marked as deposition exhibits 24 different Motorola email documents that were created in that time period and produced by Motorola in this litigation.

4.      Plaintiffs similarly say that Motorola "has not produced even a single email originating" from Larry Terry or certain other Motorola employees. (D.I. 76 at 8 (emphasis in original)). But Motorola produced 3,759 pages of email from Mr. Terry alone! (*See* Exhibit 3 at Exhibit A).

5.      Plaintiffs claim that Motorola has withheld a "mountain" of discoverable documents totaling over 3,600 pages. (D.I. 76 at ¶2). But, as Plaintiffs know, the bulk of the pages withheld are about a dozen spreadsheets that, when printed

on regular-size paper, reformat and go on forever with little additional data on most pages. The spreadsheets, which are largely duplicative of one another, range from 191 to 217 pages each when printed. The remainder of the documents withheld include hundreds of email duplicates.

6.    Plaintiffs say they "have learned through discovery that Motorola failed to pay all commissions that were properly owed under the Agreements," cite a single account reconciliation that occurred "sometime in 2004" involving Raytheon Canada as proof, and demand that Motorola produce privileged documents between Motorola and outside counsel discussing the Raytheon reconciliation. (D.I. 76 at 16). But Plaintiffs and Motorola discussed and resolved the Raytheon issue in April 2004, months before suit was filed in August 2004 (hence, Plaintiffs' "sometime in 2004" description). (*See* Exhibit 4). There has been no "discovery" during this litigation of any underpayment and, even if there had been, that would not be a ground for obviating the attorney-client privilege.

7.    At a number of points in their motion, Plaintiffs argue that portions of privileged communications should be deemed not privileged because they are factual and Plaintiffs are entitled to know the "underlying facts." (D.I. 76 at 4, 6, 7, 12-13, 15-17). But as even the cases Plaintiffs cite make clear, the way to learn about underlying facts is through depositions – Plaintiffs have taken over 50 hours thus far – or written discovery – Plaintiffs have propounded and received answers to 45 interrogatories – not by receiving privileged or work product communications from the other side.

The actual record shows an extraordinary and diligent effort by Motorola to respond to Plaintiffs' ill-considered accusations. Plaintiffs' motion should be denied.

## II.     BACKGROUND

### A.     The Parties' Relationship

In 2002, the Motorola Computer Group ("MCG"), a Motorola business unit, began entering into contracts with independent manufacturer representatives to help market certain lines of Motorola products.  By mid-2003, Motorola had contracts with nine manufacturer representatives, including with Plaintiffs J-Squared Technologies, Inc. ("JST") and J-Squared Technologies, (Oregon), Inc. ("JSO").

In early 2004, Motorola completed an evaluation of the manufacturer representative program and decided to end it, as it was not yielding the financial results Motorola had hoped or expected because many of its manufacturer representatives were underperforming.  Accordingly, Motorola notified JST that it did not wish to renew JST's representative agreement and notified JSO that its contract was being terminated because of JSO's failure to meet the minimum performance requirements in its agreement.

### B.     The Claims

Plaintiffs' rep agreements with Motorola expressly stated that they were for one-year terms and could only be renewed in writing.  Plaintiffs (which are affiliated companies) nevertheless have pled claims to the effect that they were promised or misled into believing that the agreements would be for longer than one year.  (*See* D.I. 1, Counts II, III, VII, VIII).  Both Plaintiffs also contend that the termination or non-renewal of their relationship also constituted a breach of the implied covenant of good faith and fair dealing.  (*Id.* Counts IV & IX).  Plaintiff JST says that its contract was renewed by conduct, because the parties continued to work together for a couple months after the agreement expired.  (*Id.* Count I).  And Plaintiff JSO claims that it was wrongly

terminated because it was, in fact, meeting its performance requirements.  (*Id.*
Counts VI).

###   C.   Discovery

Motorola provided its initial disclosure statement on June 29, 2005, and
documents (nearly 4,000 pages) and an initial privilege log on July 6, 2005.[1]  To date,
Motorola has produced at least 16,000 pages of documents (Plaintiffs have produced
under 2000 pages), responded to 45 interrogatories (*see* D.I. 76  Exhibit B, Exhibits 16,
18), and replied to nine requests for admission (*see* Exhibit 16).  Plaintiffs also have
deposed 8 Motorola witnesses for over 50 hours and have scheduled 4 additional
depositions.

In addition, on September 22, 2005, Plaintiffs asked Motorola to produce
many documents on its privilege log and to clarify why other documents were withheld.
Motorola responded in October 2005, explaining its assertions of privilege and producing
a few additional documents.  (D.I. 76  Exhibit E).  Thereafter, Plaintiffs' counsel sent two
other letters regarding similar (or the same) discovery issues, and Motorola responded to
each letter, with the last response dated November 17, 2005.  (D.I. 76  Exhibits F, H).
Motorola's letters make clear that Motorola diligently investigated and responded to
Plaintiffs' inquiries.  (*Id.*)

---

[1]In light of the sensitive nature of many of the relevant documents, the Court signed the
parties' stipulated protective order on September 23, 2005.  The parties had previously
agreed that the documents exchanged would be kept confidential while this stipulated
order was negotiated.  A key purpose of this order was largely undermined when
Plaintiffs' counsel provided confidential documents to three other former manufacturer
representatives, purportedly as part of the "investigation" of Plaintiffs' claims.  (*See*
Exhibit 5).  Shortly afterward, Plaintiffs' counsel filed another lawsuit against Motorola
on behalf of these three former representatives.  *See* 1:06-CV-00114-SLR (D. Del.).

From November 2005 until February 2006, Plaintiffs did not raise any more discovery concerns with Motorola until they forwarded a draft of the Motion to Compel to Motorola counsel (after business hours on the Friday before President's Day weekend), stating that they would file the Motion in less than two business days absent resolution of the issues raised to their satisfaction. (Exhibit 1). Because Motorola's lead counsel was out of the office most of that week, Motorola requested two additional days to respond. (Exhibit 6). Plaintiffs refused, claiming the delay would "prejudice" Plaintiffs. (Exhibit 2).[2]

With respect to discovery propounded by Motorola, Motorola has repeatedly requested that Plaintiffs remedy their patent failure to respond adequately. Motorola wrote letters requesting that Plaintiffs' responses be supplemented on December 22, 2005, January 12, and February 15, 2006. (*See* Exhibits 7, 8 (p. 3, 9). Plaintiffs have simply ignored the letters except to say occasionally that they will respond soon, which they then fail to do. The last promise that a response was forthcoming was on February 23, 2006, one day after filing their motion to compel complaining of Motorola's alleged unresponsiveness.[3] (Exhibit 10). Plaintiffs told Motorola that a response would be received by Monday, February 27, 2006. (*Id.*). To date, Motorola still has received no response.

---

[2]Subsequently, Plaintiffs' counsel did offer to confer while the motion was pending. Given that the motion already had been filed and given its many misstatements, Motorola had no choice but to prepare a response. (*See* Exhibit 20).

[3]We recognize the limited relevance of Plaintiffs' discovery failures to the motion at hand. But the reality is that their motion has it exactly reversed as to which party has bent over backwards to ensure a fair and timely exchange of evidence and which party has not.

III.    **PLAINTIFFS' MISSTATEMENTS AS
TO WHAT HAS BEEN PRODUCED**

    A.    **The Allegedly Missing April 2003-December 2003 Documents**

Plaintiffs complain about "Motorola's failure to produce any email correspondence whatsoever for the period April through December 2003." (D.I. 76 at 3 ¶10 (emphasis in original)). According to Plaintiffs, Motorola's failure to do so is inexcusable because, during this time period, Motorola was engaged in a "calculated, covert plan" regarding Plaintiffs. (*Id*. at 10 ¶ 26).

Since every single witness has testified that there was no such plan, any absence of email regarding it is not surprising. But Plaintiffs' motion is misleading in ways beyond the unsupported hyperbole about the merits. The Court may have observed that Plaintiffs, right after remarking about the "conspicuous absence of e-mail traffic" produced by Motorola from the April-December 2003 period, then note that "Motorola contends it has already produced some 3,000 pages of documents generated during this time period." (*Id*.). But Plaintiffs then claim that Motorola's contention about having produced documents is "in dispute," though Plaintiffs provide no explanation as to why there is a dispute. Plaintiffs also claim that, "even if" Motorola has produced over 3,000 pages, Plaintiffs are entitled to unspecified additional documents "known to exist" that Motorola allegedly is withholding. (*Id*.)

Again, there are no other documents to produce because there was no such covert plan. As for whatever "dispute" there is about Motorola's contention that "some 3,000 pages" were produced from this time period, the only discrepancy we can detect, after being put to the burden of counting, is that the actual number of pages produced during this time period is about 3,700 rather than 3,000. In addition, as noted in the

Introduction, Plaintiffs have marked as deposition exhibits 24 different Motorola email documents that were created in the April-December 2003 period.

In sum, Plaintiffs contend that Motorola failed "to produce any email correspondence whatsoever" from this period (D.I. 76 at ¶10); Motorola, in fact, has produced close to 3,700 pages of mostly email from that period.

**B.    The Alleged Lack Of Documents From Certain Employees**

Plaintiffs claim that Motorola "steadfastly refuses to produce any email" from Wendy Vittori, Kevin Parslow, Paul Holt, Tom Nallen, Nina Guibor, and Larry Terry.  (D.I. 76 at 8).  Plaintiffs go so far as to say that "Motorola has not produced <u>even a single email</u> originating from any of them."  (*Id.* ¶ 22 (emphasis in original)).

Plaintiffs apparently made very little effort to verify the facts concerning these accusations.  For example, Motorola produced approximately 3,759 pages of email from Mr. Terry's computer and at least 320 pages of email he authored.  (*See* Exhibit 3 at Exhibit A).  Plaintiffs' own deposition exhibits include at least six exhibits (76, 77, 84, 90, 94, and 100) produced by Motorola that Mr. Terry authored and others that he received, such as exhibits 70, 79, 83, 85, and 86.  Mr. Nallen is a senior employee in the finance department and had virtually no role in any of this, though very late in the game he was copied on a number of emails and those emails appear on Motorola's privilege log.  Furthermore, Plaintiffs also have it wrong as to whether, prior to filing their motion, they even asked for documents regarding Messrs. Terry or Nallen – they did not.  (*See* D.I. 76 at 3 ¶10 (falsely stating that Motorola asked for Terry and Nallen email in a Nov. 11, 2005, letter (D.I. 76 Ex. G at p. 3)).

Plaintiffs are just as mistaken with respect to Paul Holt and Nina Guibor. Plaintiffs' own deposition exhibits include documents produced by Motorola that are

email both to and from Mr. Holt (*see, e.g.*, Depo. Exhibits 102, 103) and Ms. Guibor

(Depo. Exhibits 17, 19, 95). Plaintiffs insist there "must be more," but we have

previously explained to Plaintiffs why they are wrong.

Mr. Holt changed positions at Motorola in July 2003; he was no longer

involved in overseeing the reps and did not even have the same computer after that time.

(*See* Exhibit 11 ¶1). He has testified that he was "not involved in the Motorola Computer

Group's decision to terminate any of its agreements with any manufacturer's

representative" and was not even involved in the evaluation of the rep program that led

ultimately to the program being terminated. (*Id.* ¶¶9-10). Given that the evaluation of

the rep program took place in late 2003 and the termination decision was made in early

2004, both long after Mr. Holt's transfer, it is not surprising that there are less documents

to or from him than for other witnesses. As for Ms. Guibor, she left Motorola altogether

in March 2004 but transferred relevant documents that she had at the time to others upon

her departure – a fact that we previously explained to Plaintiffs. (*See* D.I. 76 Exhibit H

at 4)).[4]

As for Mr. Parslow and Ms. Vittori, the analysis is a little different. Ms.

Vittori is a very high-level Motorola employee; she simply was not involved in any of the

day-to-day issues at Motorola that Plaintiffs complain about. There are thus few

documents from or to her. Mr. Parslow, who left a senior position at Motorola in April

---

[4]Plaintiffs know they have received numerous emails sent and received by Ms. Guibor
and that Motorola has explained that she transferred her email to another employee when
she left Motorola in March 2004. (*Id.*) Presumably, that is why Plaintiffs use awkward
phraseology in saying that they have not received "any emails specifically originating
from her account." (D.I. 76 at 9). That may technically be true – they were printed off
from another computer – but Plaintiffs knew what had occurred and their contention is
thus misleading.

2004 and who was replaced in his position in February 2004, retained his computer when he left Motorola and no longer has the computer.  Mr. Parslow, who resides in England, did, however, transfer some documents regarding the manufacturer representative program to his replacement, Dana Huth, and those documents already been produced. (*Id*.).  Motorola has already produced documents authored by Parslow or on which Parslow was copied, including Plaintiffs' own deposition exhibits (20, 23, 93, 95).  (*See e.g.* Exhibit 13)**.**

There simply are no other documents.  And Plaintiffs' speculation that there might be more neither entitles them to more nor provides a ground for this Court to enter an order against Motorola.  *See Washington v. Thurgood Marshall Academy*, 232 F.R.D. 6, 11 (D.D.C. 2005) ("Plaintiff's speculation that more emails exist does not entitle her to more and, therefore, the court will not compel defendant to produce more emails.").

### C.    The Dennis Robinson Contention

In an effort to justify their unjustified contention that Motorola "has simply failed to diligently search for documents known to have existed," (D.I. 76 at 4), Plaintiffs note that Motorola was able to provide additional emails from Dennis Robinson prior to his deposition and that, accordingly, Motorola can find additional emails when it "truly wants" to.  (D.I. 76 at 9-10).  Plaintiffs read too much into the Robinson production.  At the outset of discovery, Motorola gathered all relevant documents that were accessible.  Unfortunately, Mr. Robinson was late in submitting his own relevant emails.  When Motorola realized that it had not received Mr. Robinson's documents, it immediately followed up with him, obtained the documents, and promptly produced them

to Plaintiffs (on November 10, not November 17 as stated in Plaintiffs' Motion (Exhibit 14)).

**D.      Deleted Email From 2002-04 Are Not On Motorola's Servers**

Plaintiffs claim that any deleted email would remain on Motorola's servers and that, somehow, Motorola can just do some sort of search and find email deleted in 2002-04.  (D.I. 76 at 9, 10).  Not so.  Motorola is a mammoth international company, which during the relevant time period has had hundreds of thousands of employees.  It is impracticable for it to retain the deleted email of that many people.  Accordingly, under Motorola's document retention policy deleted email are retained on Motorola's servers for only fourteen days.  (*See* Exhibit 15).

**E.      The "Optics" And "Accounting" Documents**

Plaintiffs say it is "inexplicable" that Motorola did not produce documents from its internal sales and commission tracking system, referred to as the Optics program, given that Plaintiffs asked for such documents in their Requests for Production Nos. 5 and 9.  (D.I. 76 at 10-11).  In neither of these requests, however, did Plaintiffs ask for such information.

Request for Production No. 5 asks for "any and all communications between [Motorola] and its manufacturer representatives addressing performance, failure to perform, completion or failure to complete obligations under the MRAs."  (D.I. 76, Exhibits A, B).  This request thus asks for communications between Motorola and the reps; it does not ask for Motorola's internal sales or commission tracking information.  In response to the request, Motorola did produce correspondence between Motorola on the one hand and JST or JSO on the other.  (*Id.* Exhibit B).  Similarly, Request for Production No. 9 asks for "copies of any and all analyses or evaluations (including any

11

drafts thereof) of the manufacturer representatives' performance under the MRAs, whether or not the analyses or evaluation were ever completed or presented." (*Id.* Exhibits A, B). This request, too, does not ask about internal tracking of leads, sales, shipments, etc, and instead asks for "analyses" or "evaluations" of the reps' performance. Motorola produced hundreds of pages of documents addressing analyses or evaluations of the reps. (*Id.* Exhibit B).

Plaintiffs did ultimately specifically ask (not in RFPs 5 or 9) for documents relating to Motorola's internal sales tracking and commission payments. But in filing this Motion to Compel, Plaintiffs apparently used some sort of discovery dispute crystal ball, <u>because they did not ask for this information until their second set of written discovery</u>, and Motorola's responses to those requests were due **after** Plaintiffs filed their Motion to Compel. (D.I. 76 at 11 ¶ 28 & Exhibit 16). Plaintiffs thus filed a motion to compel complaining about Motorola's "inexplicable" failure to provide information in response to discovery that was not even due until after the motion to compel was filed. Motorola's discovery responses, served on February 24, 2006, included documents related to Optics. (*Id*).

Similarly, Plaintiffs did not ask for an accounting of all commission payments until their second set of written discovery. (D.I. 76 at 11 ¶28 & Exhibit 16). In response, Motorola timely produced spreadsheets that detail the sales for which JST and JSO would have earned commission payments under their respective agreements, including, shipment date, distributor name if applicable, end customer name and code, end city and country, distributor invoice or order number, quantity shipped, and revenue or broken price (list price minus discounts as described in paragraph 3.1 of the

Agreement).  (*Id.*).  Furthermore, each commission payment to JST and JSO was accompanied by a commission history set out in an Excel spreadsheet detailing each commissionable sale.  (*See e.g.* Exhibit 17).

Finally, Plaintiffs contend that Motorola refused to produce total point of sale numbers.  (D.I. 76 at 10 ¶ 27).  Not so.  Plaintiffs never asked for this information. Even so, the spreadsheets cited in the prior paragraph provide these total point of sale numbers.

### F.    Motorola Has Responded To Interrogatories Nos. 7 And 9

Plaintiffs contend that Motorola has "refused" to respond to JST's Interrogatories No. 7 and 9.  (D.I. 76 at 11-12).  This is not true.

### 1.    Interrogatory No. 7

Interrogatory No. 7 states: "Identify and describe all representations you made to any or all manufacturer representatives during the December 2003 meeting referenced at paragraph 40 of your Answer to Plaintiffs' Complaint."  (D.I. 76, Exhibit B).  Motorola responded by objecting to this request as misleading because paragraph 40 of Motorola's Answer does not refer to any December meeting at all.  (*Id.*).  Motorola also supplemented its response to explain that, during any discussions with reps during December 2003, Motorola did not agree to waive its contractual rights or to renew any rep's contract for another year, and that, to the extent Plaintiffs were asking whether any contrary representations were made, Motorola was not aware of any.  (Exhibit 18). Accordingly, Motorola fully answered this Interrogatory and was not aware that Plaintiffs were unsatisfied with the response.

### 2. Interrogatory No. 9

Interrogatory No. 9 states: "Identify, quantify and substantiate the value of MECCG in the two quarters immediately preceding the termination or non-renewal of the MRAs and the two quarters immediately following the termination or non-renewal of the MRAs." This is an entirely objectionable interrogatory; the value of a huge business unit of Motorola is not relevant to whether Motorola breached its contract with Plaintiffs or whether Motorola somehow promised that, notwithstanding the contractual terms, the contracts would be renewed. (*See supra* p. 4 (describing claims in the complaint)).[5] Moreover, it would be a grossly unfair burden, even if relevant, for Motorola to have to quantify the value of particular business units during the two time periods Plaintiffs mention.

Nevertheless, Motorola did not simply object and instead detailed its revenue figures for the third and fourth quarters of 2003 and the first and second quarters of 2004. (*see* D.I. 76, Exhibit B). Motorola did so despite the fact that this financial information is confidential and that the information showed no financial impact, positive or negative, on Motorola Computer Group attributable to terminating JST and JSO or any of the manufacturer representatives. (*Id*). Motorola also produced its SEC quarterly reports, which contain substantial additional financial information. Accordingly, Motorola did not refuse to answer JST's Interrogatory No. 9.

Plaintiffs now indicate, however, that they "require a further substantiation of the revenue figures" provided by Motorola. Besides being ridiculous, that is news to

---

[5]The only conceivable relevance of MCG's value would be for punitive damages. The parties' contract has a provision banning punitive damages in any dispute arising out of the contract, and the Court enforced that provision in ruling on the parties' motion to dismiss. *See* 364 F. Supp. 2d at 455.

Motorola -- Plaintiffs never raised this issue before. Moreover, they do not explain what sort of "further substantiation" they require.

## IV.    PLAINTIFFS' CHALLENGES TO MOTOROLA'S PRIVILEGE AND WORK PRODUCT CLAIMS

Plaintiffs' motion contends that many documents Motorola has labeled as privileged ought to be produced anyway. Plaintiffs' arguments should be rejected.

### A.    The "Affirmative Defense" Waiver Argument

With respect to any documents that Motorola has withheld on privilege or work product grounds that include discussion of JSO's performance issues, Plaintiffs say that the documents have to be produced because Motorola has "waived" any privilege or work product protection by putting JSO's performance "at issue." (*See, e.g*., D.I. 76 at 3, 6, 13-14). More specifically, Plaintiffs argue that "Motorola has impliedly waived any privilege that may have attached to these documents by placing JSO's performance at issue with its affirmative defense of JSO's failure to perform under the Agreement." (*Id.* at 13-14 ¶ 38). This "affirmative defense" contention is repeated elsewhere in Plaintiffs' motion. (*See, e.g., id*. at 13 ¶ 35).

Breaking Plaintiffs' argument down, it is clear that Plaintiffs suffer from two critical misunderstandings – one about the pertinent facts and one about the law. First, with respect to the claim that Motorola asserted JSO's non-performance as an affirmative defense, our copy of Motorola's Answer says no such thing. (D.I. 21) In paragraph 93 of its Answer, Motorola pleads its affirmative defenses as follows: "For affirmative defenses, Motorola alleges estoppel, waiver, statute of frauds, comparative fault, contributory negligence, failure of consideration, and offset." (*Id.*). Nothing whatsoever is said about non-performance being an affirmative defense. (*Id.*).

Second, it *is* Motorola's position (and an objective reality) that Plaintiff JSO failed to meet the performance metrics in its contract with Motorola.  JSO's performance indeed is at issue in and relevant to the case.  But that does not mean that the "at issue" exception to the attorney-client and work product privileges has any applicability to this case.  As the Third Circuit has emphasized: "Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even to go to the heart of an issue." *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 864 (3d Cir. 1994).

Plaintiffs appear confused by a line of cases from the insurance bad faith context holding that, if an insurer argues that it should not be held liable for tortious bad faith because the insurer had a subjective, good faith belief based on the advice of counsel that its conduct was legal, then it has a duty to disclose all such communications with counsel regarding its conduct.  *See, e.g., State Farm Mut. Auto Ins. Co. v. Lee*, 13 P.3d 1169 (Ariz. 2000); *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 259-60 (Del. 1995).  Even in the bad faith context,[6] however, a "'waiver exist only when the privilege holder raises and defends on the theory that its mental state was based on its evaluation of the law and the facts show that evaluation included and was informed by advice from its legal counsel.'"  *Twin City Fire Ins. Co. v. Burke*, 63 P.3d 282, 288 (Ariz.

---

[6]Plaintiffs' argument fails even if one applies the insurance bad faith cases.  Case law suggests that the analysis in the insurance bad faith cases is based somewhat on the relationship between an insurer and its insured and that the cases, therefore, does not necessarily translate to the general commercial context.  *See, e.g., Cardtoons, LC. v. Major League Baseball Players Ass'n*, 199 F.R.D. 677, 682 (N.D. Okla. 2001).  One of the bad faith cases Plaintiff cites, *Roehrs v. Minnesota Life Ins. Co.*, 228 F.R.D. 642, 644 n.7, 647 (D. Ariz. 2005), recognizes the distinction as well.

2003) (quoting *Lee*, 13 P.3d at 1182 n.7)).  The cases require that the privilege holder to have "affirmatively injected any advice it received from its counsel" into the case before any waiver is appropriate.  *Id.* at 287.

Here, JSO claims that it met the objective performance criteria in the parties' contract; Motorola has defended saying that is not so.  Motorola's defense on the merits would not constitute a waiver, even if this was a bad faith case.  *See Twin City*, 63 P.2d at 286 (noting that in prior cases "we expressly rejected the notion 'that the mere filing of a bad faith action, the denial of bad faith, or the affirmative claim of good faith may be found to constitute an implied waiver of the privilege'"); *Smithkline Beecham Corp. v. Apotex Corp.*, 2005 WL 2436662, at *2 (E.D. Pa. Sept. 28, 2005) ("In this Circuit, 'a party waives the attorney-client privilege by placing the advice of counsel in issue only where 'the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication.'").

No case law whatsoever provides even remote support for Plaintiffs' contention that Motorola's defense on the merits – that JSO did not meet its contractual performance metrics – somehow affirmatively waived Motorola's attorney-client privilege.[7]

**B.    The "Underlying Facts" Contention**

Plaintiffs argue that attorney-client and work product communications set forth in Motorola's privilege logs should be disclosed on the ground that they contain

---

[7]Plaintiffs also suggest that Motorola waived the privilege by its answer to Interrogatory No. 3.  (D.I. 76 ¶¶6, 44, 46).  That is not true.  Motorola's response simply states that Motorola reviewed the manufacturer representative program and determined that that it was not performing as well as anticipated because the majority of the representatives were not meeting their contractual performance requirements.  Motorola did not say or even imply anything about relying on advice of counsel. (*See* D.I. 76, Exhibit B).

"factual information" and, according to Plaintiffs, communications relaying "factual information" which do "not encompass the proffer of legal advice or opinions" are "discoverable in spite of the fact that they were communicated to a lawyer."  (D.I. 76 at 4, 13, 15-17).  Plaintiffs appear to have confused the distinction between disclosure of underlying facts and disclosure of actual communications – a distinction made clear in the very cases Plaintiffs cite.

A communication between a lawyer and a client relaying "factual information" is entitled to the full protection of the attorney-client privilege.  *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383, 390-91, 395-96 (1981); *Samaritan Foundation v. Goodfarb*, 862 P.2d 870, 874 (Ariz. 1993) ("Plaintiffs have argued that . . . factual communications are no longer privileged.  This is not the case.").  Similarly, if a document communicating factual information is prepared in anticipation of litigation, the work product doctrine provides another layer of protection, beyond the attorney-client privilege, to the communication.  *See, e.g., Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1261 (3d Cir. 1993) ("The Secretary next argues that the work product doctrine should not apply to the report because it contained purely factual material. . . . This argument is overbroad.").

Plaintiffs, of course, are entitled to learn underlying facts relevant to whether JSO met the contractual performance criteria.  Motorola has not claimed otherwise.  But the way to learn those facts is through depositions and written discovery, and not by insisting upon production of an adversary's privileged and work product documents.  *See, e.g., Samaritan*, 862 P.2d at 874-75 (citing *Upjohn*, 449 U.S. at 395-96); *see also Admiral Ins. Co. v. U.S. Dist. Court,* 881 F.2d 1486, 1490 n. 5 (9th Cir. 1989)

(privilege); Edna S. Epstein, THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE 499-500 (4th ed. 2001) ("Work-product protection does not shield information from disclosure; it only protects a party against having to turn over particular documents containing the information. Interrogatories can be addressed to obtain the sought-after information. Once witnesses are located, their depositions may be taken.").

Accordingly, Plaintiffs' argument that it somehow can avoid Motorola's privilege and work product protections because documents being withheld contain "factual information" must be rejected. It is directly contrary to both Arizona and Third Circuit law. Thus, the motion's demand that Motorola be compelled to produce the privileged and work product documents identified in Exhibits J, K, L, N, O, and P should be denied.

### C.     The Anticipation of Litigation Arguments

Plaintiffs' argue that the work product doctrine should not apply to several documents because Motorola did not anticipate litigation at the time these documents were created. (*See* D.I. 76 at 4, 7, 12-13, 17-18). According to Plaintiffs, "all indications point to the conclusion that the emails are nothing more than routine business discussions." (*Id.* at 14 ¶ 41). More specifically, Plaintiffs state that the "anticipation of litigation' requirement for application of the work product doctrine was lacking until Motorola received communications from its manufacturer's representatives disagreeing with the manner in which the Agreements were terminated." (*Id.* at 4 ¶ 12).

Plaintiffs cite no case law in support of their contention that litigation must have been threatened or be imminent for the anticipation of litigation requirement to be met and misstate the legal standard. The threat of litigation is not the test for anticipation of litigation. *See Upjohn,* 449 U.S. at 396 (applying the work product doctrine even

though no litigation was threatened).  Furthermore, litigation need not even be imminent.
*See Martin*, 983 F.2d at 1258 (stating that whether litigation is "imminent" is "a standard
narrower than that embodied in Fed.R.Civ.P. 26(b)(3)").  In fact, case law properly
recognizes that "prudent parties anticipate litigation," and the test is whether "the
document can fairly be said to have been prepared or obtained <u>because of the prospect</u> of
litigation."  *Id*. at 1260 (emphasis added); *accord United States v. Rockwell Int'l,* 897
F.2d 1255, 1266 (3d Cir. 1990).

       Here, Motorola suspected (correctly) that its reps might be unhappy with
their contracts not being renewed or terminated and might opportunistically sue.  Thus,
due to the prospect of litigation, Motorola employees sought the advice of their in-house
counsel, Barry Medintz on or about January 7, 2004, Michael Annes on January 16,
2004, and John Garner on January 20, 2004.  After further review of the situation,
Messrs. Annes and Garner retained outside litigation counsel, Randy Papetti (counsel in
this case), by no later than January 27, 2004, to help prepare for and address any claims
the reps might make.

       Thus, while Plaintiffs say "all indications" are that the documents at issue
were prepared in the ordinary course of business, all the documents identified as work
product in Exhibits I, J, K, and M to Plaintiffs' motion were created after Motorola
personnel involved counsel on January 7, 2004.  By contrast, counsel was not involved
during the months of internal evaluation of the rep program in late 2003, and all
documents from that period have been turned over.

       The spreadsheets detailed in exhibit I contain data relating to the
evaluation of some of the manufacturer representative's performance, a particularized

analysis that was requested by outside litigation counsel[8] in order to educate him and to confirm that Motorola's decision to terminate was sound and could, if necessary, withstand litigation. *See In re Grand Jury Investigations*, 599 F.2d 1224, 1229-30 (3d Cir. 1979) (holding that documents generated in the course of internal investigation met the criteria for work product). In fact, many, if not all, of the spreadsheets, are attached to attorney-client privileged e-mail communications. This may not be clear from Plaintiffs' exhibits, which are simply excerpts from Motorola's privilege logs. Accordingly, please find a better summary attached hereto as Exhibit 19.[9] (*See also* Exhibit 8).

The internal Motorola correspondence in Exhibits J, K, O, P, and Q involves the results of that performance evaluation and other details regarding the gathering of information necessary to implement the decision to terminate/not renew, a decision Motorola correctly assumed would create controversy among some or all of the manufacturer representatives. Furthermore, many of these documents are also protected by the attorney-client privilege. As for the draft termination/non-renewal letters in Exhibit M, which were Motorola's first communication to JST, JSO and the other manufacturer representatives about its decision not to renew/terminate, they were drafted

---

[8] As for the "master sheet," Motorola has informed Plaintiffs repeatedly that Motorola created several spreadsheets assessing performance after hiring litigation counsel and to respond to questions from that counsel; the spreadsheets are thus protected by the work product doctrine. (*See* Exhibit 8). Plaintiffs cite deposition testimony from two witnesses for the proposition that the spreadsheets were in November or December 2003, as opposed to January 2004 (which is objective fact). But these witnesses were simply guessing, in late 2005 and early 2006, when the spreadsheets were likely created. They were simply off by one or two months. Motorola's privilege log has made clear that, in fact, the "master sheet" was created in January 2004 at the request of litigation counsel.
[9] Plaintiffs' Exhibit I incorrectly states that Motorola has withheld MOT 2512-2517 (item number 27). Not so. Motorola produced a redacted version of this document with its initial production on July 6, 2005, and an unredacted version on November 9, 2005, which Plaintiffs should be well aware of, as they marked this document as a deposition exhibit.

by litigation counsel, as they would serve as the trigger for litigation, if any were to actually occur.

Although the Court need not reach the issue, Plaintiffs correctly recognize that a party seeking disclosure must demonstrate a "substantial need" for the materials and the inability without "undue hardship" to obtain the substantial equivalent of the materials.  (D.I. 76  at 7 ¶ 19).  Plaintiffs, however, do not even attempt to make such a showing.

In any event, Plaintiffs have obtained information regarding Motorola's evaluation of the rep program, including whether individual reps were meeting their performance metrics, via depositions, interrogatories and requests for admission.

### D.    The Raytheon Documents

In the Spring of 2004 – after the termination and non-renewal letters went out in February but before Plaintiffs sued in August – Motorola and plaintiff JST had discussions about whether JST was entitled to a commission on a sale to Raytheon Canada.  (Ex. 4).  Motorola agreed in April to pay the commission and did so.  (*Id.*).

Nevertheless, in their motion, Plaintiffs say they have "learned through discovery that Motorola failed to pay all commissions that were properly owed under the Agreements during the time the Agreements were in place."  (D.I. 76  at 16 ¶ 48).  The Raytheon issue is cited as proof.  Putting aside that there is no claim pled in the complaint dealing with any sort of underpayment of commissions during the life of the contracts, Plaintiffs certainly have no basis for demanding that Motorola produce e-mail between its outside litigation counsel and Motorola regarding the Raytheon issue.

## V.    CONCLUSION

This motion to compel should not have been filed.  Motorola has made a good faith and productive effort to respond to Plaintiffs' discovery and Plaintiffs' demands that privileged and work product documents be produced is legally baseless. Motorola respectively requests the Court deny Plaintiffs' Motion to Compel.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
/s/ William W. Bowser
_____
William W. Bowser (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601; Facsimile: (302) 576-3282
OF COUNSEL:
Randy Papetti, Richard A. Halloran, Cory A. Talbot
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 262-5311
Attorneys for Defendant

DATED:    March 13, 2006

063528.1001