IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J-SQUARED TECHNOLOGIES, INC., <br> J-SQUARED TECHNOLOGIES (OREGON) INC., | : <br> : <br> : <br> : | |
| Plaintiffs, | : | C.A. No. 04-960-SLR |
| v. | : <br> : | JURY TRIAL DEMANDED |
| MOTOROLA, INC., | : <br> : | |
| Defendant. | : | |

**PLAINTIFFS' REPLY MEMORANDUM
IN FURTHER SUPPORT OF THEIR MOTION TO COMPEL**

Plaintiffs J-Squared Technologies, Inc. ("JST") and J-Squared Technologies (Oregon), Inc. ("JSO") (collectively, "Plaintiffs") submit this reply memorandum in further support of their motion to compel responses to interrogatories and requests for production of documents. In support of this Motion, Plaintiffs state as follows:

1.  Defendant Motorola, Inc. ("Motorola") attempts to sidestep its responsibility to produce relevant, responsive documents in this litigation or satisfy its burden of demonstrating why they should be withheld from production by simply stating that it "has made a good faith and productive effort to respond to Plaintiffs' discovery." (Ans. Mem. at 23). Good faith efforts to respond to document requests do not and cannot shield from discovery information that is relevant and directly placed at issue through the proffer of a failure to perform defense and lack of profitability bases for the termination of all manufacturer's representatives on the very same day. Regardless of whether Motorola's affirmative defense is phrased as "non-performance" (which it alleges is not its affirmative defense) or that "JSO failed to meet the performance metrics in its contract with Motorola" (which it says "*is* Motorola's position"), the result is the same. (Ans. Mem. at 15-16). Motorola seeks by whatever means to shelter from disclosure

factual information to substantiate its performance defense or its lack of profitability rationale for terminating the entire manufacturer's representative business model.

2.  Motorola cannot use this performance and profitability information as a sword in an effort to defeat Plaintiffs' claims, while at the same time asserting attenuated claims of privilege to shield this very same factual information from disclosure. Plaintiffs are entitled to the disclosure of facts underlying the allegations Motorola intends rely upon in this litigation.

### REPLY TO MOTOROLA'S STATEMENT OF FACTS

3.  Motorola asserts that its efforts to respond to discovery were undertaken in good faith and must have been productive because from "November 2005 until February 2006, Plaintiffs did not raise any more discovery concerns with Motorola." (Ans. Mem. at 6). Motorola does not explain that the parties agreed to a *de facto* stay of discovery while a private mediation was scheduled and conducted. The two-day mediation concluded, unsuccessfully, on February 14, 2006.

4.  Within three days after the mediation, Plaintiffs delivered a complete copy of their Motion to Compel to Motorola in an attempt to "determine whether Motorola will voluntarily produce the documents and/or information requested." (Ans. Mem. at Exhibit 1). Beginning Friday afternoon (3:04 MST – not "after business hours" in Phoenix) until the following Wednesday, Motorola was able to review and comment on the proposed Motion. Instead of addressing the issues presented in the Motion (many of which were outstanding since Plaintiffs' first deficiency letter of September 2005), Motorola instead opted to stall and attempt to prolong the process. In response to Motorola's request for additional time, Plaintiffs stated that "[w]e will file the Motion, but we invite a response from Motorola to avoid the Court having to decide the Motion. If an agreement is reached after the Motion is filed, we can simply withdraw it at that point." (Ans. Mem. at Exhibit 2). Thereafter, Plaintiffs attempted follow up

requests to negotiate a resolution to the issues presented in their Motion and Motorola's single deficiency letter. Motorola chose not to respond.

5. What is most telling about Motorola's self-proclaimed "good faith" propensity to respond to discovery is the fact that it has not voluntarily produced additional documents or agreed to reassess its search criteria for any of the issues presented in the Motion.

## ARGUMENT

A. <u>Emails Originating from Motorola's Management and Decision Makers</u>

6. Following an explicit, written moratorium on the execution of additional agreements with potential manufacturer's representatives (including JSO) in April 2003, Motorola attempts to explain away the absence of any other documents that relate to this global corporate strategy change. Motorola contends: (i) that the absence of email communications can be explained by the fact that certain management employees (Paul Holt, Kevin Parslow and Nina Guibor)[1] are no longer employed by Motorola and therefore Motorola no longer has access to their email and (ii) that Wendy Vittori (the General Manager of Motorola's computer group division "MCG") has "a few documents" but that she is "a very high-level Motorola employee" and we are to presume cannot be bothered by document requests. (Ans. Mem. at 9-10). These proposed explanations are nothing more than a red herring.

7. As for Motorola's contention that its document retention policy precludes the recovery of emails from employees once they leave the company, this explanation is sophomoric at best. As an initial point of observation, Motorola does not allege that anyone deleted the email accounts of Holt, Parslow or Guibor. Motorola only alleges that emails, once deleted, are not retained pursuant to its document retention policy. As such, we are left wondering if the policy

---

[1] For reasons asserted in Motorola's Answering Memorandum, Plaintiffs' amend their statement that they did not receive emails originating from Larry Terry and accordingly withdraw that request.

WILM1\34039\1

is even applicable. Moreover, Motorola does not even allege that it searched for the emails or accounts of these individuals and that the search revealed the potential for deleted material or that the material never existed in the first instance. Motorola simply alleges that because these employees left the company, it is somehow excused from searching for and producing relevant documents.[2]

8. If the email accounts were deleted, Motorola will be exposed to claims for redress of its spoliation of evidence. Motorola's own document retention policy states that its "[e]xchange servers [email] will be backed-up only for the purposes of Server Disaster Recovery and Motorola legal requirements." (Ans. Mem. at Exhibit 15) (emphasis added). Here, Motorola explicitly states that it subjectively anticipated the prospect of litigation by January 7, 2004.[3] (Ans. Mem. at 20; Op. Mem. at Exhibit E).

9. Given Motorola's anticipation of litigation, it had an affirmative legal duty to preserve potentially relevant information from that point going forward. This duty is in addition to and distinct from its self-imposed duty to preserve information for "Motorola legal requirements" pursuant to its document retention policy.

10. Here, Holt, Parslow and Guibor all left Motorola after it anticipated litigation with its manufacturer's representatives. Kevin Parslow (Director of Worldwide Sales for MCG) left the company in April 2004. (Ans. Mem. at 9-10). Paul Holt (Director of North American Sales) left the company in October 2004. (Holt dep. at 2 (Exhibit X)). Nina Guibor (finance and receivables) left the company in March 2004. (Ans. Mem. at 9). Accordingly, Motorola had a

---

[2] This present position is completely contrary to Motorola's litigation position that all past employees are represented by counsel, that the attorney-client privilege applied to all post-separation communications and that if Plaintiffs attempted to contact the witnesses for any other reason than to schedule a deposition, Motorola would seek counsel's disqualification.

[3] Plaintiffs reserve for argument whether this anticipation of litigation was objectively reasonable. *See infra*, § E.(b).

4

affirmative legal and self-imposed duty to retain the email accounts of these individuals.[4] The Court should compel Motorola to search for the emails or account for their absence.

11. The same holds true for Wendy Vittori. Corroborating deposition testimony from Holt and Parslow indicate that Ms. Vittori was the individual that initially issued the April 2003 moratorium. Motorola concedes in its Answering Memorandum that Ms. Vittori has "a few documents from or to her." (Ans. Mem. at 9). However, Motorola has not produced these documents or otherwise claimed privilege from disclosure. Accordingly, these documents should be produced.

12. Motorola should also be compelled to search the email account of Tom Nallen (controller for MCG's sales group). Despite Motorola's allegation that Mr. Nallen "had virtually no role in any of this," (Ans. Mem. at 8), Motorola felt he had sufficient knowledge to sign the verifications for its responses to two sets of interrogatories. (Exhibit Y). As described here and in the Opening Memorandum, Motorola's "blissful ignorance" approach to its discovery responsibilities in this litigation is not indicative of the self-proclaimed "extraordinary and diligent effort [] to respond to Plaintiffs' ill-considered accusations." (Ans. Mem. at 3). Accordingly, Motorola should be compelled to search Mr. Nallen's documents and produce all relevant information.

B.   Email Correspondence From April through December 2003

13. Motorola should be compelled to search for responsive documents between April 2003 and December 2003 which address its decisions regarding the manufacturer's representative business model. Motorola contends that it has already produced 3,700 pages of documents from this time period. (Ans. Mem. at 7). However, much of this documentation is

---

[4] Motorola's relevancy objections to the production of this material are misplaced. Not only does this litigation address Motorola's unlawful termination of the Agreements, it also addresses Motorola's false and misleading representations during the negotiation of the Agreements. Both Holt and Guibor were involved in this process.

operational emails produced from the email account of Dennis Robinson, the Business Development Manager for the JSO Agreement (first line of operational contact at MCG).

14. Motorola failed to produce or meaningfully search for documents (other than these operational documents) that discuss or relate to the April 2003 decision to place a moratorium on all additional manufacturer's representative Agreements. The moratorium was in to stay in effect until such time as Motorola was able "to complete a review of the situation before we make any more commitments." (Exhibit Z). Despite this moratorium, Motorola executed the JSO Agreement in May 2003. We are therefore to assume a review was completed and a decision was made to move forward. However, Motorola refuses to produce or even conduct additional searches for documentation of this nature. Instead, Motorola responds by stating that Plaintiffs were incorrect in their "presumption" that when Motorola's Director of Worldwide Sales requires that a "complete review of the situation" be undertaken, that anyone would actually do so. (*See* Op. Mem. at Exhibit F, p.2; *id.*).

15. The reality is, that when someone of Mr. Parslow's position requests that a "complete review" be undertaken as to the company's marketing strategy, it is either completed or there is explanation as why is was not completed. This is just one facet of the information Plaintiffs are entitled to during this time period. In addition to signing JSO, Motorola executed agreements with at least two other manufacturer's representatives, but then decided in December 2003 that the business model was no longer profitable. Motorola should be compelled to conduct a diligent search for responsive documents, or account for the absence of documents its Director of Worldwide Sales required be completed.

C.  <u>Performance Metrics Materials</u>

16. Plaintiffs are entitled to performance metrics information given Motorola's principal defenses that: (i) "JSO failed to meet the performance metrics in its contract with

Motorola" or (ii) that the entire manufacturer's representative business model was terminated because "it was not yielding the financial results Motorola had hoped." (Ans. Mem. at 16, 4). Motorola's argument against the production of this information centers around when Plaintiffs requested this information. The record will demonstrate that Plaintiffs' first set of document requests embraced this type of information. (Op. Mem. at Exhibit A, Request Nos. 5 and 9). When Motorola employees identified the exact name of the Optix program and the existence of Motorola's "master sheet" of performance, Plaintiffs made a request on the record for their production and followed up with specific document requests. (Machernis dep. at 136, 228-30 (Exhibit AA); JSO's January 13, 2006 Requests (Exhibit BB)).

17.   Motorola contends that on February 24, 2006, it undertook production that "included documents <u>related</u> to Optics." (Ans. Mem. at 12) (emphasis added). However, Motorola refused to provide Plaintiffs access to a program that provided real-time tracking of all manufacturer's representatives' performance and was maintained by Motorola's own Business Development Managers. (*See, e.g.*, Machernis dep. at pp. 135-40 (Op. Mem. at Exhibit V); Parslow dep. at pp. 91-97 (Op. Mem. at Exhibit U)). Given Motorola's "performance metrics" defense strategy, Plaintiffs are entitled to be provided access to the Optix program.

18.   Motorola's only defense to the production of the master sheet of performance metrics is that the Business Development Managers, who actually created the master sheet and testified under oath to its creation in November or December 2003 (during the normal course of business), are somehow mistaken. (*See, e.g.*, Machernis dep. at pp. 224-32 (Op. Mem. at Exhibit V); Crawford dep. at pp. 211-12 (Op. Mem. at Exhibit W); Ans. Mem. at 21 n.8). As the only record evidence uncovered to date demonstrates that the master sheet of performance was created during the normal course of business, it must be produced. Even if it was produced after Motorola anticipated litigation, the transmission of this file was merely a communication of

WILM1\34039\1

factual information and not undertaken for the purpose of "securing or giving legal advice." Accordingly, the master sheet must be produced. Indeed, Motorola's trial counsel described it as such when erroneously asserting the work product doctrine as a basis to bar questioning on the subject at deposition. "And again, it's not new data, I just think it's a compilation to make people's life easier, but I don't think it has anything in it besides, other than what you've already seen in terms of data." (Machernis dep. at pp. 229-30 (Exhibit AA)). If that is true, the master sheet must be produced.

D.   <u>Interrogatory Responses</u>

19.   Motorola refuses to respond to Interrogatory No. 7 because it refers to a December 2003 meeting when, in fact, the parties only had discussions in December 2003 and no meetings. (Op. Mem. at Exhibit F p.1). Motorola continues to skirt its responsibility to fully respond to this interrogatory by responding in the negative: "during any discussions with reps during December 2003, Motorola did not agree to waive its contractual rights." (Ans. Mem. at 13). Plaintiffs are entitled to a full and complete response as to what was represented in December 2003. Moreover, the interrogatory response should be verified by someone other than Tom Nallen (who verified Motorola's previous interrogatory responses), as Motorola now asserts that he "had virtually no role" in this matter until its final stages. (Ans. Mem. at 8).

20.   Interrogatory No. 9 inquires as to Motorola's quarterly revenue for the four quarters surrounding its decision to terminate the Agreements. Plaintiffs are entitled to this information given Motorola's proffered basis for discontinuing the manufacturer's representative business model as not yielding sufficient financial return. Despite the presence of this defense, Motorola claims this interrogatory is "entirely objectionable" because it would not be relevant to whether Motorola breached the Agreements or made the alleged misrepresentations. (Ans. Mem. at 14). First, this information is relevant given Motorola's proffered defense. Either

Motorola must produce the information that substantiates its defense of insufficient profitability[5] or the defense should be stricken. Second, this financial information speaks directly to Plaintiffs' claim for the breach of the implied covenant of good faith and fair dealing. The evidence that Plaintiffs have uncovered to date demonstrates that the manufacturer's representative business model tended to increase gross revenue for Motorola and that by Motorola's own estimates, the manufacturer's representatives' sales were projected for a 20% increase in 2004. (*See* note 5, *supra*). Given these bases and the reasons set forth in the Opening Memorandum, Motorola should be compelled to fully respond to this interrogatory.

E.  Motorola's Erroneous and Hyper-Extended Claims of Privilege

21.  Under either the attorney-client privilege or the work product doctrine, Motorola bears the burden of demonstrating that otherwise relevant and responsive information is protected from disclosure. *See, e.g., Roehrs v. Minnesota Life Ins. Co.*, 228 F.R.D. 642, 645 (D. Ariz. 2005) (identifying the burden for asserting the attorney-client privilege); *Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 203 F.R.D. 159, 163 (D. Del. 2001) (identifying the burden for application of the work product doctrine). Instead of attempting to satisfy these burdens, Motorola argues that its good faith efforts to respond to discovery were sufficient and Plaintiffs are not entitled to any further information. As disclosed below as well as in the Opening Memorandum, Motorola cannot establish an immunity from production (under either the attorney-client privilege or the work product doctrine) of the facts that tend to substantiate or eviscerate its proffered defenses in this litigation. Moreover, documents that were otherwise

---

[5] Motorola has a lot of explaining to do as the revenue figures it did produce for its MCG division evidence a 46% increase over a four (4) quarter period. (Op. Mem. at Exhibit B). Moreover, the calculations Motorola ran in December 2003 and January 2004 illustrate that it anticipated a 20% "uplift" in sales and that the commissions payable there under "are conservative and should be considered minimum payments." (Exhibit CC).

created in the ordinary course of business cannot be sheltered from discovery merely because they may have been later delivered to or carbon copied to an attorney.

22. As an initial point, Motorola does not attempt to assert a privilege over any document or communication that that predates January 7, 2004. Accordingly, Motorola should be compelled to produce all documents that were created (in draft or final form) prior to this date.

    (a)    <u>Implied Waiver and Discovery of Underlying Factual Information</u>

23. The protection afforded by the attorney-client privilege only extends to those communications that were made "to or by the lawyer for the purpose of securing or giving legal advice." *Roehrs*, 228 F.R.D. at 646. Likewise, the work product doctrine will not apply to documents prepared in the ordinary course of business or that otherwise contain only factual information. (Op. Mem. at 7).

24. Motorola's first explanation for its failure to produce relevant factual information is the contention that it has not and cannot waive a privilege attaching to facts it places at issue with its defense.[6] As detailed in the Opening Memorandum and addressed briefly above, Motorola cannot assert privilege to shield from disclosure the very facts it asserts as a basis for its defense. *Roehrs*, 228 F.R.D at 646 (setting forth the elements for implied waiver under Arizona law); (Op. Mem. at Exhibits I, J, K, N, O and P).

25. Whether Motorola's defense is phrased as JSO's "non-performance" or the failure "to meet the performance metrics in its contract with Motorola" the facts underlying JSO's performance are placed at issue. (Ans. Mem. at 15-16). It would be unworkable to permit

---

[6] Motorola's attempt to pigeon-hole the implied waiver argument into an examination of insurance bad faith litigation is misplaced as Plaintiffs are not seeking the disclosure of the advice of counsel. Even if those cases are considered persuasive, Plaintiffs have alleged claims for breach of the implied covenant of good faith and fair dealing.

WILM1\34039\1

Motorola to assert a defense based on accusation and innuendo when the only record evidence set forth to date demonstrates that JSO was in full compliance with the performance metrics.

26.  The factual information Motorola withholds will substantiate one of three outcomes: (i) that JSO was operating in compliance with its performance metrics; (ii) that JSO failed to meet its performance metrics; or (iii) that Motorola did not have facts sufficient to determine compliance with the performance metrics, but terminated the Agreement for non-performance in any event. Motorola must either provide its underlying factual support for this defense or withdraw it from this litigation.

27.  Motorola next argues that the proper method to obtain discovery of the underlying facts is through deposition testimony and not document requests. (Ans. Mem. at 18). Motorola is correct in its proffer that deposition testimony is the preferred method to explore underlying facts. However, when Motorola instructs its witnesses not to respond to questions eliciting factual information concerning performance under the Agreements based on the work product Plaintiffs, that method is eliminated. (*See, e.g.*, Machernis dep at pp. 229-30 (Exhibit AA); Crawford dep. at pp. 213-223, 234 (Exhibit DD)). As such, Motorola can either: (i) produce this information or (ii) permit Plaintiffs to recall the witnesses that were not permitted to testify as to the performance issues, with Motorola to pay all costs and fees.

(b) Motorola Lacked the Requisite "Anticipation of Litigation" for Application of the Work Product Doctrine as of January 7, 2004

28.  Motorola is not entitled to claim the work product doctrine as a basis for withholding documents that pre-date its decision to terminate the Agreements. (Op. Mem. at Exhibits J, K, L and M). Motorola claims it is entitled to claim the protections of the work product doctrine from as early as January 7, 2004, the date it first communicated with an in-house attorney. Motorola's understanding of the triggering event for application of the doctrine is misplaced. The event that triggers the potential application of the work product doctrine is the

that which may give rise to litigation, not a party's decision to seek counsel from an attorney. Indeed, case law addressing the triggering of the work product doctrine in contract cases suggests that the doctrine only becomes applicable after the plaintiff makes known its potential claim for redress under the terms of the contract. *See Caremark, Inc. v. Affiliated Computer Services, Inc.*, 195 F.R.D. 610, 614-15 (N.D. Ill. 2000) (noting that not only "must the primary motivating purpose behind the creation of the document or investigative report ... be to aid in ... litigation, [] in order to be deemed protected, the document must also be of a legal nature and primarily concerned with legal assistance; technical information is otherwise discoverable") (internal citation omitted).

29.  As such, the earliest date Motorola may claim is February 26, 2004, the date it terminated all the Agreements. In reality, the date should be when Plaintiffs first wrote to Motorola disagreeing with the bases for terminating their Agreements (March 12, 2004).

30.  Regardless of the date the work product doctrine is triggered, Plaintiffs demonstrate the requisite substantial need to obtain the factual information contained in any documents that might be protected by the work product doctrine. *See supra*, § C. Accordingly, the factual information contained in these documents must be discussed.

*   *   *

WHEREFORE, Plaintiffs respectfully request that their motion to compel be granted and that Motorola be compelled to produce the documents and information requested in Plaintiffs' motion within ten (10) days of the Court's order.

Dated: March 23, 2006

*/s/ David A. Felice*
Sean J. Bellew (#4072)
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
*Attorneys for Plaintiffs*

Of Counsel:
Kevin F. Berry
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
Telephone: (215) 665-2000
Facsimile: (215) 665-2013

WILM1\34039\1

## CERTIFICATE OF SERVICE

I, David A. Felice, do hereby certify that on March 23, 2006, I electronically filed a notation of the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing to the following counsel of record:

> William W. Bowser
> Young Conaway Stargatt & Taylor
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19801
>
> Cory Talbot
> Lewis and Roca LLP
> 40 N. Central Avenue
> Phoenix, AZ 85004

> /s/ David A. Felice
> David A. Felice (#4090)
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington, DE 19801
> Telephone: (302) 295-2000
> Facsimile: (302) 295-2013
> Email: dfelice@cozen.com

WILM1\34039\1