# EXHIBIT X

# VICTORY
## VERBATIM REPORTING SERVICES

RD/sp

### UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC.,)
a Canadian corporation, and  )
                             )
J-SQUARED TECHNOLOGIES       )
(OREGON) INC., an Oregon     )    C.A. No. 04-960-SLR
corporation                  )
                             )
        Plaintiffs           )
             v.              )
                             )
MOTOROLA, INC., a Delaware   )    JURY TRIAL DEMANDED
corporation                  )
                             )
        Defendant            )
                             )
                             )


This is the Deposition of WILLIAM PAUL HOLT, taken at the offices of VICTORY VERBATIM REPORTING SERVICES, Suite 900, Ernst & Young Tower, Toronto-Dominion Centre, Toronto, Ontario, on the 8th day of December, 2005.

--------------------------

W.P. Holt - 2

self-employed person?

    A.    October of 2004.

7.    Q.    What do you do?

    A.    I did a couple of things. I did some consulting, but now I am forming a company called Making Homes Accessible, helping people as they age to stay in their homes, you know, have independent living.

    As the boomers are getting older, there is a big chunk of the population moving into that demographic, and that is kind of the business I have decided to go into.

    I also work at the volunteer fire department, so I guess I should throw that in I am also an employee of the Town of Caledon with the volunteer fire department.

8.    Q.    Prior to October, 2004, where did you work?

    A.    Motorola.

9.    Q.    What was your position with Motorola?

    A.    Well, I had a number of them, but for the last 10 years I was general manager in Canada, and then I had a number of vice-president or director responsibilities. They called it

**EXHIBIT Y**

Case 1:04-cv-00960-SLR    Document 98-2    Filed 03/23/2006    Page 5 of 39
Lewis and Roca LLP    10/28/2005 5:35 PM  PAGE    9/010    Fax Server

10/27/2005 18:43 FAX                                          ☎002/003

## VERIFICATION

Tom Nallen states as follows:

1.    I am Finance Controller for Worldwide Sales for Motorola's Embedded Communications Computing business, and I am authorized to make this verification on behalf of Motorola, subject to the limitations stated herein.

2.    I have read and reviewed Motorola's Response to Plaintiff J-Squared Technologies, Inc.'s First Set of Interrogatories and the Notice of Errata dated October 27, 2005 re same ("Response"). Subject to paragraph 3 below, the matters stated in Motorola's Response are true and correct to the best of my knowledge, information, and belief.

3.    Certain matters not within my own personal knowledge were assembled by authorized representatives of Motorola. As to such matters, I am informed and believe that such matters are true and correct.

I verify under penalty of perjury that the foregoing is true and correct.

Dated this __27__ day of October, 2005

_____
Tom Nallen

14

Case 1:04-cv-00960-SLR    Document 98-2    Filed 03/23/2006    Page 6 of 39
Lewis and Roca LLP    10/28/2005 5:35 PM  PAGE  10/010    Fax Server

10/27/2005 16:43 FAX                                                      003/003

## VERIFICATION

Tom Nallen states as follows:

1.     I am Finance Controller for Worldwide Sales for Motorola's

Embedded Communications Computing business, and I am authorized to make this

verification on behalf of Motorola, subject to the limitations stated herein.

2.     I have read and reviewed Motorola's Response to Plaintiff J-Squared

Technolgies (Oregon), Inc.'s First Set of Interrogatories ("Response"). Subject to

paragraph 3 below, the matters stated in Motorola's Response are true and correct

to the best of my knowledge, information, and belief.

3.     Certain matters not within my own personal knowledge were

assembled by authorized representatives of Motorola. As to such matters, I am

informed and believe that such matters are true and correct.

I verify under penalty of perjury that the foregoing is true and correct.


Dated this 27 day of October, 2005


                                              Tom Nallen

**EXHIBIT Z**

From: Bensted David-G19500
Sent: 4/18/2003 10:43:13 AM (Mountain Time)
To: Watts Marc-BLUW124
CC: Hamlett Sue-P25026
Subject: FW: MR contracts on hold per Kevin Parslow

Marc,

Please below directive from Kevin Parslow.

Additionally, I have received the original ███████████████████████
Agreement with Approval Record for signature.  As you will note in the email
below, the above referenced agreement is on hold until we receive direction
from Mr. Parslow.

Also, in an effort to expedite the review and approval/signature process,
please send soft copies of the Agreement and Approval Record to those
"Reviewers or Designees" that are identified on the Approval Record (excluding
the V.P./General Manager) as being required to sign with the instruction:

Please review and provide recommended changes or comments to the Agreement, or
sign the Approval Record authorizing the release of the Representative
Agreement.  Forward the recommended changes or comments to the undersigned and
the MCG Contracts department or send the signed hardcopy Approval Record to the
MCG Contracts department.

This process will enable those with signature authority to review, modify,
and/or approve the Agreement in parallel, thereby saving a lot of time chasing
down signatures or making adhoc changes.

Let me know what you think.

Regards,


David J. Bensted
Contract Manager
Motorola Computer Group
2900 S. Diablo Way, DW103
Tempe, Arizona U.S.A. 85282

Phone: 602.438.3830
Fax: 602.437.6246


  -----Original Message-----
From:  Hamlett Sue-P25026
Sent: Monday, April 07, 2003 3:45 PM
To: Bensted David-G19500
Subject: FW: MR contracts on hold per Kevin Parslow
Importance: High


FYI

*******************************



MOT 02357

Sue Hamlett
Manager, Group Contracts and
   Legal Support
Motorola Computer Group
2900 S. Diablo Way, DW103
Tempe, Arizona U.S.A. 85282

Phone: 602.438.3794
Fax:    602.437.6246
Mobile: 602.228.9789
********************************

  -----Original Message-----
From:  Blair Julie-C17394
Sent: Monday, April 07, 2003 3:45 PM
To: Hamlett Sue-P25026; Nevarez Janie-MCX1677
Subject: MR contracts on hold per Kevin Parslow

Sue/Janie, Nina just spoke with Kevin and he asked us to inform you that no
more Manufacturer Rep contracts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ should be executed
until further notice from him.  He wants to complete a review of the situation
before we make any more commitments.  He said he would communicate to Paul's
team today, but wanted to let you know right away as we believe you are the
control point for the documents.  Thanks, Julie

MOT 02358

**EXHIBIT AA**

Page 1

1                    Volume:    I

2                    Pages:    1 - 265

3                    Exhibits: 106 - 109

4      IN THE UNITED STATES DISTRICT COURT

5        FOR THE DISTRICT OF DELAWARE

6   -------------------------------------x

7   J-SQUARED TECHNOLOGIES, INC.,

8   a Canadian corporation and

9

10  J-SQUARED TECHNOLOGIES (OREGON)

11  INC., an Oregon corporation,

12          Plaintiffs,

13      v.                          **ORIGINAL**

14  MOTOROLA, INC., a Delaware corporation,

15          Defendant.

16  -------------------------------------x

17      VIDEOTAPED DEPOSITION of STEVEN MACHERNIS,

18  a witness called for examination by the

19  Plaintiffs, taken pursuant to the Applicable

20  Provisions of the Delaware Rules of Civil

21  Procedure, before Laurie K. Langer, Registered

22  Professional Reporter and Notary Public in and

23  for the Commonwealth of Massachusetts, at the

24  offices of Bingham McCutchen, LLP, 150 Federal

1    system and it was by use of that tool you could

2    see what was inputted by the BDMs and then we

3    would augment that by other communications that

4    either came from the BDMs or from the

5    manufacturer reps themselves.

6         MR. BELLEW:  And we had, we had discussed

7    Optix during the deposition of Mr. Crawford, at

8    which point we had requested a production of the

9    Optix program and I'm just going to reiterate

10   our request for that information.  It has not

11   been produced.  Apparently Motorola has a

12   computer program where it inputs certain of

13   these information and we've never seen it.

14        MR. PAPETTI:  I promise to look into it.

15   As far as I knew all of the raw data had been

16   produced.  It may have come from a database

17   called Optix, I've never heard about that until

18   I heard the name used in this deposition, but

19   I'll look into that.

20        MR. BELLEW:  Okay.

21 Q.  **How is the Optix configured; is it configured**

22   **where it's, there's certain fields that need to**

23   **be populated by whoever is inputting the**

24   **information?**

Page 228

1       involved in creating that document?

2 A.    I don't recall.

3 Q.    **Do you know if it was ever marked**

4       **attorney-client privilege or work product or**

5       **anything like that?**

6 A.    I don't recall.  It's too long ago.

7 Q.    **Would you have remembered that?  I mean, if it**

8       **was on there you would recall it?**

9 A.    I've seen many documents marked that way so I

10      don't know if that particular one was marked

11      that way.

12 Q.   **Well, you do know at some point there was a**

13      **master list based on this information that came**

14      **in that had performance criteria for all nine**

15      **reps?**

16 A.   Yes.

17 Q.   **And that was what was looked at in terms of**

18      **Motorola making the decision to terminate for**

19      **cause related to various contracts?**

20 A.   Yeah.  And I guess I don't recall if it was one

21      master list or if it was a sequence of

22      individual spreadsheets.

23 Q.   **But that was all compiled in one central**

24      **location?**

Page 229

1 A.    It was in one e-mail.

2           MR. BELLEW:  Randy, or, Mr. Papetti, we've

3      never seen that document.  And --

4           MR. PAPETTI:  I think it's been explained

5      to you guys that the document, the only document

6      like that that I'm aware of was created at my

7      direction, not in November, December, but in

8      February 2004.  I think all the data that makes

9      up the document that we're referring to, and I

10     also can't remember if it's one document or a

11     series of similar template documents back to

12     back, I can't recall, whether it's one document

13     or not.  But all the data that was used for them

14     should have been produced.  But the only

15     document like that that I'm aware of was one

16     that I specifically asked be created for my

17     review.  So it should be logged.

18          MR. BELLEW:  I don't think it is.

19          MR. PAPETTI:  Okay.  Well, we should

20     clarify that if that's, if you have that

21     continuing point.  The only one that I'm aware

22     of is the one that was created for me so that I

23     could do my job.  And again, it's not new data,

24     I just think it's a compilation to make people's

1    life easier, but I don't think it has anything

2    in it besides, other than what you've already

3    seen in terms of data.

4         MR. BELLEW:  Well, we haven't seen any

5    data, that's the issue.

6         MR. PAPETTI:  I don't think that's true.  I

7    mean, I know I've directed that you get the

8    underlying sales data and analysis of who's

9    meeting performance criteria and who is not.

10   What we looked at was data.

11        MR. BELLEW:  This is the only comment that

12   we have by any employee of Motorola regarding a

13   gathering of specific data related to

14   uncommitted, committed and the like.

15        MR. PAPETTI:  Well, I don't think there

16   would be one, correct, for J-Squared Canada; is

17   that accurate?

18        MR. BELLEW:  He said there were nine

19   created.

20        MR. PAPETTI:  I think he -- J-Squared

21   Canada there's not an Exhibit 4 to do the

22   template on is, all I'm suggesting.  Maybe they

23   did one anyway.  But this clearly meant to track

24   the templates, Exhibit 4, in the individual

**EXHIBIT BB**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J-SQUARED TECHNOLOGIES, INC., a Canadian corporation, and | ) ) ) | |
| J-SQUARED TECHNOLOGIES (OREGON) INC., an Oregon corporation, | ) ) ) ) | C.A. No. 04-960-SLR |
| Plaintiffs, | ) ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| MOTOROLA, INC., a Delaware corporation | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF J-SQUARED TECHNOLOGIES, (OREGON) INC.'S**
**FIRST SET OF REQUESTS FOR PRODUCTION DIRECTED TO DEFENDANT**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiff J-Squared Technologies (Oregon), Inc. ("Plaintiff" or "JSO") requests that Defendant Motorola, Inc. ("Defendant" or "Motorola") produce or permit Plaintiff to inspect and copy the original documents and things described herein no later than thirty (30) days after service of these requests, at the law offices of Cozen O'Connor, 1201 North Market Street, Wilmington, Delaware 19801.

### DEFINITIONS

1.    The terms "you," "your" and "Defendant" refer collectively and individually, where applicable, to Defendant Motorola, Inc., its subsidiaries, unincorporated divisions, agents, employees and assigns in the above-captioned action, and to any other person or entity that is acting or has ever acted for it, or on behalf of it (including counsel), or any person or entity on whose behalf it has acted.

2.      The terms "JSO" or "Plaintiff" refer to the Plaintiff in this matter J-Squared Technologies (Oregon), Inc., its subsidiaries, unincorporated divisions, agents, employees and assigns.

3.      The term "person" means any natural person and any corporation, association, government body or agency or other business enterprise or legal entity, and means both singular and plural.

4.      The term "documents" shall be construed in the broadest possible sense, is intended to be comprehensive and includes, without limitation, all papers of any kind, all graphically recorded items, and all electronically or magnetically recorded items such as video tapes, audio tapes and computer or word processor records and any other items, if anything, that can be requested pursuant to the Federal Rules of Civil Procedure. The term "documents" includes originals, drafts and all documents that differ in any respect from another version of that same document.

5.      The term "identify" when applied to persons shall mean state current or last known business address and telephone numbers.

6.      The term "or" shall be construed either in the disjunctive or in the conjunctive whenever appropriate in order to bring within the scope of those interrogatories information that might otherwise be considered to be beyond their scope.

7.      The word "all" shall mean both "any" and "all" as appropriate in order to bring within the scope of these interrogatories information that might otherwise be beyond their scope.

8.      The term "Complaint" shall refer to the complaint in this action as filed on August 20, 2004.

2

9.    The phrases "Motorola Embedded Communication Computing Group" or "MECCG" shall refer to the Motorola division headquartered in Tempe, Arizona, previously known as Motorola Computer Group.

10.    The phrase "manufacturer representatives" shall refer JST and any and all other companies or individuals who sought to sell or otherwise advance the products and interests of Motorola and/or MECCG to customers in North America and abroad.

11.    The phrases "manufacturer's representative agreement" or "MRAs" shall refer to those agreements by and between Motorola and its manufacturer representatives to sell or otherwise advance the products and interests of MECCG.

INSTRUCTIONS

1.    You are instructed to provide information and identify documents in your custody, possession or control and in the custody, possession or control of your attorneys. The term "document" further means any document now or at any time in the possession, custody or control of the person to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries or divisions thereof, and their officers, directors, employees, agents and attorneys). Without limiting the term "control" as used in the preceding sentence, a person is deemed to be in control of a document if the person has the right to secure the document or a copy thereof from another person having actual possession thereof.

2.    If any form of privilege or other protection from disclosure is claimed as a ground for withholding a document requested to be produced or identified, set forth with respect to the document the date, title, identity of the author, subject mater and each and every fact or basis on which you claim your privilege, with sufficient specificity to permit the Court to make a determination as to whether the claim of privilege is valid.

3.     These requests shall be deemed to be continuing, and Defendant is requested to provide any additional responsive information obtained or discovered subsequent to the date on which response is made.

4.     If any request is objected to on grounds of overbreadth, you are instructed to respond to the request as narrowed to conform to your objection within the thirty (30) day period allowed for a response.

5.     Unless otherwise noted, the time period for these interrogatories is January 1, 2001 through the present.

<u>REQUESTS FOR PRODUCTION</u>

1.     Produce any and all MRAs for other manufacturer representatives.

2.     Produce any and all drafts of MRAs for other manufacturer representatives.

3.     Produce any and all drafts of termination / non-renewal letters intended for all other manufacturer representatives.

4.     Produce the commissions payable to all other manufacturer representatives from the inception of the MRA model to its termination on or about February 2004.

5.     Produce any and all information evidencing how, when, where and if a Motorola business development manager would register a design win.

6.     Produce Motorola's Optix file information for JSO and JSO.

7.     Produce Motorola's Optix file information for all other manufacturer representatives.

8.     Produce any and all communications, email or other documents authored by Kevin Parslow concerning the MRAs.

9.     Produce any and all communications, email or other documents authored by Paul Holt concerning the MRAs.

4

10.    Produce any and all communications, email or other documents authored by Wendy Vitorri concerning the MRAs.

11.    Produce any and all communications, email or other documents authored by Larry Terry concerning the MRAs.

12.    Produce any and all communications or documents that address Motorola's consideration of continuing the manufacturer representative business model from April 2004 to present.

13.    Produce sales documentation for all direct sales made by you from February 2004 through the present to customers that were a component of the commission payments made under the JSO Agreement prior to its termination.

14.    Produce sales documentation for all direct sales made by you from February 2004 through the present to customers that were a component of the commission payments made under the JST Agreement prior to its termination.

15.    Produce all settlement agreements of any type resolving disputes arising between Motorola and any of it manufacturer representatives following the termination and/or non-renewal of the MRAs.

16.    Produce copies of all other initiating pleadings (*e.g.*, Complaint) in any civil action brought against Motorola for its termination and/or non-renewal of the MRAs.

17.    Produce all documents you relied on to admit or deny Plaintiffs' First Set of Requests for Admission.

5

Dated:  January 13, 2006

_David A. Felice_
Sean J. Bellew (#4072)
David A. Felice (#4090)
Cozen O'Connor
Chase Manhattan Centre
1201 North Market Street, Suite 1400
Wilmington, DE 19801
302-295-2000 (voice)
302-295-2013 (facsimile)
  *Attorneys for Plaintiffs*

6

## CERTIFICATE OF SERVICE

I, David A. Felice, do hereby certify that on January 13, 2006, true and correct copies of

the foregoing were caused to be served upon counsel of record at the following address as

indicated:

<u>**Via Hand Delivery**</u>
William W. Bowser
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

<u>**Via Facsimile**</u>
Randy Papetti
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, AZ  85004


David A. Felice (#4090)

**EXHIBIT CC**

**Brooke Myers - MR 2004 projection.xls**

| | |
|---|---|
| **From:** | Blair Julie-C17394 <J.Blair@motorola.com> |
| **To:** | Parslow Kevin-BLUW72 <Kevin.Parslow@motorola.com>, Guibor Nina-Q10503 <Q10503@motorola.com> |
| **Date:** | 1/9/2004 3:33 PM |
| **Subject:** | MR 2004 projection.xls |
| **CC:** | Machernis Steven-QVCL80 <Steven.Machernis@motorola.com>, Crawford Kim-SCN105 <Kim.Crawford@motorola.com>, Bensted David-G19500 <david.bensted@motorola.com> |

Kevin, Here is a high level analysis of the potential exposure we have if we cancel for convenience and reduce the commission rate on the entire existing territory, without restricting the customer list in the territory.

I took the past 12 month commission/POS revenue history, uplifted by 20% (Kim said that's what your organization was projecting), then showed the total exposure at 5,4,3,2 and 1%.

I think these numbers are conservative and should be considered "minimum payments".

I feel strongly that in addition to reducing the commission rate, we should define a list of customer accounts that each MR should get paid on based on some level of their involvement (or at least add some major customers to the legacy list ie Kodiak with projected 3.6m in POS in next 6 months). I know this would involve some quick up front work on Monday by your team, but it has some logic to it: stop paying them on things they have not influenced. This is no more administratively intensive than what we are doing for the current territory payment structure.

Please let me know any feedback you have.

Regards,
Julie



MOT 00783

**EXHIBIT DD**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., )
a Canadian corporation, and )
J-SQUARED TECHNOLOGIES )
(OREGON), INC., an Oregon )
corporation, )
)
            Plaintiffs, )
)
        vs. )
)C..A. No.
)04-960-SLR
MOTOROLA, INC., a Delaware )
corporation, )
)
        Defendant. )
)
)

DEPOSITION OF KIMBERLY CRAWFORD

Phoenix, Arizona
December 6, 2005
9:30 A.M.

REPORTED BY:
JUDI SCHNEIDER
Certified Reporter
Certificate No. 50735

PREPARED FOR:
CORY J. TALBOT
Attorney at Law

ORIGINAL

Page 213

1          DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2 you see a master list?

3     A     Yeah, I did.

4     Q     What did that look like?

5     A     It was basically performance to revenue.  It was

6 basically the -- the performance measurements of the

7 manufacturer reps against all the key contracts metrics.

8     Q     Okay.  Now, how was -- what format was that in?

9     A     What format was it in?

10    Q     Yeah.  Was it in a letter?  Was it in an email?

11 Was it in an Excel?  Was it in a Power Point?  What format

12 was that in?

13    A     It was an Excel document.

14    Q     And who created that Excel document?

15    A     It was put together by our finance group.

16    Q     When is the last time you've looked at that Excel

17 document?

18    A     I can't remember.

19    Q     Have you -- you looked at documents in

20 preparation for your deposition today?

21    A     Yeah, but I didn't look at it before I came in

22 here.

23    Q     Why wouldn't you have looked at that?  Don't you

24 think that's a pretty critical element of why you're here to

25 testify today?

Page 214

```
1          DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2     A     It's important, but I didn't look at it before I

3 came in, no.

4     Q     Do you know where it is?  Can you get me a copy

5 of it?

6     A     I don't have a copy of it, no.

7     Q     Do you know who would have a copy of it?

8     A     Maybe our finance organization has a copy of it.

9     Q     Okay.  Do you know if that's been produced in

10 this litigation?

11    A     I have no idea.

12          MR. BELLEW:  I think it might be a good time for

13 a ten-minute break.

14          MR. TALBOT:  Okay.

15          THE VIDEOGRAPHER:  We're off the record at 4:04

16 p.m.

17              (Whereupon, a discussion was held off the

18              record.)

19          THE VIDEOGRAPHER:  We're back on the record at

20 4:52 p.m.

21 BY MR. BELLEW

22    Q     Mr. Crawford, did you have a discussion with

23 Mr. Talbot during the break?

24    A     Yes, I did.

25    Q     What was the substance of that discussion?
```

1          DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2      A      The discussion was to what information I could

3 discuss here.  The discussion was relevant to what

4 information I could actually discuss here this afternoon.

5      Q      I need some more details than that.  What did you

6 discuss in the opportunity that you had to have a

7 conversation with your lawyer during what has become almost

8 an hour long break?

9      A      We just talked here a minute ago, and the

10 discussion was specifically related to what information I

11 could talk to relative to the case and relative to the

12 information that we reflected on as part of making the

13 decision to terminate the manufacturers' reps.

14      Q      Okay.  I don't think you answered my question.  I

15 want to know precisely what you spoke to with your counsel

16 about during the break.

17      A      What I spoke specifically to my counsel --

18      Q      Yes.

19      A      -- about during the break?

20      Q      Right.

21      A      Was the data that we used to make our

22 determination as part of the due diligent processes when we

23 went through this exercise of terminating our manufacturers'

24 reps agreement.  That specifically is what we talked about.

25      Q      You specifically talked about substantive issues

Page 216

1          DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2 related to the case, i.e. the data that we had?

3      A    No, we didn't talk specifically to the data that

4 we had in terms of the detail.

5          MR. TALBOT:  Sean, if you like, I'd can short

6 circuit it.

7          MR. BELLEW:  There's no need to short circuit at

8 this point.  He's under an obligation to -- we've gone

9 through this issue before.  Once he's under oath --

10         MR. TALBOT:  I understand.

11         MR. BELLEW:  Once he's under oath, he's not

12 permitted to discuss any issues with his lawyer

13 substantively related to the case.

14         MR. TALBOT:  Okay.  But we're talking about an

15 issue of privilege on the break.

16         MR. BELLEW:  There was no question that would

17 prompt an answer that would divulge attorney-client

18 privileged information.

19         MR. TALBOT:  As I just mentioned to you before we

20 went on the record, I wanted to clarify whether the

21 spreadsheet that he was discussing before we went on break

22 was in fact a spreadsheet that had been withheld as a work

23 product privileged document.

24         MR. BELLEW:  And what was the basis of your

25 feeling that you needed to discuss that with the witness

Page 217

1          DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2 after he was under oath.

3               MR. TALBOT:  I wanted to make sure that he was

4 not in any way going to be waiving Motorola's assertion of

5 privilege for this document by his testimony today.

6     Q    **Mr. Crawford, you had noted prior to the break --**

7               MR. BELLEW:  You know what, if we could stop.

8               Is there a way you can go back to the final

9 question before the break?

10              (Whereupon, the requested portion was read

11              back by the court reporter.)

12 BY MR. BELLEW

13    Q    **Mr. Crawford, that will refresh your recollection**

14 **as to what we were discussing before the break.  Do you**

15 **remember that discussion?**

16    A    I remember that discussion.

17    Q    **It involved a document that you reviewed that you**

18 **believe identified the areas of nonperformance related to my**

19 **client, J-Squared Oregon.**

20    A    Yes.

21    Q    **Do you recall looking at that document?**

22    A    Yes.

23    Q    **Do you know who prepared that document?**

24    A    No.

25    Q    **How did you receive it?**

Page 218

1           DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2      A    I specifically can't recall.

3      Q    Do you know when that document was created?

4      A    No.

5      Q    It obviously was created before February 26th,

6 2004 though; isn't that correct?

7      A    I don't recall the exact date it was created.

8      Q    Okay.  Do you know if it was created by a lawyer?

9      A    I don't know.

10     Q    Did you ever have any discussions in the presence

11 of a lawyer related to that document?

12     A    Yes, I did.

13     Q    When was that?

14     A    I don't remember the exact date.

15     Q    And who was the lawyer?

16     A    John Gardner, Motorola, and Randy Pappetti of

17 Lewis & Roca.

18     Q    And do you know the date of that?

19     A    No, I don't.

20     Q    Do you have that -- do you have your calendar

21 with you?

22     A    No, I don't.

23     Q    Would you be able to -- was that a scheduled

24 meeting with those gentlemen?

25     A    I don't recall.

**Esquire Deposition Services**
**(215) 988-9191**

Page 219

1        DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2        Q        Would that be indicated on your computer calendar

3   or perhaps in Outlook or something like that?

4        A        It may, it may not have.

5        Q        Okay.

6                 MR. BELLEW:  Obviously, we're going to reserve

7   our right to recall both Misters Crawford and Robinson based

8   on the information we're now hearing.  Obviously, there

9   exists a document that you've looked at, that the witness

10  has looked at, related to a failure on my client's part to

11  meet certain performance criteria.  We have not seen that

12  document, and I think there's been some representations by

13  counsel that it's been withheld as work product.

14                MR. TALBOT:  That is correct.  And I'll verify

15  that.  The document that you are referring to has been

16  withheld as work product.

17                MR. BELLEW:  I'm not referring to any document.

18  The witness is referring to a document.

19                MR. TALBOT:  Okay.

20       Q        Do you know how many pages that document was,

21  Mr. Crawford?

22       A        No.

23       Q        You said it was in a spreadsheet?

24       A        Yeah.

25       Q        Is there any -- was -- would you recognize it if

**Esquire Deposition Services**
**(215) 988-9191**

Page 220

```
 1            DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

 2 you saw it right now?

 3      A      Yeah.

 4      Q      Did it have Lewis & Roca's stationary attached to

 5 it?

 6      A      I don't recall that, no.

 7      Q      Did you see any indication of a lawyer's name on

 8 that document?

 9      A      I don't recall.

10      Q      Do you have any -- any idea of who was the person

11 that created that document?

12      A      Not definitively, no.

13      Q      Did you ever share any of the information in that

14 document with any -- in that document with any of the

15 manufacturers' representatives?

16      A      I don't believe I personally did, no.

17      Q      If a manufacturer's representative had contacted

18 you for information on its failure to perform, would you

19 have had to have volunteered the information in that

20 document?

21      A      No.  At that point, counsel had been engaged, and

22 we basically deferred back to our counsel.

23      Q      So there wouldn't have been any ability for them

24 to be provided the information in order to cure under the

25 contract?
```

Page 221

1          DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2     A     I don't know specifically whether that detail was

3 provided to them upon request, as an example, in response to

4 a letter you showed me here earlier or not.

5     Q     Okay.  Other than yourself, do you know any other

6 Motorola employee that had access to that document?

7     A     Julie would have definitely had access to that,

8 because she was our finance prime involved in that.  John

9 Gardner, because he was our legal prime, would definitely

10 have had access to that.  I believe Kevin and Steve probably

11 did see it as well, but I can't speak for them.

12    Q     Well, why were you provided a copy of this

13 document?

14    A     Why was I provided a copy of the document?

15    Q     That was my question to you, yes.

16    A     This was some of the data we were basing our

17 decision to move forward on.

18    Q     And why would you need that information?

19    A     Why wouldn't I need that information?

20    Q     Mr. Crawford, I'm the guy here that's asking the

21 questions.  All right?  With all due respect, it's late in

22 the day.

23          MR. BELLEW:  If the court reporter could read

24 back my final question.

25               (Whereupon, the requested portion was read

Page 222

```
 1          DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

 2                    back by the court reporter.)

 3     A       That information is part of the evidence that we

 4  had as part of the recommendation we made with the various

 5  options to go forward and terminate the agreements with the

 6  reps.

 7     Q       Did you -- did you check the information to see

 8  if it was accurate?

 9     A       I believe I reviewed it, yes.

10     Q       Did you check the information to see that it was

11  accurate?

12     A       I reviewed it, yes.

13     Q       To see that it was accurate?

14     A       Yes.

15     Q       Did you review that information at all with

16  Dennis Robinson?

17     A       I don't specifically recall.

18     Q       Do you remember discussing that information at

19  all with anybody from ES West?

20     A       Definitely not.

21     Q       What about with any other manufacturer's rep?

22     A       Like I said previously, no.

23     Q       Did any of the manufacturers' reps inquire as to

24  you -- as to what the basis was for the termination based on

25  nonperformance?
```

Page 223

1           DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2      A     Yes, they did.

3      Q     **Who was that?**

4      A     The ones that I specifically talked to that I can

5 recall here right now.  I remember the C&S conversation

6 specifically.  I don't remember the details of the others.

7      Q     Okay.  **Did you provide C&S information related to**

8 **their termination?**

9      A     It was the same level of information that I

10 indicated previously.  We were terminating for performance.

11     Q     **Did you give them any details regarding what**

12 **their nonperformance related to?**

13     A     I don't believe that I did.

14     Q     **Did you give them any of the information that was**

15 **in this document that you said exists?**

16     A     Like I said, I don't believe that I did.

17     Q     **Okay.**

18           MR. BELLEW:  I just want to note the record that,

19 you know, we've demanded a copy of this document.  We don't

20 see how it's being withheld as privilege -- privileged or

21 work product at this stage.  I just also want to note the

22 record that at about 4:00 Arizona time here, I called for a

23 five-minute break.  Counsel for the defendant did not

24 re-present into the deposition room here until about 50

25 minutes thereafter and that during that 50 minutes there was

**Esquire Deposition Services**
**(215) 988-9191**

Page 234

1         DEPOSITION OF KIMBERLY CRAWFORD - 12-6-05

2      A      So that activity was not specifically done, and

3 the reason that activity was not specifically done was that

4 programs that were being run through the distribution

5 channel predominantly were not captured in there.  So we

6 didn't have transparity (sic) or level of visibility to

7 those specific programs through the Optix tool, because the

8 detail is input specifically by the Motorola salespeople and

9 there wasn't facility built into the tool at that point in

10 time to enable a distributor or a manufacturer's rep to

11 input and get inside of the Motorola firewall.

12      Q      Okay.  So the Optix program was not a complete --

13 not a complete database for all the information that was

14 needed for this performance analysis?

15      A      Which is part of why we went back to the

16 individual --

17      Q      So your answer to my question was yes?

18      A      Yes.

19      Q      Okay.  All right.  You're free to expand on that,

20 but I didn't want to get lost.

21              The Optix program didn't give you a complete

22 snapshot of what the performance was?

23      A      Yes.

24      Q      Okay.  Because not all the information was

25 inputted?