IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., a Canadian )
corporation, and J-SQUARE TECHNOLOGIES )
(OREGON) INC., an Oregon corporation, )
                    Plaintiffs, )
                v. )      C.A. No. 04-CV-960-SLR
MOTOROLA, INC., a Delaware corporation. )
                Defendant. )

# **EXHIBIT 21**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
William W. Bowser (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
wbowser@ycst.com
OF COUNSEL: Randy Papetti, Richard A. Halloran,
Cory A. Talbot, Emily S. Cates
Lewis and Roca LLP
40 N. Central Avenue, Phoenix, Arizona 85004
Attorneys for Defendant

DATED:     April 13, 2006

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4   J-SQUARED TECHNOLOGIES, INC., a  )

    Canadian corporation, and        )

5   J-SQUARED TECHNOLOGIES (OREGON), )

    INC., an Oregon corporation,     )

6                                    )

7          Plaintiffs,               )

                                     )

        vs.                          )C.A. No. 04-960-SLR

8                                    )

    MOTOROLA, INC., a Delaware       )

9   corporation,                     )

                                     )

10         Defendant.                )

    _____      )

11

12

13           DEPOSITION OF DENNIS ROBINSON

14       Taken on Monday, December 5, 2005

15               At 9:42 a.m.

16      At 40 North Central Avenue, 19th Floor

17               Phoenix, Arizona

18

19

20

21

22  Job No. 7520

23

    REPORTED BY:  MICHAEL H. DIPPEL, RPR

24               Arizona CR No. 50716

                 Nevada CCR No. 701

25               California CSR No. 9409

Page 2

```
 1   APPEARANCES:
 2   For Plaintiffs:
 3                   SEAN J. BELLEW, ESQ.
                     COZEN O'CONNOR
 4                   1201 North Market Street
                     Suite 1400
 5                   Wilmington, Delaware  19801
                     302-295-2000
 6                   sbellew@cozen.com
 7
     For Defendant Motorola, Inc.:
 8
                     EMILY S. CATES, ESQ.
 9                   LEWIS AND ROCA, LLP
                     40 North Central Avenue
10                   Phoenix, Arizona  85004
                     602-262-5757
11                   ecates@lrlaw.com
12
     Also Present:
13                   KAELYN MEEK, LEGAL VIDEOGRAPHER
14
15
16
17
18                   DEPOSITION OF DENNIS ROBINSON, taken
19   at 40 North Central Avenue, Phoenix, Arizona, on
20   Monday, December 5, 2005, at 9:42 a.m., before
21   Michael H. Dippel, Registered Professional Reporter
22   and Certified Reporter No. 50716 in and for the State
23   of Arizona.
24
25
```

**Esquire Deposition Services**
**(215) 988-9191**

1    essentially written acknowledgements from the

2    customers -- from a customer -- the appropriate contact

3    within the customer confirming the decision to use the

4    product in production.  They were also criteria for

5    monetary thresholds that had to be met for design-in

6    criteria.  I don't recall what the specific monetary

7    thresholds were, but they have to order so much stuff.

8             And then also, in writing -- again, this is

9    inclusive of the criteria, maybe not exhaustive of

10   criteria -- that there was -- needed to be, in writing,

11   some forecast, again, from the appropriate personnel

12   from the company describing their usage over some

13   period of time, and that usage needed to hit certain

14   monetary thresholds.

15        Q.   Okay.  Did the design-win process -- I mean,

16   was that something that you were monitoring for ES West

17   and J-Squared Oregon?

18        A.   I wasn't monitoring it.  I was included in

19   it.  It was -- it's rolled up under me.  There was

20   no -- there is no distinction between a J-Squared

21   design in and a Dennis Robinson design in.

22        Q.   Okay.  Well, would it be fair to say that, on

23   Motorola's side, you would be the person in the best

24   position to identify whether the thresholds had been

25   met for a design in?

Page 73

1        A.    Certainly, from the standpoint of monitoring

2    the application for the design in, I was the guy.

3        Q.    Right.

4        A.    I did the work.  That is what I did.

5        Q.    All right.  So you -- I don't know if this

6    happened or not, but humor me.  I mean, you could have

7    been at the dinner table when the client -- the client,

8    prospect, customer -- whatever you want to say -- and

9    you and a J-Squared employee were there when they said,

10   we've done it.  Here's my order?  You could have done

11   it at that point?  If there was anybody there from

12   Motorola, it would have been you?

13       A.    Most likely.

14       Q.    And that would have been for J-Squared and

15   the other manufacturer rep that you oversaw?

16       A.    Yes.

17       Q.    So you were -- you were in the best position

18   to monitor the manufacturer's rep's performance in

19   terms of the design wins?

20       A.    Yeah, that's a fair statement.

21       Q.    Okay.  Who would have performed that

22   design-win function for Motorola prior to its entering

23   into these manufacturers' reps contracts?

24       A.    Who did the job before we had -- myself.

25       Q.    Was it at some point recognized that we

Page 74

1  needed more people to be performing that function, "we"

2  being Motorola?

3     A.   Again, I wasn't -- I don't know.  I don't

4  know.

5     Q.   Okay.  That's a fair answer.  Nobody's going

6  to get penalized for I-don't-know answers.  So if

7  that's the case, it's a fair answer.

8          And you agree that this design-win function,

9  at least under the manufacturer's rep's contracts, in

10  that dynamic, the manufacture's rep's primary focus

11  would be that high-level chronology we discussed from

12  getting them the doughnuts to signing the contract and

13  product being purchased?

14     A.   That's -- that's correct.  That's their

15  primary responsibility.  That's my primary

16  responsibility.

17     Q.   And you would be working hand in hand with

18  them to do that?

19     A.   Most often.

20     Q.   So you shared -- both the rep and the BDM

21  shared a responsibility in achieving those results?

22     A.   That's correct.

23     Q.   Okay.  Now that we've got the tutorial on the

24  design wins, could you compare that to my earlier

25  question where we wanted to understand how the run rate

Page 109

1      Q.   As far as you were concerned, was J-Squared

2   performing under its contract as of the date that you

3   requested this information?

4      A.   My -- no.  As I recall, when we rolled that

5   up, they were short against their criteria.

6      Q.   Well, we'll get to that.  I'm talking about

7   before you actually saw the information.

8           Did you have anything -- any information that

9   would lead you to believe that J-Squared was not --

10  J-Squared Oregon, of course, was not performing under

11  its contract?

12     A.   I would characterize it to say that I

13  don't -- certainly didn't closely scrutinize their

14  contract.  So, again, because J-Squared rolls up under

15  myself, I'm really looking at how I'm performing

16  against the territory.  So they're one of the channels

17  that I use.  So from that angle, I knew that we were

18  coming up short in design ins in the territory to be

19  sure.

20     Q.   Did you ever communicate that to J-Squared

21  Oregon?

22     A.   I don't think there's anything written

23  that -- that says that.  Though, again, in the

24  day-to-day meanderings, in the monthly visits we did

25  together, it was implicit in our activities that we

1    were looking for design ins.

2        Q.    Did you ever say to -- you had communication

3    with Steve Blomme; right?

4        A.    Yes.  I know Steve.

5        Q.    And did you ever say to him, Steve, you know,

6    we're in October here, and we're a little concerned

7    about the design-in criteria?  Have you ever that

8    conversation?

9        A.    I couldn't recall any specific conversations

10   where I would have said that to him, though it would

11   not have been uncharacteristic to say something like

12   that.

13       Q.    But you don't recall whether it happened or

14   not?

15       A.    I can't specifically cite any conversations.

16       Q.    Now, when you say that you had a concern

17   about the design wins, was that concern after you saw

18   the information from J-Squared Oregon or after?

19       A.    I'd say I had a general concern for

20   design ins the entire year.  That's something I watch.

21       Q.    You had stated that, in connection with your

22   own sort of assessment of your performance --

23       A.    Right.

24       Q.    -- you had identified maybe some

25   shortcomings?

Page 111

1      A.   That's correct.

2      Q.   Now, when did you identify those

3  shortcomings?  When was the date of that?

4      A.   I can't recall.

5      Q.   Was it before you got the information from

6  J-Squared or after?

7      A.   I -- I couldn't say.

8      Q.   And just to be clear, there was no -- during

9  this whole relationship, there was no formal

10 performance-review process?

11     A.   I think we've established that, right,

12 except --

13     Q.   So the answer's yes?

14     A.   Yes.

15     Q.   Mr. Robinson, can I get you to just quickly

16 look at J-Squared -- I'm sorry.  I keep calling it

17 J-Squared, but it's Exhibit 4.

18          Have you ever seen that document before?

19     A.   Not prior to -- not prior to this case.  This

20 was -- this was included in the packet of stuff that

21 was received, so I put my thumb on this.

22     Q.   Okay.  What's your general understanding of

23 what this two-page document is?

24     A.   This, again, is a fairly common, formatted,

25 Motorola-type PowerPoint slide presentation.  And I

Page 214

1      A.    For supplemental information, right.  That's

2   what that request said.

3      Q.    Right.

4      A.    It said I've got the information for these

5   accounts, can you -- got anything else, anything else

6   you want to tell me about?  And that's basically --

7      Q.    Was there -- what was your -- what was

8   your -- if you could flash back to late 2003, what was

9   your opinion of what kind of job J-Squared Oregon was

10  doing?

11     A.    My general -- my general recollection of that

12  year was that we were behind on our design ins, and I

13  don't have any direct recollection of revenues.  And my

14  direct recollection is that I got along real well with

15  all those guys.  It's a good group of guys.

16     Q.    So would you have anticipated that the

17  relationship would continue as far as you were

18  concerned?

19     A.    I had no anticipation.

20     Q.    Well, recognizing it's not your decision to

21  be made, you had -- you were not raising any objections

22  to your management by saying we need to replace

23  J-Squared Oregon?

24     A.    I don't think I ever made any requests like

25  that.

Page 215

1    Q.   Okay.  But -- and there wouldn't really have

2    been a basis for that request based on the performance

3    so far?

4    A.   I don't recall ever making -- making any

5    request of that nature at all.

6    Q.   Okay.  Now, give me some specifics on your

7    belief that there were some issues with the design --

8    design wins.

9    A.   Help me with that.  What are you asking?

10   Q.   You said that you -- you had a question

11   regarding whether they were -- whether you were --

12   meaning you and J-Squared --

13   A.   Right.

14   Q.   -- were meeting the predetermined criteria

15   for design wins.

16   A.   Right.

17   Q.   Can you expand on that?

18   A.   Other than to say that both myself and

19   J-Squared are given design-in goals, generally, I

20   mostly care about my goals, but certainly their goals

21   are going to coincide with mine.  They weren't

22   making -- we weren't having particularly good success

23   with design-in activity in that portion of the

24   territory in 2003 --

25   Q.   Okay.

Page 216

1      A.    -- or '04.

2      Q.    Could you flip back to page 20 of

3   Exhibit 14B, which is the performance criteria for

4   J-Squared Oregon?

5      A.    Yes.  This matrix we looked at before?

6      Q.    Right.

7            Now, at the time you were looking for this

8   information, it was -- it was just at the inception of

9   the sixth month -- or I should say the seventh month

10   that J-Squared Oregon was involved in this endeavor;

11   correct?

12      A.    Yes.

13      Q.    And it appears that the only metric regarding

14   design wins that would apply to that time period was

15   one.

16      A.    Yes.

17      Q.    And that time period hadn't even elapsed yet.

18   So how could there have been a concern with design wins

19   yet when J-Squared Oregon wasn't even responsible for

20   having one at the time you were asking for the

21   information?

22      A.    The concern is the continuum lasts all the

23   time.  It doesn't -- the concern for design wins is

24   cumulative, but it's always there, so --

25      Q.    Okay.  But they hadn't -- they hadn't -- they

Page 217

 1    hadn't not met a performance criteria here; correct?

 2        A.    I -- well, actually, as you stated there, I

 3    guess they had; right?

 4        Q.    How?

 5        A.    Is that Q3 made -- we were required to have

 6    one design in, and we had none then; is that correct?

 7              I guess I shouldn't ask you any questions.

 8        Q.    Right.  Well, if the -- if the contract was

 9    incepted at some time in the middle of May --

10        A.    Uh-huh.

11        Q.    All right?  We flash forward -- jump forward

12    six months from May 15th, that gets us to

13    November 15th?

14        A.    Yes.

15        Q.    So you were asked for this information, you

16    said, in -- at least from this e-mail, it was before

17    the end of that year?

18        A.    Yes.

19        Q.    So we weren't even through the third quarter

20    yet, were we?

21        A.    No.

22        Q.    So J-Squared Oregon didn't even have to, at

23    that point, to be in compliance with the metrics, to

24    have a design win?

25        A.    Okay.

Page 218

1    Q.   Is that fair?

2    A.   It -- under that reasoning, that's fair.

3  I -- you're doing math for me, so . . .

4    Q.   Well, I mean, what my concern is, is you're

5  saying that J-Squared Oregon -- you had a concern about

6  their design-win activities.

7    A.   Yes, all of our design activities in general,

8  right.

9    Q.   But in terms of the contract language, they

10  still were in the quarter in which they had --

11    A.   Yes.

12    Q.   -- to achieve that goal?

13    A.   That's true.  It doesn't alleviate me from

14  having concerns about design-in activities.

15    Q.   Okay.  But as far as you knew, when

16  Kim Crawford was contacting you for information on

17  J-Squared's performance -- J-Squared Oregon's

18  performance, you had no reason to highlight design-win

19  failure as a concern based on the fact that they had no

20  obligation for design wins --

21    A.   I don't know that I gathered -- again, this

22  thing's a continuum, and I don't know that I would have

23  coalesced the thinking in that -- in that manner.  You

24  know, how's the design-in activity going, Dennis, as it

25  comes to the end of the year?  Oh, not that good.

Page 219

1          Q.    Well, I mean --

2          A.    You know, I don't think the question was ever

3     posed.  It's -- it's Q3 they're required to have one

4     design in.  Is it complete or not what your concern

5     is.  The information wasn't presented in that fashion.

6          Q.    Mr. Robinson, earlier today, we talked about

7     the timetable where one could expect from move -- to

8     move from the starting blocks to a design win.

9          A.    Right.

10         Q.    And I think, to be fair, you said that it

11    could be a year, maybe six months, somewhere in that

12    timetable; right?

13         A.    Yeah.

14         Q.    And that actually correlates very nicely with

15    the performance standards that the record shows that

16    you had some part to do with but perhaps you hadn't.

17    Is that -- is that -- these performance standards,

18    whether you had a hand in them or not, they jibe with

19    your testimony.

20         A.    Which would be consistent, right.

21         Q.    Right.  So to have a design win in the third

22    quarter would allow J-Squared Oregon nine months to get

23    there.

24         A.    Uh-huh.

25         Q.    Right?  Now, when you were asked for this

1   information, how many months did they have to get

2   there.

3          A.   We established, what, six and a half months?

4          Q.   Six, right.  So as far as the contract

5   concerned, they -- they were in the quarter where they

6   were not only supposed to realize these design wins by

7   contract, but, practically, that's the way it would

8   work; correct?

9          A.   Right.  And if there were -- and if there was

10  no prospect for design in or concern, I certainly would

11  have expressed it at that time.

12         Q.   Okay.  So, now, if we go back and you're

13  making an assessment as of what you knew as of the end

14  of 2003 as to whether J-Squared was performing under

15  the contract, does it change your mindset that the

16  design-win issue was something that was supposed to

17  come to fruition in the months that were after you made

18  your inquiry?

19         A.   No, I don't think that changes my mind.

20         Q.   Okay.  Well, I mean, these metrics -- you

21  will agree that J-Squared Oregon wasn't in

22  noncompliance with that metric as it's written in this

23  contract?  You would agree with that?

24         A.   I -- I --

25         Q.   I mean, it's pretty tough to disagree with

Page 221

1    that based on --

2        A.    I know -- I know what you're saying, and I

3    know where you're driving.  It's just you're asking me

4    to interpret this contract as a contract.  I'm telling

5    you as a sales guy where we were driving.  So I'm able

6    to voice my opinion about being a sales guy in the

7    field.

8        Q.    I'm not asking --

9        A.    It's more difficult for me to -- to comment

10   about contractual obligations.

11       Q.    Okay.  I'm not asking you to interpret the

12   contract.  You do see there that, in this contract,

13   under quarter three, it's the first time a design win

14   uses a metric?

15       A.    Yes.

16       Q.    And you do recognize that three-quarters of a

17   year would be a nine-month time period?

18       A.    That's the completion of a --

19       Q.    Okay.  A salesman knows that.  A lawyer knows

20   that.  Motorola's chief executive officer would know

21   that.  That's not something that is specific to some

22   sort of discipline and knowledge.

23       A.    Right.

24       Q.    All right?  So as somebody that understands

25   that concept, and as somebody that was supposed to

Page 222

1    monitor or was in the best position to monitor

2    J-Squared Oregon's performance under the contract, it

3    was clear that that metric hadn't even been required as

4    of the time you were requested to obtain performance

5    data?

6         A.    That's a fair statement.

7         Q.    Okay.  So when you were asked to get data on

8    J-Squared Oregon, you would not have been -- strike

9    that.

10             When you were asked to get information on

11   J-Squared Oregon, they were not yet at a point where

12   design wins were one of the performance metrics that

13   were required in Exhibit 4; is that fair?

14        A.    That -- that may be a fair statement.  That

15   is a fair statement.  However, it doesn't -- it doesn't

16   negate the fact that I would have a concern over design

17   wins.

18        Q.    Sure.  You would -- you would like to see

19   design wins in month one?

20        A.    Sure.

21        Q.    In two, and in three, and four, five, every

22   month --

23        A.    Yes.

24        Q.    -- of the contract.

25        A.    Right.

Page 223

1       Q.    But as far as this contract is concerned,

2    when we're setting down the benchmarks, we would have

3    anticipated seeing those in -- in the months six

4    through nine?

5       A.    Yes.

6       Q.    Is that fair?

7       A.    That's -- that's what we said, yeah.

8       Q.    And that's consistent with your earlier

9    testimony?

10      A.    Yes.

11      Q.    So for J-Squared Oregon not to have had a

12   design win as of late 2004 would not signal a

13   nonperformance to -- in relation to Exhibit 4; you

14   would agree with that?

15      A.    Yes.

16      Q.    So when you talked about your concerns about

17   design wins, that was just your concern with design

18   wins that you have every day that you wake up?

19      A.    That's right.

20      Q.    Now, comparing that concern that you have

21   every day when you wake up with the reality of what

22   J-Squared was engaged to do, would it have been your

23   anticipation that it wouldn't have been uncommon for it

24   to have taken six months for them to secure their first

25   design win?

Page 224

1    A.    That wouldn't be uncommon.

2    Q.    Okay.  And as long as they got that first

3    design win before the expiration of nine months, then

4    they would be in compliance with this metrics?

5    A.    That's correct.

6    Q.    And there may be some question as to when the

7    nine months started and where it ended, but based on

8    this contract, if they did the things that they were

9    told that they needed to do within the applicable time

10   periods, they would be performing contractually?

11   A.    Yes.

12   Q.    And this is the final question I'll ask you

13   on this:  So in terms of whether they were performing

14   in connection with Exhibit 4, design wins were not even

15   an issue based on the timing that you were required to

16   give the information?

17   A.    We were within that time frame where

18   design ins were an issue, so we -- within that quarter

19   when I was asked to report, design ins were highlighted

20   because that's -- the deadline hadn't reached, as

21   you've pointed out many times, but it was coming -- it

22   was in there -- it was something we needed to measure.

23   Q.    Okay.  Well, if J-Squared came in at the

24   beginning of month seven and was a design win, one at

25   the beginning of month eight and one at the beginning

Page 225

1    of month nine, that would be --

2        A.    Very nice.

3        Q.    -- very nice.

4              And if they came in with five on the last day

5    of the ninth month, that would even be better?

6        A.    That would be fine, too, yeah.

7        Q.    All right.  And the reason why the design

8    wins were set out to be a metric after nine months is

9    because the reality of it is it takes time to achieve

10   them; correct?

11       A.    Yeah, that's certainly part of it.

12       Q.    Okay.  So to expect them to have achieved

13   design wins at some point prior to six months may have

14   been a little bit unreasonable?  You would like to have

15   seen it, but --

16       A.    I can't characterize it as unreasonable, but

17   you would -- you would like to see it.

18       Q.    And what is your -- what is your feeling on

19   the -- as somebody with the expertise in sales that you

20   have in this industry, how realistic are these metrics?

21       A.    I think that there was a reasonable amount of

22   sanity put on these metrics.  These don't seem to be

23   particularly unreasonable.

24       Q.    Right.  So there was a thought process

25   involved with setting these out?

Page 226

1       A.    Yeah, you would hope so.

2       Q.    Right.

3             One of the major components to the metrics

4    is -- is it revenue line?  Right?  Is that right?

5       A.    Yes.  This is territory revenue in C here,

6    yeah, uh-huh.

7       Q.    Obviously, the others are important, and

8    we've gone over this earlier, but that's a pretty good

9    indicator of, you know, successful sales?

10      A.    Yes.

11      Q.    The money that comes in?

12      A.    It's a good thing.

13      Q.    If we could quickly go to J-Squared 10, which

14   we were unable to look at earlier --

15      A.    Oh.

16            MS. CATES:  Is that his copy?

17      Q.    (By Mr. Bellew)  It's going to be -- you can

18   use that one?

19      A.    All right.

20      Q.    Have you seen that document before?

21      A.    We're talking about the cover letter on this

22   or the matrix afterwards or both?

23      Q.    This is one document.

24      A.    I don't know that I've seen this exact

25   document, but I've seen formatted documents that look

Page 326

1      Q.    Okay.  It says, "Unfortunately, I will not be

2   realizing the revenue since Motorola's terminated the

3   contracts"; right?

4      A.    That's what it says.

5      Q.    Okay.  But that would have been a design win

6   assuming it came to fruition?

7      A.    That -- that would be true.  If that came to

8   fruition, it would be a design win.  That's sales.

9      Q.    What we could probably do to speed this part

10  of it up, if we can go off the record, I can mark these

11  real quick, give you a chance to look at them, and then

12  we can go a little more quicker on the questions.  Is

13  that fair?

14     A.    Yes.

15     Q.    Instead of spending a lot of time -- okay.

16           THE VIDEOGRAPHER:  We're off the record.  The

17  time is 5:02.

18                   (Pause in proceedings.)

19                   (Exhibits 43 through 70 were marked.)

20           THE VIDEOGRAPHER:  We're back on the record.

21  The time is 5:23.

22     Q.    (By Mr. Bellew)  Mr. Robinson, we've marked a

23  series of exhibits that are 43 through 70, and we've

24  given you a chance to look at those in the interest of

25  time.  And these are various discussions between

Page 327

1    yourself and employees of my client; correct?

2        A.    That's correct.

3        Q.    And these discussions, is there anything in

4    these e-mails that is inconsistent with your

5    recollection of how things occurred?

6        A.    No.

7        Q.    And would you describe these communications

8    as related to sales efforts for the most part?

9        A.    For the most part.

10       Q.    And do they identify committed, uncommitted,

11   those types of --

12       A.    Yeah.  At the very least, these are starting

13   to describe our target accounts as we move through the

14   chain.

15       Q.    Okay.  And, for example, you've looked at

16   Exhibit 43, and that deals with the University of

17   Washington; right?

18       A.    Right.

19       Q.    So that was an account that both you and

20   J-Squared were coordinating on; correct?

21       A.    Yes.

22       Q.    And the efforts with that account would be

23   efforts that could have met the metrics?  Assuming that

24   there was an uncommitted or a committed, that would be

25   an account that could qualify for some of these

Page 328

1   metrics?

2       A.   There was a run-rate account that we had.   It

3   looks like we may have talked to them about selling a

4   new product.   I can't tell you if they're going to meet

5   the design or not, but these are certainly target

6   accounts or existing accounts.   We'd want to talk about

7   new programs.

8       Q.   What about the VideoTele?

9       A.   It's an existing account, as well.   So

10  that -- that has run-rate programs in it.   And this

11  e-mail, if I recall, was our interrogation about some

12  new sales efforts there.

13      Q.   Okay.   And you were looking at 44 --

14  Exhibit 44 there?

15      A.   That's right.

16      Q.   Okay.   And Exhibit 45, it says, "Subject:

17  Uncommitted LocalDial"?

18      A.   Right.

19      Q.   Is that how Steve Blomme would communicate to

20  you a -- an uncommitted, just by an e-mail?

21      A.   Not necessarily, but in this case, he

22  certainly did.

23      Q.   Would there be any follow-up to see if

24  that -- if that was substantiated?

25      A.   I don't know what you mean.   I know

Page 329

1    LocalDial.  I visited them many times, personally.  So

2    the fact that he labeled it uncommitted -- I mean, I

3    understand the nature of the account, so . . .

4         Q.   Okay.  Well, I mean --

5         A.   I would say his characteristic of

6    uncommitted, pretty accurate.

7         Q.   Okay.  Well, would -- would -- would there be

8    any follow-up to determine whether his assessment was

9    accurate?

10        A.   Yes.

11        Q.   46, Exhibit 46, that's a sales quotation?

12        A.   Uh-huh.

13        Q.   And who's the client there.

14        A.   The prospect is General Dynamics in Redmond,

15   Washington.

16        Q.   And they're a military contract, aren't they,

17   General Dynamics?

18        A.   Yes.

19        Q.   A pretty substantial customer?

20        A.   Not for me, but a substantial target for

21   sure, but not -- customer differentiating, again,

22   between people who actually buy stuff for you and

23   prospects or targets, people who you want to sell to.

24        Q.   Okay.  And this -- this is a sales quotation;

25   right?

Page 330

1    A.   Yes.

2    Q.   Do we know if this ever came to fruition?

3    A.   I don't believe so.

4    Q.   So what would this constitute?  Would this

5  constitute at least an uncommitted?

6    A.   It's tough to say, but it certainly was a

7  target account they felt good enough about to quote a

8  product on, so . . .

9    Q.   How about the next one, 47?  It's F22 Test

10  Systems Project.  Do you see that?

11    A.   Yes.

12    Q.   What's the company that's involved there?

13    A.   If you look down here, if it's F22, it's

14  probably Boeing.

15    Q.   Well, Myron Lee's -- his e-mail is

16  @f22boeing.com?

17    A.   Yeah.  There you go.  It's at Boeing.

18    Q.   So this is some -- some sales efforts with

19  Boeing; correct?

20    A.   That's right.

21    Q.   And they're based out of Seattle, aren't

22  they?

23    A.   Yes.

24    Q.   They would be a substantial --

25    A.   It's a beautiful target account for us.

Page 331

1    Q.    Beautiful.  Beautiful.

2    A.    Target account.

3    Q.    So they were at least uncommitted?

4    A.    Again, on this sort of stuff here, I'm not

5    even sure it would reach uncommitted.  Like I said,

6    it's a target account, beautiful target account.

7    Q.    Okay.  The next one is 48.  It's talking

8    about PrPMC System Opportunity, Portland.  Do you see

9    that?

10    A.    Yes.

11    Q.    Kentrox?

12    A.    Kentrox, uh-huh.

13    Q.    And there's at least -- it's Steve Blomme

14    making a proposal; right?

15    A.    Right.

16    Q.    So this again identifies some sales

17    activity --

18    A.    This is prospecting a target account to be

19    sure.

20    Q.    Okay.  And what about 49?  Straightline, is

21    that the company?

22    A.    I'm looking down it.  Yes, Straightline.

23    Q.    Okay.  And this looks to be sort of a call

24    report at the very beginning?

25    A.    Right.

Page 332

1    Q.    Is that what you call that, a call report?

2    A.    Yeah.

3    Q.    Were there any requirements for submitting

4    call reports, or was that just --

5    A.    It's pretty customary in the industry just in

6    the call reports.  She didn't attend but had an

7    interest in --

8    Q.    Okay.

9    A.    This looks like he made a call, just

10   Straightline without me, so he's doing me the courtesy

11   of telling me what he did.

12   Q.    Okay.  But if he -- on the sales calls that

13   you were together, he wouldn't need to give you a call?

14   A.    No, because I was there and took my own

15   notes.

16   Q.    Do you give any sales-call reports to your

17   supervisors?

18   A.    As requested, but I don't offer them.

19   Q.    All right.  If there's -- a little bit of a

20   nuisance in your job --

21   A.    That's right.

22   Q.    -- I suspect?

23   A.    That's right.

24   Q.    So was there any protocol in place to receive

25   sales calls from -- sales reports, I should say, from

Page 333

1    J-Squared?

2        A.    I think the best way to determine it would be

3    it was just customary for sales people to give me call

4    reports when I didn't go on a call.

5        Q.    This 51 deals with Mike Shurtleff, Naval

6    Undersea Warfare Centre.  Do you see that?

7        A.    Uh-huh.

8        Q.    Was that a prospect or --

9        A.    Yeah.  I would term Naval Undersea Warfare

10    Centre as a one-time customer, and I'm not sure the

11    status of this, but certainly, again, he's prospecting

12    for a new target opportunity.

13        Q.    Okay.  And this is your response to a

14    Steve Blomme e-mail.  It says, "We definitely want to

15    follow up on this one for size and timing."

16        A.    Right.

17        Q.    "It may qualify for design in," and you have

18    an exlamation point there; right?

19        A.    Right.  That would be accurate.  So I was

20    telling him let's look at opportunities that qualify

21    for design ins, not small ones.  This one doesn't sound

22    small.  Let's size it.

23        Q.    Okay.  And then 52 is an e-mail from

24    John Mitchell to you and Steve Blomme as well as

25    others.  Do you see that?

Page 334

1      A.   Yes.

2      Q.   And this is setting up your schedule for a

3 visit to Portland?

4      A.   Right.

5      Q.   It looks like you're making three calls

6 there; right?

7      A.   Right.

8      Q.   FEI?

9      A.   Uh-huh.

10      Q.   VideoTele?

11      A.   Yes.

12      Q.   And Tektronix?

13      A.   Right.

14      Q.   Now, whose customers were those initially?

15      A.   VideoTele was our direct account.  Tektronix

16 was actually an account of Motorola and of

17 Meredith Jaeger, who's on this copy -- this cc here,

18 the Arrow rep.  She sold into there, as well.  I don't

19 know if John sold into there.  And FEI, too, was a

20 customer of Meredith's.  I don't recall if John sold in

21 there or not.

22      Q.   The next one, 53 -- we're going to go through

23 these quickly --

24      A.   Uh-huh.

25      Q.   -- Lattice, is that how you say that?

Page 335

1    A.    Sure.

2    Q.    "Send me lead report."  So it's a lead that

3  they're following up on there?

4    A.    Yeah, that appears to be what it is.

5    Q.    And this 54, this is actually a spreadsheet

6  with leads that you're sending to Steve Blomme;

7  correct?

8    A.    That's correct.

9    Q.    Part of -- part of this joint venture

10  involved Motorola actually identifying possible leads;

11  right?

12    A.    That's right.  These -- these leads came from

13  various marketing sources, trade shows, magazines, Web

14  registrations, and we would forward them off the reps

15  for follow-up.

16    Q.    So you were actually giving J-Squared leads

17  on prospective customers --

18    A.    These are --

19    Q.    -- joint venture?

20    A.    These are unqualified leads, yeah.

21    Q.    Okay.  And so to a certain extent, you know,

22  that was -- it was desirous that that was going to

23  forward the joint venture that, they would have these

24  leads and that they would make a call on them?

25    A.    We sent it to them to help them out.

1      Q.    Okay.  Fifty-seven, Exhibit 57, this deals

2   with Midstream?

3      A.    Right.

4      Q.    What were they?

5      A.    Another target account.  My recollection on

6   Midstream was that we wanted to -- their desire was to

7   get a very fast Intel-based CPU card, which we simply

8   didn't build, and it looks like some of this is talk on

9   that -- the sales guy's designing a board that fit and

10  our realization that that probably wasn't going to fit.

11     Q.    Fifty-eight was 888 LocalDial?

12     A.    This is -- yes, LocalDial.

13     Q.    What was the substance of that --

14     A.    LocalDial was a account in Oregon that

15  sold -- they call it local toll bypass service.  It's a

16  subscription service for telephone whereby local users

17  could bypass long-distance toll fees by using their

18  service.  So they had existing product that was based

19  on what John describes here, this Advantec Chassis, et

20  cetera.  So John and I targeted that as an account to

21  go try to sell.

22     Q.    Would that be uncommitted?

23     A.    At best.  Again, these guys were a target

24  type of an account.

25     Q.    Exhibit 60, did you have any information

Page 337

1  regarding Kevin Parslow's desire to not issue any

2  additional press releases?

3      A.   Didn't have any insight into it.  This looks

4  like my forwarding of what I was told.  It looks like

5  Steve's asked me, and I went up and got an answer for

6  him.  I went up through the chain of command, I

7  believe.  Shannon -- this Shannon here, I think, is

8  Shannon Reid.  She worked in Marcomm.

9      Q.   And the upshot of that is that Motorola would

10  not agree on a joint press release, essentially?

11      A.   I don't know if it was an agreement issue or

12  not, but certainly Kevin directed -- directed us that

13  we would not be doing any more press releases --

14      Q.   Well, Steve was -- he was inquiring as to

15  whether there could be a press release similar to the

16  one attached --

17      A.   That's right.

18      Q.   And he was told by Motorola that they -- they

19  would sign off on one, perhaps, but they weren't going

20  to actively release those -- is that accurate?

21      A.   I mean, that's -- yeah.  That's -- there was

22  something about that in here.

23      Q.   Okay.  Exhibit 62, it's an e-mail from

24  Steve Blomme to Kim Crawford?

25      A.   Yep.

Page 338

1      Q.   Discussing opportunities, I guess, at Boeing,

2   AWACS?

3      A.   Right.

4      Q.   "The Boeing opportunity is for around 350

5   boards if we win all six projects" --

6      A.   Right.

7      Q.   -- whatever became of that?

8      A.   My recollection is not much.  We very clearly

9   didn't win six projects.  And, in fact, I believe

10  there's no continuing business on this at all.

11     Q.   What about this 63, Credence?  Is that

12  another company?

13     A.   Credence is another prospect, uh-huh.

14     Q.   And there was a nondisclosure agreement with

15  Credence?

16     A.   Help me where we are.

17     Q.   Sixty-three.

18     A.   Oh.  I'm sorry.  We moved to 63.

19          Yes.  This is just, again, another target

20  account.  Apparently, they required us to have a

21  nondisclosure agreement in place before we talked to

22  them.

23     Q.   What about Exhibit 64?  That's University of

24  Washington again?

25     A.   Right.

Page 339

1      Q.    What was the status of that account?

2      A.    The University of Washington was a

3   preexisting Motorola account, so it was a target for

4   new design-in opportunities.

5      Q.    Sixty-six there, that deals with the trade

6   show, does it?

7      A.    Where are we?  9-23.  This is -- as I recall,

8   this is J-Squared -- and I could be wrong on this, but

9   as I recall, this is J-Squared's independent activity

10  at a trade show, and he's telling me, hey, we at

11  J-Squared are going to this trade show.

12     Q.    And that was one of the requirements under

13  the contract.  We went over that earlier; correct?

14     A.    Right.

15     Q.    And he's letting you know that he's -- he's

16  doing that; correct?

17     A.    Yes.

18     Q.    What does your 67 look like?

19     A.    This is what 67 looks like.

20     Q.    It's a duplicate.  We're going to keep it as

21  67 for the purposes of continuity.

22           Sixty-eight deals with VideoTele; right?

23     A.    Yes.

24     Q.    Do you have any idea of what became of

25  that --

Page 340

1    A.    Yeah.   VideoTele, this is another targeted

2    opportunity in an existing account and -- who went on

3    to build their own product.  So, again, we sold

4    nothing.

5    Q.    This 69, is that an e-mail from a Phil

6    Spivey?

7    A.    That's from Phil Spivey, yes.

8    Q.    Okay.   Who is he?

9    A.    Phil Spivey is a Motorola employee who's had

10   various responsibilities.   I'm not sure what he was

11   doing in this time frame.

12   Q.    Okay.   That's announcing the agreement with

13   C & -- meaning C ampersand -- S --

14   A.    Yes.

15   Q.    -- of Dallas?

16   A.    That's right.

17   Q.    Okay.   I'm particularly interested in that

18   second paragraph.   It says, "We're taking a reasonably

19   slow approach to signing reps up.   We have an untested

20   program that may well need modification.   Before we go

21   too wide, we want to test things out.   That's not to

22   say we have the brakes totally on, but we are

23   proceeding cautiously.   In the pipeline, we have one

24   candidate in western Canada, two in eastern Canada, one

25   in San Jose, and one in Boston."

Page 341

1      Do you have any understanding why there was

2  this -- like this reluctance to move forward quickly?

3      A.   Not anything past what he says here.  It just

4  sounds like he's being cautious.

5      Q.   The final one is marked 70; correct?

6      A.   Yes.

7      Q.   What does this deal with?  It deals with a

8  rep contract for northern California; right?

9      A.   Let's see what I've got here.  This is

10  Larry Terry writing.  It's saying northern California,

11  though.  I wouldn't associate Larry with northern

12  California.

13      Q.   It says, "Interview for" -- it indicates,

14  "Interview with rep for hire."

15      A.   Right.

16      Q.   It says, "Hold off forwarding this to J2

17  until we get a couple more things in place."

18      A.   This is from Jeanne Kolasa to Larry Terry.

19  It looks like they're referring to some document that I

20  don't know.

21          MS. CATES:  Object to foundation.

22      Q.   (By Mr. Bellew)  All right.  So there was at

23  least some discussions back in September of 2002, as

24  far as this e-mail, regarding J-Squared's contract?

25      A.   Yeah.  That's what it looks like.