# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J-SQUARED TECHNOLOGIES, INC., <br> a Canadian corporation, and | ) <br> ) <br> ) | |
| J-SQUARED TECHNOLOGIES (OREGON) INC., <br> an Oregon corporation, | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | C.A. No. 04-960-SLR |
| v. | ) <br> ) | JURY TRIAL DEMANDED |
| MOTOROLA, INC., <br> a Delaware corporation | ) <br> ) <br> ) | |
| Defendant. | ) <br> ) | |

**PLAINTIFF J-SQUARED TECHNOLOGIES, INC.'S**
**RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES,**
**REQUESTS FOR ADMISSION AND REQUESTS FOR PRODUCTION**

Pursuant to Federal Civil Rules 26, 33 and 34, Plaintiff J-Squared Technologies, Inc.

("Plaintiff"), by its undersigned counsel, hereby responds to Defendant Motorola, Inc.'s

("Defendant") First Set of Interrogatories and Requests for Production as follows:

**GENERAL OBJECTIONS**

1.    Plaintiff objects to Defendant's First Set of Interrogatories and Requests for

Production (collectively, the "Discovery Requests") to the extent that the interrogatories

contained therein seek information or documents that are protected by any privilege, including

but not limited to the attorney work-product or attorney-client privileges.  The inadvertent

disclosure of any privileged information or documents shall not constitute a waiver of any

privilege or any other ground for the objection to discovery at any time.

2.    Plaintiff objects to the Discovery Requests to the extent that the requests

contained therein seek materials prepared in anticipation of litigation or for trial, or seek the

discovery of the mental impressions, conclusions, opinions or legal theories of counsel or any

other representative of the Plaintiff concerning this litigation. The inadvertent disclosure of any such information or documents shall not constitute a waiver of any privilege or any other ground for the objection to such discovery at any time.

3.    Plaintiff objects to the Discovery Requests to the extent that the requests contained therein are vague, unduly burdensome, overly broad, unlimited as to time, or directed to any information which is not relevant to the subject matter of this litigation, or are not reasonably calculated to lead to the discovery of admissible evidence.

4.    Plaintiff objects to the Discovery Requests to the extent that the requests contained therein require disclosure of information that is confidential, proprietary, or trade secret information.

5.    Plaintiff reserves the right to supplement its responses to the Discovery Requests up to and including the time of trial should information responsive thereto subsequently be discovered. The responses contained herein are based upon Plaintiff's knowledge, information and belief at the present time.

6.    Plaintiff does not waive any objections as to the admissibility of any answers to Discovery Requests provided herein or the right to object to any other Discovery Requests involving or relating to the subject matter hereof.

7.    Notwithstanding anything herein to the contrary, none of the responses herein constitute a waiver of these General Objections, or are these responses an acknowledgement by the Plaintiff that it is aware of or are currently in possession, custody or control of information or documents responsive to the Discovery Requests.

8.    The General Objections are incorporated in every individual response set forth below, whether referenced specifically or not.

## RESPONSES TO INTERROGATORIES

1.     Identify and describe with specificity any and all representations you believe Motorola made regarding its intent to "forge long-lasting relationships with JST," as alleged in paragraph 13 of your complaint, including the names of the Motorola representative or representatives making the representations, the time and place of the representations, to whom the representations were made, all reasons you believe these representations were false when made, as alleged in paragraph 14 of your complaint, and all other facts and documents that support your answer.

**RESPONSE:**    Pursuant to Rule 33(d), Plaintiff identifies its Answering Brief in Opposition to Defendant's Motion to Dismiss and the Declaration of Jeffrey Gibson submitted therewith. In addition, Steven Machernis, Larry Terry, Ed Kaczor and Paul Holt made numerous representations to Jeff Gibson and Claude Langlois during the negotiations of the JST agreements and afterwards concerning the requirement that Motorola outsource its manufacturer representatives following a substantial decrease in the Motorola in-house sales force from 55 to 12 sales representatives. These representations were made over the telephone, at in-person meetings and at Motorola presentations to Plaintiff and other manufacturer representatives. Similar representations were made to Scott Williams and Mark Gernhardt at G.L. Williams Associates, Inc. (through Steve Cunha, Paul Holt and Marc Watts) when Defendant negotiated the contract that was finally executed between those two parties. Indeed, G.L. Williams dropped a profitable competing line (SBS Technologies) in favor or Motorola given representations of a long-term relationship. Comparable representations were also made to RT Technologies through some of the same individuals, through the same medium of communication.

Defendant, through Marc Watts, Jeanne Kolasa and Larry Terry, represented that the POS commission payments payable to Plaintiff, based upon a 5% commission and a historical run rate, would be sufficient to permit Plaintiff to realize a substantial revenue source at the commencement of the engagement. These representations were made both orally and through acknowledgment of financial forecasts received by these individuals from Claude Langlois and

Jeff Gibson. Plaintiff has discovered that these representations were known to be false or were made with a reckless indifference to the truth of the matters asserted. Pursuant to Rule 33(d), Plaintiff identified the following document: MOTJ00556.

2.    Identify and describe with specificity any and all representations you believe Motorola made to JST as to the expected profitability of JST as a manufacturer representative for Motorola, including the names of the Motorola representative or representatives making the representations, the time and place of the representations, to whom the representations were made, all reasons you believe these representations were false when made, and all other facts and documents that support your answer.

**RESPONSE:** See Plaintiff's response to Interrogatory No. 1 above. By way of further response, Plaintiff states that representations were made by Ed Kaczor, Larry Terry and Jeanne Kolasa that POS commissions would be at least $10,000 per month based upon a 5% commission rate. Initially, Plaintiff requested a 10% commission rate, but Defendant declined to accept such a rate, indicating that sales were in the approximate range of $2 million to $3 million per year, sufficient enough to drive a $10,000 per month commission payment based upon an agreed-upon 5% commission rate. As identified through discovery, Defendant knew commission payments at a 5% rate would reach a maximum of only $5,000 per month based on historical run rates. *See* MOTJ00556. In reality, the monthly commissions Plaintiff received following execution of the Agreement were far below even this historical-based calculation given Defendant's neglect (through a 78% reduction in the MCG in-house representatives) of the demand creation component of the embedded technologies division. *See, e.g.*, MOT00757.

3.    Identify and describe with specificity any and all representations you believe Motorola made to JST as to the expected integration of JST into the Motorola business model, including the names of the Motorola representative or representatives making the representations, the time and place of the representations, to whom the representations were made, all reasons you believe these representations were false when made, and all other facts and documents that support your answer.

4

**RESPONSE:** See Plaintiff's responses to Interrogatory Nos. 1 and 2 above. Pursuant to Rule 33(d), Plaintiff identifies the following documents: MOTJ 01073-78 and MOT 01873-1901.

4.    Identify and describe with specificity any other representations or material false statements you believe Motorola made to JST on which JST relied to its detriment, including the names of the Motorola representative or representatives making the representations, the time and place of the representations, to whom the representations were made, all reasons you believe these representations were false when made, and all other facts and documents that support your answer.

**RESPONSE:** The above-referenced individuals also made representations concerning client referrals to Plaintiff for the non-competing product lines as well as various other benefits derived from Plaintiff's entry into the embedded technologies marketplace.

5.    Identify and describe with specificity each and every way JST relied on Motorola's purported representations of a long-lasting relationship, of expected profitability, of expected integration, and any other representation or false statements you believe Motorola to have made and on which JST relied to its detriment, including but not limited to how JST invested more than $500,000 supporting Motorola's sales objectives in Canada, as alleged in paragraph 13 of your complaint, how JST expended "substantial capital" as alleged in paragraph 53 of the complaint, and all other facts and documents that support your answer.

**RESPONSE:** Plaintiff incurred substantial expenses (payroll, technology, training, travel, marketing, etc.) through the demand creation and design-in phases of working with original equipment manufacturers ("OEM") and other customers. Plaintiff incurred costs and additional overhead in monitoring and complying with the demand fulfillment aspect of the relationship. Further, there were certain opportunity costs (both within and outside of the embedded technologies marketplace) associated with Plaintiff's exclusive relationship with Motorola. Indeed, Plaintiff reassigned various existing employees to work on Motorola's line when they were previously working on other projects. *See also* Responses to Interrogatory Nos. 1, 2 and 3 above.

6.     Describe how JST calculated its anticipated profit of $100,000 for sales of Motorola products for the first year of the parties' Agreement, as alleged in paragraph 13 of the complaint, and all facts and documents that support your answer.

**RESPONSE:** Plaintiff misstated the definition for the $100,000 identified in paragraph 13 of its Complaint. That figure is more accurately defined as gross commission revenue. Ed Kaczor, Marc Watts, Larry Terry and Jeanne Kolasa made representations as to present and historical run rates that would drive approximately $10,000 in gross commission payments per month under the JST Agreement. These representations were made to Claude Langlois and Jeff Gibson.

7.     Explain what you mean in paragraph 13 of the complaint and how it relates to JST when you refer to expenditures as "collectively envisioned by the parties to support the sale of Motorola's products under the respective agreements" and identify all facts and documents that support your answer.

**RESPONSE:** By the very framework of the uncommitted, committed and design win phases, Plaintiff was required to expend substantial amounts of capital in personnel, training, marketing and travel expenses, amongst other costs. During the September 2003 meeting in Boston, Massachusetts, Jeff Gibson informed Motorola (through Kevin Parslow and Steven Machernis) that JST was behind the curve when it came to revenue and profit realization, or even breaking even with their ongoing investment commitments. Pursuant to Rule 33(d), Plaintiff identifies the following documents: MOTJ 01142, MOTJ 01774, MOTJ 01785, MOTJ 01681 and J2 1675-81.

8.     Describe in detail the "considerable time, energy, and funds" JST expended to support Motorola's sales objectives, as alleged in paragraph 16 of the complaint, in what ways Motorola approved these expenditures, as alleged in paragraph 17 of the complaint, and all facts and documents that support your answer.

6

**RESPONSE:** See Plaintiff's response to Interrogatory No. 5 above.


9.    Identify (as defined in Instruction D) the individuals at JST who negotiated the Agreement with Motorola and describe the length of time it took for the parties to finalize their Agreement, the number of drafts that were circulated to JST before the parties finalized their Agreement, the number of drafts that were circulated to JST before the parties finalized their agreement, each and every basis for the allegation in paragraph 20 of the complaint that Motorola "drafted the material terms of the contracts and presented them on a take it or leave it basis to JST," and all facts and documents that support your answer.

**RESPONSE:** Plaintiff objects to this interrogatory to the extent this information is

equally accessible to Motorola. Pursuant to Rule 33(d), Plaintiff identifies its Answering Brief in

Opposition to Defendant's Motion to Dismiss and the Declaration of Jeffrey Gibson submitted

therewith. Further, Plaintiff states that Claude Langlois and Mike Nykoluk represented JST

during the contract negotiations. While there was only one contract that was proposed, there

were communications between the parties concerning certain provisions contained in

Defendant's self-proclaimed standard contract. These communications were necessitated by

Defendant's representation before, during and after the negotiations surrounding the execution of

the contract.


10.    Describe each and every basis for the allegation in paragraph 21 of the complaint that Motorola knew JST was "expending substantial sums of capital" to sell Motorola products and all facts and documents that support your answer.

**RESPONSE:** See Plaintiff's response to Interrogatory No. 7 above. Defendant knew,

through various progress emails, telephone calls and teleconferences that JST was making a

substantial investment in the Motorola product line pursuant to the requirements of the

agreement and the parties' understanding of the manufacturer representatives' role in the new

marketing strategy. By the very framework of the uncommitted, committed and design win

phases, Plaintiff was required to expend substantial amounts of capital in personnel, training, marketing and travel expenses, amongst other costs.

11.    Describe each and every basis for the allegation in paragraph 24 of the complaint that after the JST Agreement expired, the parties waived the requirement of a writing in order to renew the contract's term, including but not limited to what "conduct," "words," and "deeds" support JST's allegation that the parties "continued to operate in accordance with the terms and conditions of the JST Agreement as though it had been renewed" and all facts and documents that support your answer.

**RESPONSE:**    Following the purported expiration of the JST Agreement in December 2003, Motorola continued to transact business with JST and their combined customer base as if the Agreement had been renewed (indeed, by conduct later affirmed by an addendum to the JSO Agreement, Motorola and JSO conducted business in the JSO territory before a fully-executed agreement was in place). Through JST's post-December 2003 interaction with Ed Kaczor, Steve Machernis and others at Motorola, both parties operated as if the Agreement was renewed. This complied with JST understanding of the manufacturer representative relationship and prior representations made by Defendants before, during and after the negotiations leading to the execution of the JST Agreement. All routine and customary interactions between the parties proceeded as if Motorola was honoring it representations as to a long-term relationship. Accordingly, Motorola had waived requirement that a renewal be in writing or acquiesced to parties' failure to enter into a formal written agreement to renewal the Agreement.

Alternatively, Motorola's continuing conduct, post-December 2003, as to the following activities constituted sufficient written acknowledgement that the Agreement was renewed: (i) written commission payments and reconciliations sent to JST; (ii) written correspondence with JST concerning uncommitted, committed and design win opportunities occurring after December 4, 2003; and (iii) written confirmation concerning upcoming marketing events at tradeshows and/or conventions.

12.    Describe each and every basis for the allegation in paragraph 27 of the complaint that Motorola's letter dated February 26, 2004 to JST was defective or void, how it failed to terminate the parties' relationship, and all facts and documents that support your answer.

**RESPONSE:**    The termination letter was defective and/or void given the fact that the

Agreement had not expired "by its terms."  Given the fact that the Agreement had not "expired

by its terms" the termination letter did not purport to relay any other basis for termination, valid

or not.  *See also* Plaintiff's response to Interrogatory No. 11 above.

13.    Describe with specificity how JST met its obligations under the parties' Agreement, as alleged in paragraph 32 of the complaint, and all facts and documents that support your answer.

**RESPONSE:**    Plaintiff objects to this interrogatory to the extent Plaintiff's performance

under the JST Agreement is not a fact at issue in this litigation.  By way of further response,

Plaintiff states that it complied with all terms and conditions under the Agreement.  JST's

compliant performance under the Agreement confirmed by Ed Kaczor shortly before Motorola's

unlawful termination.

14.    Explain what you mean in paragraph 3 of your disclosure statement and how it relates to JST when you write that "Plaintiffs have incurred in excess of $750,000 to design-in Motorola products with Plaintiffs' customers in reliance on Defendant's representations of fact" and identify all facts and documents that support your answer.

**RESPONSE:**    See Plaintiff's response to Interrogatory No. 5 above.  At a minimum,

Plaintiff is due the additional commission payments under the Agreement, given proper

expiration of the Agreement following its one-year anniversary and a *bona fide* decision not to

renew by either party.  Alternatively, Plaintiff forecasted a substantial return on investment after

the first two years under the Agreement. Had Defendant complied with the representations made

both before, during and after the negotiations leading to the execution of the Agreement, Plaintiff

would have realized a return on investment depicted in J2 1675. Plaintiff's expectations are also

partially substantiated by Motorola's own "uplift" calculations of commissions owing under the

Agreement, given the historical run rates for sales.

Plaintiff may, in accordance with the requirements of the scheduling order, designate a

trial expert to provide additional testimony on this subject. Accordingly, Plaintiff reserves its

right to amend or supplement this response.


15.    Explain in detail JST's computation of damages, including but not limited to its
method of calculation, how JST together with JSO has incurred in excess of $750,000 in
damages as set forth in JST's disclosure statement, and all facts and documents that support this
computation.

**RESPONSE:** See Plaintiff's response to Interrogatory Nos. 5, 6 and 14 above and JSO's

responses to Defendant's First Set of Interrogatories.


16.    If you deny request for admission no. 1, explain why.

**RESPONSE:** See Plaintiff's response to Interrogatory No. 11 above.

## RESPONSES TO REQUESTS FOR PRODUCTION

1.    Please produce any and all documents that support your responses to Motorola's interrogatories or that you consulted or referred to in responding to these interrogatories.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

2.    Please produce any and all documents relating to any representations you believe Motorola made to JST regarding the anticipated duration of Motorola's relationship with JST.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

3.    Please produce any and all documents relating to any representations you believe Motorola made to JST regarding the expected profitability of JST as a manufacturer representative for Motorola.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

4.    Please produce any and all documents relating to any representations you believe Motorola made to JST regarding the expected profitability of JST into the Motorola business model.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

5.    Please produce any and all documents relating to any other representations or false statements you believe Motorola made to JST on which JST relied to its detriment.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

11

6.    Please produce any and all documents supporting your contention that JST relied on representations Motorola made about a long-lasting relationship, expected profitability, expected integration, and any other representations or false statements you believe Motorola made to JST on which JST relied to its detriment.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

7.    Please produce any and all documents supporting JST's contention that it anticipated a profit of $100,000 for sales of Motorola products for the first year of the parties' Agreement.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

8.    Please produce any and all documents supporting JST's contention that it expended "considerable time, energy, and funds" to support Motorola's sales objectives.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

9.    Please produce all documents relating to the negotiation and drafting of JST's Agreement with Motorola, including but not limited to all correspondence between Motorola and JST, all correspondence between employees at JST involved in negotiation and drafting the parties' Agreement, all notes created by employees at JST regarding the negotiation and drafting of the parties' Agreement, and all drafts of the parties' Agreement.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

10.    Please produce any and all documents that support the allegation in paragraph 21 of the complaint that Motorola knew JST was expending substantial sums of capital to sell Motorola products.

**RESPONSE:** All responsive, non-privileged documents have been or will be produced, should any exist.

11.     Please produce any and all documents that support JST's contention that Motorola waived the requirement of a writing in order to renew the parties' Agreement.

**RESPONSE:**  All responsive, non-privileged documents have been or will be produced, should any exist.


12.     Please produce any and all documents that support the allegation in paragraph 32 of the complaint that JST met all of its obligations under the parties' Agreement.

**RESPONSE:**  All responsive, non-privileged documents have been or will be produced, should any exist.


13.     Please produce any and all communications from August 1, 2002 to the present between JST and Motorola and any document that refers or relates to such communications.

**RESPONSE:**  Plaintiff objects to this request as overly broad and unduly burdensome. Plaintiff will not undertake such a search other than as contemplated through its responses to the balance of Defendant's requests.


14.     Please produce any and all documents that support JST's claim for damages and its computation of damages.

**RESPONSE:**     Plaintiff will provide any additional information concerning the computation of damages as required by the expert disclosure deadlines identified in the Court's scheduling order.


15.     Please produce any and all documents sent to or received from any person you expect to call as an expert witness in this case that refer or relate to that person's testimony and/or opinion including but not limited to communications, checks, invoices, or statements, reports, data, analysis, notes, tangible things, and memoranda.

**RESPONSE:**  Plaintiff will provide any additional information concerning the

computation of damages as required by the expert disclosure deadlines identified in the Court's

scheduling order.

AS TO OBJECTIONS:

Dated: December 6, 2005

David A. Felice

Sean J. Bellew (#4072)
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE  19801
Telephone:  (302) 295-2000
Facsimile:  (302) 295-2013
 *Attorneys for Plaintiffs*

Of counsel:
Kevin F. Berry
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103
Telephone:  (215) 665-2000
Facsimile:  (215) 665-2013

# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| J-SQUARED TECHNOLOGIES, INC.; and J-SQUARED TECHNOLOGIES (OREGON), INC., | ) ) ) ) |
| Plaintiffs, | ) ) C.A. No. 04-CV-960-SLR ) |
| vs. | ) ) |
| MOTOROLA, INC., | ) ) |
| Defendant. | ) ) ) |

## DEFENDANT'S RESPONSE TO PLAINTIFFS'
## FIRST REQUEST FOR ADMISSION

Defendant Motorola, Inc., hereby answers Plaintiffs' First Request for Admissions as follows:

### GENERAL OBJECTIONS

1.      Motorola objects to all requests for admission to the extent they are overbroad, vague, ambiguous, unduly burdensome, irrelevant to the subject matter of this litigation, or not reasonably calculated to lead to the discovery of admissible evidence. Motorola has attempted to answer each request based on a reasonable interpretation of the information requested and has specifically stated objections in response to particular requests. But to the extent Motorola and Plaintiffs subsequently differ in their interpretations of what the requests requested, Motorola hereby reserves all rights to object to Plaintiffs' interpretation on the grounds stated in this general objection.

2.      Motorola objects to all requests for admissions to the extent they ask for information that is protected by the work product doctrine and the attorney-client privilege. If any privileged information is inadvertently produced in response to Plaintiffs' requests, there shall be no waiver of Motorola's right to assert these privileges.

3.      Each of the foregoing objections is hereby incorporated in each and every one of the following responses to Plaintiffs' First Request for Admissions, whether or not it is specifically identified.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Motorola objects to Plaintiffs' definition of "documents" in Definition number 4 as overbroad, unduly burdensome, and to the extent that it asks for information that is protected by the work product doctrine and the attorney-client privilege.

2.      Motorola objects to the "time period" noted in Plaintiffs' Instruction number 5 as overbroad, unduly burdensome, irrelevant to the subject matter of this litigation, and not reasonably calculated to lead to the discovery of admissible evidence.

## RESPONSES TO REQUESTS FOR ADMISSION

1.      Admit that Motorola decided to place on hold the execution of all new Manufacturer Representative Agreements as of April 2004.

**Response: Motorola objects to this request as misleading, vague and ambiguous. By April 2004, Motorola had notified the manufacturer representatives that their Agreements would either be terminated for non-performance or not renewed after expiration. Accordingly, Motorola denies that it placed the execution of new Agreements on hold as of April 2004.**

2.      Admit that Motorola did not provide the manufacturer representatives an opportunity to cure following the February 26, 2004 terminations for cause.

1711773.1

**Response:** Motorola objects to this request as overbroad, vague and ambiguous. Subject to and without waiving these objections, Motorola denies this request. While Motorola terminated several manufacturer representatives, including JSO, for failure to meet their performance requirements, Motorola denies that it failed to provide these manufacturer representatives with an opportunity to cure. In fact, Motorola's termination letter to JSO, among others, specifically stated that it would terminate its Agreement "absent JSO's full compliance with, and satisfaction of the performance standards." Motorola also stated that "[s]hould JSO fully cure its noncompliance with, and otherwise satisfy, the performance standards" it did not intend to renew its Agreement with JSO beyond the one-year term. Communicating its intent not to renew beyond the one-year term, however, is quite different from failing to provide the representatives with an opportunity to cure.

3.    Admit that Motorola did not provide JSO an opportunity to cure following the February 26, 2004 termination.

**Response:** Deny. See Motorola's response to Request for Admission No. 2. above.

4.    Admit that the February 26, 2004 termination of the JSO Agreement was a purported termination for cause pursuant to paragraph 4.4 of that Agreement.

**Response:** Deny. As Motorola's termination letter expressly states, it terminated JSO for cause pursuant to section 7.2A.

5.    Admit that no disclosures were made to any manufacturer representatives concerning Motorola's decision to place all new Manufacturer Representative Agreements on hold as of April 2004.

**Response:** Motorola objects to this request as misleading, overbroad, vague and ambiguous. By April 2004, Motorola had notified the manufacturer

representatives that their Agreements would either be terminated for non-performance or not renewed after expiration. Accordingly, Motorola denies that it placed the execution of new Agreements on hold as of April 2004.

To the extent that Plaintiffs intended to ask about April 2003, Motorola denies that it placed execution of the manufacturer representative program on hold as of April 2003. As deposition testimony and documents demonstrate, Mr. Parslow, who became the Director of Worldwide Sales in approximately January 2003, undertook a due diligence review in April 2003. This review was of MCG's contract approval process for all contracts, not just manufacturer representative contracts. (*See* Parslow Depo. beginning at 150:8). After a full review was undertaken, Motorola signed Agreements with seven manufacturer representatives, including JSO. Motorola did not not inform the manufacturer representatives of this due diligence review of the contract approval process, nor was it under any obligation to do so.

6.     Admit that the G9 Policy does not expressly prohibit multi-year third party sales representative agreements.

**Response: Admit.**

7.     Admit that Larry Terry made representations to potential manufacturer representative(s) concerning the expected duration of the manufacturer representative business plan.

**Response: Deny. Mr. Terry had no involvement with any representative other than JST. To the extent that this request seeks information about JST, Motorola denies that Larry Terry made representations to JST concerning the expected duration of the manufacturer representative business plan. For an explanation, see Larry Terry's declaration.**

1711773.1

8.    Admit that Motorola's profit margins were higher in the years following its termination/non-renewal of the manufacturer representatives in February 2004 than it was prior to this time.

**Response:  Motorola objects to this request as vague, ambiguous, irrelevant to the subject matter of this litigation, and not reasonably calculated to lead to the discovery of admissible evidence.  It is unclear what Plaintiffs' mean by "profit margins."  Furthermore, whether the overall profits for Motorola, a multi-billion dollar company, were higher or lower in the years following its termination/non-renewal of the manufacturer representatives is irrelevant to this case.**

9.    Admit that Motorola's profit margins were lower in the years following its termination/non-renewal of the manufacturer representatives in February 2004 than it was prior to this time.

**Response:  See Motorola's response to Request for Admission No. 8.**

1711773.1

DATED:  February 24, 2006.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
William W. Bowser (No. 2239)

and

LEWIS AND ROCA LLP

Randy Papetti
Richard A. Halloran
Cory A. Talbot
40 N. Central Avenue
Phoenix, Arizona  85004
(602) 262-5311

Attorneys for Defendant

6

## CERTIFICATE OF SERVICE

I, Cory A. Talbot, do hereby certify that on February 24, 2006, true and correct copies of Defendant's Response to Planitiffs' Request for Admissions were caused to be served upon counsel of record at the following addresses as indicated:

Via U.S. Mail:

David A. Felice
Cozen O'Connor
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, DE  19801

Kevin F. Berry
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Cory A. Talbot

1711773.1

RD/sp

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC.,)
a Canadian corporation, and )
                             )
J-SQUARED TECHNOLOGIES       )
(OREGON) INC., an Oregon     )        C.A. No. 04-960-SLR
corporation                  )
                             )
      Plaintiffs             )
          v.                 )
                             )
MOTOROLA, INC., a Delaware   )        JURY TRIAL DEMANDED
corporation                  )
                             )
      Defendant              )
                             )
                             )

     This is the Deposition of WILLIAM PAUL HOLT, taken
at the offices of VICTORY VERBATIM REPORTING SERVICES,
Suite 900, Ernst & Young Tower, Toronto-Dominion Centre,
Toronto, Ontario, on the 8th day of December, 2005.

-------------------------

VICTORY
VERBATIM REPORTING SERVICES

W.P. Holt - 124

to what that is going to be, you know, I
would think, you know, what I would do if I
was them.

BY MR. FELICE:

317.            Q.    So if you had a five percent rate
based on historical yearly number, which we have
here as 2002, and it breaks down to a monthly
average of $78,000, is it truthful to make
representations based on that figure in the last
three data points you have for 2002, are less than
$1,000 a month?

            MS. CATES:    Object to form.

            THE DEPONENT:    I would hope nobody was
making any representation based on that
number.  I would be disappointed in anybody
that was pulling that number out, and
showing that to a customer, and making a
representative.  That would have been a big
problem for me.


---    DISCUSSION OFF THE RECORD


---    EXHIBIT NO.  98:    E-mail from Jeanne Kolasa to Sue
                          Hamlett, dated October 11, 2002

# EXHIBIT 4

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES,              :
INC., a Canadian Corp., and          :    No. 04-960-SLR
J-SQUARED TECHNOLOGIES               :
(OREGON) INC., an Oregon             :    JURY TRIAL DEMANDED
Corp.,                               :
                                     :
            Plaintiffs,              :
                                     :
    vs.                              :
                                     :
MOTOROLA, INC., a Delaware           :
Corp.,                               :
                                     :
            Defendant.               :

                    -    -    -

                March 16, 2006
                    -    -    -

        Video deposition of LARRY B. TERRY,
held at COZEN O'CONNOR, P.C., 1201 North Market
Street, Suite 1400, Wilmington, Delaware
19801, on the above date, commencing at 11:00
a.m., before Gwen D. Davenport, Registered
Professional Reporter, Notary Public.


        LOVE COURT REPORTING, INC.
            1500 Market Street
        12th Floor, East Tower
    Philadelphia, Pennsylvania   19102
            (215) 568-5599

Larry B. Terry

1    that point as to the duration of the contract?

2              MS. CATES:  Object to form.

3              THE WITNESS:  No.

4    BY MR. BELLEW:

5         Q    You never made any -- any statements at that

6    point regarding Motorola's intention with -- in terms

7    of what the duration of the contract would be?

8         A    Not in terms of what the duration of the

9    contract would be.  In terms of the duration of the --

10   the expectation of the agreement on the partnership,

11   so to speak, of the intention of what we wanted to do.

12   We -- I was very clear with Jeff that we were

13   interested in a longer term relationship.

14        Q    And how did you communicate that to him?

15        A    It would have been verbally.  And I would say,

16   We're in this -- the premise that I would have set

17   was -- over some length of time our business in Canada

18   had slipped to what I below -- what I believe to be

19   below acceptable levels.  We were disappointing our

20   customers, we really need to shore that up, and what

21   I'm really interested in is building that business

22   back up again over the long-term.

23        Q    And in terms of your own expectations, how

24   long do you think it would take to rebuild that

Larry B. Terry

business up in Canada?

    A    It had taken pretty much four years to erode. It would take at least -- at least two to three years to shore back up again to reasonable levels.

    Q    Did you ever communicate that to Jeff?

    A    We had discussions along that. How long do you think we could -- "How long do you think it would take", Jeff would say, "to build this business back up?"

    Q    Okay.

    MR. BELLEW:  I think we'll just switch the tape.

    THE VIDEOGRAPHER:  We are now going off the record. This completes Tape No. 1.

        (Whereupon, off the record.)

    THE VIDEOGRAPHER:  We are now on the record. This is Videotape No. 2.

    MR. BELLEW:  I'm going to just ask the reporter to read back the last question.

    (The Court Reporter read back the following question and answer: Q. Did you ever communicate that to Jeff? A. We had discussions along that. How long do you think we could -- "How long do you think it would

Larry B. Terry

address that at the end of the contract.

You're aware that there was provisions in these contracts that precluded competition?

A     That's correct.

Q     So, you didn't have to wait to cancel the contract at the end of the year, you could do it immediately if they were competing lines?

A     That's correct.

Q     Your contract with Motorola, you had said if you perform, you'll be renewed. If not, then perhaps you won't be renewed.

A     That's one of several measurements. Yes.

Q     Is it -- do you have a level of -- of good faith at Motorola, that if you do your job and perform, that they will renew your contract each year, isn't that your expectation?

A     I -- that is a reasonable expectation for me to have. Yes.

Q     Okay. Is that -- would that have been a reasonable expectation for J-Squared to have when it -- J-Squared (Canada) had when it entered into its contract, that if -- if it performed --

A     And if --

Q     -- the contract would be renewed?

# EXHIBIT 5

J2 ch

**Claude Langlois**

| | |
|---|---|
| **From:** | Kolasa Jeanne-MCG32018 [Jeanne.Kolasa@motorola.com] |
| **Sent:** | Friday, November 15, 2002 5:40 PM |
| **To:** | Claude Langlois |
| **Cc:** | Terry Larry-MCG32003; Kaczor Edwin-BLUW112; jeff gibson; Mike Nykoluk; Hamlett-Dean Sue-P25026 |
| **Subject:** | MR Agreement |



J2 Rep Agmt 14
nov.doc

Bonjour Claude:

I am pleased to finally (!) send to you the attached Manufacturer's
Representative Agreement.  Exhibits 1 and 2 specify the commission rates
along with MCG house accounts and legacy programs.  I believe all open
contract issues are addressed, however, let me provide clarification on
two items:

Section 3.1        As the contract states, commissions are paid on net
sales price which is defined as actual price paid to Motorola by
customers for direct orders, or the Motorola distributor for indirect
orders less any discounts, refunds, liquidated damages, etc. (for
distribution, this is list minus discount, not POS price).

POS @ cost

Section 7.1        Motorola's G9 policy prohibits the automatic
renewal of TPSR contracts.  Therefore, we must retain the the verbiage
stating that the agreement is in effect for a term of one year and
renewable only upon written agreement of both parties.

Thank you for sending the signed copy of the G9 agreement.  As we
discussed yesterday, Jeff Gibson is speaking to Craig Caldwell at MCG to
work out the financial data needed to close out MCG's G9 requirements.
This will need to be completed prior to final signatures of the
contract.

Have a good weekend and thanks for your patience.

Best Regards,
Jeanne Kolasa



EXHIBIT
Kolasa
84
12-7-05

1

J2 1605

**Kolasa Jeanne-MCG32018**

| | |
|---|---|
| **From:** | Kolasa Jeanne-MCG32018 |
| **Sent:** | Wednesday, October 30, 2002 5:02 PM |
| **To:** | Hamlett-Dean Sue-P25026 |
| **Subject:** | Open Contract Issues for J Squared |

Hi Sue:

Wanted to check with you and see if you had a chance to get the updates done to the J Squared contract.   Below are the other open issues on the contract that they are asking about.   Julie Blair gave me some info on Net Sales and when we pay commissions....we probably want to update the doc with some of this info.   Take a look at the below notes and let me know what you think.

Thanks!

JK

-----Original Message-----
From: Claude Langlois [mailto:langlois@jsquared.com]
Sent: Monday, October 28, 2002 8:35 AM
To: Kolasa Jeanne-MCG32018
Cc: Terry Larry-MCG32003; Kaczor Edwin-BLUW112; jeff gibson; Mike Nykoluk
Subject: RE: Open Contract Issues

Tks Jeanne, i appreciate the follow-up. Based on my notes from our meeting in TOR, i see a couple of points that remain outstanding. Can you give me an understandig as to where you are with the following:

- Section 3.1:     " ...commission will be based upon the Net Sales Prices...". I believe this had to be confirmed, you weren't sure as to how somevof your other reps were getting paid on disti resales.

JK notes - no mods to the contract needed on this one.   Section 3.1 defines net sales for distribution as indirect orders less any discounts, refunds, liquidated damages , sales, etc.   We'll confirm that we are paying on net sales.

- Section 3.1, 2nd paragraph: "...on all orders received for a period of 120 days...". By "orders", I assume we mean shipments ( pls confirm ) and we had talked about extending the period from 120 days to 180.

JK notes - Can we clarify this?  The question is does orders equal shipments? If so, then I'd suggest we change the verbiage to say shipments of backlog through 120 days.   If it means orders, then this implies that we might be shipping and paying commissions to the rep past the 120 day time period.   I believe that Sue and JK decided we'd leave this one at 120 days to give us the flexibility to change the account responsibility more quickly in the event of poor performance.

- Section 3.9:     "...requires written notice to Motorola within ninety ( 90 ) days..." We had asked to extend to 180 days.

JK notes - I believe Sue and JK agreed to change this to 180 days.

- Section 7.1:     "...may be renewed only upon written the written agreement of both parties" . we had asked the agreement get automatically renewed unless terminated as provided in Par. 7.2 .

JK notes - I didn't respond to him on this one because you told me that this was a G9 requirement.   I figure I'll explain this when I send him back the updated document.

1



MOTJ 00380

- Section 3       add a paragraph covering design splits and compensation.
- Section 2.2     J2 Appointment should be exclusive.
- Section 2.7     If J2 appointment is not exclusive then J2 should be allowed to represent manufacturers that compete with MCG.
- Section 3.1     J2 commission based on distribution cost not resale. Should be based on resale.
- Section 3.1     in last paragraph, change "… for a period of 120 days" to "… for a period of 180 days".
- Section 3.4     Commissions are paid to J2 after customer has paid MCG invoice . Should be after customer has been invoiced. If not how will this apply to distribution POS sales?
- Section 3.6     change "… will be effective 90 days" to " … will be effective 180 days".
- Section 3.7     What is purpose of this paragraph?
- Section 3.9     change "…within 90 days" to "… within 180 days".
- Section 4.3     J2 will not translate documents at Motorola's request
- Section 4.9     in 2nd paragraph, 2nd line. The word "may" is used twice ( typo )
- Section 6.1     Confidentiality and Proprietary rights clause must apply for both parties.
- Section 7.1     change "…hereof and thereafter may be renewed only upon the written Agreement of both parties" to "… hereof and will automatically be renewed unless terminated in writing by either party per section 7.2".
- Section 7.2 change all "( 30 ) days" to "( 60 ) days".
- Section 7.2G  Delete paragraph
- Section 7.3     J2 wants to see a 30 days written notice prior to termination taking effect and receive full compensation for direct and distribution shipments 180 days following the date of termination.
- Section 7.3 B  clause has to apply to both parties.
- Section 7.3 D  change " …period of 120 days " to " … period of 180 days".
- Section 9.      Add " MCG and J2 can not solicit each other's employees without written approval".

MOTJ 00381