# EXHIBIT 6

From: Bensted David-G19500
Sent: 4/18/2003 10:43:13 AM (Mountain Time)
To: Watts Marc-BLUW124
CC: Hamlett Sue-P25026
Subject: FW: MR contracts on hold per Kevin Parslow

Marc,

Please below directive from Kevin Parslow.

Additionally, I have received the original ███████████████████
Agreement with Approval Record for signature. As you will note in the email
below, the above referenced agreement is on hold until we receive direction
from Mr. Parslow.

Also, in an effort to expedite the review and approval/signature process,
please send soft copies of the Agreement and Approval Record to those
"Reviewers or Designees" that are identified on the Approval Record (excluding
the V.P./General Manager) as being required to sign with the instruction:

Please review and provide recommended changes or comments to the Agreement, or
sign the Approval Record authorizing the release of the Representative
Agreement. Forward the recommended changes or comments to the undersigned and
the MCG Contracts department or send the signed hardcopy Approval Record to the
MCG Contracts department.

This process will enable those with signature authority to review, modify,
and/or approve the Agreement in parallel, thereby saving a lot of time chasing
down signatures or making adhoc changes.

Let me know what you think.

Regards,


David J. Bensted
Contract Manager
Motorola Computer Group
2900 S. Diablo Way, DW103
Tempe, Arizona U.S.A. 85282

Phone: 602.438.3830
Fax: 602.437.6246


  -----Original Message-----
From: Hamlett Sue-P25026
Sent: Monday, April 07, 2003 3:45 PM
To: Bensted David-G19500
Subject: FW: MR contracts on hold per Kevin Parslow
Importance: High


FYI

*******************************



MOT 02357

Sue Hamlett
Manager, Group Contracts and
  Legal Support
Motorola Computer Group
2900 S. Diablo Way, DW103
Tempe, Arizona U.S.A. 85282

Phone: 602.438.3794
Fax:      602.437.6246
Mobile: 602.228.9789
*********************************

 -----Original Message-----
From: Blair Julie-C17394
Sent: Monday, April 07, 2003 3:45 PM
To: Hamlett Sue-P25026; Nevarez Janie-MCX1677
Subject: MR contracts on hold per Kevin Parslow

Sue/Janie, Nina just spoke with Kevin and he asked us to inform you that no
more Manufacturer Rep contracts                          should be executed
until further notice from him.  He wants to complete a review of the situation
before we make any more commitments.  He said he would communicate to Paul's
team today, but wanted to let you know right away as we believe you are the
control point for the documents.  Thanks, Julie

MOT 02358

# EXHIBIT 7

Commission Estimate for J Squared                **CONFIDENTIAL**
2002 Annual POS for Canada plus tracan direct
comm rate = 5%
excludes Nortel POS

|                        | 2002 Rev |                              |
|------------------------|----------|------------------------------|
| Canada POS             | 536,841  |                              |
| TRACAN direct          | 400,000  | will need to get POS instead |
|                        |          |                              |
| TOTALS                 | 936,841  |                              |
| monthly average POS rev| 78,070   |                              |
| monthly 5% comm        | 3,904    |                              |



This is

Exhibit No. 97

on the examination of:

William P. Holt in

J-squared v Motorola

held on Dec. 8. 2005

VICTORY VERBATIM AA
Reporting Services
Toronto. Ont

MOT 001245

CONFIDENTIAL

Sales in Canada eligible for J-Squared

| | Arrow/Avnet-POS | Tracan-Direct | Total Rev | comm per month |
|---|---|---|---|---|
| Jan-02 | 140,006 | 2,657 | 142,663 | 7,133 |
| Feb-02 | 1,265 | 37,357 | 38,622 | 1,931 |
| Mar-02 | 59,769 | 149,544 | 209,313 | 10,466 |
| Apr-02 | 2,931 | 36,523 | 39,454 | 1,973 |
| May-02 | 24,507 | 9,529 | 34,036 | 1,702 |
| Jun-02 | 28,936 | 106,516 | 135,452 | 6,773 |
| Jul-02 | 53,970 | 2,473 | 56,443 | 2,822 |
| Aug-02 | 62,814 | 20,433 | 83,247 | 4,162 |
| Sep-02 | 9,364 | 20,515 | 29,879 | 1,494 |
| Oct-02 | 5,243 | 5,840 | 11,083 | 554 |
| Nov-02 | 5,462 | | 5,462 | 273 |
| Dec-02 | 12,589 | | 12,589 | 629 |
| | 406,855 | 391,387 | 798,242 | 39,912 |
| | 5% | 5% | | |
| | 20,343 | 19,569 | 39,912 | |

MOT 001246

# EXHIBIT 8

**Blair Julie-C17394**

| | |
|---|---|
| **From:** | Kolasa Jeanne-MCG32018 |
| **Sent:** | Tuesday, December 03, 2002 12:01 PM |
| **To:** | Guibor Nina-Q10503; Blair Julie-C17394; Peterson Brandon-G15159; Van Duyne JoAnn-Q11308 |
| **Subject:** | J-Squared Rep Agreement |



J2 Rep Agmt 25
nov.pdf (Compre...

Hi All:

Attached is the final version of the J-Squared rep agreement.    J-Squared has signed the agreement and Kevin or his designee will sign on our end.   Highlights are:

1)  A flat 5% commission was quoted.
2)  All Nortel projects and the Harris Basestation 8216T project were identified as ineligible for commission payment.
3)  The total 5% commission on POS into Canada is considerably less than the $10K a month we were budgeting as a base run rate payment (we got a deal on this one!), so no specific disty opptys were identified as ineligible for commission payment.
4)  Performance measurements will be developed by the local BDM team (Ed Kaczor and Larry Terry) based upon the guidelines that are set forth and will be added, when ready, as an appendix to this document.

Please let me know if you have any questions.

JK



EXHIBIT
KolaS9
8B
12.7.05

**MOTJ 00114**

# EXHIBIT 9

# CanLII
Canadian Legal Information Institute



FRANÇAIS

Canada >> Statutes and Regulations >> Consolidated Statutes of Canada >>
Competition Act, [R.S., 1985, c. C-34]

[<< Previous] [Table of Contents] [Noteup] [Next >>]

---

### Competition Act
### PART VII.1: DECEPTIVE MARKETING PRACTICES
### Reviewable Matters

Misrepresentations
to public

**74.01** (1) A person engages in reviewable conduct who, for the purpose of promoting, directly or indirectly, the supply or use of a product or for the purpose of promoting, directly or indirectly, any business interest, by any means whatever,

(a) makes a representation to the public that is false or misleading in a material respect;

(b) makes a representation to the public in the form of a statement, warranty or guarantee of the performance, efficacy or length of life of a product that is not based on an adequate and proper test thereof, the proof of which lies on the person making the representation; or

(c) makes a representation to the public in a form that purports to be

(i) a warranty or guarantee of a product, or

(ii) a promise to replace, maintain or repair an article or any part thereof or to repeat or continue a service until it has achieved a specified result,

if the form of purported warranty or guarantee or promise is materially misleading or if there is no reasonable prospect that it will be carried out.

Ordinary price:
suppliers generally

(2) Subject to subsection (3), a person engages in reviewable conduct who, for the purpose of promoting, directly or indirectly, the supply or use of a product or for the purpose of promoting, directly or indirectly, any business interest, by any means whatever, makes a representation to the public concerning the price at which a product or like products have been, are or will be ordinarily supplied where suppliers generally in the relevant geographic market, having regard to the nature of the product,

(a) have not sold a substantial volume of the product at that price or a higher price within a reasonable period of time before or after the making of the representation, as the case may be; and

(b) have not offered the product at that price or a higher price in

good faith for a substantial period of time recently before or immediately after the making of the representation, as the case may be.

Ordinary price: supplier's own

(3) A person engages in reviewable conduct who, for the purpose of promoting, directly or indirectly, the supply or use of a product or for the purpose of promoting, directly or indirectly, any business interest, by any means whatever, makes a representation to the public as to price that is clearly specified to be the price at which a product or like products have been, are or will be ordinarily supplied by the person making the representation where that person, having regard to the nature of the product and the relevant geographic market,

(a) has not sold a substantial volume of the product at that price or a higher price within a reasonable period of time before or after the making of the representation, as the case may be; and

(b) has not offered the product at that price or a higher price in good faith for a substantial period of time recently before or immediately after the making of the representation, as the case may be.

References to time in subsections (2) and (3)

(4) For greater certainty, whether the period of time to be considered in paragraphs (2)(a) and (b) and (3)(a) and (b) is before or after the making of the representation depends on whether the representation relates to

(a) the price at which products have been or are supplied; or

(b) the price at which products will be supplied.

Saving

(5) Subsections (2) and (3) do not apply to a person who establishes that, in the circumstances, a representation as to price is not false or misleading in a material respect.

General impression to be considered

(6) In proceedings under this section, the general impression conveyed by a representation as well as its literal meaning shall be taken into account in determining whether or not the representation is false or misleading in a material respect.

1999, c. 2, s. 22.

---

[About CanLII] [Conditions of Use] [Advanced search] [Help] [Français]
[Privacy Policy] [Mailing Lists] [Technical Library]
[Contact CanLII]

by *LexUM* _____ for the Federation of Law Societies of Canada

# **EXHIBIT 10**

Westlaw.

Page 1

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**


**H**
2005 CarswellOnt 2784

Amertek Inc. v. Canadian Commercial Corp.

AMERTEK INC., AMERKON CAPITAL CORPORATION, LINDA FORDER, executor and trustee
under the last will and testament of WILLIAM FORDER, deceased, and VICTOR MELE
(Plaintiffs / Respondents / Appellants by way of cross-appeal) and CANADIAN
COMMERCIAL CORPORATION, ATTORNEY GENERAL OF CANADA, and FIRST INVESTORS CAPITAL
CORPORATION (Defendants / Appellants / Respondents by way of cross-appeal)

Ontario Court of Appeal

Laskin, MacPherson, Juriansz JJ.A.

Heard: April 25-29, 2005
Judgment: July 5, 2005
Docket: CA C40593


Copyright © CARSWELL,


a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.




Proceedings: reversing *Amertek Inc. v. Canadian Commercial Corp.* (2003), 229 D.L.R. (4th) 419, 39 B.L.R. (3d) 163, 2003
CarswellOnt 3100 (Ont. S.C.J.)

Counsel: Robert C. Taylor, Lisa M. Bolton, John D. McCamus for Amertek Inc.

Alan J. Lenczner, Q.C., Ian R. Dick for Canadian Commercial Corporation and Attorney General of Canada

Subject: Contracts; Corporate and Commercial; Torts; Public; Restitution; Civil Practice and Procedure; Estates and Trusts;
Evidence

Fraud and misrepresentation --- Fraudulent misrepresentation -- Particular relationships -- Fiduciary relationship -- Failure to
disclose

Canadian Commercial Corporation ("CCC") was federal Crown corporation which had mandate to assist Canadian
companies to sell their products in export markets -- When US sought to award contracts for military work, it permitted only
one Canadian company, CCC, to submit bids to compete against US bidders -- In 1984, A Ltd. was small Canadian company
whose business included manufacture of aluminum truck bodies for dump trucks and garbage trucks -- In 1985, CCC and A
Ltd. entered into contract by which A Ltd. agreed to design and build 362 multi-purpose fire crash trucks for US Army -- In
late 1989, A Ltd. discovered, for first time, that it was losing money on US Army contract -- In 1996, A Ltd. commenced

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

action against CCC, alleging that CCC had abused its role by duping A Ltd. into entering into contract which it could not perform at its bid price -- According to A Ltd., CCC was potentially liable for re-procurement penalty pursuant to CCC's direct contract with US Army -- Penalty would be imposed if another Canadian company, which had initially won contract but which was in financial trouble, could not perform it, and US Army then awarded replacement contract to higher bidder among American companies -- According to A Ltd., CCC was desperate to avoid penalty and recruited A Ltd. to replace first Canadian company, K Inc., even though CCC knew that A Ltd. could not perform contract at its bid price -- Trial judge found liability against CCC on four bases: tort of deceit, breach of fiduciary duty, breach of contract and unjust enrichment -- CCC appealed -- Appeal allowed -- No "mutual understanding" that CCC had relinquished its own self-interest and had agreed to act solely on A Ltd.'s behalf -- In context of commercial contract, both parties acted in their own self-interest throughout -- Accordingly, trial judge mischaracterized as fiduciary relationship what was essentially commercial relationship.

**Fraud** and misrepresentation --- Fraudulent **misrepresentation** -- Specific **elements** -- Miscellaneous **elements**

Canadian Commercial Corporation ("CCC") was federal Crown corporation which had mandate to assist Canadian companies to sell their products in export markets -- When US sought to award contracts for military work, it permitted only one Canadian company, CCC, to submit bids to compete against US bidders -- In 1984, A Ltd. was small Canadian company whose business included manufacture of aluminum truck bodies for dump trucks and garbage trucks -- In 1985, CCC and A Ltd. entered into contract by which A Ltd. agreed to design and build 362 multi-purpose fire crash trucks for US Army -- In late 1989, A Ltd. discovered, for first time, that it was losing money on US Army contract -- In 1996, A Ltd. commenced action against CCC, alleging that CCC had abused its role by duping A Ltd. into entering into contract which it could not perform at its bid price -- According to A Ltd., CCC was potentially liable for re-procurement penalty pursuant to CCC's direct contract with US Army -- Penalty would be imposed if another Canadian company, which had initially won contract but which was in financial trouble, could not perform it, and US Army then awarded replacement contract to higher bidder among American companies -- According to A Ltd., CCC was desperate to avoid penalty and recruited A Ltd. to replace first Canadian company, K Inc., even though CCC knew that A Ltd. could not perform contract at its bid price -- Trial judge found liability against CCC on four bases: tort of deceit, breach of fiduciary duty, breach of contract and unjust enrichment -- CCC appealed -- Appeal allowed -- Trial judge erred in his conclusions on both misrepresentation (fraud) and reliance components of tort of deceit -- Standard of review on issue of deceit is that trial judge's conclusions should be upheld unless they constitute palpable and overriding error, or are "clearly wrong" -- When Department of Supply and Services representative said at meeting with A Ltd. on May 28, 1985, that "this was a profitable contract", he was merely reiterating what A Ltd. and other contractors, experienced companies all, already thought -- While A Ltd. ultimately lost money on contract, A Ltd. thought, and its auditors confirmed, that it would make rich profit on contract until late 1989.

Crown --- Contractual principles regarding Crown -- Formation of contract with Crown -- Procedure on tender of contract

Canadian Commercial Corporation ("CCC") was federal Crown corporation which had mandate to assist Canadian companies to sell their products in export markets -- When US sought to award contracts for military work, it permitted only one Canadian company, CCC, to submit bids to compete against US bidders -- In 1984, A Ltd. was small Canadian company whose business included manufacture of aluminum truck bodies for dump trucks and garbage trucks -- In 1985, CCC and A Ltd. entered into contract by which A Ltd. agreed to design and build 362 multi-purpose fire crash trucks for US Army -- In late 1989, A Ltd. discovered, for first time, that it was losing money on US Army contract -- In 1996, A Ltd. commenced action against CCC, alleging that CCC had abused its role by duping A Ltd. into entering into contract which it could not perform at its bid price -- According to A Ltd., CCC was potentially liable for re-procurement penalty pursuant to CCC's direct contract with US Army -- Penalty would be imposed if another Canadian company, which had initially won contract but which was in financial trouble, could not perform it, and US Army then awarded replacement contract to higher bidder among American companies -- According to A Ltd., CCC was desperate to avoid penalty and recruited A Ltd. to replace first Canadian company, K Inc., even though CCC knew that A Ltd. could not perform contract at its bid price -- Trial judge found liability against CCC on four bases: tort of deceit, breach of fiduciary duty, breach of contract and unjust enrichment -- CCC appealed -- Appeal allowed -- Trial judge erred in his conclusions on both misrepresentation (fraud) and reliance components of tort of deceit -- Standard of review on issue of deceit is that trial judge's conclusions should be upheld unless they constitute palpable and overriding error, or are "clearly wrong" -- When Department of Supply and Services representative said at meeting with A Ltd. on May 28, 1985, that "this was a profitable contract", he was merely reiterating

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

what A Ltd. and other contractors, experienced companies all, already thought -- While A Ltd. ultimately lost money on contract, A Ltd. thought, and its auditors confirmed, that it would make rich profit on contract until late 1989.

Crown --- Contractual principles regarding Crown -- Miscellaneous issues

Fiduciary relationship with Crown -- Canadian Commercial Corporation ("CCC") was federal Crown corporation which had mandate to assist Canadian companies to sell their products in export markets -- When US sought to award contracts for military work, it permitted only one Canadian company, CCC, to submit bids to compete against US bidders -- In 1984, A Ltd. was small Canadian company whose business included manufacture of aluminum truck bodies for dump trucks and garbage trucks -- In 1985, CCC and A Ltd. entered into contract by which A Ltd. agreed to design and build 362 multi-purpose fire crash trucks for US Army -- In late 1989, A Ltd. discovered, for first time, that it was losing money on US Army contract -- In 1996, A Ltd. commenced action against CCC, alleging that CCC had abused its role by duping A Ltd. into entering into contract which it could not perform at its bid price -- According to A Ltd., CCC was potentially liable for re-procurement penalty pursuant to CCC's direct contract with US Army -- Penalty would be imposed if another Canadian company, which had initially won contract but which was in financial trouble, could not perform it and US Army then awarded replacement contract to higher bidder among American companies -- According to A Ltd., CCC was desperate to avoid penalty and recruited A Ltd. to replace first Canadian company, K Inc., even though CCC knew that A Ltd. could not perform contract at its bid price -- Trial judge found liability against CCC on four bases: tort of deceit, breach of fiduciary duty, breach of contract and unjust enrichment -- CCC appealed -- Appeal allowed -- No "mutual understanding" that CCC had relinquished its own self-interest and had agreed to act solely on A Ltd.'s behalf -- In context of commercial contract, both parties acted in their own self-interest throughout -- Accordingly, trial judge mischaracterized as fiduciary relationship what was essentially commercial relationship.

Fraud and misrepresentation --- Fraudulent misrepresentation -- Particular relationships -- Fiduciary relationship -- General

Fiduciary relationship with Crown -- Canadian Commercial Corporation ("CCC") was federal Crown corporation which had mandate to assist Canadian companies to sell their products in export markets -- When US sought to award contracts for military work, it permitted only one Canadian company, CCC, to submit bids to compete against US bidders -- In 1984, A Ltd. was small Canadian company whose business included manufacture of aluminum truck bodies for dump trucks and garbage trucks -- In 1985, CCC and A Ltd. entered into contract by which A Ltd. agreed to design and build 362 multi-purpose fire crash trucks for US Army -- In late 1989, A Ltd. discovered, for first time, that it was losing money on US Army contract -- In 1996, A Ltd. commenced action against CCC, alleging that CCC had abused its role by duping A Ltd. into entering into contract which it could not perform at its bid price -- According to A Ltd., CCC was potentially liable for re-procurement penalty pursuant to CCC's direct contract with US Army -- Penalty would be imposed if another Canadian company, which had initially won contract but which was in financial trouble, could not perform it, and US Army then awarded replacement contract to higher bidder among American companies -- According to A Ltd., CCC was desperate to avoid penalty and recruited A Ltd. to replace first Canadian company, K Inc., even though CCC knew that A Ltd. could not perform contract at its bid price -- Trial judge found liability against CCC on four bases: tort of deceit, breach of fiduciary duty, breach of contract and unjust enrichment -- CCC appealed -- Appeal allowed -- No "mutual understanding" that CCC had relinquished its own self-interest and had agreed to act solely on A Ltd.'s behalf -- In context of commercial contract, both parties acted in their own self-interest throughout -- Accordingly, trial judge mischaracterized as fiduciary relationship what was essentially commercial relationship.

Contracts --- Performance or breach -- Collateral contracts

Canadian Commercial Corporation ("CCC") was federal Crown corporation which had mandate to assist Canadian companies to sell their products in export markets -- When US sought to award contracts for military work, it permitted only one Canadian company, CCC, to submit bids to compete against US bidders -- In 1984, A Ltd. was small Canadian company whose business included manufacture of aluminum truck bodies for dump trucks and garbage trucks -- In 1985, CCC and A Ltd. entered into contract by which A Ltd. agreed to design and build 362 multi-purpose fire crash trucks for US Army -- In late 1989, A Ltd. discovered, for first time, that it was losing money on US Army contract -- In 1996, A Ltd. commenced action against CCC, alleging that CCC had abused its role by duping A Ltd. into entering into contract which it could not perform at its bid price -- According to A Ltd., CCC was potentially liable for re-procurement penalty pursuant to CCC's

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

direct contract with US Army -- Penalty would be imposed if another Canadian company, which had initially won contract but which was in financial trouble, could not perform it, and US Army then awarded replacement contract to higher bidder among American companies -- According to A Ltd., CCC was desperate to avoid penalty and recruited A Ltd. to replace first Canadian company, K Inc., even though CCC knew that A Ltd. could not perform contract at its bid price -- Trial judge held that CCC breached collateral contract with A Ltd. and also breached implied contractual duty to provide "vital information" to A Ltd. -- CCC appealed -- Appeal allowed -- Trial judge held that there was collateral contract between CCC and A Ltd. on basis of statement of representative of Department of Supply and Services that contract would be profitable -- Trial judge erred in finding that representative's statement was false -- Consequently, no collateral contract arose -- Trial judge's holding on implied contractual duty related to accuracy of nine items of "vital information" -- Nine items were either irrelevant to A Ltd. during contract negotiations or were known by A Ltd.

Restitution --- General principles -- When remedy available

Canadian Commercial Corporation ("CCC") was federal Crown corporation which had mandate to assist Canadian companies to sell their products in export markets -- When US sought to award contracts for military work, it permitted only one Canadian company, CCC, to submit bids to compete against US bidders -- In 1984, A Ltd. was small Canadian company whose business included manufacture of aluminum truck bodies for dump trucks and garbage trucks -- In 1985, CCC and A Ltd. entered into contract by which A Ltd. agreed to design and build 362 multi-purpose fire crash trucks for US Army -- In late 1989, A Ltd. discovered, for first time, that it was losing money on US Army contract -- In 1996, A Ltd. commenced action against CCC, alleging that CCC had abused its role by duping A Ltd. into entering into contract which it could not perform at its bid price -- According to A Ltd., CCC was potentially liable for re-procurement penalty pursuant to CCC's direct contract with US Army -- Penalty would be imposed if another Canadian company, which had initially won contract but which was in financial trouble, could not perform it, and US Army then awarded replacement contract to higher bidder among American companies -- According to A Ltd., CCC was desperate to avoid penalty and recruited A Ltd. to replace first Canadian company, K Inc., even though CCC knew that A Ltd. could not perform contract at its bid price -- Trial judge held that A Ltd. had established claim for unjust enrichment -- CCC appealed -- Appeal allowed -- CCC's conduct in its dealings leading to its contract with A Ltd. was not grounded in fraud or deceit -- Consequently, there was no foundation for trial judge's finding of unjust enrichment.

**Cases considered by *MacPherson J.A.*:**

> *Becker v. Pettkus* (1980), [1980] 2 S.C.R. 834, 117 D.L.R. (3d) 257, 34 N.R. 384, 8 E.T.R. 143, 19 R.F.L. (2d) 165, 1980 CarswellOnt 299, 1980 CarswellOnt 644 (S.C.C.) -- referred to

> *Frame v. Smith* (1987), 78 N.R. 40, [1987] 2 S.C.R. 99, 42 D.L.R. (4th) 81, 23 O.A.C. 84, 42 C.C.L.T. 1, [1988] 1 C.N.L.R. 152, 9 R.F.L. (3d) 225, 1987 CarswellOnt 347, 1987 CarswellOnt 969 (S.C.C.) -- referred to

> *Hodgkinson v. Simms* (1994), [1994] 9 W.W.R. 609, 49 B.C.A.C. 1, 80 W.A.C. 1, 22 C.C.L.T. (2d) 1, 16 B.L.R. (2d) 1, 6 C.C.L.S. 1, 57 C.P.R. (3d) 1, 5 E.T.R. (2d) 1, [1994] 3 S.C.R. 377, 95 D.T.C. 5135, 97 B.C.L.R. (2d) 1, 117 D.L.R. (4th) 161, 171 N.R. 245, 1994 CarswellBC 438, 1994 CarswellBC 1245 (S.C.C.) -- followed

> *Housen v. Nikolaisen* (2002), 2002 SCC 33, 2002 CarswellSask 178, 2002 CarswellSask 179, 286 N.R. 1, 10 C.C.L.T. (3d) 157, 211 D.L.R. (4th) 577, [2002] 7 W.W.R. 1, 219 Sask. R. 1, 272 W.A.C. 1, 30 M.P.L.R. (3d) 1, [2002] 2 S.C.R. 235 (S.C.C.) -- followed

> *Hunt v. TD Securities Inc.* (2003), 175 O.A.C. 19, 229 D.L.R. (4th) 609, 36 B.L.R. (3d) 165, 66 O.R. (3d) 481, 39 C.P.C. (5th) 206, 2003 CarswellOnt 3141 (Ont. C.A.) -- considered

> *International Corona Resources Ltd. v. Lac Minerals Ltd.* (1989), 6 R.P.R. (2d) 1, 44 B.L.R. 1, 35 E.T.R. 1, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.*) 69 O.R. (2d) 287, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.*) 61 D.L.R. (4th) 14, 101 N.R. 239, 36 O.A.C. 57, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.*) [1989] 2 S.C.R. 574, (sub nom. *LAC Minerals Ltd. v. International*

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

*Corona Resources Ltd.)* 26 C.P.R. (3d) 97, 1989 CarswellOnt 126, 1989 CarswellOnt 965 (S.C.C.) -- referred to

*L. (H.) v. Canada (Attorney General)* (2005), 2005 SCC 25, 2005 CarswellSask 268, 2005 CarswellSask 273, 24 Admin. L.R. (4th) 1, 8 C.P.C. (6th) 199 (S.C.C.) -- referred to

*Martel Building Ltd. v. R.* (2000), 2000 SCC 60, 2000 CarswellNat 2678, 2000 CarswellNat 2679, 36 R.P.R. (3d) 175, (sub nom. *Martel Building Ltd. v. Canada)* 193 D.L.R. (4th) 1, (sub nom. *Martel Building Ltd. v. Canada)* 262 N.R. 285, 3 C.C.L.T. (3d) 1, 5 C.L.R. (3d) 161, 186 F.T.R. 231 (note), (sub nom. *Martel Building Ltd. v. Canada)* [2000] 2 S.C.R. 860 (S.C.C.) -- referred to

*Peek v. Derry* (1992), 3 C.L.R. (2d) 1, (sub nom. *Bank of Montreal v. Bail Ltée)* 93 D.L.R. (4th) 490, (sub nom. *Bank of Montreal v. Bail Ltée)* [1992] 2 S.C.R. 554, (sub nom. *Bank of Montreal v. Bail Ltée)* [1992] R.R.A. 673, (sub nom. *Banque de Montréal c. Hydro-Québec)* 138 N.R. 185, (sub nom. *Bank of Montreal v. Bail Ltée)* 48 Q.A.C. 241, 1992 CarswellQue 117 (S.C.C.) -- referred to

*R. v. W. (R.)* (1992), 13 C.R. (4th) 257, 137 N.R. 214, (sub nom. *R. c. W.)* [1992] 2 S.C.R. 122, 54 O.A.C. 164, 74 C.C.C. (3d) 134, 1992 CarswellOnt 90, 1992 CarswellOnt 991 (S.C.C.) -- referred to

*978011 Ontario Ltd. v. Cornell Engineering Co.* (2001), 2001 CarswellOnt 1290, 8 C.C.E.L. (3d) 169, 12 B.L.R. (3d) 240, 198 D.L.R. (4th) 615, 144 O.A.C. 262, 53 O.R. (3d) 783 (Ont. C.A.) -- referred to

**Statutes considered:**

*Canadian Commercial Corporation Act*, R.S.C. 1985, c. C-14

Generally -- referred to

APPEAL by Crown of judgment reported at *Amertek Inc. v. Canadian Commercial Corp.* (2003), 229 D.L.R. (4th) 419, 39 B.L.R. (3d) 163, 2003 CarswellOnt 3100 (Ont. S.C.J.), finding Crown corporation liable for breach of contract, breach of fiduciary duty and tort of deceit.

*MacPherson J.A.*:

### A. Introduction

1    Canadian Commercial Corporation ("CCC") is a federal Crown corporation wholly owned by the Government of Canada. One of its mandates is to assist Canadian companies to sell their products in export markets.

2    Since 1956, CCC has had a commercial relationship with the United States Government (the "USG"). Indeed, when the USG seeks to award contracts for military work, it permits only one Canadian company, CCC, to submit bids, to compete against U.S. bidders, and to enter into contracts with the USG for such work.

3    In 1984, Belgium Standard Limited ("BSL") was a reasonably small Canadian company whose business included a small operation in Waterloo, Ontario where it manufactured aluminum truck bodies for dump trucks and garbage trucks.

4    In 1985, after extensive negotiations, CCC and BSL entered into a contract by which BSL agreed to design and build 362 multi-purpose fire crash trucks for the U.S. Army. The contract price was US$130,300 per vehicle for a total of US$47,181,413.

5    BSL, which changed its name to Amertek Inc. ("Amertek") shortly after it entered into the contract on October 3, 1985, had never designed or built such sophisticated military equipment. Nevertheless, from 1986 to 1989, Amertek built 320 of the 362 trucks. The U.S. Army accepted and paid for all of them.

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

6    Amertek's design and manufacturing performance was so good that in November 1989 the U.S. Navy contracted with
Amertek, again through CCC, for 118 fire crash vehicles. Amertek performed this contract to the complete satisfaction of the
U.S. Navy.

7    In late 1989, Amertek discovered, for the first time, that it was losing money on the U.S. Army contract. In February
1990, the President of Amertek was dismissed, 80 employees were laid off, and the production line for the U.S. Army trucks
was shut down. Eventually, with the assistance of Canadian investors, the production line re-opened and the remaining 42
trucks were built and delivered to the U.S. Army. Amertek was paid the full contract price, US $47,181,413.

8    In 1996, Amertek commenced an action against CCC. It alleged that CCC had abused its role by duping Amertek into
entering into a contract which it could not perform at its bid price. The reason CCC did this, according to Amertek, was that
CCC was potentially on the hook for a re-procurement penalty pursuant to CCC's direct contract with the U.S. Army. This
penalty -- potentially in the CDN$10-$14 million range -- would be imposed if another Canadian company, which had
initially won the contract but which was in financial trouble, could not perform it and the U.S. Army then awarded a
replacement contract to a higher bidder, an American company. According to Amertek, CCC was desperate to avoid this
penalty and recruited Amertek to replace the first Canadian company, King Seagrave (1982) Inc. ("KS"), even though CCC
knew that Amertek could not perform the contract at its bid price.

9    The trial unfolded over a five-month period in 2002. Thirteen months later, in August 2003, the trial judge, O'Driscoll J.,
delivered a 197-page judgment. His judgment, on almost every issue and certainly in total, was a spectacular victory for
Amertek and a complete and devastating loss for CCC.

10    The trial judge found liability against CCC on four bases -- the tort of deceit, breach of fiduciary duty, breach of
contract and unjust enrichment.

11    The trial judge did not award damages because Amertek did not seek them. He accepted Amertek's submission that the
appropriate remedy was disgorgement by CCC of the re-procurement penalty it would have had to pay to the USG if it had
not improperly seduced Amertek into stepping into the contract when KS could not fulfil the initial contract. He fixed the
amount CCC had to disgorge to Amertek at US$26,507,000.

12    The trial judge also awarded punitive damages of CDN$500,000 to Amertek.

13    The trial judge awarded costs to the plaintiffs on a substantial indemnity basis fixed at CDN$3,284,508.50 and
disbursements of CDN$792,457.80. He also awarded a costs premium of CDN$2,000,000 to the plaintiffs.

14    CCC appeals virtually every aspect of the trial judge's judgment relating to Amertek, including liability, remedy,
punitive damages and the costs premium.

15    Amertek cross-appeals on several grounds. On the issue of liability, it contends that the trial judge erred by not finding
CCC liable on a fifth basis, misfeasance in public office. Amertek also seeks an increase in punitive damages, compound
interest, and an increase in the costs premium.

**B. Facts**

*(1) The parties and the events*

16    CCC, a federal Crown corporation, was established in 1946 under the *Canadian Commercial Corporation Act*, R.S.C.
1985, c. C-14. One of its roles is to assist Canadian companies to sell their products in export markets where, by reason of
legislation in foreign countries, the transactions must be processed through a government agency.

17    Pursuant to the *Canada-United States Defence Production Sharing Agreement*, CCC may submit bids to the USG for
military work, compete against American bidders, and enter into 'prime contracts' with the USG for such work. CCC bids on

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

behalf of a specific Canadian company, which in turn acts as a subcontractor to CCC. CCC submits the Canadian subcontractor's bid to the USG by "certifying" and "endorsing" the bid to the USG as CCC's own prime contract bid.

18    If CCC's bid is accepted by the USG, CCC enters into a USG contract for the performance of the military work, and CCC is required to subcontract 100 per cent of the work described in the prime contract to its Canadian subcontractor. CCC is prohibited from transferring any of the contract work to any other subcontractor without the USG's prior written consent. The Government of Canada guarantees to the USG that CCC will complete all obligations under each prime contract.

19    In 1984, the USG issued an invitation to bid for the supply of 362 Military Adapted Commercial Equipment or Item multi-purpose fire crash trucks ("MACE or MACI trucks") to be supplied over a five-year period. The MACE trucks had to be light, mobile and configured to be loaded into military aircraft. The trucks had to fulfil three functions -- responding to fires in downed aircraft, in buildings on army bases, and in the brush on or near those bases.

20    KS, a Canadian company, made a bid for this contract. KS was based in Woodstock, Ontario and designed and manufactured municipal fire trucks. KS was wholly owned by Walter of Canada Inc. ("Walter"), a Quebec company controlled by Georges LaPorte, its President. Walter's business included the manufacture of military fire crash trucks.

21    CCC endorsed KS's technical bid, certifying that it was within KS's technical and delivery capabilities. The USG accepted the technical bids of KS and of four American companies.

22    KS then prepared its pricing proposal. The material and labour costing was prepared by William McNeilly, its design engineer. The price was set by LaPorte. The pricing proposal submitted to CCC covered options for 362 MACE trucks. If the USG agreed to purchase all 362 trucks from KS, the price would be US$125,100 per vehicle for a total contract price of US$45,286,452.

23    On August 27, 1984, CCC endorsed and submitted KS's price proposal to the USG as CCC's bid for the prime contract. The four American bidders also submitted pricing proposals on the same day. When opened, the bids were:

```
1. CCC                        US$45,286,452

2. Fire Truck Inc. (FTI)      US$55,535,276

3. Grumman                    US$63,818,232

4. Kovatch                    US$67,398,498

5. Emergency One Inc. (E-1)   US$74,326,610
```

24    Because KS's bid was 23 per cent below the next lowest bid, the USG immediately sent CCC a price verification request. After receiving this request, CCC had the option of withdrawing its bid on the prime contract, with no penalty, or of confirming its price.

25    CCC sent a contracting officer, W.C. Ames, to KS's facility in Woodstock. Ames had been there in July to conduct a facility evaluation. He had toured the plant with McNeilly and determined that KS could produce the MACE trucks and meet a five-year delivery schedule for 362 trucks.

26    Prior to his second visit, Ames reviewed KS's 76-page pricing proposal. On August 30, 1984, he visited KS's facility, met with LaPorte, and made a contemporaneous note:

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

Visited King Seagrave's 30/8/84 to verify their prices. All components costing over $100 were supported by quotations by their suppliers. Components costing under $100 were taken from invoices of recent purchases.

Quotations for major components were presented such as engine, axles, transmissions, steering, fire pump, turrets, etc. and found to be factual. Direct labour was reviewed and found correct based on production orders for recent manufacture. Overhead and burden applied is the same as applied to regular production.

. . . . .

I can guarantee the prices and weight as bid [emphasis in original].

27    CCC confirmed its price to the USG and was awarded the prime contract. On October 5, 1984, CCC entered into a subcontract with KS which was guaranteed by Walter.

28    Almost immediately, KS ran into serious financial difficulties, unrelated to its new contract. On December 18, the National Bank of Canada appointed a Receiver.

29    CCC called on Walter, pursuant to its guarantee, to perform the subcontract.

30    On February 11, 1985, McNeilly, who had been retained by the Receiver to assist with work in progress, made a detailed analysis of the differences among the five bidders' prices for the MACE contract. The purpose of his report was to explain why the KS bid was lower than the other bids. McNeilly reported:

**B. Analysis**

1. None of the above quotations may be compared directly. All individuals bids were made based on each company's own technical proposal, thus the above bids were to quite difference specifications.

We are in possession of certain chassis bids used by bidders 2 and 3. We also know the technical content of bids received by bidders 2, 3 and 4 above from the various suppliers as follows:

i) Hale Pump

ii) Rockwell International

iii) Akron

iv) Duplex

v) approximately 40 suppliers of lower value items relative to the above.

2. Only bidders 1 and 5 build their own chassis thus overhead absorption would display some real advantage.

3. The following features, if employed on the King-Seagrave MM-840 would result on approximate unit selling price differences indicated.

i) Addition of transfer case and attendant controls and drive train.

-- add approximately $10,000

ii) The use of full midship fire pump instead of simple equal quality centrifugal pump.

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

-- add approximately $5,500

iii) The use of a conventional 'T' type water tank instead of the simple cylindrical tank

-- add approximately $2,500

iv) The use of engine fan clutch.

-- add approximately $1,200

v) The use of U.S. Content materials 100% and Labour 100% instead of Canadian content materials 50% and Labour 100%. (using exchange U.S. @ .8 Can.)

-- add approximately $8,000

vi) The use of welded cab/body structure instead of Huck bold construction

-- 50 hours @ 40.00/hr $2,000

vii) The use of Rockwell Magirus front and rear axles instead of Eaton front and rear axles.

-- add approximately $2,000

In addition there are several other minor advantageous design features in the King Seagrave technical proposal which we feel are not in competitive proposals.

Total of i) thru vii) above is $31,200 per unit.

This difference would place King Seagrave between bidders 3 and 4. Conversely, if bidders 2 and 3 had bid on the King Seagrave technical specification, then their bids would have been less than King Seagrave.

It should be remembered that the King Seagrave bid on its own chassis was a total surprise to the other bidders. King Seagrave used the latest technology in preparing its specification (eg. The Eaton axles used and the elimination of the drive transfer case is the most recent fire truck drive technology used on the P-19 U.S. Air Force Crash Truck. None of the above competitors used this system.).

31    By late 1984, BSL, the small company based in Waterloo, Ontario, knew of KS's problems. BSL began to explore the possibility of trying to take over the MACE subcontract. On February 20, 1985, BSL sent a letter to R.V. Hession, the Deputy Minister of the Department of Supply and Services ("DSS"), with copies to various politicians, including the Minister of International Trade, the Minister of Supply and Services and the Minister of Regional Industrial Expansion. In the letter, William Thomas, the President of BSL, described BSL and included financial statements for the six months ending June 30, 1984. Thomas wrote:

It is our understanding the Canadian Government may be considering an alternative source of supply for the above order. Therefore, we respectfully submit an unsolicited proposal to consider Belgium Standard Limited as a viable alternative to supply Tactical Fire Fighting Vehicles for the United States Army....

Belgium Standard Industries, the manufacturing division of Belgium Standard Limited, is located in Waterloo, Ontario. This division has been in business since 1946 manufacturing truck bodies, trailers, and the "Shu-Pak" side-load one-man refuse collection vehicle. The staff of this division comprise of a total of 600 years experience in the transport equipment field.....

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

> At this writing, we have term deposits with the Continental Bank in excess of $1 million (copy of certificate enclosed) and have available a bank line of $1.2 million with a Canadian chartered bank. As our operations have been self-financed for some time, our term deposit funds and our line of credit facilities are available for financing compatible business opportunities to enhance our present operations and provide expanded product lines.

> Further funds can be made available from our present real estate holdings which are encumbered by relatively minor mortgage commitments....

> Without doubt, the above indicates the present financial strength of Belgium Standard Limited and its ability to finance a major project of the magnitude of the MM840 U.S.

> Army Tactical Fire Fighting Vehicle, without the necessity of government funding.

> We submit to you for consideration the following reasons to consider our firm as the alternative supplier for this order:

> 1. Belgium Standard Limited has the financial strength to finance the project.

> 2. Belgium Standard Limited has met with and agreed to work with and employ the present Technical and Engineering Team involved in this project.

> 3. Belgium Standard Limited has expertise in allied transport equipment lines and a reputation of quality products and timely delivery of same....

> 7. Belgium Standard Limited has management and production experience in the transport equipment field.

> 8. Belgium Standard Limited owns many pieces of manufacturing equipment that will be necessary to equip a manufacturing facility to fill the MM840 U.S. army order.... [emphasis in original].

32    On March 1, 1985, BSL hired K.G. Hooton, a former KS salesperson who had been involved in the MACE bid. A week later, when McNeilly's employment with the Receiver ended, BSL hired him as a design engineer.

33    On March 1, 1985, Thomas sent a telex to Prime Minister Mulroney and several federal Cabinet ministers:

> We have learned today that the Services and Supply Canada intend to award a U.S. military contract for 362 tactical fire fighting vehicles -- approximate value US$45 million to a company that is currently in receivership, and whose assets were sold by public auction on February 27, 1985 by a liquidator ....

> We find this decision unfortunate and doomed to failure. A creditable alternative has been proposed by Belgium Standard Limited, and we have not been granted the courtesy of a reply.

> We urge you to become involved with this project and to review the current decision before the contract reverts to the United States.

> Such an action by Truscom of the U.S. military could result in costing the Canadian government and taxpayer in excess of 10 million dollars in penalties.

34    On March 4, the USG sent its first show cause notice to CCC indicating that it was considering terminating CCC's contract. CCC was given ten days to respond. Government documents prepared around this time indicated that the Government could be liable for cancellation charges of CDN$10-14 million if the contract were cancelled.

35    On March 22, CCC agreed to give Walter a price increase on the MACE subcontract of US$4,000 per vehicle. The

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

effect of this decision was that the prime contract between the USG and CCC remained at US$45,286,452 whereas the subcontract between CCC and Walter increased to US$46,734,452. The Canadian Government, not the USG, would be required to cover this difference.

36    At around the same time, CCC had concerns about whether Walter could step into KS's shoes and fulfil the subcontract. CCC commenced discussions with BSL about its interest in the subcontract.

37    On April 3, 1985, BSL submitted to CCC a 50-page formal proposal to manufacture 362 MACE trucks. The price was US$47,794,623, representing US $132,029.34 per vehicle, which was about US$7,000 per vehicle more than KS's original bid and US$3,000 per vehicle more than the price under which Walter was prepared to perform the contract.

38    On April 16, CCC awarded the MACE subcontract to Walter. Throughout April and May, Walter experienced serious financial problems.

39    On May 27, CCC invited BSL representatives to come to Hull to discuss the MACE subcontract. The meeting took place on May 28. At the meeting, Pierre Comeau, DSS's Director General, Industrial and Commercial Products Directorate, told the BSL delegation that "your price is too high" and "the contract is profitable". Thomas, BSL's President, instantly responded by lowering the price by US$2,000 per vehicle because he knew that in BSL's formal price proposal there was an item for a sales commission of US$2,000 per vehicle which BSL would not have to pay. Several days later, BSL formally amended its bid price, lowering it by US$2,000 per vehicle for a total reduction of US$724,000.

40    On June 7, the USG sent a second show cause notice to CCC. CCC terminated the KS/Walter subcontract and on June 17 requested the USG's consent to substitute BSL as the Canadian subcontractor. The USG gave its consent on August 27.

41    From late August to early October, BSL and its solicitors from Campbell Godfrey and Lewtas negotiated with CCC. The result was an 87-page contract signed on October 3. The contract price was US$130,300 per vehicle for a total of US$47,181,413. In November, BSL changed its name to Amertek.

42    In 1986, Amertek was awarded a contract for the construction of 68 fire crash trucks for the Department of Transport. Amertek successfully completed this contract.

43    In November 1986, the U.S. Army approved the first test vehicle and Amertek began the production phase. By the end of 1989, Amertek had built 320 MACE trucks and delivered them to the U.S. Army, which accepted and paid for them.

44    In November 1989, CCC awarded Amertek a subcontract to manufacture 118 fire crash vehicles for the U.S. Navy. Amertek successfully completed this contract.

45    Throughout the 1986-1989 period, there was no hint that anything was wrong at Amertek, including anything relating to the MACE subcontract. Amertek conducted physical inventories twice a year. Ernst & Whinney, its auditor, prepared audited financial statements each year. The 1988 statement recorded a projected profit from the subcontract of CDN$9,000,000.

46    In early 1990, Amertek discovered that it was losing money on the MACE contract, which was more than 85 per cent complete (320 of 362 trucks built, delivered, accepted and paid for). On January 24, Amertek wrote to CCC, indicating that it had incurred a loss:

> While it is not, as of this writing, been finally confirmed by our auditors, it would appear that our total costs for the 362 vehicles (including costs to complete) will total $67,648,000.00 compared to a contract price of $63,238,000.00. All US dollars have been converted at $1.33 Canadian factor. We will therefore have a net cash deficiency of $4.4 million with no contribution to interest, selling, administrative expenses or any profit whatsoever.
>
> During the early part of February, we will require to have available an additional $4.4 million to complete this contract, but will have, in fact, exhausted all progress claims from you.

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

47    On February 1, after announcing its loss, Amertek asked CCC for financial assistance. CCC refused and Amertek shut down its production line and laid off 80 employees. On February 8, Amertek dismissed Thomas, its President.

48    In March, Amertek asked CCC for a loan guarantee. CCC refused and Amertek announced that it was making a proposal to its creditors. The proposal was accepted and Amertek survived. The manufacture of the MACE trucks restarted in October and the remaining 42 trucks were delivered, accepted and paid for.

49    Amertek, with CCC's support, bid on and won contracts for 118 fire crash trucks for the U.S. Navy, as mentioned above, and for 10 crash rescue trucks for the Egyptian Air Force. These contracts were successfully completed by July 1993.

50    On June 10, 1993, Consulting and Audit Canada reported to CCC the result of its audit of the MACE contract for the period September 1, 1985 to December 31, 1991. The auditor reported that the costs of the contract in Amertek's books were US$54,542,663, which exceeded the contract price by US$6,911,648.

51    Citing 3,500 constructual change orders initiated by the U.S. Army, Amertek sought an equitable adjustment of US$17,992,576.71 on the MACE contract. On August 6, 1993, the U.S. Army made an award of US$35,266.76. CCC appealed on behalf of Amertek and ultimately settled the claim for US$375,000.

52    In 1996, Amertek and its investors commenced an action against CCC. [FN1]

53    There are other facts relevant to the appeal. However, I find it convenient to mention those facts in the discussion of the legal issues to which they relate.

*(2) The trial judgment*

54    The trial judge held that Amertek had established CCC's liability on four bases -- the tort of deceit, breach of fiduciary duty, breach of contract and unjust enrichment.

55    As for remedy, the trial judge held that CCC should disgorge the re-procurement penalty it would have had to pay to the USG if Amertek had not stepped into KS/Walter's shoes and performed the MACE contract. The trial judge determined that the second lowest bidder, F.T.I., was in liquidation with only two employees by June 1985. He further held that the third lowest bidder, Grumman, got out of the fire truck business by shortly after 1985. Accordingly, the trial judge concluded that the USG probably would have awarded the contract to the fourth lowest bidder, Kovatch. Calculating the difference between the original KS bid and the Kovatch bid and adding a 10 per cent contingency mark-up, the trial judge awarded Amertek US$26,507,000.

56    The trial judge ordered CCC to pay pre-judgment interest from October 3, 1985, the date of the contract between BSL and CCC. He also chose August 7, 2003, the date of the release of his reasons, as the date for converting U.S. dollars to Canadian dollars.

57    The trial judge awarded Amertek punitive damages of CDN$500,000.

58    The trial judge awarded costs to the plaintiffs on a substantial indemnity basis fixed at CDN$3,284,508.50 and disbursements of CDN$792,457.80. He also awarded a costs premium of CDN$2,000,000. In supplementary reasons, he determined that the plaintiff Amertek was entitled to 70 per cent of these costs.

59    CCC appeals the judgment relating to Amertek in almost every respect, including liability, remedy, punitive damages and the costs premium.

60    Amertek cross-appeals. It contends that the trial judge erred by not finding CCC liable for misfeasance in public office. Amertek also seeks an increase in punitive damages, compound interest, and an increase in the costs premium.

**C. Issues**

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

61    The issues on CCC's appeal are:

  (1) Did the trial judge err by holding that CCC committed the tort of deceit?

  (2) Did the trial judge err by holding that CCC's conduct constituted a breach of fiduciary duty owed to Amertek?

  (3) Did the trial judge err by holding that CCC breached its contract with Amertek?

  (4) Did the trial judge err by holding that CCC's conduct amounted to unjust enrichment?

  (5) Did the trial judge err by ordering the remedy of disgorgement?

  (6) Did the trial judge err by awarding pre-judgment interest or by choosing October 3, 1985 as the date from which to calculate it?

  (7) Did the trial judge err by setting August 7, 2003 as the date for the conversion of U.S. dollars to Canadian dollars?

  (8) Did the trial judge err by awarding punitive damages of CDN$500,000 to Amertek?

  (9) Did the trial judge err by awarding Amertek a costs premium?

62    The issues on Amertek's cross-appeal are:

  (10) Did the trial judge err by concluding that CCC did not commit the tort of misfeasance in public office?

  (11) Did the trial judge err by awarding simple, rather than compound, pre-judgment interest?

  (12) Did the trial judge err by not awarding punitive damages in a higher amount?

  (13) Did the trial judge err by not awarding a costs premium in a higher amount?

**D. Analysis**

*CCC's Appeal*

*(1) The tort of deceit*

63    The trial judge, relying on *Peek v. Derry* (1889), L.R. 14 App. Cas. 337 (U.K. H.L.), and *Lewis N. Klar et al., Remedies in Tort*, vol. 1, (Scarborough: Carswell, 1987+), at 5-11 and 5-14, correctly set out the elements of the tort of deceit:

  (a) the defendant made a false representation of fact to the plaintiff

  (b) the defendant

    (i) knew the representation was false;

    (ii) had no belief in the truth of the representation; or

    (iii) was reckless as to the truth of the representation

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
(Publication page references are not available for this document.)

(c) the defendant intended that the plaintiff should act in reliance on the representation,

(d) the plaintiff did act on the representation

(e) the plaintiff suffered a loss by doing so.

64    The trial judge found that CCC committed the tort of deceit at the meeting between CCC and Amertek[FN2] representatives in Hull on May 28, 1985. The trial judge found:

At the May 28, 1985 general meeting, Pierre Comeau told the BSL personnel that: (a) the MACE contract was profitable and; (b) BSL's price, as set out in its April 3, 1985 proposal, was too high.

. . . . .

It is my conclusion, on all of the evidence, that these statements by P. Comeau at the two meetings on the morning of May 28, 1985 were false, and that he, the maker of the statement, knew they were false.

. . . . .

BSL acted to its detriment by immediately reducing the bid price by US$2,000 per vehicle. There is no doubt BSL suffered grievous losses. Mr. Thomas testified that if he had known the truth, he would never have let BSL got involved in the MACE contract.

I accept the evidence of Mr. Thomas about what took place on May 28, 1995.

65    The appellant contends that the trial judge erred "factually and legally" in this analysis. This submission raises the thorny issue of standard of review.

66    The leading case on standard of review is *Housen v. Nikolaisen* , [2002] 2 S.C.R. 235 (S.C.C.), in which the court held that the standard of review on a pure question of law is correctness whereas on findings of fact it is palpable and overriding error.

67    With respect to the third, or middle, category -- namely a question of mixed fact and law -- the court stated at para. 36:

To summarize, a finding of negligence by a trial judge involves applying a legal standard to a set of facts, and thus is a question of mixed fact and law. Matters of mixed fact and law lie along a spectrum. Where, for instance, an error with respect to a finding of negligence can be attributed to the application of an incorrect standard, a failure to consider a required element of a legal test, or similar error in principle, such an error can be characterized as an error of law, subject to a standard of correctness. Appellate courts must be cautious, however, in finding that a trial judge erred in law in his or her determination of negligence, as it is often difficult to extricate the legal questions from the factual. It is for this reason that these matters are referred to as questions of "mixed law and fact". Where the legal principle is not readily extricable, then the matter is one of "mixed law and fact" and is subject to a more stringent standard. The general rule, as stated in [*Jaegli Enterprises Ltd. v. Taylor*, [1981] 2 S.C.R. 2] is that, where the issue on appeal involves the trial judge's interpretation of the evidence as a whole, it should not be overturned absent palpable and overriding error.

68    In my view, the trial judge's conclusions about what Comeau said at the May 28 meeting (false representations) and their effect on Amertek (reliance) are matters of mixed fact and law. He found crucial facts based on his assessment of the evidence and he applied the law of deceit to those facts. In doing so, since the appellant does not allege that the trial judge misstated the law, his conclusions must be regarded as ones involving his "interpretation of the evidence as a whole". The

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

result is that the standard of review on this issue must be that the trial judge's conclusions should be upheld unless they constitute a palpable and overriding error, or are "clearly wrong", "unreasonable" or "unsupported by the evidence": see *L. (H.) v. Canada (Attorney General),* [2005] S.C.J. No. 24 (S.C.C.) at paras. 55 and 56.

69    Comeau did not testify at the trial. The evidence about what he said at the May 28 meeting came from Thomas, Amertek's President, and William Schultz, the Vice-President of Finance. In his testimony, Thomas described Comeau's statements at the May 28 meeting in this fashion:

> Q. Did Mr. Comeau say anything about the Belgium Standard pricing proposal?

> A. His opening -- his opening remarks centered right in on the proposal I'd have to say in a blustery sort of way, but that's probably Mr. Comeau. *He said that our price was too high. He said that this was a profitable contract,* and he was looking for a price reduction.

> Q. When he used the word 'contract', what did you understand him to mean?

> A. There was no question it was the MACE contract.

> Q. And did you understand that to mean the CCC contract with the U.S. Army?

> A. Yes [emphasis added].

70    Schultz described the contents of what Comeau said at the May 28 meeting in a similar vein:

> Q. Was there any discussion at the meeting regarding Belgium Standard's price in its April 3rd proposal?

> A. There was. As I recall, Mr. Comeau brought up the subject very shortly into the meeting; said that they had reviewed our proposal and our price was too high; and that they believed the contract was profitable and was there something we could do to address the price difference.

Schultz's testimony on this point is confirmed by the contemporaneous notes he made during the meeting, which included: "P.C. Price difference", with "P.C." meaning Pierre Comeau.

71    The appellant contends, as it did at trial, that Comeau's statement was merely an opinion, not a representation of fact, and that only the latter is actionable. The trial judge rejected this submission. I agree with the trial judge. Thomas' description of what Comeau said at the meeting employs the common language of factual assertion, not opinion.

72    The appellant submits that the trial judge erred in concluding that Comeau's statements were lies, that Comeau knew they were lies, and that Amertek relied on the statements in entering into the contract with CCC. Having read all of the evidence relating to the May 28 meeting (as required by *L. (H.) v. Canada (Attorney General)* at para. 56, where the court quotes from *R. v. W. (R.),* [1992] 2 S.C.R. 122 (S.C.C.): "after considering all of the evidence and having due regard to the advantages afforded to the trial judge"), and with great respect to the trial judge, I agree with the appellant's position on this issue. In my view, the trial judge made a palpable and overriding error in reaching these conclusions on a question of mixed fact and law.

73    I begin with Comeau's representations. There was some confusion in the evidence about whether Comeau's statement about profitability related to the original KS bid, the Amertek bid, or both, since Comeau did not testify at trial and no one at the May 28 meeting asked Comeau what he meant. Schultz testified that he thought that Comeau was referring to the KS bid. Thomas, on the other hand, interpreted Comeau's statement in terms of both bids:

> Q. When Mr. Comeau said there's profit in this contract, just so I'm clear, which contract did you understand him to be referring to?

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

> A. We were only there for the MACI.
>
> Q. All right, but there was the MACI prime contract, and there was the potential subcontract with BSL. Which of those two did you understand him to be referring to?
>
> A. The prices of the two quotes were fairly close to each other. They had guaranteed the first one. I would presume he means all of them.
>
> Q. So you -- when you heard plenty of -- or there was profit, you assumed he was referring to the BSL subcontract as well?
>
> A. Yes.

74    The trial judge's finding was that Comeau said that "the MACE contract was profitable". By this, I think he probably meant the original CCC-USG contract and the back-to-back CCC-KS subcontract. However, I do not think that Thomas' interpretation of Comeau's statement as relating to both the original contract and the later Amertek bid is misplaced. The reality, as Thomas testified, is that the prices in the KS and Amertek bids were "fairly close to one another". Comeau knew both prices, and so his profitability comment could well have been a global one relating to both bids.

75    The question, then, is whether Comeau's statement about the profitability of the contract was a false representation on the day it was made, May 28, 1985. In my view, it was not.

76    The essential point, it seems to me, is that in a one year period (1984-1985), CCC dealt with three proposals from three Canadian companies with long experience in the truck assembly business and each company projected a profit.

77    The first price proposal came from KS. Its bid on the U.S. Army contract was for US$125,100 per vehicle for a total of US$45,286,452. This bid comprehended a projected profit of 11 $\frac{1}{2}$ per cent.

78    When KS's bid was successful, the USG sent a price verification request because the KS bid was 23 per cent lower than the next lowest bid. KS and CCC reviewed KS's very detailed pricing proposal and, after W.C. Ames' visit to KS's facility in Woodstook, CCC confirmed the bid. CCC awarded KS the subcontract.

79    When KS ran into financial difficulties, CCC was required to explore alternatives. As it embarked on this process, it is clear, as the trial judge found, that CCC became aware that the KS price *might* have been underbid. Deputy Minister Hession testified that there was a belief inside DSS during this period "that there was a price problem." Moreover, at a meeting between CCC (including Comeau) and Walter on March 15, 1985, an *aide memoire* of the meeting stated: "(1) MACE was too low by a minimum of US$7,000 per unit." An internal CCC memorandum prepared three days later stated that "the costs of a new McNeilly design are unknown but they would probably be at least $10,000 higher than the KS bid since the Seagrave bid was developed in 1984."

80    I observe that Walter was present at the March 15 meeting where the figure of US$7000 per unit was recorded. Nevertheless, seven days later, on March 22, 1985, the CCC Board of Directors agreed to give Walter, which the respondent describes in its factum as "a very experienced crash truck manufacturer", a price increase on the MACE subcontract of US$4,000 per vehicle, bringing the subcontract price to US$46,734,452. The contract between CCC and Walter came into force on April 16. A fair inference is that Walter's acceptance of this contract was premised on its view that the original KS profit projection of 11 $\frac{1}{2}$ per cent was maintained by this new enhanced price.

81    At almost exactly the same time, Amertek was aggressively lobbying the federal Government to consider it as a potential replacement for KS. Amertek knew intimately the details of the KS bid (because McNeilly was now working for Amertek) and it knew that KS's bid had been about US$10 million below the next lowest bid. Amertek worked up a 50-page formal proposal to manufacture the 362 MACE trucks. Amertek's proposed price was higher than both KS's and Walter's --

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

namely, US$132,029.34 per vehicle for a total contract price of US$47,794,623. It is important to observe that the per vehicle price of Amertek's bid was US $6929.34 more than KS's original bid, which is strikingly close to the US$7,000 per vehicle figure that the CCC internal *aide memoire* three weeks before had mentioned as the potential shortfall in the KS contract. Moreover, Thomas testified that Amertek's bid was premised on a projected profit of 13 $^1/_2$ per cent.

82    The conclusion I reach is this: when Comeau said at the start of the meeting on May 28, 1985, "in a blustery sort of way" according to Thomas, that "this was a profitable contract", he was merely reiterating what KS, Walter and Amertek, experienced companies all, already thought. In 1984, KS thought that it would make a profit of 11 $^1/_2$ per cent, in early 1985 Walter thought the same, and also in early 1985 Amertek thought that its profit would be 13 $^1/_2$ per cent. Moreover, any concerns that CCC might have had about the contract price (it might be too low by US$7,000 per vehicle) were overcome by the fact that Amertek's bid price was US$6,929.34 per vehicle higher than KS's bid.

83    It is true that Amertek ultimately lost money on the contract. However, even that point tells in favour of CCC on the misrepresentation point. Amertek thought, and its auditors confirmed, that it would make a rich profit on the contract -- until late 1989! If Amertek did not learn the truth for more than four years, how can it credibly claim that Comeau lied when all Comeau said was what Amertek itself said, and believed, for so many years.

84    The trial judge commenced his reasons dealing with the tort of deceit with a passage from the speech by Lord Herschel in *Peek v. Derry* at 374:

I think the authorities establish the following propositions: First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice.

The trial judge found that CCC had committed a fraud against Amertek and even the USG (which is difficult to see given that the USG accepted and paid for all 362 MACE trucks). For the above reasons, this conclusion amounts to a palpable and overriding error.

85    Turning to the reliance component of the tort of deceit, in my view the evidence is overwhelming that Amertek did not rely on Comeau's statement at the May 28 meeting.

86    Before the May 28 meeting, Amertek aggressively sought the USG contract. Amertek wrote to federal politicians, including the Prime Minister and senior public servants, and begged to be considered. Boldly, Amertek declared that it knew the federal Government faced a substantial penalty ("in excess of $10 million") if CCC defaulted on the prime contract with the USG. Amertek knew virtually all of the details of KS's bid, it engaged in extensive preparation of its own bid, the bid submitted on April 3, 1985 was highly detailed, and, perhaps most importantly, Amertek was prepared to stand by its bid. As Thomas testified:

Q. And, Mr. Thomas, you intended or you realized that the April 3, 1985 proposal would be a firm proposal in that it would be open for acceptance by CCC?

A. If they had accepted it immediately as presented would have been firm.

87    As for the May 28, 1985 meeting, Schultz testified that he regarded Comeau's statement about the contract's profitability as a negotiating tactic relating to the price difference between the KS contract and the Amertek bid:

A. I would suggest that we went to Ottawa to discuss our pricing proposal, and another way of discussing a pricing proposal might be negotiation. And Mr. Comeau, I would suspect would withhold some bargaining power if he wanted to negotiate with us; otherwise, he'd just sign a contract with us.

88    This strikes me as an accurate interpretation of Comeau's statement. After all, by virtue of the prime contract, the USG was required to pay CCC US $45,286,452. If CCC negotiated a subcontract with a Canadian supplier for a higher price, CCC would have to make up the difference. In other words, CCC (and through it, Canadian taxpayers) had a direct financial interest in the ultimate price in a replacement subcontract with Amertek. Accordingly, it was to be expected, as Schultz

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

recognized, that CCC would negotiate with Amertek about its bid price.

89    Moreover, no one at the meeting asked Comeau what he meant by profitability. And Thomas's response -- an immediate suggestion that Amertek would reduce its bid by US$2,000 per vehicle (for a total of US$724,000) -- was based on his knowledge that this amount represented a commission that Amertek would not have to pay.

90    After the May 28 meeting, Amertek proceeded to negotiate a very comprehensive contract, with the assistance of a large, experienced commercial law firm. Amertek negotiated tenaciously over many clauses in the proposed contract. There is no profitability representation clause in the contract.

91    In addition, Amertek protected itself against rising costs by putting a 90-day pricing protection clause in its April 3, 1985 bid. In August 1985, Amertek verified materials prices with suppliers again. It negotiated a materials increase with CCC in August and September 1985 and settled on a price increase of US$420 in December 1985. In my view, all of these steps point towards self-reliance and self-protection, not reliance on Comeau's May 28 "profitability" statement.

92    For the above reasons, I conclude that Amertek relied throughout on its own analysis of profits. It did so as it prepared the bid it submitted on April 3, 1985 and it continued to do so during the months it negotiated the final contract that was ultimately signed on October 3, 1985. Nothing Comeau said about profitability on May 28 changed any of this. All his comments provoked was a price reduction of US$2,000 per vehicle, which Thomas knew could be covered by an itemized commission that Amertek had included in its own calculations but would not have to pay.

93    In summary, the trial judge erred in his conclusions on both the misrepresentation (fraud) and reliance components of the tort of deceit. His conclusions were "clearly wrong" and amount to a "palpable and overriding error".

*(2) Breach of fiduciary duty*

94    The trial judge, relying on *Frame v. Smith*, [1987] 2 S.C.R. 99 (S.C.C.), at 136, and *International Corona Resources Ltd. v. Lac Minerals Ltd.*, [1989] 2 S.C.R. 574 (S.C.C.), at 599, correctly stated the indicia of a fiduciary relationship:

> Relationships in which a fiduciary obligation have been imposed seem to possess three general characteristics:
>
> (1) The fiduciary has scope for the exercise of some discretion or power.
>
> (2) The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.
>
> (3) The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power.

95    The trial judge found that all of the elements of a fiduciary relationship were present. He dealt with all three elements in a single paragraph:

> In the case at bar, CCC had total discretionary power over BSL. Unless CCC agreed to do business with BSL, unless CCC agreed to "certify" and "endorse" BSL to USG, BSL would be locked out of the MACE contract by CCC, the gatekeeper. There can be no doubt that CCC can and did unilaterally exercise that discretion so as to affect BSL's legal and financial interests. CCC kept BSL "on a string" until CCC assured itself that there was no other subcontractor willing to get involved. BSL was particularly vulnerable because without CCC's blessing and without the vital information that CCC failed to supply to BSL, BSL was "at the mercy of the other's [CCC's] discretion".

96    On the question of whether CCC breached its fiduciary duty to Amertek, the trial judge found:

> It is my conclusion, on the evidence before me, that CCC breached its fiduciary duties by putting its own self-interest ahead of the interests of BSL/Amertek and by failing to disclose material/vital information to BSL/Amertek prior to the CCC/BSL contract of October 3, 1985.

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

97   In my view, there is a clear error of law in the trial judge's reasoning on the existence of a fiduciary relationship. On the vulnerability element of the analysis, the trial judge attaches significance to "the vital information that CCC failed to supply to BSL" and concludes that this suggests that Amertek was "particularly vulnerable". Yet, when he turns to his breach analysis, the trial judge relies on precisely the same factor as establishing the breach. With respect, this is bootstraps reasoning. In *Hunt v. TD Securities Inc.* (2003), 229 D.L.R. (4th) 609 (Ont. C.A.), at 622, Gillese J.A. cautioned against such reasoning:

> [O]ne cannot reason backwards from the fact that an individual is harmed by the unauthorized acts of their broker, to the conclusion that they are vulnerable. Rather, the individuals and the nature of the relationship must be examined.

98   In light of this conclusion, it is necessary to consider whether, on the basis of all the evidence, there was a fiduciary relationship between CCC and Amertek.

99   The question of what comprises a fiduciary relationship has been comprehensively considered by the Supreme Court of Canada in several cases: see *Frame v. Smith, Lac Minerals,* and *Hodgkinson v. Simms,* [1994] 3 S.C.R. 377 (S.C.C.). In those cases, the court has described two categories of relationship. In the first category, which includes such relationships as trustee-beneficiary, guardian-ward and agent-principal, the court has identified an inherent vulnerability which gives rise to the rebuttable presumption that one party has a duty to act in the best interests of the other party. The second category is more open-ended than the first and introduces the possibility of new or non-traditional legal relationships being sheltered under the protective umbrella of 'fiduciary'. The essence, or *sine qua non*, of this category is expressed by La Forest J. in *Hodgkinson v. Simms* at 409-10:

> Thus, outside the established categories, what is required is evidence of a mutual understanding that one party has relinquished its own self-interest and agreed to act solely on behalf of the other party.

100   In my view, it is simply impossible to describe the CCC-Amertek relationship in this light. There was no relationship between CCC and Amertek prior to their negotiations in 1985 relating to the MACE contract. Amertek pursued the contract and it did so in a particularly visible, even aggressive, way by writing to the Prime Minister and senior public servants. There was only one formal meeting between the parties, on May 28, 1985.

101   The core of the relationship between CCC and Amertek was the negotiation concerning a potential commercial contract involving millions of dollars. As discussed above in dealing with the issue of reliance, in negotiating the contract Amertek took active steps to protect its self-interest. The contract would potentially give rise to several million dollars in profit for Amertek.

102   The subject matter of the contract was the manufacture of fire crash trucks for the U.S. Army. Amertek was in the truck assembly business, and had been since 1945. CCC was a federal Crown corporation whose statutory mission was to assist Canadian companies obtain and execute commercial contracts with foreign governments.

103   Amertek prepared a 50-page proposal relating to the MACE contract. The proposal addressed in considerable detail design, manufacture, price and delivery.

104   On the question of vulnerability, in the spring of 1985 CCC was in a potentially vulnerable position. If KS, and later Walter, were unable to perform the subcontract, CCC, pursuant to the prime contract, was potentially on the hook for a re-procurement penalty of CDN$10-$14 million. Importantly, Amertek was aware of CCC's vulnerability in this regard and, bluntly, wrote to the Prime Minister and brought it to his attention with a view to being considered as a replacement for KS on the subcontract.

105   Moreover, Amertek also knew that the price of the USG prime contract was frozen. This meant that if the CCC-Amertek subcontract was for a higher price than the CCC-KS subcontract, CCC would be liable for the difference. Schultz's description of Comeau's comment about the profitability of the contract, as one made in the context of this price differential, was a clear recognition that CCC was not a mere conduit between the USG and a Canadian company; rather, CCC had a

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

pronounced financial self-interest in the contract it was negotiating with Amertek.

106    In summary, there was no "mutual understanding" that CCC had relinquished its own self-interest and had agreed to act solely on Amertek's behalf. In the context of this commercial contract (and, in my view, it is crucial to recognize the centrality of this context), both parties acted in their own self-interest throughout. Accordingly, the trial judge mischaracterized as a fiduciary relationship what was essentially a commercial relationship.

107    In light of this conclusion, it is unnecessary, strictly speaking, to consider the question of whether the trial judge erred by finding that CCC breached its fiduciary duty. However, for the sake of completeness, I would indicate that, in my view, the trial judge erred by concluding that CCC breached its fiduciary duty "by failing to disclose material/vital information to BSL/Amertek prior to the CC/BSL contract of October 3, 1985". Since this finding also serves as the fulcrum on which the trial judge held that CCC also breached its contract with Amertek, I will address this matter in the next section of these reasons.

*(3) Breach of contract*

108    The trial judge held that CCC breached a collateral contract with Amertek and also breached an implied contractual duty to provide "vital information" to Amertek.

**(a) Collateral contract**

109    The trial judge held that there was a collateral contract between CCC and Amertek. The foundation for the collateral contract was Comeau's false statements at the May 28, 1995 meeting with Amertek representatives. The trial judge stated:

> It is my conclusion that the statements of P. Comeau on May 28, 1985, known by him and all those from CCC/DSS present, to be false, amounted to a warranty that induced BSL to enter into the contract.

110    In a previous section of these reasons relating to the tort of deceit, I concluded that the trial judge erred in finding that Comeau's statement about the profitability of the MACE contract was false and in holding that Amertek relied on the statement in entering into the contract. That conclusion is equally applicable to, and disposes of, this issue.

**(b) Implied contractual duty of disclosure**

111    The trial judge recognized that, generally, parties engaged in arm's-length pre-contractual negotiations have no obligation to disclose information to each other: see *Martel Building Ltd. v. R.*, [2000] 2 S.C.R. 860 (S.C.C.). However, the trial judge found that in this case CCC possessed "vital information" which it should have disclosed to Amertek. In reaching this conclusion, he relied heavily on an American legal doctrine, the doctrine of superior knowledge, which he described in this fashion:

> For more than forty (40) years, in the U.S.A., pursuant to what has been termed as "the Doctrine of Superior Knowledge", a government in pre-contractual negotiations for the purchase of goods or services has a duty to inform a contractor of information required for the successful performance of the contract.

112    The trial judge then identified nine pieces of "vital information" which, because of its superior knowledge, CCC possessed and should have disclosed. His legal conclusion was that the failure to disclose this information constituted a breach of an implied contractual duty owed to Amertek.

113    I do not find it necessary to consider the doctrine of superior knowledge in these reasons. Although *Martel* and other cases warn against imposing legal duties on contracting parties with respect to pre-contractual negotiations, there are cases in which a special relationship between contracting parties, where one party has special knowledge of important facts, has given rise to a discussion of a potential duty to disclose the information: see, for example, *Québec (Commission hydroélectrique) c. Banque de Montréal*, [1992] 2 S.C.R. 554 (S.C.C.), and *978011 Ontario Ltd. v. Cornell Engineering Co.* (2001), 53 O.R. (3d) 783 (Ont. C.A.). Accordingly, I would not want to foreclose the potential adoption of the American "doctrine of superior

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

knowledge" in an appropriate case (although, I confess, the results of the American cases in which the doctrine has been applied seem to me to be attainable in Canadian law by employing existing concepts like good faith and unconscionability).

114    My concern with the trial judge's reasons on the implied contractual duty issue relates to the accuracy of the nine items of "vital information" he discusses. In my view, these items were either irrelevant to Amertek during the contract negotiations or were known by Amertek.

115    Because the nine items of "vital information" serve as the foundation for the trial judge's legal conclusion on this issue, it is necessary that I address them quite specifically.

116    In items (1) and (6), the trial judge records that the U.S. Army sent a price verification request to CCC after the five bids were opened and it was discovered that KS's bid was $10.25 million below the next lowest bid. The trial judge found that CCC should have disclosed this request to Amertek.

117    I do not see how disclosure of the price verification request would have mattered to Amertek. Amertek knew that KS's bid was $10.25 million below the next lowest bid by mid-February 1985. In February 1985, McNeilly, who was working for the Receiver of KS, made a detailed comparison of the differences in prices among all five bidders. After McNeilly and Hooton started to work at Amertek, Schultz, the Vice-President of Finance, specifically asked them why KS's bid was so much lower than the next lowest bidder. Schultz received a specific and detailed explanation, which he communicated to Thomas, Amertek's President. Thomas testified:

> Q. Mr. Thomas, I'd like to ask you about your knowledge of the other bid prices for the U.S. Army contract at the time you submitted your pricing proposal on April 3, 1985. Prior to Belgium Standard submitting its pricing proposal on April 3, were you aware of the bid prices of the other bidders for the U.S. Army contract?
>
> A. No.
>
> Q. Were you aware of none of them?
>
> A. I was aware that there was a $10-million difference between Belgium Standard and the next -- and the next lowest bidder.
>
> Q. Who told you that?
>
>
> A. Hooton and McNeilly.

In the face of all this knowledge, Amertek made its bid, which was about $2.5 million above KS's original bid, on April 3, 1985.

118    In items (2) and (3), the trial judge recorded that CCC had been in default under the prime contract since January 14, 1985 and that on March 5, 1985 the USG had served CCC with a show cause notice concerning the prime contract. The trial judge found that CCC had a duty to disclose these matters to Amertek.

119    I disagree. Amertek was well aware of what was happening in early 1985. Its knowledge included a possible default/show cause scenario. Thomas testified in his examination-in-chief:

> Q. Were you aware that this Show Cause Notice had been sent to the government defendants?
>
> A. No.
>
>
> Q. Did you subsequently become aware of that?

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

> A. Well, the rumours, of course, were flying in the industry and, you know, we -- I didn't have a formal notice of it, but certainly we accepted that that was probably a fact.

120    In his cross-examination, Thomas testified:

> Q. ... What do you mean by it had reached "a critical phase"?

> A. Well, the company was in receivership.

> Q. The company being King Seagrave?

> A. Yes. Receivership is more than likely a cause for a default. They could have been in danger of getting a show cause. Those are all natural sequential events that would take place.

> Q. So you were aware as of the date of writing this letter [the Feburary 20, 1985 letter to Deputy Minister Hession, with copies to Cabinet ministers] of the potential situation CCC might find itself in on the MACI prime contract?

> A. We made a scenario that might take place, yes.

> Q. And you from your letter I assume presumed that that might make CCC inclined to be looking for an alternative contract?

> A. If they were, we're saying we're here.

> Q. And that was part of your --

> A. Expression --

> Q. -- marketing approach?

> A. Expression of interest, yes.

121    It is clear from Thomas' testimony that Amertek knew of the possibility of a default by KS and a show cause notice being issued to CCC by early 1985. Importantly, far from being a cause of concern for Amertek, this scenario provided the impetus for Amertek to develop and submit its own proposal. In short, items (2) and (3) in the trial judge's list were a green light, not a yellow or red light, in Amertek's eyes.

122    Finally, I note that although CCC did not provide Amertek with formal notice of the first show cause notice from the U.S. Army, when CCC received the second show cause notice it notified Amertek on June 12, 1985, almost four months before Amertek signed the subcontract.

123    In items (4) and (7), the trial judge recorded that in the February -- April 1985 period CCC was aware that KS had underbid the MACE contract and failed to communicate this to Amertek.

124    In the section of these reasons relating to the tort of deceit, I concluded that CCC had information in this period that the KS bid might have been too low. However, Amertek had the same information, was better positioned to explore the issue, and in fact did so in detail before submitting its own bid on April 3, 1985, a bid which was, incidentally, $2.5 million higher than KS's bid.

125    In item (5), the trial judge stated that Georges Laporte, the President of Walter, also knew that KS had underbid the

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

MACE contract.

126    I do not understand the relevance of this point. When Walter replaced KS on the subcontract, it negotiated a price increase of US$4,000 per vehicle. Amertek's bid was US$7,000 per vehicle higher than KS's bid and US$3,000 per vehicle higher than Walter's subcontract price. Amertek's bid was based on a projected profit of 13 $^1/_2$ per cent. In short, if KS's price was underbid, Amertek had the relevant information, investigated the price issue and, importantly, submitted a higher bid.

127    In item (8), the trial judge observed that there was an internal government memorandum dated March 18, 1985 which stated: "The costs of a new McNeilly design manufactured by Belgium Standard are unknown but they would probably be at least $10,000 higher than the present King Seagrave bid". The trial judge held that CCC should have disclosed this information to Amertek.

128    I disagree. The author of the internal government memorandum is unknown. Moreover, it is difficult to see the relevance to Amertek of CCC's internal knowledge ("costs ... are unknown") and speculation ("at least $10,000 higher than the present King Seagrave bid") concerning Amertek's possible bid. Indeed, it strikes me that, in the context of a commercial relationship, this is the type of information that a contracting party should be able to keep to itself. Finally, it turned out that Amertek's bid was for US$7,000 more per vehicle than KS's bid.

129    In item (9), the trial judge stated that Karl Morgenroth, a senior contract officer at CCC, told his superiors that Amertek could not fulfil the MACE contract and that CCC should have disclosed this to Amertek.

130    I disagree. Morgenroth's report to his superiors about Amertek's capability was generally favourable; indeed, during his visit to Amertek's plant in March 1985 he invited Amertek to submit an "unsolicited" bid for the MACE contract in light of the uncertainties surrounding KS and Walter. Moreover, in a letter to Amertek dated July 4 Morgenroth said: "In terms of the hardware and contract, you adopted a realistic plan and it will eventually pay off."

131    Morgenroth's testimony at the trial was in a similar vein. He testified that he told his superiors that Amertek could design the trucks, but it would need help (i.e. specialized personnel) to manufacture them.

132    In summary, the trial judge committed palpable and overriding errors in his analysis of the nine items he labelled as "vital information". In my view, the adjective "vital" is misplaced with respect to much of this information. Some of the information was irrelevant from Amertek's perspective, some of it was inaccurately described by the trial judge and, of particular importance, Amertek was aware of most of the information in the period when it was trying to obtain the contract. Accordingly, the trial judge erred in finding that CCC breached an implied contractual duty.

*(4) Unjust enrichment*

133    The trial judge, relying on *Becker v. Pettkus,* [1980] 2 S.C.R. 834 (S.C.C.), correctly set out the requirements for establishing a claim of unjust enrichment -- an enrichment, a corresponding deprivation, and the absence of any juristic reason for the enrichment.

134    The trial judge held that Amertek had satisfied these requirements. He said:

I find that the Plaintiffs have established, on a balance of probabilities, that:

(1) CCC was enriched or received a negative/saved expense -- the benefit bestowed by Amertek was the release of CCC from its reprocurement liability to the USG. The Government Defendants obtained this immunity through their misconduct, deceit. The Government Defendants were saved an inevitable expense.

(2) The Plaintiff, Amertek, discharged the Government Defendants legal liability to USG....

(3) CCC, but for Amertek's conferral of value on the USG, would have been subject to a reprocurement liability of US$19,767,000.00.

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

> (4) There is no just juristic reason for the transfer of the benefit to CCC; the Government Defendants cannot rely on the subcontract as "juristic reason" justifying the enrichment because it was induced by fraud/deceit and the legal maxim *fraus omnia corrumpit* (fraud invalidates all) comes into play.

135    With respect, I disagree with this conclusion. In a previous section of these reasons, I concluded that CCC's conduct in its dealings leading to its contract with Amertek was not grounded in fraud or deceit. It follows that there is no foundation for the trial judge's finding of unjust enrichment.

### (5) Other Issues

136    In light of my conclusion that the trial judge erred in imposing liability on CCC -- on the basis of the tort of deceit, breach of fiduciary duty, breach of a collateral contract and of an implied contractual duty to disclose "vital information" and unjust enrichment -- it is not necessary to consider the other grounds of appeal advanced by the appellants relating to the remedy of disgorgement, pre-judgment interest, the date for the conversion of U.S. dollars to Canadian dollars, punitive damages and the costs premium.

### *Amertek's cross-appeal*

### *(6) The tort of misfeasance in public office*

137    The trial judge held that CCC had not committed the tort of misfeasance in public office. He concluded:

> In my view, the Plaintiffs cannot succeed on a claim under this heading because the CCC Act does not impose any duty upon CCC. The Act creates the corporate entity CCC and grants it the powers of a corporation in order that it may perform its purposes. However, there is no statutory, regulatory or administrative duties conferred on CCC nor upon its officers.

138    Although Amertek cross-appeals on this issue, it does not challenge the trial judge's reasoning. Rather, it advances a different argument, namely that liability does not depend on a finding of a specific statutory duty owed to Amertek if CCC "has acted for the express purpose of harming the plaintiff".

139    For the reasons set out in previous sections, I do not think that CCC did anything with a view to harming Amertek. In entering into the contract with Amertek, CCC was trying to promote Amertek's commercial interests and to protect its own commercial interests.

### *(7) Other issues*

140    In light of my conclusions relating to CCC's appeal, it is not necessary to consider Amertek's cross-appeal on the issues of pre-judgment interest, punitive damages and the costs premium.

### E. Disposition

141    I would allow the appeal, set aside the trial judgment as it relates to Amertek and dismiss Amertek's action.

142    I would dismiss the cross-appeal.

143    The appellants propose that the costs order be in the amount of $200,000 for the appeal *if demanded*, and that there be no costs order for the trial. This is a fair, indeed generous, proposal which I would be prepared to order.

144    In conclusion, I wish to thank counsel for their able and helpful submissions in this matter.

### *Laskin J.A.:*

Copr. © West 2005 No Claim to Orig. Govt. Works

5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 200 O.A.C. 38, 256 D.L.R. (4th) 287,
76 O.R. (3d) 241
**(Publication page references are not available for this document.)**

I agree.

*Juriansz J.A.*:

I agree.

*Appeal allowed.*

FN1. The other plaintiffs in this action were also successful at trial and were awarded damages of CDN$2,131,000, punitive damages of CDN$100,000, and 30 per cent of the costs awarded to the plaintiffs. This component of the judgment relates to events in the November 1990 to March 1991 period. There is no connection between these events and the events which ground the substantive claims made by Amertek. The appellants do not appeal the trial judge's decision relating to the entities who invested in Amertek in the 1990-1991 period.

FN2. Although BSL was the name of the corporate entity until November 1985, I will use Amertek throughout the remainder of these reasons.

END OF DOCUMENT

Copr. © West 2005 No Claim to Orig. Govt. Works