IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., )
J-SQUARED TECHNOLOGIES )
(OREGON) INC., )
                                 )
                 Plaintiffs, )        C.A. No. 04-960-SLR
                                 )
     v. )
                                   )
MOTOROLA, INC., )
                                   )
               Defendant. )
                                   )

## MOTOROLA'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

William W. Bowser
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

Of Counsel:

Randy Papetti
Cory A. Talbot
Emily S. Cates
LEWIS AND ROCA LLP
40 N. Central Avenue
Phoenix, Arizona  85004
(602) 262-5311

Attorneys for Defendant

Dated:  May 1, 2006

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING ................................................. 1

SUMMARY OF ARGUMENT ........................................................................... 1

      1.      The Promissory Estoppel Claims ........................................... 2

      2.      The Negligent Misrepresentation Claims ................................ 2

      3.      The Good Faith Claims ......................................................... 3

      4.      The "Renewed By Conduct" Breach of Contract Claim ........................... 3

      5.      JSO's Claim that It Was Meeting Performance Standards ........................ 4

      6.      The Plaintiffs' Damages Claims .................................................. 4

STATEMENT OF FACTS ................................................................................. 4

I.      MCG Restructures its Sales Force .................................................. 4

II.      JST Agrees to be a Sales Representative for MCG ................................... 5

      A.      MCG and JST Begin Discussions .............................................. 5

      B.      JST Was Unconvinced the Relationship Would Be Profitable ................ 5

      C.      MCG Provides Historic Sales Data ............................................ 6

      D.      MCG and JST Begin Negotiating an Agreement ...................................... 6

      E.      MCG Refuses to Allow Automatic Renewal of the Agreement ............... 6

III.      MCG Negotiates An Agreement with JSO .................................................. 7

      A.      MCG Provides Historic Sales Information ..................................... 7

      B.      The JSO Agreement Also Is for A One-Year Term ............................ 7

      C.      MCG Requires Performance Standards ........................................... 7

IV.      The MCG Relationship Was Not Working for J-Squared .......................... 8

      A.      JST Has Difficulty Signing Other Manufacturers ............................ 8

      B.      MCG's Distributors Did Not Create Demand .................................... 9

      C.      Products Did Not Sell as Expected ............................................ 9

D.    JST Tells MCG that the Parties' Contract Must Be Changed...................9

1.    JST Demands Changes in May 2003 ............................................9

2.    JST Again Tells MCG the Relationship Must Change ...............10

3.    JST Meets With MCG to Complain It Is Losing Money ............10

4.    JST Continues Pressing to Change the Relationship ...................11

V.    The Agreements End ...................................................................................12

VI.    The Representatives Are Informed ...........................................................13

VII.    J-Squared Signs with an MCG Competitor ...............................................13

ARGUMENT........................................................................................................13

I.    Plaintiffs' Promissory Estoppel Claim Fails................................................14

A.    The Alleged Promises...............................................................14

B.    The Contracts Bar the Promissory Estoppel Claim................................14

C.    The Alleged Representations Are Not Actionable Promises...................16

D.    No Reasonable Reliance .......................................................18

E.    The Doctrine of Promissory Estoppel Is Inapplicable...........................19

II.    The Negligent Misrepresentation Claims are Meritless.............................21

A.    There Is No Alleged Misrepresentation of Fact ......................................21

B.    The Economic Loss Doctrine Bars Plaintiffs' Claim..............................23

III.    Plaintiffs' Breach of Contract Claims Fail ................................................24

A.    The Good Faith and Fair Dealing Claims................................................24

1.    MCG Did Not Terminate JST's Agreement................................24

2.    MCG Did Not Act in Bad Faith in Terminating JSO .................25

B.    JST Agreement Was Not Renewed "By Conduct" ..................................26

C.    JSO Did Not Meet Its Performance Obligations.....................................27

IV.    Damages Plaintiffs Seek Are Precluded By the Parties' Agreements ........29

CONCLUSION ................................................................................................. 31

1732562_1

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*All-Tech Telecom, Inc. v. Amway Corp.*,
  174 F.3d 862 (7th Cir. 1999) ............................................................................................... 19

*Apollo Group, Inc. v. Avnet, Inc.*,
  58 F.3d 477 (9th Cir. 1995) ................................................................................................. 23

*Arnold & Associates, Inc. v. Misys Healthcare System*,
  275 F. Supp. 2d 1013 (D. Ariz. 2003)................................................................................. 22

*Mann v. GTCR Golder Rauner, LLC*,
  --- F. Supp. 2d ---, 2006 WL 851516 (D. Ariz. March 28, 2006)..............................18, 19, 20

*Mitchell v. Franklin Bank, S.S.B.*,
  2005 WL 2406034 (D. Minn. Sept. 29, 2005)...................................................................... 22

*Murray v. Xerox Corp.*,
  811 F.2d 118 (2d Cir. 1987) ................................................................................................ 22

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ............................................................................................. 22

*Simmons Foods, Inc. v. Hill's Pet Nutrition, Inc.*,
  270 F.3d 723 (8th Cir. 2001) ............................................................................................... 15

*Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*,
  971 F.2d 401 (9th Cir. 1992) ............................................................................................... 17

*Tractor & Equip. Co. v. Kobelco Am., Inc.*, 1988 WL 71243, at 3 (N.D. Ill. 1988)................... 15

*Trent Partners & Associate v. Digital Equipment Corp.*,
  120 F. Supp. 2d 84 (D. Mass. 1999) ................................................................................... 17

### STATE CASES

*7200 Scottsdale Road General v. Kuhn Machine*,
  909 P.2d 408 (Ariz. App. 1995) .......................................................................................... 14

*Carondelet Health Services v. Ariz. Health Care Cost Containment System
  Admin.*,
  930 P.2d 544 (Ariz. App. 1996) .......................................................................................... 18

*Carstens v. City of Phoenix*,
    75 P.3d 1081 (Ariz. App. 2003) ................................................................. 23, 24

*Chanay v. Chittenden*,
    563 P.2d 287 (Ariz. 1977) ............................................................................ 20

*Darner Motor Sales v. Universal Underwriters Insurance Co.*,
    682 P.2d 388 (Ariz. 1984) ............................................................................ 14

*Double AA Builders v. Grand State Construction*,
    114 P.3d 835 (Ariz. App. 2005) ................................................................... 20

*Goglia v. Bodnar*,
    749 P.2d 921 (Ariz. App. 1987) ................................................................... 26

*Hadley v. Southwest Properties, Inc.*,
    570 P.2d 190 (Ariz. 1977) ............................................................................ 31

*Higginbottom v. State*,
    51 P.3d 972 (Ariz. App. 2002) ..................................................................... 18

*Johnson International v. City of Phoenix*,
    967 P.2d 607 (Ariz. App. 1998) ............................................................. 15, 20

*Jones v. Industrial Commission*,
    401 P.2d 172 (Ariz. App. 1965) ................................................................... 27

*Kersten v. Continental Bank*,
    628 P.2d 592 (Ariz. App. 1981) ................................................................... 20

*Kuehn v. Stanley*,
    91 P.3d 346 (Ariz. App. 2004) ............................................................... 24, 25

*McAlister v. Citibank*,
    829 P.2d 1253 (Ariz. App. 1992) ................................................................. 21

*School District No. 69 v. Altherr*,
    458 P.2d 537 (Ariz. App. 1969) ................................................................... 16

*Southwest Savings & Loan Association v. SunAmp System, Inc.*,
    838 P.2d 1314 (Ariz. App. 1992) ................................................................. 25

*Tarmann v. State Farm Mutual Automobile Insurance Co.*,
    2 Cal. Rptr. 2d 861 (App. 1991) .................................................................. 22

*United Dairymen of Ariz. v. Schugg*,
    128 P.3d 756 (Ariz. App. 2006) ................................................................... 30

## FEDERAL RULES OF CIVIL PROCEDURE

Federal Rule of Civil Procedure 56(b)......................................................................... 1, 2

## MISCELLANEOUS

31 C.J.S. *Estoppel & Waiver* § 68 (2005)................................................................... 27

*Ballinger, Jr. & Thumma, The History, Evolution & Implications of Arizona's Economic Loss Rule,* 34 Ariz. St. L.J. 491, 502 (2002)....................................... 24

Restatement (Second) of Contracts §§ 209, 210, 213, & 216............................... 14, 15

## NATURE AND STAGE OF THE PROCEEDING

On August 20, 2004, plaintiffs J-Squared Technologies, Inc. ("JST"), and J-Squared Technologies (Oregon), Inc. ("JSO") (collectively, J-Squared), sued defendant Motorola, Inc., in this Court, asserting claims of (1) breach of contract, (2) promissory estoppel, (3) negligent misrepresentation, (4) breach of duty of good faith and fair dealing, and (5) violation of Arizona's Consumer Fraud Act. [D.I. 1.]  Plaintiffs also sought punitive damages.

Motorola subsequently moved to dismiss plaintiffs' claims for promissory estoppel, negligent misrepresentation, violation of Arizona's Consumer Fraud Act, and punitive damages.  [D.I. 10.]  The Court granted the motion to dismiss in part, eliminating plaintiffs' claims for violation of Arizona's Consumer Fraud Act and punitive damages [D.I. 18 & 19.]

Motorola now moves for summary judgment on plaintiffs' remaining claims pursuant to Federal Rule of Civil Procedure 56(b).

## SUMMARY OF ARGUMENT

This is almost a paradigm case in which one party to a commercial contract later finds itself unhappy with the deal it cut and sues claiming that the "real deal" was not embodied in the written terms of the contract.  Motorola Computer Group ("MCG") honored each and every term of its Manufacturer's Representative Agreements with JST and JSO, which are sophisticated entities that heavily negotiated their Agreements with MCG.  But when MCG chose not to continue the parties' relationship longer than the contracts provided, the J-Squared entities sued, claiming that MCG made "representations" and "promises" not embodied in the contracts about the Agreements being "long term."  Nefarious motives are attributed to MCG, but, as will be shown in this motion, there is no evidence to support the accusations and, more to the point, the law precludes this type of suit.

For the following reasons, Motorola is entitled to summary judgment under Federal Rule of Civil Procedure 56(b) on all plaintiffs' claims:

1.    **The Promissory Estoppel Claims**.  Courts routinely grant summary judgment on promissory estoppel claims such as J-Squared's on various distinct, but similar grounds, all rooted in the notion that written contracts are not to be easily circumvented based on allegations of assurances or representations during pre-contractual negotiations.

Here, plaintiffs' Agreements with MCG are completely integrated. Accordingly, any extra-contractual understandings as to the length of the parties' relationship are precluded by the parties' Agreements and the parol evidence rule. In addition, the representations that the J-Squared witnesses allege are that MCG employees represented that MCG expected a long-term relationship and that MCG had a "long-term strategy" of using independent representatives.  The case law is clear that such statements of expectation, strategy, or intention are not actionable because they are not sufficiently concrete; or, as some cases reason, there is no reasonable right to rely on such pre-contractual statements when the parties later executed a written agreement containing provisions on term and termination.  To the extent necessary, we ask the Court to revisit an argument that the Court did not find to be adequately supported by case law at the motion to dismiss stage—*i.e.*, that the doctrine of promissory estoppel is inapplicable where the parties reduce their discussions to a written contract—based on a recent federal court decision from Arizona.

2.    **The Negligent Misrepresentation Claims**.  Plaintiffs also try to avoid their contracts by claiming that MCG "negligently misrepresented" its intent and expectations regarding the duration of the parties' relationship during negotiations.  But because this claim is based on alleged misrepresentations of MCG's intent or expectations, they are not actionable under a negligent

misrepresentation theory, which requires a misrepresentation of a presently existing fact, as opposed to a representation or promise about future conduct or events. Furthermore, the economic loss doctrine bars these claims because plaintiffs incurred no physical injury. In Arizona, a negligent misrepresentation claim will not lie between two parties to a contract absent physical injury.

3. **The Good Faith Claims.** The J-Squared entities argue that MCG exercised its contractual rights in "bad faith." Specifically, J-Squared claims that MCG's decision to terminate JSO for non-performance and to allow its agreement with JST to expire was based on bad motives. But JSO did fail to meet the performance standards (other sales representatives, which were meeting the performance standards, were not terminated) and the express terms of the JST Agreement, requiring a written agreement from both parties for renewal, contradict JST's assertion that MCG had some sort of duty to renew the Agreement. There is no evidence that MCG did anything other than make a good faith business decision that the independent rep program was not profitable and then sought to end it relationships with the reps as expeditiously as the contracts allowed. That is not bad faith.

4. **The "Renewed By Conduct" Breach of Contract Claim.** JST's contract expired, by its terms, in December 2003. JST, however, contends that the contract was "renewed by conduct" because MCG did not inform JST that it was not renewing the agreement until MCG sent a letter in February 2004 clarifying the relationship. The parties, however, had specifically negotiated, at MCG's insistence, a provision stating that the contract would <u>not</u> automatically renew and instead could only be renewed via a writing signed by both parties. Now, JST opportunistically claims that MCG's failure to alert JST of the expiration date somehow created a contract for an entire new year. That argument is blocked by the parties' actual Agreement.

1732562_1

5.    **JSO's Claim that It Was Meeting Performance Standards**.  JSO contends that MCG had no basis to terminate the Agreement with cause.  Not so.  The primary goal of the Agreements was for the independent representatives to achieve "design wins," that is, to convince end customers to design MCG "boards" or "systems" into their own products.  To qualify as a design win, a project had to meet specific revenue thresholds set out in the independent representatives' agreements.  After three quarters, JSO was required to achieve one design win.  While JSO's initial analysis suggested that it had achieved four design wins when terminated (almost one year into its contract), the author of that analysis has since conceded that JSO had no design wins upon actually comparing this analysis to the terms of the Agreement.  Additionally, JSO's own initial analysis indicates that it did not meet the cumulative new revenue requirement under the Agreement.  Thus, MCG properly terminated JSO with cause.

6.    **The Plaintiffs' Damages Claims**.  Plaintiffs seek reliance and/or lost profits damages for their promissory estoppel, negligent misrepresentation, and good faith and fair dealing claims.  They allege that these damages were "suffered by JST and JSO as a result of the termination of the JST and JSO agreements."  But JST and JSO expressly agreed in their contracts that they would not seek reliance or lost profits damages for the "termination or nonrenewal" of the Agreements.  Again, the contractual language is straightforward and binding.

## STATEMENT OF FACTS

### I.    MCG Restructures its Sales Force

In 2001, the telecommunications market collapsed.  (A-338; A-372.)  This collapse affected the entire high tech business sector, and MCG was no exception.  (A-318; A-338.)  As business plummeted, MCG reduced its sales staff of over fifty in-house employees to about a dozen.  (A-318; A-338.)

1732562_1

With its diminished sales force, MCG faced a challenge to have enough "feet on the street" to sell its product.  (A-339.)  MCG thus sought to use more third-party sales channels, such as distributors, value-added resellers (or VAR's),[1] and independent sales representatives to help sell its products.  (A-401.)  MCG ultimately contracted with nine independent sales representatives, including JST and JSO.  (A-441.)

## II.    JST Agrees to be a Sales Representative for MCG

### A.    MCG and JST Begin Discussions

MCG and JST first met in the summer of 2002 about adding JST as an MCG independent representative.  (A-333 to A-334.)  At the time, JST did not represent any embedded systems lines, but was attempting to break into the market.  (A-333.)  JST was aware of the telecommunications market collapse—the market still had not improved—and that MCG's Canadian sales in particular were "going down the tubes."  (A-371; A-421 to A-422.)

During these preliminary discussions, according to JST, MCG employee Larry Terry said that MCG sales in Canada had dropped to about $2-3 million for the last year.  (A-356.)  JST claims that Terry relayed that he believed that the market had "bottomed out" and projected the $2-3 million figure as a reasonable baseline going forward.  (A-356; A-422.)  JST understood that this was nothing more than Terry's good faith estimate.  (A-419 to A-420.)

### B.    JST Is Unconvinced the Relationship Would Be Profitable

By September 2002, Claude Langlois—head of J-Squared's newly-formed Embedded Systems Group ("ESG")—had determined that, because of the low commission rate being offered by MCG, a deal between JST and MCG was not "as compelling as we [JST] initially believed."  (A-190.)  Nevertheless, he believed that contracting with MCG might be worthwhile because of the

[1] VAR's buy a manufacturer's product, add value to it (e.g., load on software or package the product), and resell it to end customers.  (A-427.)

5

opportunity for "tag-along lines," *i.e.*, MCG could connect JST with other manufacturers in the embedded systems business.  (A-190; A-365; A-389.)

### C.    MCG Provides Historic Sales Data

As discussions progressed, MCG provided historic sales data for (what would become) JST's Canadian territory.  (A-192 to A-198; A-200 to A-207.) The data showed $3.86 million in sales for 2001 and $901,000 in sales over the first three quarters of 2002.[2]  (A-192 to A-198; A-200 to A-207; A-366 to A-367.) Beyond the historic sales figures, MCG provided no written or verbal sales forecasts other than, according to JST, Terry's $2-3 million prediction.  (A-373 to A-374; A-431.)

### D.    MCG and JST Begin Negotiating an Agreement

After MCG provided its sales data, the parties began negotiating an agreement.  (A-375 to A-376.)  The negotiations were lengthy—longer than Langlois has negotiated any other contract.  (A-379 to A-380.)  Correspondence between the parties shows that they discussed almost every provision in the contract.  (A-39 to A-41; A-514 to A-525.)

### E.    MCG Refuses to Allow Automatic Renewal of the Agreement

One disagreement between JST and MCG involved what terms would govern whether or not the contract would renew.  (A-39 to 41; A-516 to A-518.) The initial draft provided for a single one-year term and stated that renewal would occur only by written agreement of both parties:

> [T]his Agreement will continue in full force and effect for an initial term expiring one (1) year after the effective date hereof and thereafter may be renewed only upon the written Agreement of both parties.

(A-526; A-537 to A-538.)  JST management did not like the clause because it did not provide for automatic renewal.  (A-380 to A-382.)  JST thus repeatedly

---

[2] The data provided to JST did not include sales for certain MCG accounts.  (A-368 to A-370; A-408.)  Thus, the data understated MCG's actual sales.  (A-408 to A-410.)

proposed that the provision be dropped in favor of a clause providing that the Agreement would renew automatically unless a party gave prior notice of an intent not to renew.  (A-39 to A-41; A-357 to A-359; A-380 to A-382; A-516 to A-518.)  Ultimately, however, MCG refused, JST relented, and the provision remained unchanged from the quotation above.  (A-11; A-380 to A-382.)  The Agreement became effective on December 5, 2002.  (A-3; A-14.)

### III.    MCG Negotiates An Agreement with JSO

During negotiations, JST pressed MCG to sign JST's sister company, JSO, to a rep agreement in the Pacific Northwest.  (A-524 to A-525.)  MCG still needed more independent representatives and, accordingly, began negotiating a similar Manufacturer's Representative Agreement with JSO.  (A-315.)

#### A.    MCG Provides Historic Sales Information

MCG negotiated the JSO Agreement primarily with JSO's Steve Blomme.  (A-315.)  In terms of historic sales data, MCG provided what Blomme described as "a ball park number of where that territory had been in the past."  (A-317.)  However, MCG did not give any sales forecasts, written or verbal for this territory.  (A-316 to A-317.)

#### B.    The JSO Agreement Also Is for A One-Year Term

MCG insisted on the same provision regarding the term of the JSO Agreement that JST had tried to change—*i.e.*, that the agreement would be for one year and could be renewed "only upon the written Agreement of both parties."  (A-28.)  As with JST, the Agreement also provided that, at any time after six months, either party could terminate the Agreement, without cause, by providing 30 days' prior notice.  (A-28.)

#### C.    MCG Requires Performance Standards

In the Agreement, JSO agreed to meet certain performance standards.  (A-36 to A-37.)  Those standards were specifically negotiated and tailored to the

expectations in JSO's territories and are set forth in Exhibit 4 to the Agreement under the title, "Performance Standards." (A-36 to A-37; A-321 to A-323.) Exhibit 4 identifies minimum performance obligations on both a quarterly and cumulative basis for "uncommitted" accounts, "committed" accounts, and "design wins," as well as certain revenue metrics. (A-36 to A-37.)

At the time when JSO was taking over, business in the JSO/MCG territory "would have been the lowest it's ever been for them"; however, JSO still believed that the performance metrics were reasonable. (A-318; A-322 to A-323.) The Agreement between MCG and JSO became effective in March 2003.[3]

## IV.    The MCG Relationship Was Not Working for J-Squared

When JST signed with MCG, the Canadian embedded systems market was still in "very poor" condition. (A-421.) As a result, JST's relationship with MCG performed poorly in terms of generating sales. (A-392 to A-393.)

### A.    JST Has Difficulty Signing Other Manufacturers

J-Squared had anticipated that signing with MCG would lead to substantial business from "tag-along lines." (A-190; A-365; A-389.) While JST ultimately did sign with other manufacturers, these agreements were slow in developing and were not nearly as successful as JST had hoped:  At the outset of 2003, JST forecasted $4 million in ESG sales for the year apart from MCG (which, at a 5% commission rate, would yield $200,000 in commissions), but ultimately scaled this back dramatically and, by July 2003, was only forecasting $4,000 in total commissions from non-MCG embedded systems lines for the year. (A-66 to A-67; A-138; A-392 to A-393.)

---

[3] JSO had signed the Agreement at the end of March 2003, (A-31), and began acting as MCG's independent representative immediately afterward.  Accordingly, MCG agreed to compensate JSO as of March 31. (A-558.)

### B.    MCG's Distributors Did Not Create Demand

In addition to the independent sales representatives, MCG also sold products through large distributors, such as Arrow, Avnet, and Tracan.  (A-390.)  JST was unhappy with these distributors because, in JST's view, the distributors were not doing enough to help create demand for MCG product.  (A-84.)  JST complained about this to MCG.  (A-390; A-212 to 214; A-424 to 425.)

### C.    Products Did Not Sell as Expected

JST initially forecast $3 million in MCG sales for 2003 and a jump to $6 million in sales in 2004.  (A-48; A-417 to A-419.)  As it turned out, JST's forecasts were overly optimistic.  Of the six embedded systems product lines that JST forecasted at the outset of 2003, only one met the forecast, one other was close, and the other four—including MCG—were not even close.  (A-48; A-423.)

By the end of the first quarter of 2003, the continued slump in embedded systems sales was evident, and JST slashed its 2003 sales forecast for its embedded systems lines in half, from $7 million to $3.5 million.  (A-102; A-425 to A-426.)  Midway through the year, the situation had not improved.  (A-120; A-138; A-429 to A-432.)  Consequently, in July 2003, JST again downgraded its forecasted 2003 embedded systems sales, from $3.5 million to about $850,000.  (A-102; A-152; A-392 to A-393.)

### D.    JST Tells MCG that the Parties' Contract Must Be Changed

Within six months of signing its contract with MCG, JST began, on a regular basis, telling MCG that JST was losing money on the arrangement and that the parties' contract, therefore, needed to be changed.

### 1.    JST Demands Changes in May 2003

In May 2003, JST provided financial information to MCG specifically to show that it was losing money on the relationship.  (A-544 to A-545.)  JST reasoned that it "need[ed]" to be set up as a "distributor and/or VAR" in western

Canada and asked that the contract be amended to allow JST to receive commissions on sales to Harris, an MCG "house" account that preceded the MCG/JST relationship and that the parties had excluded from JST's territory. (A-391; A-544 to A-545.) In an effort to appease JST, MCG, with no duty to do so, agreed to remove Harris as a house account, thus allowing JST to receive commissions on MCG sales to Harris. (A-136; A-391; A-428.) MCG did not, however, agree to convert JST's role from an independent sales representative to a distributor or VAR. (A-546.)

### 2.    JST Again Tells MCG the Relationship Must Change

In August 2003, JST's Langlois met with MCG's Steve Machernis, who oversaw MCG sales in Eastern North America. (A-394 to A-395; A-399.) The "key topic," from JST's perspective, was another JST proposal to change the MCG/JST contract. (A-394 to A-395; A-399.) JST told Machernis about "the financial situation we were in" and emphasized its view that the relationship "had to make financial sense" to continue. (A-395 to A-396.)

In terms of a specific proposal, JST proposed that MCG pay its distributors (such as Arrow and Avnet) less and pay JST more—JST believed MCG's distributors were being overcompensated while JST was being under compensated. (A-207; A-397.) Internally, JST saw this strategy as an opportunity to "move up the food chain" from sales rep to distributor and, ultimately, to become a VAR for MCG. (A-207; A-397 to A-398.)

### 3.    JST Meets With MCG to Complain It Is Losing Money

In September 2003, JST asked to and did meet with Machernis and Kevin Parslow (MCG Director of Worldwide Sales) to discuss restructuring the parties' Agreement. (A-158 to A-172; A-347.) The message delivered, in JST's words, was: "There is a need to create a new business model that better aligns MCG and J2's ROI [return on investment]." (A-172; A-347 to A-348.) JST claimed that it

needed to change its relationship with MCG to make it financially worthwhile "or at least make it a break-even." (A-433.)

JST at this point again proposed that it become an MCG distributor, reasserting that MCG's existing distributors had "not demonstrated the willingness to invest in Canada." (A-163; A-169; A-434 to A-436.) As part of its presentation, JST also showed MCG a forecast showing that, if the existing contract continued unchanged, JST would lose money in 2003, 2004 and 2005 and only begin to turn a slight profit by year-end 2006. (A-166; A-340 to A-347; A-550.)

Shortly after this meeting, while MCG was still considering JST's proposal, JST reiterated to MCG that, if the current contract were not changed, JST would continue to lose money. (A-400 to A-401; A-552.) This was based on an internal JST analysis that, unless MCG agreed to raise the commission rate from 5% to over 10%, JST would lose money. (A-173 to A-181; A-349 to A-355.)

### 4.    JST Continues Pressing to Change the Relationship

In October 2003, Langlois told MCG that his cost/revenue analysis for 2004 showed that, "even under the best scenario," JST would not be able to cover its costs on MCG. (A-209; A-402 to 403.) He further said that JST could not afford to spend as much time on MCG as it had in the past unless the relationship became more lucrative to JST. (A-209.) Langlois proposed that (1) JST be put on a $15,000 per month retainer (rather than being paid on straight commission) or (2) MCG increase the commission rate it was paying JST. (A-209.)

The next day, Langlois emphasized yet again to MCG that it was important for JST to get a new financial arrangement with MCG. (A-212.) Machernis responded, indicating that perhaps JST was spending too much time on MCG. (A-183.) Machernis also asked to visit Canada to conduct a reviews of sales activities and any other issues. (A-184.) Absent MCG agreeing to JST's requests to change

the parties' Agreement, however, Langlois' reaction was negative:  "I feel like telling MCG to go pound sand."  (A-184.)

## V.    The Agreements End

In late 2003, MCG's Parslow requested an evaluation of the independent representative program.  (A-442 to A-444; A-449.)  His impression was that many of the representatives were not producing much new business and that the program was eating up considerable administrative and management time.  (A-442 to A-446.)  He was particularly concerned because, under the agreements, MCG had agreed to pay commissions to the representatives in their territories even for orders from customers that the representatives had no role in obtaining.  (A-445 to A-446; A-452 to A-454.)  These commissions were, in Parslow's view, substantial compared to the new business the representatives were generating.  (A-447 to A-448; A-452 to A-454.)

For the next few months, at Parslow's request, individuals in MCG's sales and finance groups analyzed the program, including how the individual representatives were performing, what MCG's options were in terms of ending the program, and, overall, whether the benefits of the program going forward were greater or less than the costs of the program.  (A-442 to 446; A-450 to A-451.)

The analysis showed that a few of the representatives were performing to expectations, but that most of the representatives were performing below even the minimum performance requirements.  (A-438 to A-439.)  After consulting with both the finance people (who definitely wanted the program ended) and the sales people (who eventually understood the program was not working), Parslow decided in late January 2004 to end the program, which in his view made no sense to continue.  (A-442 to A-443.)

## VI.    The Representatives Are Informed

At the time he made the decision to end the program, Parslow was transitioning out of his position at MCG.  (*Id*.)  After his replacement, Dana Huth, was brought up to speed on the decision, the sales representatives all received letters in late February 2004.  (*Id*.)  For the sales representatives that were not performing, such as JSO, they were notified that their contracts would be terminated under section 7.2A, which allowed termination for failure to perform under the contract, unless they cured their performance shortcomings within 30 days.[4]  (A-553.)  The letters also stated that, even if the sales representatives were able to cure, MCG was not interested in continuing a relationship with the representatives beyond the expiration date of the parties' contracts.  (A-553.)

## VII.   J-Squared Signs with an MCG Competitor

JSO did not attempt to cure its performance deficiencies.  JSO admits that it stopped working on MCG the very next day after getting the 30-day termination letter from MCG.  (A-362 to A-363.)  The JST Agreement had expired two months earlier, in December 2003, and by January 2004 JST had already begun talks with an embedded systems manufacturer, GE Fanuc, that competed with MCG.  (A-3; A-11; A-14; A-335 to A-336; A-554.)  After MCG sent its letter to JST clarifying that its contract with JST had expired and MCG was not interested in continuing the relationship, JST promptly finalized a sales representative agreement with GE Fanuc.  (A-335 to A-336; A-556.)

## ARGUMENT

MCG is entitled to summary judgment on all plaintiffs' claims.

---

[4] Section 7.2A provides that the contract could be terminated if a "party should fail to perform any of its obligations hereunder and should fail to remedy such nonperformance within thirty (30) calendar days."  (A-11; A-28.)

## I.    Plaintiffs' Promissory Estoppel Claim Fails

### A.    The Alleged Promises

Plaintiffs claim that MCG employees "stated that MCG's long-term intention" was to use an independent sales network and that MCG told JST it was "seeking to forge long-lasting relationships with JST and JSO."  [D.I. 1 ¶ 13.]  JST and JSO say that they reasonably relied on these representations to their detriment.[5]  [D.I. 1 ¶ 18.]

### B.    The Contracts Bar the Promissory Estoppel Claim

The contracts have broad integration/merger clauses stating that what is on paper is the parties' entire agreement.  Specifically, the contracts state:

> 9.1 **Entire Agreement**.  This Agreement represents the entire agreement between the parties and supersedes all prior discussions, agreements, and understandings of every kind.  . . . . Any and all side letters or supplementary agreements not specifically added to this agreement by amendment or addendum shall be of no effect whatsoever.

(A-13; A-30.)  JST and JSO thus agreed that their Agreements with MCG superseded all prior discussions or understandings of every kind between them, yet they now assert claims based on alleged pre-contractual discussions and understandings regarding the term of the Agreements.

The Agreements are, on their face, completely integrated, meaning that the parties agreed that each agreement was "a complete and exclusive statement of the terms of the[ir] agreement."  RESTATEMENT (SECOND) OF CONTRACTS § 210(1); *see also id*. § 216 cmt. e (1981) (stating that such provisions are "likely to conclude the issue whether the agreement is completely integrated").[6]

---

[5] Although not stated in their Complaint, plaintiffs asserted in interrogatory responses that MCG falsely predicted that JST's "commissions would be at least $10,000 per month" and that JSO's "commissions would be approximately $10,000 to $15,000 per month."  (A-275; A-292.)  When testifying, however, plaintiffs' witnesses did not regard MCG's assurances as to potential future revenue to be promises or guarantees.  (A-431.)

[6] The Arizona courts rely on these Restatement provisions regarding integrated agreements.  *See Darner Motor Sales v. Universal Underwriters Ins. Co*., 682 P.2d 388,

When parties enter into a binding, completely integrated agreement, they cannot later assert contractual or quasi-contractual claims based on prior alleged understandings.  *See, e.g.*, RESTATEMENT, *supra*, § 213.  Such an agreement "supersedes even consistent additional terms."  *Id.* § 209 cmt a; *see also id.* § 213(2).  More specifically, a completely integrated agreement broadly precludes claims based on prior understandings or promises "to the extent they are within its scope."  *Id.* § 213(2); *id.* § 210 cmt a (stating that "evidence of the alleged making of consistent additional terms must be kept from the trier of fact").

Based on these principles, courts reject attempts, such as plaintiffs' here, to grow their limited-duration contracts by invoking alleged pre-contractual representations or agreements about the relationship supposedly being "long term."  *See, e.g.*, *Simmons Foods, Inc. v. Hill's Pet Nutrition, Inc.*, 270 F.3d 723, 727 (8th Cir. 2001) (holding that, in light of parties having entered into one-year contracts, alleged prior promises of a "long-term relationship were barred by the parol evidence rule"); *Tractor & Equip. Co. v. Kobelco Am., Inc.*, 1988 WL 71243, at *3 (N.D. Ill. 1988) (reasoning that "if the parties had 'understood, contemplated, and agreed' to enter into a long-term relationship which would go beyond the initial one year period, they should have expressly stated as such in their Distributor Agreement").[7]

Plaintiffs' promissory estoppel claims that MCG promised them that their Agreements would be "long term" or that they would make a certain amount per month, are "within the scope" of the Agreements they negotiated and signed and which contain no such promises.  The claims are thus precluded.

---

391 (Ariz. 1984); *see also 7200 Scottsdale Rd. Gen. v. Kuhn Mach.*, 909 P.2d 408, 414 (Ariz. App. 1995) (following the Restatement (Second) of Contracts and recognizing that, "in the absence of law to the contrary, Arizona generally follows the Restatement").

[7] Pursuant to Local Rule 7.1.3, a copy of the *Kobelco* case is attached at A-311.

### C.     The Alleged Representations Are Not Actionable Promises

A promissory estoppel claim requires a clear promise.  *See Johnson Int'l v. City of Phoenix*, 967 P.2d 607, 615 (Ariz. App. 1998).  Mere "expressions of an intention" are not actionable as "a promise."  *School District No. 69 v. Altherr*, 458 P.2d 537, 544 (Ariz. App. 1969) (overruled on other grounds).  It therefore is important to examine the precise promises that plaintiffs allege were made to them.

As to the JSO Agreement, Steve Blomme, the primary negotiator for JSO, recalled "no specific statement" regarding the Agreement's duration.  (A-319.) Rather, he relied on MCG's "[b]ody language" and "tone" to conclude that "this was a long term deal."  (A-320.)

As to MCG's representations regarding the duration of the JST Agreement, Langlois, the "point person" for JST on the deal, testified:

> Q.     What do you remember about that issue [MCG's insistence on a one-year term and no automatic renewal]?
>
> A.     That was a big issue for J-Squared.
>
> Q.     Okay?
>
> A.     Quite unusual from a contract -- from a Rep Contract standpoint -- quite unusual.  It literally stuck out so needless to say I tried very, very, very hard to get that addressed and change the premise being is this a long term relationship -- yes, no.
>
> **We were told a number of times that indeed it was a strategic long term relationship that Motorola wanted to put in place in the Canadian market place**, therefore, I'm going -- if that's the case, why do we have this clause which from my perspective based on my past experience was totally, totally, unusual.
>
> Q.     So you tried to get this changed with Motorola and ultimately Motorola refused to take it out of the contract:  Is that correct?
>
> A.     That is correct.

16

(A-378; A-380 to 381 (emphasis added).)  Langlois further explained that the alleged representations were made to him "at the very front end of our discussions" and that he could only "speculate" as to what Terry meant by a "long term" relationship, because he had "never stopped to think, what does long term mean as we were going back and forth."  (A-382 to A-383; A-388.)

The statements JST alleges—that they were told MCG viewed the JST Agreement as a "strategic long term relationship"—are, as one case put it, "not the type of specific promises which can support an action for promissory estoppel." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 409 (9th Cir. 1992).

For example, in *Trent Partners & Assoc. v. Digital Equip. Corp.*, 120 F. Supp. 2d 84, 104 (D. Mass. 1999), the court rejected promissory estoppel claims based on "promises" of a long-term relationship between the defendant and nine independent sales reps.  At a meeting, the defendant presented its computer line to the reps, explained its long-term goals, and one employee stated that the defendant was committed to a three-year relationship.  The reps then signed contracts that did not contain a three-year term, but instead stated that the contracts could be terminated upon thirty days written notice.  *Id.*  Six months into the program, the defendant concluded the program did not make economic sense and terminated the reps.  Two reps sued for promissory estoppel, but the court held that the defendant's statements were "merely hopes or expectations" and did not constitute an enforceable promise.  *Id.*

Here, the same reasoning applies.  Notwithstanding J-Squared's attempts to negotiate these provisions away, the parties' contracts contained provisions providing they (1) could be terminated, without cause, after six months; (2) were for a defined one-year term; and (3) would not be automatically renewed and a written agreement was required to renew.  (A-11 to A-12.)  Against this backdrop,

1732562_1

precisely how long do plaintiffs claim MCG "promised" to continue the agreements?  How exactly did MCG promise that its strategy might not change in the future?  Did J-Squared itself feel bound beyond the contract term?  Attempting to answer these questions highlights the lack of clarity and, accordingly, the lack of enforceability, of the alleged promises.

In sum, MCG stating that its strategy or intention was to use independent representatives on a long-term basis is not the type of clear promise that can support a promissory estoppel claim, particularly in light of the expressly negotiated contract terms.

### D.     No Reasonable Reliance

Similarly, even assuming the representations were made, JST cannot claim that it reasonably relied on any such statements in light of the contract provisions and the nature of the statements.  *See, e.g.*, *Mann v. GTCR Golder Rauner, LLC*, --- F. Supp. 2d ---, 2006 WL 851516, at *21 (D. Ariz. March 28, 2006) ("Regardless, the Court concludes that Plaintiffs cannot establish that they justifiably relied on the alleged promises due to the express contracts between the parties referencing the same subject matters and the integration clauses contained therein."); *Higginbottom v. State*, 51 P.3d 972, 977 (Ariz. App. 2002) (quoting *Carondelet Health Servs. v. Ariz. Health Care Cost Containment Sys. Admin.*, 930 P.2d 544, 547 (Ariz. App. 1996), for the proposition that "[r]eliance is justified when it is reasonable, but is not justified when knowledge to the contrary exists").

This is especially true given the situation that plaintiffs allege:  Firmness by the MCG contract negotiators on the contract terms while allegedly contradictory statements were being made by Terry, a local MCG salesman, who was not even directly involved in handling the negotiation of the contract.  When asked about the alleged assurance regarding the term, Langlois testified that Terry told him "'not to worry about it,' <u>whatever that means</u>."  (A-385A (emphasis added).)  And

while he did not "never stopped to think" about what it did mean, (A-388),

Langlois was willing to enter into the Agreement anyway:

> Q:    Okay, let me be fair.  Mr. Terry told you you're stating don't
> worry, this is a long term strategic provision.  Don't worry
> about the automatic renewal provision?  Correct?
>
> A:    Correct.
>
> Q:    Okay.  While [MCG] Corporate was reporting to you we
> can't take that provision out of the contract for corporate
> purposes?  Correct?
>
> A:    Correct.
>
> [Objection]
>
> Q:    So you had this decision to make at J-Squared whether to
> trust Mr. Terry's assurances or not do the contract because it
> had a provision in it you didn't like?  Correct?
>
> A:    Correct.

(A-387.)  In sum, as a matter of law, J-Squared could not have reasonably relied

on vague representations as to term in the face of the clear terms of the

Agreements they later signed.

### E.    The Doctrine of Promissory Estoppel Is Inapplicable.

Finally, promissory estoppel is entirely inapplicable when the parties have

entered into a contract governing their relationship.  *See, e.g., All-Tech Telecom,*

*Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999).  Based on this principle,

Motorola previously moved to dismiss plaintiffs' promissory estoppel claims.

[D.I. 10.]  The Court, however, determined that no Arizona case went so far and

thus disagreed in its motion to dismiss ruling that the contracts necessarily would

"preclude any and all claims of promissory estoppel."  [D.I. 18 & 19.]

Since this Court's decision on the motion to dismiss, the District of Arizona

addressed the same issue in the summary judgment context.  In *Mann v. GTCR*

*Golder Rauner, LLC*, --- F. Supp. 2d ---, 2006 WL 851516 (D. Ariz. 2006), the

court (which, like this Court, had denied a motion to dismiss a promissory

estoppel claim) granted summary judgment on the claim. *Id*. at ** 17, 21. Noting that the parties had entered into an express agreement after the alleged promises were made, the *Mann* court reasoned that, "as the Supreme Court of Arizona has clarified, '[t]here can be no implied contract where there is an express contract between the parties in reference to the same subject matter.'" *Id*. at *17 (quoting *Chanay v. Chittenden*, 563 P.2d 287, 290 (Ariz. 1977)). The *Mann* decision is consistent with Arizona cases stating that promissory estoppel is meant to apply when, for some reason, the parties have not reached an agreement. *See Double AA Builders v. Grand State Constr*., 114 P.3d 835, 844 (Ariz. App. 2005) (promissory estoppel exists "to allow a promise to be enforced in certain instances <u>even though no actual contract exists</u>"); *Johnson*, 967 P.2d at 615 ("promissory estoppel is not a theory of contract liability, <u>but instead a replacement for a contract when the parties are unable to reach a mutual agreement</u>"); *Kersten v. Cont'l Bank*, 628 P.2d 592, 595 (Ariz. App. 1981) (promissory estoppel applies where "some element necessary to the creation of an enforceable contract, such as consideration, is not present").

Without doubt, the alleged pre-contractual assurances and promises plaintiffs rely upon regarding the duration and terms of the parties' relationship are within the "subject matter" of "an express contract between the parties." Indeed, JST's argument is that it is entitled to rely on Terry's statement that JST should "not worry" about the express contractual restrictions. We acknowledge the Court's prior ruling that adequate authority had not been presented to grant a motion to dismiss based on this argument, but ask that the Court, if it is necessary to reach this argument, take a second look at the issue in light of the clarity provided by discovery and the additional authorities cited above.

## II.  The Negligent Misrepresentation Claims are Meritless

Plaintiffs' negligent misrepresentation claims cannot stand.  Plaintiffs have not alleged a misrepresentation of fact and, further, the claims are barred by Arizona's economic loss doctrine.

### A.  There is No Alleged Misrepresentation of Fact

An element of a negligent misrepresentation claim is that there must be a misrepresentation of a fact.  *McAlister v. Citibank*, 829 P.2d 1253, 1261 (Ariz. App. 1992).  Plaintiffs' claims are based on the same allegations that Terry and, perhaps, others at MCG  made representations and promises about MCG's long-term intent to work with JST and JSO and to use independent representatives.  But to support this claim, plaintiffs go a step further and claim that the statements were false when made.  [D.I. 1 ¶ 14.]

As an initial matter, the claim should be dismissed because there is no evidence, none, that Terry or anyone else at MCG falsely represented either their or MCG's current intentions or expectations regarding the relationships with plaintiffs or the rep program.  In fact, Langlois, the lead on the JST contract, stated that he does not have any reason to believe that what Terry was telling him was not the truth:

> Q:    When Mr. Terry indicated that in his view it was a long term strategic move for Motorola, do you have any reason to believe now that he didn't believe that to be true when he said it?
>
> [Objection]
>
> A:    I will answer the question.  Do I have any reason now to think that he was not basically saying the truth?
>
> Q:    Correct?
>
> A:    I don't have any reason to believe that.

(A-384 to A-385.)  MCG invested heavily in investigating and negotiating contracts over a lengthy period with nine different representative firms; it

obviously hoped the strategy would be successful.  (A-379 to A-380.)  There is zero evidence that MCG deliberately made any false statement to JST.

In any event, regardless of Terry's state of mind, the tort is inapplicable. An important limitation on the scope of this tort action is that the representation not involve "[a] promise of future conduct."  *McAlister*, 829 P.2d at 1261; *accord Arnold & Assocs., Inc. v. Misys Healthcare Sys.*, 275 F. Supp. 2d 1013, 1029 (D. Ariz. 2003) (dismissing claim that only "involve[d] promises concerning future events"); *Murray v. Xerox Corp.*, 811 F.2d 118, 123-24 (2d Cir. 1987) ("Promises of future conduct are not actionable as negligent misrepresentations. . . . [Plaintiff's] efforts to frame broken promises into misrepresentations of present facts are fruitless.").  This is because a "promise" is either true – the person intended to honor it – or it is false – the person never intended to honor it, which might be fraud but is <u>not</u> negligent misrepresentation.[8]  As the cases explain, "it is not possible to be negligent in failing to ascertain the truth or falsity of one's present intention to act in the future."  *Mitchell v. Franklin Bank, S.S.B.*, 2005 WL 2406034, *3 (D. Minn. Sept. 29, 2005)[9]; *see also Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. Rptr. 2d 861, 863-64 (App. 1991) (concluding there is no negligent misrepresentation cause of action for a "negligent false promise").

Here, plaintiffs' claims are based entirely on promises or representations about future conduct—all amounting to, in plaintiffs' view, a promise to renew or continue the plaintiffs' contracts in the future.  All plaintiffs' alleged damages on this claim flow from, as their expert put it, "the termination of the JST and JSO Agreements."  (A-225.)  Thus, the alleged misrepresentation being a purported promise or representation of what MCG intended or how it would act in the future,

---

[8] MCG recently made this argument in moving to dismiss a copycat lawsuit filed in this Court by plaintiffs' lawyers on behalf of other representatives.  In response, plaintiffs on April 25 recklessly moved to amend their Complaint in this case to state an intentional fraud claim.  That allegation will be addressed in response to the motion to amend.

[9] Pursuant to Local Rule 7.1.3, a copy of the *Mitchell* case is provided at A-307.

there cannot be a negligent misrepresentation claim. *See Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1165-66 (9th Cir. 1997) (ruling that defendant's statement during negotiations that he "was looking for a long-term distributor," was "not a promise on which to base a negligent misrepresentation claim").

### B.    The Economic Loss Doctrine Bars Plaintiffs' Claim

Additionally, under Arizona's economic loss rule, negligent misrepresentation claims are precluded if the plaintiff has suffered only pecuniary, and not physical, injury. *See Apollo Group, Inc. v. Avnet, Inc.*, 58 F.3d 477, 479-81 (9th Cir. 1995) (upholding dismissal of negligent misrepresentation claim). As summarized by the Arizona Court of Appeals: "The economic loss rule bars a party from recovering economic damages in tort unless accompanied by physical harm." *Carstens v. City of Phoenix*, 75 P.3d 1081, 1083 (Ariz. App. 2003). In such circumstances, "the claimant is limited to recovery under the law of contract." *Apollo Group*, 58 F.3d at 479.

Ruling on Motorola's Motion to Dismiss, the Court found the economic loss doctrine inapplicable because the case "is one for services" and thus "the UCC does not apply." [D.I. 18 & 19.] Neither MCG nor the plaintiffs briefed whether that distinction is relevant in their motion to dismiss papers, and, respectfully, we believe that the Court was mistaken.

Prior to that ruling, no case held that the economic loss doctrine in Arizona was limited to UCC cases. To the contrary, in *Carstens*, the Arizona Court of Appeals applied the doctrine to bar non-UCC claims—the claims turned on the city's alleged failure to properly inspect real property for construction defects—and cited similar cases in doing so. 75 P.3d at 1083-84; *see also* Ballinger, Jr. & Thumma, *The History, Evolution & Implications of Arizona's Economic Loss Rule*, 34 ARIZ. ST. L.J. 491, 502 (2002) ("Does Arizona's economic loss rule apply to common law contracts? Yes.").

The Court also stated, seemingly as *dicta* as again the issue was not briefed, that the economic loss doctrine did not apply because the alleged misrepresentations were "not covered by the contract" and thus not barred. [D.I. 18 & 19.] However, while that reasoning may be pertinent in other jurisdictions, in Arizona the rule is that a negligent misrepresentation claim will not lie "unless accompanied by physical harm." *Carstens*, 75 P.3d at 1083. This is true even if the plaintiff has no remedy based on the parties' Agreement:

> Arizona courts have never held that the application of the economic loss rule depends upon the plaintiff also having a viable contract claim against the defendant. Irrespective of a plaintiff's contractual claims against a defendant, the rule bars recovery of economic damages in tort because such damages are not cognizable in tort absent actual injury.

75 P.3d at 1085.

Here, there is no alleged non-economic injury. Accordingly, the economic loss doctrine precludes plaintiffs' negligent misrepresentation claim.

## III.    Plaintiffs' Breach of Contract Claims Fail

### A.    The Good Faith and Fair Dealing Claims

JST says that MCG acted in bad faith "by fabricating facts surrounding the termination of JST's contract and misrepresenting its intent to use independent companies to sell its products." [D.I. 1 ¶ 57.] JSO adds that MCG acted in bad faith in terminating the parties' Agreement, using JSO's non-performance as a pretext. [D.I. 1 ¶ 69.]

### 1.    MCG Did Not Terminate JST's Agreement

The argument that MCG "fabricat[ed] facts surrounding the termination of JST's contract" does not even make sense; there was no termination—JST's contract expired by its own terms. (A-3; A-11; A-14; A-38.) In addition, MCG paid JST trailing commissions for six months after the Agreement expired. (A-220.) To the extent JST is claiming that MCG breached its contractual duty of good faith by not renewing, MCG was under no obligation to continue the

relationship—it was ending its entire independent representative program.  Indeed, the express terms of the Agreement directly contradict such an obligation.  *Kuehn v. Stanley*, 91 P.3d 346 (Ariz. App. 2004) ("As a general rule, an implied covenant of good faith and fair dealing cannot directly contradict an express contract term.").

### 2.    MCG Did Not Act in Bad Faith in Terminating JSO

This case involves commercial contracts between sophisticated business entities.  (A-1 to A-37; A-326 to A-332; A-357.)  The JSO contract imposed upon JSO certain objective performance obligations, and provided that, if JSO "failed to perform any of its obligations," MCG could terminate the Agreement.  (A-28.)

That JSO failed to meet its performance obligations is an objective reality, which is addressed *infra* in section III(C).  Assuming that is correct, JSO nevertheless seems to contend that MCG acted in "bad faith" by using JSO's failure to meet its performance obligations as a "pretext" to terminate.  That argument, however, fails as a matter of law.

"If contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires."  *Southwest Savings & Loan Ass'n v. SunAmp Sys., Inc.*, 838 P.2d 1314, 1319 (Ariz. App. 1992).  Accordingly, where there is no proof that a party acted out of ill will, spite or some motive unrelated to the performance of the contract, an "objectively reasonable" business decision precludes a commercial bad faith claim as a matter of law.  *Id.* at 1320.

Again, the reality was that MCG analyzed the sales representatives program, concluded that it was an economic loser—the representatives were not producing enough new business to justify the continued cost—and MCG, therefore, ended the program.  (A-439.)  Such a motive is not "bad faith."  There is

no proof that the terminations were done out of ill will, spite or any other motive unrelated to the performance of the program.  Accordingly, JSO's bad faith claim fails.

### B.    JST Agreement Was Not Renewed "By Conduct"

As detailed in this brief (*see* Statement of Facts § II(E), *supra*), JST repeatedly asked MCG to include a clause in the Agreement providing that the contract would "automatically be renewed unless terminated in writing."  MCG repeatedly refused, and the contract ultimately provided that it was for a one-year term and would only renew upon the "written Agreement of both parties."  (A-11.)

Nevertheless, JST claims that its contract with MCG renewed even though there was no "written Agreement of both parties" to renew.  The contract expired in December 2003.  In February 2004, MCG notified JST that the contract had expired and that MCG was not interested in continuing the relationship.  JST contends that, because MCG did not more promptly notify JST of its intentions and because JST purportedly continued to make sales calls after expiration, MCG effectively "waived" the writing requirement and the Agreement renewed for another year.  [D.I. 1 ¶ 42.]

As a starting point, the contract is clear:  There can be no renewal absent a written agreement.  The parties' understanding at the time of contracting is also clear:  MCG would not allow automatic renewal and insisted that renewal not happen except by written Agreement.  Here, the parties did not even discuss renewal, let alone agree in writing to renew.

As for the waiver contention, JST has no legal basis to say that MCG "waived" its rights and committed itself to a full-year renewal.  A "clear showing of intent to waive is required for waiver of rights."  *Goglia v. Bodnar*, 749 P.2d 921, 928 (Ariz. App. 1987); *see also* 31 C.J.S. *Estoppel & Waiver* § 68 (2005) (stating that, because waiver by conduct is disfavored, the "conduct, acts, or

circumstances relied upon to show waiver must make out a clear case of waiver"). Further, a party may only claim waiver if "misled to his prejudice into the honest belief that such waiver was intended." *Jones v. Indus. Comm'n*, 401 P.2d 172, 177 (Ariz. App. 1965) (source omitted).

Shortly after the expiration of the Agreement, no later than January 7, 2004, JST was in contact with GE Fanuc, a MCG competitor, about representing GE Fanuc. (A-554.) At the time, MCG was still paying commissions to JST. Unlike the other sales representatives' Agreements, JST had negotiated with MCG to receive six months trailing commissions upon expiration of the parties' Agreement. (A-12.) Consistent with this Agreement, MCG paid JST commissions on the sales in JST's territory for six months after the Agreement expired. (A-220.) Thus, assuming JST, as it claims, continued to make a handful of sales calls after the Agreement expired in the early part of the six-month trailing commission period, that does not mean the parties intended or agreed to renew their contract for another year, let alone that JST had an "honest belief" that Motorola was waiving the need for a written contract.

### C.     JSO Did Not Meet Its Performance Obligations

In paragraph 30 of its Complaint, JSO acknowledges that section 7.2A of the Agreement gave MCG the right to terminate JSO it if failed to meet its performance obligations. And without clearly alleging that it met those obligations, JSO claims that MCG had no "good faith basis" to conclude that it had not. Hardly.

By the time its Agreement was terminated, JSO was supposed to achieve eleven uncommitted accounts, three committed accounts, and one design win. (A-36 to A-37.) Each category represents a different step in the MCG sales cycle; however, the design win serves as the reps' ultimate goal because it represents "the leading indicator of new business." (A-36.) By the time JSO was terminated

in March 2004—nearly one year after it had signed the Agreement and began working as an independent representative and receiving commissions from MCG—JSO had not met any of these requirements.  And, while JSO contends that this is not the case, it is beyond dispute that JSO achieved zero design wins.

Following the termination, Blomme prepared a written analysis of JSO's performance.  (A-187; A-560 to A-567.)  This written analysis (which was inexplicably provided for the first time during the course of Blomme's deposition) concluded that JSO had four total design wins.  (A-187.)  Blomme later admitted at his deposition, however, that the analysis was incorrect and that JSO had zero design wins:

> Q:    So according to this document [Blomme's written analysis], when you apply it to the terms of the contract in Exhibit 4, none of these are design wins under the terms of the Contract?  Is that correct?
>
> [Objection]
>
> A:    Yes.
>
> Q:    That's correct?
>
> A:    Sure.

(A-324.)  Accordingly, even JSO agrees that it failed to meet the most important requirement of bringing in one design win.  This is consistent with the testimony of Dennis Robinson, the MCG employee who oversaw JSO's territory.  (A-456 to A-461.)  Robinson was to be compensated for all design wins achieved in JSO's territory, including design wins achieved by JSO; however, Robinson never received any compensation for a JSO design win.  (A-568.)

Further, JSO was supposed to have brought in a total of $100,000 in new cumulative revenue by the end of the third quarter under the Agreement.  Yet, JSO's own analysis of its performance indicates that it had "trouble with the total new cumulative revenue bar."  (A-187.)

In light of this, MCG was fully justified in terminating the Agreement based on JSO's failure to meet its performance standards.

**IV.     Damages Plaintiffs Seek Are Precluded By the Parties' Agreements**

In their expert report (as well as in discovery responses), the damages plaintiffs seek on their promissory estoppel, negligent misrepresentation and good faith and fair dealing claims, are reliance and/or lost profits damages.  Plaintiffs claim these damages allegedly were "suffered by JST and JSO as a result of the termination of the JST and JSO agreements."  (A-225.)  But JST and JSO expressly agreed in their contracts that they would not seek reliance or lost profits damages for the "termination or nonrenewal" of the contracts.  (A-13; A-29.)  The contractual language is clear and binding; it simply is being ignored by plaintiffs and their expert.  Summary judgment on these damage claims, therefore, is appropriate.

The JST and JSO Agreements contain multiple provisions precluding recovery of damages for reliance or lost profits arising from termination or nonrenewal of the Agreements:

> **7.4  Sole Remedy**.  Motorola's payment obligations in this Article VII shall be Representative's sole remedy for the *termination or nonrenewal* of this Agreement and will be in lieu of all other claims that Representative may have against Motorola as a result hereof. . . . Motorola will not be liable to Representative by reason of *termination or nonrenewal* of this Agreement for compensation, reimbursement, or damages for:
>
> A.     *Loss of prospective compensation*;
>
> B.     Goodwill or loss thereof; or
>
> C.     Expenditures, investments, leases, *or any type of commitment made in connection with the business of such party or in reliance* on the existence of this Agreement.

(A-13; A-29 (emphasis added).)  Similarly,

> **3.8  Limitation of Liability.** IN NO EVENT, *WHETHER FOR BREACH OF CONTRACT*, WARRANTY, *MOTOROLA'S NEGLIGENCE*, STRICT LIABILITY IN TORT *OR OTHERWISE* WILL MOTOROLA BE LIABLE FOR INCIDENTAL, SPECIAL, PUNITIVE OR *CONSEQUENTIAL DAMAGES* INCLUDING, BUT NOT LIMITED TO, FRUSTRATION OF ECONOMIC OR BUSINESS EXPECTATIONS, *LOSS OF PROFITS*, LOSS OF DATA, *COST OF CAPITAL*, COST OF SUBSTITUTION OF

1732562_1

> PRODUCTS, FACILITIES OR SERVICES, DOWNTIME, COSTS,
> OR ANY SIMILAR CLAIM OF A SPECIAL, INCIDENTAL,
> CONSEQUENTIAL OR PUNITIVE NATURE WHATSOEVER
> TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

(A-7; A-23 to A-24 (emphasis added).)

Despite these provisions, plaintiffs seek both reliance and lost profits damages that they claim they suffered due to MCG's alleged breach of the Agreements and its alleged improper termination or non-renewal of the Agreements. With regard to reliance damages, plaintiffs' expert reasons:

> To perform its responsibilities under the JST and JSO Agreements, JST and JSO incurred project related costs. Examples include salaries, training, marketing, and other types of costs . . . . As a result of Motorola's improper termination of the JST and JSO Agreements, JST and JSO are entitled to recover these project related costs as reliance damages.

(A-223.) Plaintiffs' expert estimates, "based on . . . discussions with JST and JSO management" that combined, JST and JSO have suffered $474,522 in reliance damages. (*Id.*)

As for lost profits, which also allegedly flow "as a result of the termination" of the Agreements, he estimates that JST and JSO suffered between $688,969 and $964,556 in such damages. (A-225.)

Estimating damages for reliance and lost profits "as the result of Motorola's breach of the Agreements" and "as a result of the termination of the JST and JSO Agreements," is clearly contrary to the express terms of plaintiffs' Agreements.

Under Arizona law, "[a] contract provision governing remedies or damages is generally binding on the parties." *United Dairymen of Ariz. v. Schugg*, 128 P.3d 756, 761 (Ariz. App. 2006). "The parties to a contract may specify certain remedies which may be used in case of breach. They may in addition make such a provision the exclusive remedy or remedies, barring all others which would

otherwise be available." *Hadley v. Southwest Props., Inc.*, 570 P.2d 190, 193 (Ariz. 1977).[10]

The Court thus should grant summary judgment on plaintiffs' reliance and lost profits damage claims.

## **CONCLUSION**

In light of the foregoing, the Court should grant summary judgment in favor of Motorola on all counts and on plaintiffs' reliance and lost profits damage claims.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
/s/ William W. Bowser

William W. Bowser (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601; Facsimile: (302) 576-3282
wbowser@ycst.com
OF COUNSEL:
Randy Papetti, Cory A. Talbot, Emily S. Cates
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 262-5311
Attorneys for Defendant

DATED:      May 1, 2006

---

[10] This Court has already found that Paragraph 3.8 precluded plaintiffs' claims for punitive damages.  [D.I. 18 & 19.]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., a )
Canadian corporation, and J-SQUARE )
TECHNOLOGIES (OREGON) INC., an )
Oregon corporation, )
                Plaintiffs, )
v. )      C.A. No. 04-CV-960-SLR
MOTOROLA, INC., a Delaware corporation. )
                Defendant. )

## CERTIFICATE OF SERVICE

I, William W. Bowser, Esquire, hereby certify that on this 1st day of May

2006, I electronically filed a true and correct copy of the foregoing **Motorola's Opening**

**Brief in Support of its Motion for Summary Judgment** with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

David Allan Felice
Cozen O'Connor
Chase Manhattan Centre, 1201 North Market, Suite 1400
Wilmington, DE 19801

I further certify that on this 1st day of May 2006, I mailed by United States

Postal Service the foregoing **Motorola's Opening Brief in Support of its Motion for**

**Summary Judgment** to the following non-registered participant:

Kevin F. Berry
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ William W. Bowser
William W. Bowser, Esquire (Bar I.D. 2239)
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601
Facsimile: (302) 576-3282
Email: wbowser@ycst.com