# Exhibit 1

## REPRESENTATIVE PRODUCT LIST AND
## COMMISSION RATES

**PRODUCT LIST**

All MCG Board and System Products

**COMMISSION RATES:**

Commissions for the monthly distributor POS run rate business in the Territory shall be paid at a rate of _____five_____ percent (_5 %).

Commission for all new MCG direct business in which Representative is directly involved, as evidenced by registration of the opportunity by the Representative's MCG contact, shall be paid at a rate of:____five_____ percent (_5__%).

A-16

# Exhibit 2

### TERRITORY AND HOUSE ACCOUNT LIST

**Territory:**
All POS Distribution accounts in Canada.

All direct accounts within the Territory not called out as Motorola House Accounts or Legacy Projects.

**Motorola House Accounts:**

Nortel

**Motorola Legacy Projects:**

Harris BWA Basestation Oppty – 8216T

17



A–17

*oregon*

# MANUFACTURER'S REPRESENTATIVE AGREEMENT

between

## MOTOROLA COMPUTER GROUP

and

## J-SQUARED TECHNOLOGIES ( OREGON ) INC.



A-18

TABLE OF CONTENTS

Article I. Definitions...................................................................................................3

Article II. Appointment and Scope .............................................................................3

Article III. Representative's Compensation ................................................................3

Article IV. Representative Obligations ........................................................................3

Article V. Motorola Obligations .................................................................................3

Article VI Confidentiality and Proprietary Rights......................................................3

Article VII. Term and Termination..............................................................................3

Article VIII. Dispute Resolution..................................................................................3

Article IX. General Provisions ....................................................................................3

LIST OF EXHIBITS

- EXHIBIT 1: REPRESENTATIVE PRODUCT LIST/COMMISION RATES
- EXHIBIT 2: TERRITORY AND HOUSE ACCOUNT LIST
- EXHIBIT 3: FOREIGN CORRUPT PRACTICES ACT CERTIFICATION
- EXHIBIT 4: PERFORMANCE STANDARDS

J2 NW Rep Agmt 030328.doc                    2                    Rev. Date 27 March 2003

THIS AGREEMENT is made and effective on the date of the last signature below by and between Motorola Inc., a Delaware corporation, by and through its Computer Group having an office at 2900 South Diablo Way, Tempe Arizona, United States of America ("Motorola "), and J-Squared Technologies ( Oregon ) Inc., a Corporation organized under the laws of Oregon, and having an office address of 6700 Southwest 150th Avenue, Suite 307 Beaverton, Oregon 97008 ("Representative").

## Article I. Definitions

1.1     Agreement. "Agreement" means this document and any exhibit, attachment, schedule, addendum, or modification unless the context otherwise indicates.

1.2     Customer. "Customer(s)" means any purchaser of Products from Motorola for end use in the Territory.

1.3     Products. "Products" means those Motorola products and systems that are specifically identified at Exhibit 1.

1.4     Confidential Information. "Confidential Information" means all information which is disclosed in oral, written, graphic, machine recognizable, and/or sample form, and which is clearly designated, labeled or marked as confidential or its equivalent and includes all know-how, designs, drawings, specifications, catalogs, data sheets, sales and technical bulletins, service manuals, mechanical diagrams, and all other information relating to the design, manufacture, use, and service of the Products, including any other information relating to Motorola's business that may be sent to Representative during performance of this Agreement and that is not generally known in the trade.

1.5     Territory. "Territory" is limited to the area or specified accounts identified in Exhibit 2.

## Article II. Appointment and Scope

2.1     Appointment.   Subject to the terms, conditions and duration of this Agreement, Motorola appoints Representative as a non-exclusive, independent manufacturer's representative of the Products for end use in the Territory at such prices and upon such terms and conditions as established by Motorola.   Representative accepts this appointment and agrees to devote such time and attention to the performance of such duties as may be reasonably necessary. Representative shall not, without Motorola's written authorization, register as Motorola's representative in any country or jurisdiction other than Territory.

2.2     Territory Exclusivity.   This appointment is non-exclusive. While it is not currently Motorola's intent, Motorola retains the right to appoint additional sales representatives, agents, distributors or other representative for Products in or for the Territory. Motorola may also at any time sell any Products directly, as identified in Exhibit 1 or by written notice as provided for in paragraph 3.1, or indirectly through any Motorola subsidiary or affiliate without incurring any commission or other payment obligation to Representative of any type or nature. Motorola specifically reserves the House Accounts listed in Exhibit 2 as Motorola direct accounts for which Representative will not be entitled to receive any commission, including cases where a House Account places an order through Motorola's distributors.

2.3     Distribution Outside Territory.   Representative will limit its Product sales activities to Customers within the Territory and will not market Products outside the Territory.

2.4     **Agents and Subrepresentatives.** Representative may not appoint any agent, subrepresentative, or other person ("Sub-Agent") to promote Product sales or to otherwise perform any of Representative's obligations without Motorola's prior written approval and compliance with Motorola's policy for obtaining such approval. Motorola's approval of any such Sub-Agent shall be based upon Motorola's review of information provided by Representative. Any such approval shall not be deemed to create any obligation between Motorola and Sub-Agent. Actions of Sub-Agents shall be the sole responsibility of Representative and Representative agrees to indemnify and hold Motorola harmless against any and all acts, whether unintentional or deliberate, on the part of the Sub-Agent. Prior to furnishing any Product to a Sub-Agent, Representative shall obtain a signed agreement from such Sub-Agent consistent with the terms of this Agreement and shall, among other things, require that the Sub-Agent comply with the United States Foreign Corrupt Practices Act and Motorola's Code of Business Conduct. Sub-Agents will in no event be allowed to describe themselves or advertise themselves as Motorola authorized representatives or distributors.

2.5     **Independent Contractor Status.** Representative is an independent contractor who will not be considered a Motorola employee, agent or legal representative for any purpose; neither Representative nor any of its directors, officers, employees or agents will be, or will be considered, a Motorola agent or employee. Representative is not granted and will not exercise any right or authority to assume or create any obligation or responsibility on behalf of, or in the name of, Motorola. Specifically, Representative does not have authority, on Motorola's behalf, to: a) contract or make commitments; b) change prices or terms and conditions of sales; c) make warranties, oral or written, express or implied concerning Products; or d) take any action which would result in Motorola's liability for state, federal, or local taxes or any expenses of any kind.

2.6     **Operations and Expenses.** Representative's detailed operations under this Agreement are subject to the sole control and management of Representative. Except for training as may be provided by Motorola under Section 5.5, Representative is responsible for all its own expenses and employees and for providing, at its own expense, such office space, facilities, and training as may be required to carry out its obligations under this Agreement. Representative will incur no expense chargeable to Motorola, except as specifically authorized in advance in writing by Motorola. Any such chargeable expense shall be documented in accordance and consistent with applicable Motorola policies.

2.7     **Noncompetition.** Representative will not sell, offer for sale, or act as sales agent for the solicitation of orders for any products that are competitive with any of the Products as defined by Motorola; nor will Representative engage in any activity that may result in a relationship with current or future customers that creates a conflict of interest as defined by Motorola.

## Article III. Representative's Compensation

3.1     **Commissions.** For services detailed in this Agreement, commissions will be based upon the Net Sales Price of Product for those orders to Motorola from either Motorola's distributors or those direct Customers that are in the Territory, other than Motorola House Accounts. Eligible orders shall be limited to those received by Motorola after the effective date of this Agreement and registered through the Motorola registration system, whether prior or newly registered by Motorola's distributor for indirect orders or new orders prior or newly registered by Representative, through its Motorola contact, for direct orders. Net Sales Price is defined as the:

(1) actual price (i.e., original contract price adjusted by change orders and termination orders) paid to Motorola by Customers for direct orders less any discounts, refunds, liquidated damages, sales or other applicable taxes, C.O.D. charges, insurance, commissions and finance charges, freight or transportation costs, or other allowances from the delivery point, if any; or

(2) Motorola list price less the then current Motorola distributor discount for indirect orders less any additional discounts, refunds, liquidated damages, sales or other applicable taxes, C.O.D. charges, insurance, commissions and finance charges, freight or transportation costs, or other allowances from the delivery point, if any.

The commission rate is identified for each Product in Exhibit 1. This agreed to commission rate is subject to subsequent reduction should business circumstances dictate or as may be restricted by law, regulation or contract with the Customer.

Motorola may make adjustments to authorized Territory and direct accounts upon written notice to Representative. In such cases of adjusted Territory and/or direct accounts, Representative will be eligible for a commission, pursuant to the commission schedule included in Exhibit 1, on all orders accepted and shipped within a period of 120 days following the date of adjustment for orders effected by those Territory and direct accounts changes.

3.2     **Net Sales Price Changes.** If: (a) the Net Sales Price changes after acceptance of the order by Motorola; or (b) credit is granted or a refund is made to a Customer for returned Products, and such change, credit or refund results in a different commission from the commission derived from Paragraph 3.1 above; any over or underpayment will be: (i) subtracted from or added to the next commission payment payable to Representative; or (ii) refunded by or paid to Representative within 30 days of written notice by Motorola if no further commissions are to become due.

3.3     **Billing Documents.** Any and all billing documentation which Motorola may provide to its Customers will be in accordance with Motorola's standard invoicing techniques reflecting the actual terms and conditions (prices, terms, commissions, etc.) of the sales transaction. Under no circumstances will a Customer be invoiced at other than the actual sales price.

3.4.    **Payments.** Commissions are earned on orders when payments of the invoices have been received from Customers, or on behalf of Customers, whether such payments are in whole or in part and shall be payable in accordance with Motorola standard policy of payment to third party representatives as follows. Where payment is less than the full amount due on an invoice, the commission earned will be limited to the applicable commission rate multiplied by the amount actually received. Commissions earned may be subject to delay based upon milestone payments to Motorola, payment holdbacks and performance bond requirements and which delay shall be agreed to in writing by the parties prior to final customer contract award. Commissions earned will accumulate monthly and be due and payable on the end of the month following the month in which Customer payments have been received Commissions will be made payable to Representative and transmitted by mail to Representative's business address or such other means as are permissible under the laws of the Territory and the United States of America and in accordance with the internal policies of Motorola. Representative represents and warrants that it will report and disclose all commissions, fees or other types of compensation received under this Agreement as required under law.



3.5    Refusal to Accept Orders. Representative's entitlement to a commission depends on Motorola's acceptance of Customer orders during the term of this Agreement and Representative's efforts to secure such orders.   Motorola's failure or refusal to accept any order for any reason shall not create an obligation to pay either a commission or any damages in lieu thereof, nor shall any delay or default in the performance of any accepted order create an obligation to pay a commission or any claimed damages. Motorola shall not be obligated to make any commission payments for any orders received or accepted before the effective date of this Agreement, for sales from one government to another government, or for any order which is not, in Motorola's opinion, the result of Representative's efforts consistent with the terms and conditions of this Agreement.

3.6    Commission Changes. Commission levels may be amended by Motorola from time to time on all future business opportunities and will be effective 180 Days after written notice to Representative.

3.7    Commission Restrictions. MOTOROLA WILL NOT PAY A COMMISSION WHERE PROHIBITED OR TO THE EXTENT LIMITED BY UNITED STATES OR LOCAL LAW OR REGULATION, OR BY ANY CONTRACTUAL, FINANCING, OR OTHER SIMILAR PROVISION. REPRESENTATIVE ASSUMES THE RISK THAT A COMMISSION MIGHT BE SUBJECT TO A PROHIBITION OR LIMIT AND THAT REPRESENTATIVE WILL NOT BE PAID AS A RESULT. REPRESENTATIVE IS ENCOURAGED TO REVIEW LOCAL LAW, LOCAL REGULATIONS, POTENTIAL CONTRACTS, AND FINANCING ARRANGEMENTS FOR PROHIBITIONS OR LIMITATIONS ON COMMISSIONS. IF PAYMENT OF A COMMISSION IS LIMITED, BUT NOT ENTIRELY PROHIBITED, BY APPLICABLE UNITED STATES OR LOCAL LAW OR REGULATION, CONTRACT OR FINANCING ARRANGEMENTS, MOTOROLA AND REPRESENTATIVE MAY NEGOTIATE PAYMENT OF COMMISSION ON A CASE-BY-CASE BASIS WITHOUT OBLIGATING MOTOROLA TO PAY A COMMISSION IN EXCESS OF SUCH LIMITATIONS EXCEPT TO THE EXTENT IT AGREES IN ADVANCE AND IN WRITING.

Commissions on the sale of products pursuant to Foreign Military Sales/Foreign Military Financing (FMS/FMF), NATO and other sales where commissions may be otherwise restricted shall be payable in accordance with the relevant local law and United States law and regulations as follows:

   1)    Where there is no restriction on commissions, a commission will be paid at the agreed to rate as defined in Paragraph 3.1.

   2)    Where commissions are restricted, Motorola will pay a commission at the agreed to rate, not to exceed the amount restricted by law or regulation, or as otherwise specifically stipulated to by the Customer in writing prior to contract award.

   3)    Where a commission is prohibited, Motorola will pay no commission.

3.8    Limitation of Liability. IN NO EVENT, WHETHER FOR BREACH OF CONTRACT, WARRANTY, MOTOROLA'S NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE WILL MOTOROLA BE LIABLE FOR INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, FRUSTRATION OF ECONOMIC OR BUSINESS EXPECTATIONS, LOSS OF PROFITS, LOSS OF DATA, COST OF CAPITAL, COST OF SUBSTITUTION OF PRODUCTS, FACILITIES OR SERVICES, DOWNTIME, COSTS, OR ANY SIMILAR CLAIM OF A SPECIAL, INCIDENTAL,

CONSEQUENTIAL OR PUNITIVE NATURE WHATSOEVER TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

3.9    **Claims Procedures.** Any dispute or claim against Motorola related to this Agreement, or its expiration or termination, requires written notice to Motorola within one hundred eighty (180) days of the event giving rise to the claim. Failure to give such notice will constitute a waiver of any claim against Motorola and will relieve Motorola from any and all liability on any such claim.

3.10    **Offsets.** Any credits, allowances, or other amounts payable or creditable to Representative by Motorola will be subject to offset for any claims or other amounts owed by Representative to Motorola pursuant to the provisions of this Agreement or otherwise.

3.11    **Taxes.** All taxes (including, but not limited to, income, withholding, sales, use, registration, ad valorem, excise, employment and documentary taxes), duties, excises or other such charges imposed by governmental or quasi-governmental bodies relating to the sale, shipment, acquisition, holding and disposition of Products by Representative or Representative's actions or presence in the Territory or any performance under this Agreement that are not the responsibility of the Customer will be paid by Representative, which agrees to indemnify and hold harmless Motorola or any Motorola Affiliate with respect to any such charges paid by Motorola or any Motorola Affiliate.

## Article IV. Representative Obligations

4.1    **Sales Promotion.** Representative will use best efforts to promote the sale and use of Products in Territory. Representative will immediately submit to its contact within Motorola all leads, forecasts, purchase orders, and other communications Representative develops or receives from a Customer or prospective Customer for the Products.

Representative must register all sales efforts and leads through the Motorola registration system for those opportunities that may result in direct orders to Motorola and will be eligible for a commission on only those direct orders so registered. Motorola will direct Representative as to the method of adequate registration.

4.2    **Facilities and Personnel.** Representative will maintain, at its own expense, such office space and facilities, and hire and train such personnel, as may be required to carry out its obligations under this Agreement.

4.3    **Promotional Materials.** Representative will maintain an adequate inventory of Motorola's current sales material and samples for use in an efficient and effective manner to promote the sale of Products in the Territory. At Motorola's request, Representative will not use any non-Motorola advertising or promotional materials to promote the Products without Motorola's prior written approval.

4.4    **Performance Standards.** Representative agrees to maintain minimum performance standards as provided in Exhibit 4, which standards may be amended from time to time by written consent of both parties. If Representative fails to meet such minimum performance standards, Motorola may terminate this Agreement without cause in accordance with Paragraph 7.2G.

4.5    **Sales Policies.** Representative will comply, and will cause its employees and agents to comply, with all Motorola sales policies and the Motorola Code of Ethics and Business Conduct and the United States Foreign Corrupt Practices Act.

4.6     Service and Training.  Representative will assist Motorola in arranging for warranty, maintenance, and repair service for all Customers.  Representative will ensure that appropriate personnel attend any local or regional training as Motorola reasonably requires.

4.7     Local Law. Representative will notify Motorola of the existence and content of any mandatory provision of law in the Territory or any other applicable law that conflicts with or otherwise affects any provision of this Agreement at the time of its execution or thereafter. Representative agrees to comply with all laws and regulations of the Territory.  Failure to comply with this Paragraph 4.7 will be considered a material breach of this Agreement, allowing Motorola to terminate this Agreement effective immediately upon notice to Representative under Paragraph 7. 2E hereof.

4.8     Questionable Payments. Representative and Motorola shall use only ethical and legitimate business practices in the activities contemplated by this Agreement. Neither party shall engage in any improper gifts or payments in connection with the marketing or sale of any Product under this Agreement nor engage in any other improper, illegal or unethical conduct. In addition, Representative agrees to cooperate fully with Motorola in any investigation of such matters.  As used in this paragraph, the term unethical conduct shall include improper, illegal or unethical conduct and corrupt payments within the meaning of the Motorola Code of Business Conduct, the United States Foreign Corrupt Practices Act (15 United States Code Section 78dd-1 and -2) and local anti-corruption laws. Representative certifies that neither it, nor any of its directors, officers, employees, or agents is an official, agent, or employee of any government or governmental agency or political party or a candidate for any political office as of the effective date of this Agreement. Representative represents and warrants that all information provided to Motorola during the process of qualification of Representative, is true, accurate and correct and that Representative will promptly notify Motorola of any change to that information or of any event that would or may result in an exception to the representations contained in this Agreement. Representative will require each of its directors, officers, employees, and agents to comply with the provisions of this Paragraph 4.8, and it will ensure that appropriate personnel attend any regional Motorola briefings on this topic. Motorola will make available to Representative the Motorola Code of Business Conduct and any other information requested under this Paragraph 4.8. Notwithstanding any provision of this Agreement, any breach of the provisions of this Paragraph 4.8 will be considered a material breach of this Agreement and entitle Motorola to terminate this Agreement effective immediately on notice to Representative under Paragraph 7.2E and may result in Representative's surrender of any claim for payment under this Agreement and the refund any payment received. Representative shall certify to the representations and warranties contained in this Paragraph 4.8 by reading and executing Exhibit 3 prior to the execution of this Agreement.

4.9     Indemnification. Representative agrees to indemnify, defend and save Motorola harmless from and against all claims, proceedings, losses, penalties, damages or actions, and all expenses incidental to any investigation, negotiation or defense thereof, based upon, arising out of, or in connection with: a) damage or injury (including death) to persons, property, reputation, or business opportunity, caused by or sustained in connection with the performance of services hereunder or by conditions created hereby, except for damage or injury resulting solely and directly from Motorola's negligence or willful misconduct; b) breach of any of the provisions of this Agreement; c) negligence or other tortious conduct; d) representations or statements not specifically authorized by Motorola in this Agreement or in writing; e) violation by Representative (or any of its directors, officers, employees or agents) of any



A-25

applicable law, regulation, or order in the Territory or of the United States; or f) any material misrepresentation or omission made by Representative in connection with the information supplied relative to paragraph 4.12.

Motorola will indemnify and hold Representative, its officers, directors, employees, successors, and assigns harmless against all claims and losses, that may be sustained as a result of: a) breach of any of the material provisions of this Agreement; b) disputes between Motorola and its customers to the extent that such dispute is due solely to Motorola's negligence or non-performance; or c) any material misrepresentation or omission made by Motorola in connection with the Products.

4.10    Insurance. Both parties agree to maintain adequate financial resources or insurance to fulfill their financial responsibilities under this Agreement.

4.11    Security. If, during this Agreement, Representative is involved in negotiations with sovereign governments or agencies for sale or use of Motorola Products by such governments or agencies requiring security clearance of Representative's personnel, Representative agrees to cooperate fully, to undertake at Representative's expense to acquire the necessary security clearance as requested by the governments or agencies and to observe all regulations or instructions issued by such governments or agencies with respect to such security clearance and maintenance of security.

4.12    Due Diligence Review. Representative, prior to initial appointment as a representative hereunder and any subsequent renewals, shall provide information to Motorola in order for Motorola to perform a due diligence review to assess Representative's ability to perform its obligations under this Agreement. Representative represents and warrants and will, at the time of submission, certify that all information supplied in accordance with Motorola's request is complete and accurate and that Representative will immediate notify Motorola of any and all changes to that information.

## Article V. Motorola Obligations

5.1    Sales Support. Motorola will provide Representative English language sales and marketing information for Products and furnish at reasonable cost such catalogs, specifications, promotional literature, and other materials pertaining to Products as are available.

5.2    Advertising Programs. Motorola may advertise in the Territory, with or without consultation with Representative.

5.3    Notification of Changes. Motorola will advise Representative, either in writing or by electronic means, of any changes in or affecting the Products or prices, terms and conditions of sale, sales policies, projected delivery dates, schedule changes, and other matters that Motorola determines may affect the business of Representative.

5.4    Assistance. Motorola will provide Representative reasonable access to and assistance of its technical, sales, and service personnel as Motorola deems appropriate. Such assistance will be without charge to Representative except as otherwise mutually agreed.

5.5    Training. Motorola will conduct, and Representative will cause its personnel to attend, such technical and sales training sessions for Products as Motorola deems necessary to allow Representative to effectively market the Products. Such training will be provided without charge to Representative. All

compensation, transportation, or living expenses of Representative's personnel while in attendance at such training sessions will be borne by Representative.

## Article VI Confidentiality and Proprietary Rights

6.1     **Confidential Information.** Both parties acknowledge that Confidential Information is valuable and proprietary. The receiving party will hold Confidential Information in strict confidence for five (5) years after expiration or termination of this Agreement and will not disclose it to any other person, firm, or corporation without the disclosing party's prior written approval. This obligation will not extend to information which is now available or becomes available to the public without breach of this Agreement, is released in writing by disclosing party, is lawfully obtained from a third party or parties without confidential obligation, is known to the receiving party prior to such disclosure or is at any time developed by the receiving party independently of any such disclosure or disclosures from the disclosing party.

6.2     **Use of Confidential Information.** The receiving party will limit its use of Confidential Information and any patent, trademark, or other intellectual property rights of the other party to implementation of this Agreement. Representative shall place the following legend on all Motorola Confidential Information disclosed by Representative to its government customers:

"The information contained in this document is submitted in confidence, is privileged and exempt from disclosure under the "Freedom of Information Act" (5 U.S.C. Section 552) by reason of exemptions in Sections (b)(3) by reference to 18 U.S.C. Section 1905 – and (b)(4) of said act."

Both parties acknowledge that damages sustained as a consequence of any breach of the other party's obligations under this Paragraph 6.2 may be difficult to measure in monetary terms. Both parties hereby agree that as such the disclosing party shall be entitled seek: a) to have the continuation of any such breach immediately and permanently enjoined; and b) an award of exemplary damages in an appropriate amount determined by a court of competent jurisdiction in the State of Arizona.

6.3     **Trademarks and Trade Names.** Products may bear Motorola's trademarks, which Representative will not remove or efface. Representative shall have no right under this Agreement to use the tradenames, trademarks, or logos of Motorola without Motorola's prior express written consent. All use of such trademarks will inure solely to Motorola's benefit. Representative will not directly or indirectly use any of Motorola's trademarks or part thereof, or any mark or name confusingly similar thereto, as part of its corporate or business name or in any other manner, except that: a) Representative may identify itself as an authorized Representative of Motorola in accordance with Motorola's written instructions; and b) upon Motorola's written consent, Representative may use Motorola's trademarks relating to the Products for display purposes in connection with solicitation of orders for Products. In addition, Representative will not register any of Motorola's trademarks or any mark or name closely resembling them.

6.4     **Protection of Proprietary Rights.** Representative will cooperate with and assist Motorola, at Motorola's expense, in the protection of trademarks, patents, or copyrights owned by or licensed to Motorola and will inform Motorola immediately of any infringement or other improper action with respect to such trademarks, patents, or copyrights that come to the attention of Representative.

## Article VII. Term and Termination

7.1    Term. Unless terminated as provided in Paragraph 7.2 below or by mutual written consent, this Agreement will continue in full force and effect for an initial term expiring one (1) year after the effective date hereof and thereafter may be renewed only upon the written Agreement of both parties.

7.2    Termination. This Agreement may be terminated before expiration of the initial or any renewal term, as provided in Paragraph 7.1 above, by prior written notice to the other party as follows:

A.    By either party, in the event the other party should fail to perform any of its obligations hereunder and should fail to remedy such nonperformance within thirty (30) calendar days after receiving written demand therefore or, if the nature of the default does not reasonably allow it to be remedied in thirty (30) days, the Agreement will be considered terminated if the defaulting party fails to take corrective action within thirty (30) days after receipt of a notice of default and intent to terminate from the nondefaulting party;

B.    By either party, effective immediately, if the other party should become the subject of any voluntary or involuntary bankruptcy, receivership, or other insolvency proceedings or make an assignment or other arrangement for the benefit of its creditors, or if such other party should be nationalized or have any of its material assets expropriated;

C.    By Motorola, effective immediately, if Representative should attempt to sell, assign, delegate, or transfer any of its rights and obligations under this Agreement without having obtained Motorola's prior written consent thereto, or if there should occur any material change in the management, ownership, control, sales personnel, sales and marketing capability, or financial condition of Representative;

D.    By Motorola, effective immediately, if any law or regulation should be adopted or in effect in the Territory that would restrict Motorola's termination rights or otherwise invalidate any provisions hereof;

E.    By Motorola, effective immediately, if Representative should violate the terms of Paragraph 2.7 above or otherwise in accordance with provisions of Paragraphs 4.5, 4.7 and 4.8;

F.    By Motorola, effective immediately, if Representative knowingly makes any false or untrue statements or representations to Motorola herein or in the performance of its obligations hereunder; and

G.    By either party, without cause after the initial 180 days following the effective date of this Agreement, on thirty (30) days prior written notice to the other party.

7.3    Rights of Parties on Termination. Upon termination or expiration of this Agreement:

A.    Representative will cease all sales and other activities on behalf of Motorola, return to Motorola and immediately cease all use of Confidential Information, turn over to Motorola Representative's current Customer mailing list and take such action as is necessary to terminate Representative's registration as Motorola's sales Representative with any government authority.

B.    All indebtedness of Representative to Motorola will become immediately due and payable without further notice or demand, which is hereby expressly waived. Both parties will be entitled

to seek reimbursement for reasonable attorneys' fees that it may incur in collecting or enforcing payment of any such obligations under this Agreement.

C.    Representative will: a) remove from its property and immediately discontinue all use, directly or indirectly, of trademarks, designs, and markings owned or controlled, now or hereafter, by Motorola, or of any word, title, expression, trademark, design, or marking that, in the opinion of Motorola, is confusingly similar thereto; and b) further certify in writing that Representative has completely terminated its use of any and all such trademarks, designs, or markings, or any other word, title, or similar expression that appeared in or on any devices or other materials used in conjunction with Representative's business.

D.    Representative shall not be eligible for any commissions in the case of termination by Motorola as described in Paragraphs 7.2 A through F.  Representative will be only be eligible for further commissions in the case of termination by Motorola pursuant to Paragraph 7.2 G and only on:

    1)    All direct open orders and new direct orders accepted and shipped within a period of 180 days as of the date of termination or expiration; and

    2)    All net distribution POS orders and new distribution POS orders accepted and shipped within a period of 180 days as of the date of termination or expiration.

E.    The obligations of Representative under Paragraphs 4.9, 4.10, 4.11 and Article VI will survive the termination or nonrenewal of this Agreement for any reason.

7.4    **Sole Remedy.**  Motorola's payment obligations in this Article VII shall be Representative's sole remedy for the termination or nonrenewal of this Agreement and will be in lieu of all other claims that Representative may have against Motorola as a result thereof.  Representative hereby waives its right to any termination compensation and damages it may have a right to under local law.  Motorola will not be liable to Representative by reason of termination or nonrenewal of this Agreement for compensation, reimbursement, or damages for:

A.  Loss of prospective compensation;

B.  Goodwill or loss thereof; or

C.  Expenditures, investments, leases, or any type of commitment made in connection with the business of such party or in reliance on the existence of this Agreement.

## Article VIII. Dispute Resolution

8.1    MOTOROLA and Representative agree to attempt to settle any claim or controversy arising out of this Agreement through consultation and negotiation in the spirit of mutual friendship and cooperation.  If such attempts fail, then the dispute may first be submitted to a mutually acceptable neutral advisor for initial fact finding in preparation for mediation or other form of alternate dispute resolution.  The Court shall finally determine any dispute that cannot be so resolved between the parties in good faith under Arizona law.



## Article IX. General Provisions

9.1     Entire Agreement. This Agreement represents the entire agreement between the parties and supersedes all prior discussions, agreements, and understandings of every kind. No modification of this Agreement will be effective unless in writing and signed by both parties. Any and all side letters or supplementary agreements not specifically added to this agreement by amendment or addendum shall be of no effect whatsoever.

9.2     Notices. All notices under this Agreement will be in English and will be in writing and given by certified mail, overnight courier, or telefax (acknowledged by answerback) addressed to the parties at the addresses immediately below their respective signatures hereto, or to such other address of which either party may advise the other in writing. Notices will be deemed given when sent.

9.3     Force Majeure. Neither party will be in default hereunder by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any cause beyond the reasonable control and without the fault or negligence of such party. Such causes will include, without limitation, storms, floods, other acts of nature, fires, explosions, riots, war or civil disturbance, strikes or other labor unrest, embargoes and other governmental actions or regulations that would prohibit either party from ordering or furnishing Products or from performing any other aspects of the obligations hereunder, delays in transportation, and inability to obtain necessary labor, supplies, or manufacturing facilities.

9.4     Severability. Subject to the provisions of Paragraph 7.2D above, the illegality or unenforceability of any provision of this Agreement will not affect the validity and enforceability of any legal and enforceable provisions hereof.

9.5     Nonassignment. This Agreement will be binding on and inure to the benefit of the successors and assigns of the business interests of Motorola and may be assigned by Motorola only to the acquirer of substantially all of Motorola's assets in conjunction with such an acquisition. Representative will not sell, assign, delegate, or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Motorola.

9.6     Language. The English language version of this Agreement will govern and control any translations of the Agreement into any other language.

9.7     Applicable Law. This Agreement will be construed, enforced, and performed in accordance with the internal laws of Arizona, U.S.A. without reference to principles of conflicts of laws and specifically excluding the UN Convention of the Sale of Goods with respect to any purchases hereunder. Use of Arizona law shall apply exclusively to this Agreement.

9.8     Non-Solicitation. During the term of this Agreement and for a period of eighteen (18) months following the expiration or termination of this Agreement, neither party or its successors and assigns will encourage or solicit any employee to leave the employ of the other without written approval; the foregoing does not prohibit mass media advertising not specifically directed towards any particular employee of the other party.

9.9     Waiver. Motorola's failure to require Representative's performance of the provisions herein will not operate as a waiver of Motorola's right to request strict performance of the same or like provisions, or any other provisions hereof, at a later time.

9.10   Headings.  Headings are for convenience of reference only and are not a part of this Agreement, nor will they in any way affect interpretation hereof.

IN WITNESS WHEREOF, Motorola and Representative have caused this Agreement to be executed by their duly authorized employees.

Representative:
**J Squared Technologies ( Oregon ) Inc.**

_(Authorized Signature)_
Jeff  Gibson
(Typed Name)
President
(Title)
March 31, 2003.
(Date)

**Motorola Inc., Motorola Computer Group**

_(Authorized Signature)_
Kevin  Parslow
(Typed Name)
Director  World-Wide Sales
(Title)
15th May 2003
(Date)

**ADDRESS FOR FORMAL NOTICE:**

J-Squared Technologies, Inc. _____

4015 Carling Ave, Suite 101 _____

Kanata, Ontario _____

K2K 2A3, Canada _____

Fax No. (613) 592-7051 _____

ATTENTION: Jeff Gibson _____

**ADDRESS FOR FORMAL NOTICE:**

Motorola Computer Group

2900 S. Diablo Way, DW103

Tempe, AZ 85282 USA

Fax No. (602) 437-6246

ATTENTION: Group Contracts

# Exhibit 1

## REPRESENTATIVE PRODUCT LIST AND
## COMMISSION RATES

### PRODUCT LIST

All MCG Board and System Products

### COMMISSION RATES:

Commissions for the monthly distributor POS run rate business in the Territory shall be paid at a rate of Five percent (5 %).

Commission for all new MCG direct business in which Representative is directly involved, as evidenced by registration of the opportunity by the Representative's MCG contact, shall be paid at a rate of Five percent (5%).

# Exhibit 2

### TERRITORY AND HOUSE ACCOUNT LIST

<u>Territory:</u>
All POS Distribution accounts in Washington State, Oregon and Idaho.

All direct accounts within the Territory not called out as Motorola House Accounts or Legacy Projects.

<u>Motorola House Accounts:</u>

Nortel Networks.................................................................................................. All
Motorola ........................................................................................................... All
General Electric Medical Systems...........................................................Milwaukee, WI
Tellabs ..................................... Cambridge, MA and Lisle, Bolingbrook, & Naperville, IL
Marconi Communications..................................................................Warrendale, PA
Eastman Kodak........................................................ St. Paul, MN & Rochester, NY
Alcatel ...................................................................................................Dallas, TX
Scitex ....................................................................................................Dayton, OH
   All Contract Manufacturers and Distribution that buy for the above account sites are also including under Motorola House Accounts List whether currently in or moved to the above defined Territory.

<u>Motorola Legacy Projects:</u>

Agilent Rembrandt ............................................................................................VP22
ETEC Next Gen Mask / GE2....................................................................PrPMC800



A–33

# Exhibit 3

## FOREIGN CORRUPT PRACTICES ACT CERTIFICATION

While representing or distributing MOTOROLA products, and in consideration for entering into a Representative Agreement, I make the following covenants understanding that MOTOROLA will rely on these covenants in connection with my Agreement.

1. I acknowledge that I understand the requirements of the Foreign Corrupt Practices Act ("FCPA") and MOTOROLA'S Code of Conduct as they relate to my representation or distribution of MOTOROLA products. I will attend local or regional FCPA briefings as requested by MOTOROLA.

2. I will not, directly or indirectly, in connection with my Representative Agreement and business resulting there from offer, pay, promise to pay, or authorize the giving of money or anything of value (e.g. a promise of future employment, a retainer agreement) to any government official as defined in the FCPA (as amended), to any political party or official thereof or to any candidate for political office, or to any person, while knowing or being aware of a high probability that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any government official, to any political party or official thereof, or to any candidate for political office, for the purposes of:

   a) influencing any act or decision of such official, political party, party official, or candidate in his or its official capacity, including a decision to fail to perform his or its official functions; or

   b) inducing such official, political party, party official, or candidate to use his or its influence with the government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, to assist MOTOROLA in obtaining or retaining business for or with, or directing business to MOTOROLA. I understand that this payment prohibition is not limited to payments made from commission proceeds.

3. No partner, owner, principal or staff member of my organization are officials, officers or representatives of any government or political party or candidate for political office.

4. None of my compensation will be used for any purpose, nor will I take any action, which would constitute a violation of any law of the various jurisdictions in which I perform services or of the United States, including the FCPA. I will not seek to obtain or to provide to anyone documents or other information the disclosure of which is prohibited by the law of any jurisdiction in which I perform services, including any information regarding competitor's bids or proposals regardless whether the disclosure of such information is so prohibited.

5. My representation of MOTOROLA is permitted under local law, and I have complied with all local government registration, approval and disclosure requirements. I will make my financial records

J2 NW Rep Agmt 030328.doc                    17                    Rev. Date March 27, 2003



A-34

available to MOTOROLA and law enforcement authorities in case of alleged violation of the FCPA. I understand that the payment of all commissions will be made by wire transfer to my bank account in the country in which I am performing services.

6. I agree that I will obtain advance agreement in writing from MOTOROLA before incurring travel and entertainment expenses for, or providing gifts to, public officials or employees of any Government customer or potential Government customer involved in the purchase of MOTOROLA products. I understand that MOTOROLA will not approve any expenditure that would violate U.S. or local law and will approve only those entertainment expenditures that are considered reasonable.

7. The services described in my Representative Agreement are services which I have the capacity to perform and are the only services for which I am being compensated. I understand that any invoice that I submit describing services performed is a certification that the services in question have actually been performed and are the only services giving rise to the invoice. The submission of a false or inaccurate invoice will be grounds for immediate termination of the Agreement.

8. I agree to provide MOTOROLA written updates to the information form that I completed in order for MOTOROLA to perform its FCPA due diligence review. I will provide such updates whenever there is a material change in the information previously provided, but in no event less frequently than annually (beginning January 30 of _2004_) and no later than January 30 of each succeeding year in which I am under contract with MOTOROLA.


_____
Authorized Signature
REPRESENTATIVE



A–35

# Exhibit 4

## Performance Standards

### A) Customer Opportunity Requirements

The leading indicator of new business is new design wins. Expectations for both new revenue and design wins are set forward in this Exhibit.

### Definitions:

**Uncommitted Account/Program (Level 1):** An identified Account/Program that has been funded by the customer with assigned personnel working design requirements and possible solutions where MCG has an opportunity to be a supplier of products and/or services.

**Committed Account/Program (Level 2):** An Uncommitted Account/Program that has become a program where customer has actually purchased MCG product for development specific to the program.

**Design Win (Level 3):** A Committed Account/Program is classified as a Design Win when:

    a)  A new customer buys MCG product, OR

    b)  An existing MCG customer buys a different product for a new or redesigned program.

To qualify as a design win, a project or account must have the intent to transition the development products into run rate business (in other words released to production). For the purposes of measuring and tracking design win performance it must meet the Design Win Revenue Baseline. The revenue baseline is the customer's expectation (forecast) of market demand for the product once it is in full production. Once a customer has purchased $25K in board level product or $50K in systems level product this is called a design win.

**Design Win Revenue Baseline:**

    a)  Military/Aerospace Opportunities - $100K Annual; and

    b)  Other - $250K Annual.

**New Revenue:** New revenue is revenue generated from new committed business and design wins.



A-36

|  | Q1 | Q2 | Q3 | Q4 | Q5 | Comments |
|---|---|---|---|---|---|---|
| Uncommitted – cumulative | 2 | 5 | 11 | 17 | 25 | Uncommitted opptys are cumulative - |
| Per Qtr |  | 3 | 6 | 6 | 8 | some move to committed |
| Committed – cumulative |  | 1 | 3 | 5 | 8 | New committed opptys |
| Per Qtr | 1 | 2 | 2 | 3 |  |  |
| Design Wins – cumulative |  |  | 1 | 2 | 3 | New committed opptys that meet |
| Per Qtr |  | 1 | 1 | 1 |  | Design Win criteria |
| Total New Rev – Cumulative |  | $50K | $100K | $250K | $500K |  |
| Per Qtr |  | $50K | $50K | $150 | $250K |  |

## B) Territorial Development Requirement

A. In conjunction with MCG, participate/promote a minimum of four Motorola-sponsored public seminars per year.

B. In conjunction with Motorola and/or its distributors, participate in a minimum of one Motorola-sponsored territory specific sales promotion per year.

C. Support Motorola's efforts at shows with promotion and personnel attendance.

D. Submit monthly account update reports on lead follow up, account calls and other pertinent activity.

E. Insure all sales personnel receive a minimum of 24 hours of training on MCG products and services. This may include recorded webinars and/or live training presented by Motorola.

## C) Territory Revenue

Manufacturer's Representative agrees to interface and support MCG customers in their territory. The MR is expected to maximize the revenue achievement within their defined territory. The territory is defined in Exhibit 2 and the revenue quota for the period of 1 year after the contract date is $1,464,342.

