CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax: (613) 231-4605

Examination No. 06-0288.1          Court File No. CA 04-960-SLR

(District of Delaware)

### IN THE UNITED STATES DISTRICT COURT

B E T W E E N:

J-SQUARED TECHNOLOGIES, INC., a Canadian Corporation, and

J-SQUARED TECHNOLOGIES (OREGON) INC., an Oregon Corporation

PLAINTIFFS

- and -


MOTOROLA, INC. A DELAWARE CORPORATION

DEFENDANT


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF MICHAEL NYKOLUK, pursuant to an appointment

made on consent of the parties to be reported by

Cornell•Catana Reporting Services, on March 21, 2006,

commencing at the hour of 8:44 in the forenoon.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:

Sean J. Bellow                                      for the Plaintiffs

Randy Papetti and Emily S. Cates                    for the Defendant


This Examination was taken down by sound recording

by Janice West at Ottawa, Ontario, Canada.

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5

Tel: (613) 231-4664                    1-800-893-6272                    Fax:  (613) 231-4605

22

1          A.  The majority are, yes.

2    110.          Q.  The majority are?

3          A.  Are.  Well, they have an automatic renewal

4    in them.

5    111.          Q.  So would it be fair to say that most of them

6    are for one year but provide for automatic renewal if

7    neither party decides to terminate?

8          A.  That's correct.

9    112.          Q.  Let me show you some documents.  Let me mark

10   what we'll call Exhibit 114.  Could I ask the Court

11   Reporter to mark this one as Exhibit 114.  Hand it to

12   her please and she'll hand it back to you.

13          **EXHIBIT NO. 114:**  Power Point Presentation

14          entitled J-Squared and Market Overview dated

15          March 10, 2003.

16          THE WITNESS:  Thank you.

17          BY MR. PAPETTI:

18   113.          Q.  Let me make sure I didn't give you guys

19   mine.  I don't think I did.  Is it marked up?

20          A.  So far I don't see anything.

21   114.          Q.  Yes, I've got mine, I'm sorry.  I've handed

22   you what we'll call Exhibit 114?

23          A.  Yes.

24   115.          Q.  Do you know what it is?  Have you seen that

25   before?

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax:  (613) 231-4605

26

131.          Q.  Out of these six, there are Forecasts in
here because if I understand the abbreviation right,
FCST?

              A.  Yes.

132.          Q.  Is that a Forecast for 2003 and 2004?

              A.  That's correct.

133.          Q.  What is being Forecast?

              A.  Sales for those lines.

134.          Q.  Total sales of the Project, not commissions?
Correct?

              A.  That's correct.

135.          Q.  The Forecast for Motorola is how much for
2003?

              A.  Three million dollars.

136.          Q.  And the Forecast for 2004 is how much?

              A.  Six million dollars.

137.          Q.  Do you recall how J-Squared came to those
Forecast figures?

              A.  I recall how we came to the 2003 figure.

138.          Q.  Okay?

              A.  I do not know how the $6 million figure was
derived.

139.          Q.  Could you tell me what you recall about how
you came to the $3 million for 2003 of Motorola?

              A.  Yes.  Well, I can tell you how -- where I

Case 1:04-cv-00960-SLR    Document 126-8    Filed 05/04/2006    Page 4 of 48

29

1    2002, maybe February, so we had a history with them and

2    that was the Forecast that we had based on some of the

3    Design Wins and where the business was going.

4    154.          Q.  Okay, how about IDT?

5              A.  That was based on IDT's input to us because

6    they were later in the year and they had provided us

7    with some Presentation material when we interviewed with

8    them to secure their business.

9    155.          Q.  Now, for the 2004 Forecast figures where did

10   those figures come from?  Let's start with Motorola?

11             A.  They would have come from Claude Langlois.

12   He was running our Embedded Systems Business.

13   156.          Q.  So, these would have been Forecasts that J-

14   Squared was coming to on its own for what it believed

15   the sales would be in 2004?

16             A.  That's correct.

17   157.          Q.  That's true for Motorola and the other Rep

18   Lines that are on here -- Product Lines that are on

19   here?

20             A.  That's correct.

21   158.          Q.  And so, J-Squared believes it could take

22   essentially the Forecast for 2003 and double the sales

23   in 2004?

24             MR. BELLEW:  Objection.                              *O*

25             MR. PAPETTI:  Is that correct?  For Motorola?

Case 1:04-cv-00960-SLR    Document 126-8    Filed 05/04/2006    Page 5 of 48

30

1              THE WITNESS:  For Motorola, yes.

2              BY MR. PAPETTI:

3   159.       Q.  I want to ask you some more about the

4   conversations with Motorola about the two to $3 million

5   Forecast for 2003?

6              A.  Okay.

7   160.       Q.  I want to know what the nature of the

8   discussions was a little more specifically.  Did anybody

9   on the Motorola side of those discussions promise J-

10  Squared there'd be at least two to $3 million sales in

11  Canada during that year?

12             A.  I'd like to kind of get what your definition

13  of "promise" is?  Nobody said "I promise J-Squared will

14  bring in $3 million".

15  161.       Q.  Did you view them as any more than

16  Motorola's Good Faith Estimates as to what the business

17  would be in 2003 in the Territory J-Squared would be

18  covering?

19             MR. BELLEW:  Objection.                          *O*

20             THE WITNESS:  Yes.

21             BY MR. PAPETTI:

22  162.       Q.  What did you view them as?

23             A.  As Good Faith Estimates.

24  163.       Q.  My question was did you view them as

25  anything more than simply Motorola's Good Faith

31

1    Estimates as to what the business would be in 2003 in

2    the Territory would be covering?

3              MR. BELLEW:  Objection.                              *O*

4              THE WITNESS:  No.

5              BY MR. PAPETTI:

6  164.         Q.  Do you recall whether Motorola showed you

7    any data during those meetings that played into the

8    Forecast for 2003?

9              A.  I seem to recall -- I did not see any data

10   but I seem to recall they asked Ed Kaczor to check into

11   the data during the meeting in September.  It goes back

12   quite a ways so -- and we had a lot of different

13   meetings, so -- but I seem to recall -- they said, just

14   check into it and confirm it -- what the numbers were.

15   I mean, you can only really look at the history of the

16   business.

17  165.         Q.  What had been the trend line at the time of

18   these meetings with respect to Motorola's MCG Business

19   in Canada?  Was it trending up sales wise or in recent

20   years had it been trending down?

21             A.  It had been trending down from what I was

22   told by Larry Terry.

23  166.         Q.  Do you recall why or have an understanding

24   why it had been trending down?

25             A.  His theory -- Larry Terry's theory was that

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                     1-800-893-6272                     Fax:  (613) 231-4605

32

1        because they did not have sales coverage for the past

2        year or so in the market besides Nortel.

3  167.          Q.  Was it your understanding at the time you

4        mean that Motorola had dramatically reduced its sales

5        force in Canada?

6                 A.  That's what I understood the situation to

7        be.

8  168.          Q.  How was the general business conditions in

9        late 2002 with respect to the types of customers that J-

10        Squared would be marketing Motorola's products to in

11        Canada?

12                A.  I think it was a soft market.

13  169.          Q.  By "soft" do you mean generally kind of

14        poor?

15                A.  Very poor.

16  170.          Q.  Do you remember what the causes of that

17        were, the general major causes of that were?

18                A.  Well, we had a general significant downturn

19        in the Telecommunications business that occurred in

20        2001.  So Companies -- the best example I have is Nortel

21        shrunk from 30 billion to 10 billion.

22  171.          Q.  So at the time you were negotiating or

23        having these discussions with Motorola in July and

24        September of 2002, you were aware that it was a soft

25        business market for the consumers who would buy the

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax:  (613) 231-4605

33

1       products you would be repping for Motorola?

2              A.   Well, we actually were a little bit more

3       optimistic about the market and thought it had bottomed

4       out.

5   172.       Q.   But at the time it was still generally

6       fairly poor?

7              A.   It was soft.

8   173.       Q.   It had been trending downwards for at least

9       over the last year?

10             A.   It really took kind of a step function down

11      and then it kind of bounced along the bottom.  So in --

12      we could see -- we had a dramatic impact on our business

13      in the fall of 2001.  We were sheltered.

14             It actually started early in 2001, the downturn

15      but we were sheltered because of back-logs on components

16      that were non-cancellable -- things along those lines,

17      so our business was sheltered for some time, but the

18      actual Telecommunications downturn started in January

19      and February of 2001.

20  174.       Q.   These other lines that are on here -- these

21      other five lines besides Motorola, does J-Squared

22      continue to rep all the other five?

23             A.   No.

24  175.       Q.   Which ones did J-Squared no longer rep for?

25             A.   IDT, SMC, Motorola and Celoxica.

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. w., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax: (613) 231-4605

34

176.        Q.    So five of the six that J-Squared signed up
in 2002 had no longer reps for?

            A.    That's correct.

177.        Q.    Let's go to -- do you have any recollection,
I realize you don't have figures in front of you, as to
which of these six met the Forecast for 2003?

            A.    I believe that Marvell would have met the
Forecast for 2003 and that's it.

178.        Q.    And the other five probably did not?

            A.    SMC would have been fairly close, I believe.

179.        Q.    Okay, and the other four?

            A.    Did not.

180.        Q.    How about for 2004?  Were you still repping?
I realize the Motorola relationship ended in 2004 but
were you still repping the other five in 2004?

            A.    We were Marvell, IDT -- we were.  They did
not meet the Forecast.

181.        Q.    Who's "they"?

            A.    IDT.

182.        Q.    Okay?

            A.    SMC -- we terminated our relationship with
them in 2004 and we were forced to terminate our
relationship with Celoxica in 2004 by Mentor so they
didn't.

183.        Q.    How about SaRonix?

44

1    that time but at the end in the next quarter it did work

2    out.

3    233.        Q.   "Customers Design Cycles" is listed as a

4    disappointment.  Do you recall what that references?

5             A.   My perception is that the Design Cycles were

6    a little bit longer than we anticipated.

7    234.        Q.   It took longer for customers to go from

8    expressing an interest to ---

9             A.   Concept -- to reality.

10   235.        Q.   By customers you mean potential ESG

11   Customers?

12            A.   That's right.  Potential Motorola Customers.

13   236.        Q.   And it says, "Limited demand creation from

14   Distributors"?  What's that reference?

15            A.   That refers to the fact that Motorola had

16   Distributors -- I believe they were Aero, Avnet and

17   Tracan in Canada, anyhow I'm not sure about the Pacific

18   North West and they -- our perception was they were not

19   driving any activity for new designs.  They were

20   basically looking to inherit business we worked on but

21   were proactively engaged in selling Motorola.

22   237.        Q.   And so, you had hoped that Avnet, Tracan,

23   and Aero would have been more active in developing new

24   business or assisting you guys in developing new

25   business?

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax: (613) 231-4605

45

1              A.   That's right.

2   238.       Q.   Let's go to 1871 please?

3              A.   Okay.

4   239.       Q.   This has Forecast Information?  Correct?

5              A.   Yes.

6   240.       Q.   Let me know if I'm reading this right.  As I

7        read it, there was an original Forecast for 2003 which

8        is the second to last column, Original Sales Forecast

9        for 2003?  Is that correct?

10             A.   That's correct.

11  241.       Q.   Then it was revised by the time of this

12       Presentation in the First Quarter of 2003?

13             A.   I'm not sure.  Is this from that

14       Presentation?

15  242.       Q.   It appears to all be from the same

16       Presentation?  We can go back one page and maybe if you

17       think it's a new document -- I'm pretty sure it's the

18       same document?

19             A.   Is it?  Okay, well then this Forecast was

20       revised by the time March rolled around.

21  243.       Q.   Okay, and for the ESG Group, what was the

22       revision?

23             A.   I'm not sure where Claude -- where the

24       number came from that Claude went from $7 million to

25       $3.5 million.  I believe that we must have figured out

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                                1-800-893-6272                                Fax:  (613) 231-4605

46

1      that the Motorola number wasn't going to be where we

2      thought it was going to be and he revised his Forecast

3      downwards.

4  244.          Q.   There had been some delay in signing up at

5      least Interphase?

6              A.   Yes, and maybe we didn't at that point in

7      time, he didn't look at the revenue stream occurring as

8      quickly as he thought from some of the other lines we

9      were targeting and talking to at the time.

10 245.          Q.   So by -- near the end of the First Quarter,

11     it looks like J-Square was revising its sales figures

12     down from -- for ESG at least, from $7 million down to

13     three and a half million?  Is that fair?

14             A.   Yes.

15 246.          Q.   Let's go to 1875 please?

16             A.   Yes.

17 247.          Q.   There's a -- the heading on this page is

18     "2002 Management Concerns"?

19             A.   Yes.

20 248.          Q.   The second star down says, "The sales

21     funnels (new opps) are very small"?

22             A.   Correct.

23 249.          Q.   Do you recall what that referenced?

24             A.   That just refers to that we weren't seeing

25     as much design activity in the market.  Originally we

54

1       a line?  They're not a line now?

2              A.  No, they're not.

3    281.      Q.  Is Znyx a line?

4              A.  No.

5    282.      Q.  So they were signed up in 2003 but they're

6       gone too?

7              A.  That's correct.

8    283.      Q.  How about Adtron?

9              A.  Yes.

10   284.      Q.  And SMA?

11             A.  Yes, I believe they're still a line.

12   285.      Q.  What happened to Znyx?

13             A.  I don't recall.

14   286.      Q.  About three lines down it says "Ongoing

15      Reseller/VAR conversations with Four Manufacturers"?  Do

16      you see that?

17             A.  Yes.

18   287.      Q.  What does a "VAR" mean in J-Squared

19      Nomenclature?

20             A.  Value Added Reseller.

21   288.      Q.  It's a particular type of relationship that

22      J-Squared has with certain manufacturers or suppliers?

23      Is that correct?

24             A.  That's correct.

25   289.      Q.  How would you describe what that

55

1      relationship is when you're a Value added -- did you say

2      Reseller?

3              A.   A Value Added Reseller -- so you would buy

4      product, add some value to it -- it might you load some

5      software on it or you package it in a box and then you

6      resell it.

7   290.        Q.   It says you had conversations with four

8      manufacturers.   Was part of J-Squared's strategy to try

9      and become a VAR for more manufacturers and let's make a

10     higher margin than just the commission rate it did as an

11     Independent Rep?

12             A.   I can't answer that accurately I don't

13     think.   Claude would be in a better position to answer

14     that.

15  291.        Q.   Okay, I should talk to -- how do you say his

16     last name?

17             A.   Claude Langlois.

18  292.        Q.   Then it says, "Harris House Account Program

19     turned over to J-Squared, 1.5 million plus"?   Do you

20     recall what that was referencing?

21             A.   Again, it's not firm but I believe -- so

22     it's speculation that Motorola turned over Harris to us

23     which was a House Account for Motorola based on the

24     numbers not being where we expected or they expected

25     them to be for us.

Case 1:04-cv-00960-SLR    Document 126-8    Filed 05/04/2006    Page 15 of 48

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax: (613) 231-4605

57

1         A.  I have to look.  If I can see through the

2    rest of the Presentation I could probably tell you

3    but ---

4    300.       Q.  That would be great, yes.  Take a second.  I

5    couldn't tell?

6         A.  I think this is just referring to Western

7    Canada.

8    301.       Q.  Okay and not Pacific North West?

9         A.  That's correct.

10   302.       Q.  Let's go back then to 1929, please?  Let's

11   go to 1930?

12        A.  Yes.

13   303.       Q.  The first line says, "MCG 1H 03 Revenue is

14   substantially less than expected".  What would you

15   interpret "1H 03" to mean?

16        A.  That would be the period for January 1st,

17   2003 until June 31st, 2003.

18   304.       Q.  So that would be the first Half of 2003?

19        A.  That's correct.

20   305.       Q.  MCG is the business unit of Motorola that

21   you were repping for at J-Squared?

22        A.  Yes.

23   306.       Q.  And so, by this point, you're realizing that

24   the Motorola revenue is substantially less than

25   expected?  Correct?

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax: (613) 231-4605

58

1              A.    That's correct.

2  307.         Q.    If you go to the next page for all of ESG,

3        it would appear that the overall revenue for ESG, not

4        just for Motorola but for the other suppliers that had

5        been added was substantially less than initially

6        forecasted?  Is that correct?

7              A.    That's what it appears.

8  308.         Q.    Is that based on your recollection at least

9        in part due to the business conditions that J-Squared

10       was confronting on the market place?

11             A.    I don't think so.  My recollection would be

12       that in some cases it takes a while before revenue

13       starts and Claude really may have missed that.

14  309.        Q.    You mean over-Forecast for the year

15       initially?

16             A.    On the revenue side of it to J-Squared, yes

17       -- not the sales side of it.  The actual sales occurred

18       but it takes usually three to four months to get paid.

19  310.        Q.    Is it fairly common that the supplier or

20       manufacturer pays J-Squared when the manufacturer or

21       supplier actually gets paid by the consumer?

22             A.    I'd say 90 percent.

23  311.        Q.    Let's go to JS1945, please?  This has

24       Commissions and Margin Forecasts for the whole year?  Is

25       that correct?

64

1    day on our cash flow.  So the sales -- they report --

2    they forecast in dollars but we probably forecasted a

3    flat Canadian dollar not a 25 percent change with our

4    crystal ball.

5  346.    Q.  Well forecasts are by their nature just

6    estimates?  Correct?

7          A.  Correct.

8  347.    Q.  They're subject to changing business

9    conditions?  Correct?

10          A.  Correct.

11  348.    Q.  And bad luck?  Well sometimes you think

12    you'll get an account and you don't get it?  Correct?

13          A.  Correct.

14  349.    Q.  Do you ever recall seeing any written

15    forecast that Motorola provided to you or anyone else at

16    J-Squared for 2003 or beyond 2003 for the MCG Business?

17          A.  No.

18  350.    Q.  The next entry says, "Opportunity quantity

19    and dollars are way down".  We've seen similar entries

20    in the two documents we've looked at?

21          A.  Yes.

22  351.    Q.  This was still the case by July of 2003?

23          A.  Yes.

24  352.    Q.  That was fairly wide spread across the

25    divisions including ESG?

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                   1-800-893-6272                   Fax: (613) 231-4605

65

```
 1              A.   Correct.

 2   353.       Q.   The bottom says, "The next three months will

 3        be the toughest for J-Squared".  Was that an entry you

 4        made?

 5              A.   I believe.

 6   354.       Q.   Do you recall what you intended to convey?

 7              A.   Well just that because of the Canadian

 8        Dollar's rapid change, we were adjusting very -- it was

 9        a very difficult adjustment for our business.

10              MR. PAPETTI:  Have we been at it for an hour?

11        Does anybody -- do you want to take a break?

12              THE WITNESS:  I'm fine.

13              MR. BELLEW:  How long are your tapes?  Two

14        hours?

15              MR. COURVILLE:  Two hours.  Yes, I've got a half

16        hour.

17                    ( OFF RECORD DISCUSSION )

18              BY MR. PAPETTI:

19   355.       Q.   During the time that the Motorola contract

20        was in place with J-Squared Canada, do you recall

21        meeting with particular Motorola people during the time

22        it was actually in place?

23              A.   Yes.

24   356.       Q.   Who do you recall meeting with?

25              A.   Actually no, I don't.  I think it was before
```

Case 1:04-cv-00960-SLR    Document 126-8    Filed 05/04/2006    Page 19 of 48

CORNELL·CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax: (613) 231-4605

69

1           position?

2                   A.   Yes.

3    379.           Q.   Is Starvoy, in any way though, a formal

4           subsidiary of J-Squared or vice versa?

5                   A.   No.

6    380.           Q.   To your knowledge does Starvoy have any sort

7           of relationship with Motorola at this time?

8                   A.   No.

9    381.           Q.   The little icon has a caption for the

10          Presentation.  It says "J2 MCG VAR September, 2003

11          Presentation"?

12                  A.   Correct.

13   382.           Q.   Is that correct?  Did you interpret that to

14          be -- VAR to be Value Added Reseller?

15                  A.   That's what I would assume.

16   383.           Q.   Let me ask you some questions about this

17          document.  Is it fair to say, just sort of as an

18          overview that by this time, mid-September of 2003, J-

19          Squared was trying to change its relationship with

20          Motorola to make the relationship more financially

21          worthwhile from J-Squared's perspective?

22                  A.   I believe that would be the case or we were

23          exploring ideas on how we could at least make it a

24          break-even.

25   384.           Q.   So, it's not performing very well, it's not

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                          1-800-893-6272                          Fax:  (613) 231-4605

71

1          billion to 10 billion.  I know what -- this was probably

2          similar.  Losing 66 percent of your business is a pretty

3          big drop in business.

4     390.            Q.  Let's go to Page 1672.  The first heading

5          is, "Existing Distribution Partners have not

6          demonstrated the willingness to invest in Canada?  Who

7          did you understand the existing Distribution Partners to

8          be at the time?

9                     A.  Aero, Avnet, Tracan.

10    391.            Q.  Was it J-Squared's position at this time

11         that they were not doing enough to -- the term I think

12         you always use is "generate demand creation"?

13                    A.  That's correct.

14    392.            Q.  In Canada, and was J-Squared proposing that

15         it would take on some Distribution Functions in part

16         because the other Distributors weren't doing a full job

17         in Canada?

18                    A.  I need to look at this Presentation

19         again ---

20    393.            Q.  Yes, feel free?  It's not that long?

21                    A.  That looks like that's the case.

22    394.            Q.  What's the case?  I'm sorry?

23                    A.  That we were looking to resell the Motorola

24         product into the market.

25    395.            Q.  And thus make a Distribution Margin in some

72

1   cases as well as a commission when you actually

2   generated the sales?

3          A.   Some of the contracts that we've signed, we

4   don't get commissions if we become -- if we're a

5   Distributor -- others we do.

6   396.        Q.   Others are mixed Distribution Margin and

7   Commission?

8          A.   That's correct so it's more of a stocking

9   rep model where for larger -- usually, I'd say ninety-

10  plus percent where we've done this -- we haven't done

11  that -- so if we do it as a Distributor we do not get a

12  commission.  If we do the business as a Distributor.

13  The higher volume business in the larger accounts -- we

14  do it on the Rep Model.  That's the term Stocking Rep.

15  397.        Q.   Okay.  Go to 1674 please?  This is J2

16  Challenges or I guess J-Squared Challenges.  It says,

17  "What are our options" and one of the options at the

18  bottom is "Change our Rep Model from Limited Line Card,

19  five to 10 lines, to Expanded Line Card, 20 to 30 lines?

20         A.   Right.

21  398.        Q.   Do you recall what the thinking was there?

22         A.   Well to bring in additional revenue there

23  really are two options available in a business like

24  ours.  You can stick with the same ones you have and

25  generate more revenue with a different model which

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax:  (613) 231-4605

83

1    There might be one in all I gave you but I'm assuming I

2    didn't mark the right one because I keep a lot of e-

3    mails.

4    464.        Q.   You mean the right one in response?

5                A.   That's correct with feedback.

6    465.        Q.   Let's go to 1678, please?  This is the J-

7    Squared Proposal.  Did you understand this to be J-

8    Squared's Proposal to Motorola or what was in it?

9                A.   That's correct.  Sorry.

10   466.        Q.   And this would have -- would this have J-

11   Squared becoming a Distributor, in part for Motorola in

12   Canada?

13               A.   Yes.

14   467.        Q.   Who was Tracan?  Tracan was a Distributor

15   for Motorola in Canada whose contract was being

16   terminated?  Is that accurate?

17               A.   That's kind of what I've heard second-hand.

18   468.        Q.   And J-Squared was hoping to pick up some of

19   the Distribution Business that Tracan was doing?

20               A.   Correct.

21   469.        Q.   Let's go to the last page, the conclusion?

22   The second bullet says, "There's a need to create a new

23   business model that better aligns MCG and J-Squared

24   ROI"?  Do you see that?

25               A.   Yes.

Page 1

1                    Volume:   I

2                    Pages:   1 - 265

3                    Exhibits: 106 - 109

4    IN THE UNITED STATES DISTRICT COURT

5       FOR THE DISTRICT OF DELAWARE

6  ------------------------------------x

7  J-SQUARED TECHNOLOGIES, INC.,

8  a Canadian corporation and

9

10  J-SQUARED TECHNOLOGIES (OREGON)

11  INC., an Oregon corporation,

12          Plaintiffs,

13      v.

14  MOTOROLA, INC., a Delaware corporation,

15          Defendant.

16  ------------------------------------x

17      VIDEOTAPED DEPOSITION of STEVEN MACHERNIS,

18  a witness called for examination by the

19  Plaintiffs, taken pursuant to the Applicable

20  Provisions of the Delaware Rules of Civil

21  Procedure, before Laurie K. Langer, Registered

22  Professional Reporter and Notary Public in and

23  for the Commonwealth of Massachusetts, at the

24  offices of Bingham McCutchen, LLP, 150 Federal

Page 176

1    **continuation of the manufacturers rep**

2    **relationship?**

3 A.    No, I'm not familiar with the parallel string of

4    e-mails, but I am, I am familiar with

5    discussions that we had about gathering the data

6    and making the assessments to see what made

7    sense territory by territory.

8 Q.    **Did you ever send or receive any e-mails from**

9    **Kevin Parslow that related to an examination of**

10    **perhaps continuing in the relationship with**

11    **these MRs?**

12 A.    I don't recall a specific e-mail that said we

13    should continue with, you know, these three or

14    this one or these ten MRs.  What I do recall is

15    that there was communications about which ones

16    had met performance criteria, which ones hadn't,

17    and subsequent discussions surrounding the, the

18    feasibility of, you know, does it make sense

19    from a business strategy perspective to have a

20    network of three manufacturer reps or five

21    manufacturer reps.

22 Q.    **Okay.**

23 A.    At some point in time you say, hey, the

24    administrative costs of managing a small handful

Page 216

1  Q.    Let me, let me see if I can't read a couple

2        lines from the deposition of your colleague

3        Mr. Crawford.  This is a question that I

4        presented to him when he was deposed on December

5        6th.  "Question:  Was there any real intent on

6        Motorola's part to allow the manufacturers reps

7        to cure any perceived non performance?

8        Mr. Talbot:  Object to form.  Question:  Was

9        Motorola really interested in seeing that

10       happen?  Answer:  No."  Do you take exception

11       with Mr. Crawford's testimony on that same

12       issue?

13            MR. PAPETTI:  Object to form.

14  A.   I guess my answer would depend on what time

15       frame did you, were you asking Kim that

16       question.  Was it, was it in February of '04 or

17       was it in November of '03 or was it in July of

18       '03?  Because the answers change based on the

19       time frame.  And we subsequently came to the

20       conclusion that there were enough MRs who were

21       failing performance metrics that it just didn't

22       make sense to continue with the program.

23  Q.   So as of the date of the termination letters

24       you'll agree that Motorola had no intention or

Page 1

1                    Volume:    I

2                    Pages:    1 - 268

3                    Exhibits: 110

4       IN THE UNITED STATES DISTRICT COURT

5           FOR THE DISTRICT OF DELAWARE

6     ------------------------------------x

7    J-SQUARED TECHNOLOGIES, INC.,

8    a Canadian corporation and

9

10    J-SQUARED TECHNOLOGIES (OREGON)

11    INC., an Oregon corporation,

12            Plaintiffs,

13        v.

14    MOTOROLA, INC., a Delaware corporation,

15            Defendant.

16    ------------------------------------x

17        VIDEOTAPED DEPOSITION of KEVIN PARSLOW, a

18    witness called for examination by the

19    Plaintiffs, taken pursuant to the Applicable

20    Provisions of the Delaware Rules of Civil

21    Procedure, before Laurie K. Langer, Registered

22    Professional Reporter and Notary Public in and

23    for the Commonwealth of Massachusetts, at the

24    offices of Bingham McCutchen, LLP, 150 Federal

COPY

1  A.  14B.

2  Q.  So you've seen the Oregon contract.  Do you

3       recall ever seeing the Canadian contract?

4  A.  I don't recall it.  Having read through it.  We

5       had contracts people that would do that.

6  Q.  As far as the, these contracts are concerned,

7       these are two in a series of nine contracts --

8  A.  Right.

9  Q.  -- that were executed; you're aware of that?

10 A.  Yes, I am.

11 Q.  And while my two separate clients are two of the

12      reps involved in this, we'll call it this

13      manufacturers representative relationship, there

14      were seven others?

15 A.  Uh-huh.

16 Q.  Are you aware that the, the nine contracts are,

17      are somewhat similar, --

18 A.  Yes.

19 Q.  -- at least?

20 A.  Yeah.

21 Q.  And for the most part, and we've had some

22      testimony on this earlier, they're identical

23      and, to a great extent; you're aware of that?

24 A.  Yep.

Page 29

1    A.    Correct.

2    Q.    Was Miss Vittori the general manager up until

3          April of 2004 to the best of your recollection?

4    A.    Correct.  She was general manager at the time I

5          left.

6    Q.    Was it -- let me strike that.

7                Do you know, do you recall when

8          Miss Vittori actually came on as the general

9          manager?

10   A.    No, I don't.

11   Q.    Do you know who the general manager was at the

12         time a decision was made by Motorola to

13         terminate the nine manufacturers representative

14         contracts?

15               MR. PAPETTI:  Object to form.

16   A.    That would be Wendy Vittori because that was,

17         any decisions that were taken were taken just

18         before I left.

19   Q.    Who made that decision?

20   A.    To terminate, the decision to terminate any rep

21         contracts?

22   Q.    (Nods in the affirmative.)

23   A.    That was initially my decision.

24   Q.    And when you say initially your decision?

Page 30

1    A.    Because again from recollection, and you perhaps

2          can help me clarify this, is that those

3          agreements were terminated within a few weeks of

4          me leaving the organization and at that point my

5          responsibilities were not covering manufacturer

6          reps of North America, we had recruited my

7          replacement.

8    Q.    Would that have been Dana Huth?

9    A.    Correct.

10   Q.    And Dana Huth actually signed the letters that

11         went out on February 26, 2004?

12   A.    I believe so, yes.

13   Q.    But you had actually made that decision, you

14         being the person within Motorola that had the

15         authority to do that at some point prior to

16         those letters going out?

17   A.    Yes, within a few weeks of them, yeah.

18   Q.    Your ultimate decision to do that, was that a

19         result of a process of analyzing these

20         contracts?

21   A.    The decision was taken on the basis of analyzing

22         the financial aspects of the operation of

23         working with manufacturer reps.

24   Q.    When did you begin that analysis?

1    A.    I couldn't tell you the exact date but it will

2          be late 2000 and --

3    Q.    3?

4    A.    The terminations were --

5    Q.    4?

6    A.    Yeah, it would be late 2003 was when we started

7          to do the analysis.

8    Q.    Okay.  Did you have any issues with those

9          contracts even dating back to the beginning of

10         2003?

11              MR. PAPETTI:  Object to form.

12   A.    Can you clarify what you mean by "issues."

13   Q.    At some point it became clear to Motorola that

14         they were no longer interested in pursuing this

15         sales strategy; correct?  They were no longer

16         going to utilize these manufacturer

17         representatives?

18   A.    The decision on manufacturer representatives was

19         taken on financial grounds, not contractual

20         grounds.  It was based on the analysis that I

21         instigated late 2003 to see what return we were

22         getting on the approach of using manufacturer

23         reps and whether it was financially viable going

24         forward.

1  Q.   Okay.  So I think what you're saying to me is

2       that by some point later in 2003 you had enough

3       financial information that served as the impetus

4       for a decision to end these manufacturers reps

5       contracts; is that correct?

6            MR. PAPETTI:  Object to form.

7  A.   I don't think I could tell you the date.  It was

8       certainly into 2004 before we collected, I

9       believe, all the data.  And very close to the

10      point at which these contracts were terminated.

11 Q.   Okay.  Other than that collection of this

12      financial data, --

13 A.   Uh-huh.

14 Q.   -- do you recall at anytime in 2003 there being

15      other concerns, your concerns regarding the

16      feasibility of utilizing manufacturers reps in

17      the way that Motorola was using them?

18 A.   No.

19 Q.   There was no issues regarding performance

20      standards?

21           MR. PAPETTI:  Object to form.

22 A.   That is the financial reasons.  I mean, the

23      issue is that it costs money to employ, pay

24      commission to manufacturer reps and they're

Page 33

1    expected to contribute new business.  And the

2    financial analysis was based on what new

3    business was being generated against what costs

4    were being incurred, paying manufacturer reps on

5    existing business that we had already brought in

6    and effectively handed to them a startup cost

7    payment.

8    Q.    Those startup cost payments, what was the

9    purpose of those?

10   A.    To help them fund any additional, additional,

11   any investment they would need to grow that

12   business.

13   Q.    Okay.  And the purpose, the objective of this

14   relationship with the manufacturers reps was to

15   have outside sales professionals attain these

16   Design Wins for the company; correct?  Isn't

17   that the objective?

18   A.    The objective -- in essence, yes.  The objective

19   is that they would supplement the worker,

20   Motorola's own direct sales team.

21   Q.    Your decision to terminate or end these

22   contracts, it obviously was made at some point

23   prior to your departure from Motorola?

24   A.    Correct.

Page 40

```
 1   A.   I don't recall anything specifically.  No.

 2   Q.   Well, you had stated earlier that part of this

 3        financial analysis with the reps and the

 4        decision to terminate them was that you were

 5        paying them money and expecting them to generate

 6        business for you?

 7   A.   Correct.

 8   Q.   Was there any -- at some point, obviously, you

 9        were dissatisfied with the amount of business

10        they were generating?

11   A.   Correct.  I didn't think it was reaching

12        anywhere close to the expectations.

13   Q.   And at the same time do you recall there being a

14        concern that certain reps were being

15        overcompensated for work that they did not

16        generate?  Historical work.

17   A.   So, as I stated earlier on the two issues went

18        hand in hand.  And we were always expecting to

19        pay for a period of six months or so commission

20        relating to business which was not generated by

21        the manufacturer reps to allow them to do the

22        investment of, they need to time wise to

23        generate the new business.  They were always

24        very insistent on having an income stream and I
```

Page 41

```
 1            was happy to sign up and do that by allocating

 2            accounts to them that they would earn commission

 3            on.  And the problem then became that there was

 4            little, very little new business that was being

 5            brought in and so it wasn't a case of the

 6            commission payments going out being too high,

 7            they were just too high commensurate with the

 8            amount of business coming in.

 9    Q.      So there was an issue -- I guess going back to

10            my question.  At some point there was an issue

11            that arose regarding the amount of commission

12            payments that the reps were getting consistent

13            with the business they were generating?

14    A.      That's correct.  And we were looking at our

15            overall cost base of the business at the back

16            end of 2003.  And margin calculations and many

17            of the cost-based issues, this was one of a

18            number of things that we were looking at.

19    Q.      And if I understand your testimony correctly,

20            and this is supplemented by what I've heard in

21            previous depositions, you were glad to provide

22            the reps with that revenue stream from the

23            inception of these contracts because it was

24            understood that it would take them at least
```

Page 48

1       Miss Blair's testimony, her bringing to your

2       attention any anomalies in the commission

3       payment?

4    A.    No, I don't recall it.  When she refers to sales

5          management that could quite easily be Kim

6          Crawford and Steve Machernis, at that level.

7    Q.    Or it could have been Paul Holt before then?

8    A.    It could have been Paul Holt, depending on the

9          time.

10   Q.    These commission payment anomalies, based on or

11         your testimony today are you saying that they

12         had nothing to do with the termination of these

13         contracts?

14   A.    In isolation, that's correct.  No, there's no,

15         there's no linkage there.  My initiative to look

16         at the overall contractual position with

17         manufacturer reps was based on the overall

18         business within Motorola.  Our cost base and the

19         projected future growth we could see using the

20         manufacturer reps to generate new business.

21   Q.    How much interaction did you have with, I think

22         you already answered this with Miss Blair, it

23         was just basically on a monthly?

24   A.    Occasionally.  I work more with her boss Nina

Page 197

1          contracts until the end of 2004.

2    Q.    Can I get you to move on to the next exhibit

3          which is 16.

4    A.    Do you have a copy of it?

5    Q.    I do.

6    A.    Thank you.

7    Q.    At some point did you task Julie Blair with

8          performing an analysis as to the various

9          termination options under the contract?

10   A.    She was tasked to, from what I remember, to do,

11         check the financial data on the costs and

12         revenue performance of the manufacturer reps and

13         to look at, you know, pending, depending on what

14         the result of that would be, what would be the

15         effective ways of us terminating those contracts

16         should we choose to do so.

17   Q.    Okay, at some point the prospect of terminating

18         these contracts came up and --

19   A.    Yes.  Yeah, as part of a review.

20   Q.    And this e-mail is actually, is sometime in

21         December of '03?

22   A.    Yes.

23   Q.    So as of this date that was at least one of the

24         possibilities that was being explored?

1    A.    Yes.

2    Q.    And was it you that tasked Miss Blair with doing

3          this analysis?

4    A.    I believe so, yes.

5    Q.    And did you tell her to look into the financial

6          exposure Motorola would have regarding its

7          pursuing certain termination options?

8    A.    Yes.

9    Q.    If you look at the first e-mail in that chain,

10         do you see that e-mail that's from Julie Blair

11         to Messrs. Machernis and Crawford?

12   A.    Yes.

13   Q.    What's your understanding of what's being

14         communicated in that e-mail?  And you were

15         obviously copied on it as well?

16   A.    Well, it looks as though she's requested of

17         Steve and Kim exactly what I asked for, which

18         was an analysis of, by rep, the position we're

19         in with them and what the costs would be to

20         Motorola to terminate the contracts under the

21         various terms.

22   Q.    Okay.  What is this, this last sentence supposed

23         to mean?  "Please do what you can to make this a

24         thorough analysis as it seems like we are

Page 233

1      that decision has been made, yeah, absolutely.

2  Q.  Do you think that in any way motivated Motorola

3      to exercise a bias towards establishing cause

4      for the termination of the contract?

5          MR. PAPETTI:  Object to form.

6  A.  You would only terminate the contract if there

7      was good reason to do it, because of

8      performance.  Performance would always be the

9      basis for this.  If a distributor, sorry, a rep

10     was performing you wouldn't even be doing this

11     exercise.

12 Q.  Well, that's an interesting question, because

13     your initial concern with performance was not

14     tied directly to Exhibit 4 performance

15     standards; correct?  It was tied to some concern

16     you had with Optix and perhaps discussions that

17     you had with --

18 A.  No, I didn't say that.  No, I didn't say that.

19     What I said was, I'm going back even before the

20     Optix, the whole discussion we had earlier on

21     was based on the fact that we were paying money

22     on a regular monthly basis to help fund the

23     startup costs of the manufacturer reps, we were

24     not seeing a return in terms of revenue six

Page 234

1       months in.  We were not seeing it.  So you go

2       back from revenue.  If we're not getting revenue

3       are we getting Design Wins?  If we're not

4       getting Design Wins are we getting committed

5       projects?  If we're not getting committed

6       projects are we getting uncommitted projects?

7       The whole thing is a trail back from revenue.

8       It all starts at revenue.

9    Q.  Okay.

10   A.  And it's all been backtracked through that and

11       you end up at the point where you're saying

12       well, we're not getting performance, what are

13       the reasons for it.  Is it competing product, is

14       it mind share, is it the fact they're not

15       trained up enough; is it the fact that they're

16       not good enough; is it the fact they don't know

17       the accounts; do they not have the contacts.

18       And ultimately you look at this and say, well,

19       these guys have had a good run of this; they

20       understand we're not going to continually fund

21       their efforts through existing business in

22       perpetuity.  It was going to be for a fixed

23       period, three, four, six months.  That period

24       gone into it's only fair that we look at what

Page 235

1          we're doing overall, and if they're not

2          performing then we'll terminate the contracts.

3          Optix is merely a tool to look at the reasons

4          behind some of this.

5     Q.   When in the life of the contracts were the reps

6          required to actually demonstrate revenue?

7     A.   I can't remember.  I have to refer to the

8          contract.

9     Q.   Was it the third quarter?

10    A.   From what you said -- let me have a look.  Q2.

11         So that's anywhere between four and six months.

12         Which by my recollection on this contract would

13         put it anywhere between September and November.

14    Q.   Was that consistent for all the contracts?

15    A.   I don't know.  I imagine if not exactly the

16         same, similar.  It would depend on the maturity

17         of the individual marketplace that they're

18         operating in.  But this would say that between,

19         unless I'm calculating, between September and

20         November we should have produced some measurable

21         significant revenue.  So we would have been

22         monitoring that from September.

23    Q.   This is an e-mail that was dated February 24,

24         '04, it's two days before these letters went

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4   J-SQUARED TECHNOLOGIES, INC., a  )
    Canadian corporation, and        )
5   J-SQUARED TECHNOLOGIES (OREGON), )
    INC., an Oregon corporation,     )
6                                     )
7          Plaintiffs,                )
                                      )
         vs.                          )C.A. No. 04-960-SLR
8                                     )
    MOTOROLA, INC., a Delaware        )
9   corporation,                      )
                                      )
10         Defendant.                 )
    _____  )

11

12

13              DEPOSITION OF DENNIS ROBINSON

14          Taken on Monday, December 5, 2005

15                   At 9:42 a.m.

16          At 40 North Central Avenue, 19th Floor

17                   Phoenix, Arizona

18

19

20

21

22   Job No. 7520

23

     REPORTED BY:  MICHAEL H. DIPPEL, RPR
24                 Arizona CR No. 50716
                   Nevada CCR No. 701
25                 California CSR No. 9409

Page 109

1        Q.   As far as you were concerned, was J-Squared

2   performing under its contract as of the date that you

3   requested this information?

4        A.   My -- no.  As I recall, when we rolled that

5   up, they were short against their criteria.

6        Q.   Well, we'll get to that.  I'm talking about

7   before you actually saw the information.

8             Did you have anything -- any information that

9   would lead you to believe that J-Squared was not --

10  J-Squared Oregon, of course, was not performing under

11  its contract?

12       A.   I would characterize it to say that I

13  don't -- certainly didn't closely scrutinize their

14  contract.  So, again, because J-Squared rolls up under

15  myself, I'm really looking at how I'm performing

16  against the territory.  So they're one of the channels

17  that I use.  So from that angle, I knew that we were

18  coming up short in design ins in the territory to be

19  sure.

20       Q.   Did you ever communicate that to J-Squared

21  Oregon?

22       A.   I don't think there's anything written

23  that -- that says that.  Though, again, in the

24  day-to-day meanderings, in the monthly visits we did

25  together, it was implicit in our activities that we

Page 110

1    were looking for design ins.

2        Q.    Did you ever say to -- you had communication

3    with Steve Blomme; right?

4        A.    Yes.  I know Steve.

5        Q.    And did you ever say to him, Steve, you know,

6    we're in October here, and we're a little concerned

7    about the design-in criteria?  Have you ever that

8    conversation?

9        A.    I couldn't recall any specific conversations

10   where I would have said that to him, though it would

11   not have been uncharacteristic to say something like

12   that.

13       Q.    But you don't recall whether it happened or

14   not?

15       A.    I can't specifically cite any conversations.

16       Q.    Now, when you say that you had a concern

17   about the design wins, was that concern after you saw

18   the information from J-Squared Oregon or after?

19       A.    I'd say I had a general concern for

20   design ins the entire year.  That's something I watch.

21       Q.    You had stated that, in connection with your

22   own sort of assessment of your performance --

23       A.    Right.

24       Q.    -- you had identified maybe some

25   shortcomings?

Page 214

1          A.    For supplemental information, right.   That's

2     what that request said.

3          Q.    Right.

4          A.    It said I've got the information for these

5     accounts, can you -- got anything else, anything else

6     you want to tell me about?  And that's basically --

7          Q.    Was there -- what was your -- what was

8     your -- if you could flash back to late 2003, what was

9     your opinion of what kind of job J-Squared Oregon was

10    doing?

11         A.    My general -- my general recollection of that

12    year was that we were behind on our design ins, and I

13    don't have any direct recollection of revenues.  And my

14    direct recollection is that I got along real well with

15    all those guys.  It's a good group of guys.

16         Q.    So would you have anticipated that the

17    relationship would continue as far as you were

18    concerned?

19         A.    I had no anticipation.

20         Q.    Well, recognizing it's not your decision to

21    be made, you had -- you were not raising any objections

22    to your management by saying we need to replace

23    J-Squared Oregon?

24         A.    I don't think I ever made any requests like

25    that.

Page 215

1      Q.    Okay.   But -- and there wouldn't really have

2   been a basis for that request based on the performance

3   so far?

4      A.    I don't recall ever making -- making any

5   request of that nature at all.

6      Q.    Okay.   Now, give me some specifics on your

7   belief that there were some issues with the design --

8   design wins.

9      A.    Help me with that.   What are you asking?

10      Q.    You said that you -- you had a question

11   regarding whether they were -- whether you were --

12   meaning you and J-Squared --

13      A.    Right.

14      Q.    -- were meeting the predetermined criteria

15   for design wins.

16      A.    Right.

17      Q.    Can you expand on that?

18      A.    Other than to say that both myself and

19   J-Squared are given design-in goals, generally, I

20   mostly care about my goals, but certainly their goals

21   are going to coincide with mine.   They weren't

22   making -- we weren't having particularly good success

23   with design-in activity in that portion of the

24   territory in 2003 --

25      Q.    Okay.

Page 216

1      A.    -- or '04.

2      Q.    Could you flip back to page 20 of

3  Exhibit 14B, which is the performance criteria for

4  J-Squared Oregon?

5      A.    Yes.  This matrix we looked at before?

6      Q.    Right.

7            Now, at the time you were looking for this

8  information, it was -- it was just at the inception of

9  the sixth month -- or I should say the seventh month

10  that J-Squared Oregon was involved in this endeavor;

11  correct?

12      A.    Yes.

13      Q.    And it appears that the only metric regarding

14  design wins that would apply to that time period was

15  one.

16      A.    Yes.

17      Q.    And that time period hadn't even elapsed yet.

18  So how could there have been a concern with design wins

19  yet when J-Squared Oregon wasn't even responsible for

20  having one at the time you were asking for the

21  information?

22      A.    The concern is the continuum lasts all the

23  time.  It doesn't -- the concern for design wins is

24  cumulative, but it's always there, so --

25      Q.    Okay.  But they hadn't -- they hadn't -- they

1    Q.    (By Ms. Cates)    Could it have provided a

2    basis for terminating for nonperformance?

3    A.    It could have.

4    Q.    Is it possible that J-Squared -- do you know

5    if J-Squared met the required 11 uncommitted accounts

6    for the end of quarter three?

7    A.    I don't have any recollection specifically of

8    what their performance metrics were here when I was

9    asked to submit them, which was documented again in --

10    it looks like at least the request to document that was

11    in this Exhibit 73.

12    Q.    So you don't know whether they met 11?

13    A.    Yeah, I really -- I really don't have any

14    direct recollection.

15    Q.    And, likewise, with the committed accounts,

16    you don't know whether they --

17    A.    That's right.    Just -- I just don't -- I

18    mean, this is a long time ago.    I just don't --

19    Q.    And with design wins, do you know whether

20    they were able to bring in a design win?

21    A.    Yeah.    To the best of my recollection, we

22    don't -- we didn't get any design wins.

23         MS. CATES:    Okay.    That's all I have.

24    ///

25    ///

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., a )
Canadian corporation, and J-SQUARE )
TECHNOLOGIES (OREGON) INC., an )
Oregon corporation, )
                     Plaintiffs, )
                     v. )    C.A. No. 04-CV-960-SLR
MOTOROLA, INC., a Delaware corporation. )
                  Defendant. )

**<u>REDACTED DOCUMENT</u>**

# ENTIRETY OF DOCUMENT
# (A-462 THROUGH A-513)
# CONFIDENTIAL

YOUNG CONAWAY STARGATT & TAYLOR, LLP
/s/ William W. Bowser
_____
William W. Bowser (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601; Facsimile: (302) 576-3282
wbowser@ycst.com
OF COUNSEL:
Randy Papetti, Cory A. Talbot, Emily S. Cates
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 262-5311
Attorneys for Defendant

DATED:     May 4, 2006