Kolasa Jeanne-MCG32018

| | |
|---|---|
| **From:** | Kolasa Jeanne-MCG32018 |
| **Sent:** | Wednesday, October 30, 2002 5:02 PM |
| **To:** | Hamlett-Dean Sue-P25026 |
| **Subject:** | Open Contract Issues for J.Squared |

Hi Sue:

Wanted to check with you and see if you had a chance to get the updates done to the J Squared contract.   Below are the other open issues on the contract that they are asking about.   Julie Blair gave me some info on Net Sales and when we pay commissions....we probably want to update the doc with some of this info.   Take a look at the below notes and let me know what you think.

Thanks!

JK

-----Original Message-----
From: Claude Langlois [mailto:langlois@jsquared.com]
Sent: Monday, October 28, 2002 8:35 AM
To: Kolasa Jeanne-MCG32018
Cc: Terry Larry-MCG32003; Kaczor Edwin-BLUW112; jeff gibson; Mike Nykoluk
Subject: RE: Open Contract Issues

Tks Jeanne, i appreciate the follow-up. Based on my notes from our meeting in TOR, i see a couple of points that remain outstanding. Can you give me an understandig as to where you are with the following:

- Section 3.1:    " ...commission will be based upon the Net Sales Prices...". I believe this had to be confirmed, you weren't sure as to how somevof your other reps were getting paid on disti resales.

JK notes - no mods to the contract needed on this one.   Section 3.1 defines net sales for distribution as indirect orders less any discounts, refunds, liquidated damages , sales, etc.   We'll confirm that we are paying on net sales.

- Section 3.1, 2nd paragraph: "...on all orders received for a period of 120 days...". By "orders", I assume we mean shipments ( pls confirm ) and we had talked about extending the period from 120 days to 180.

JK notes - Can we clarify this?  The question is does orders equal shipments? If so, then I'd suggest we change the verbiage to say shipments of backlog through 120 days.   If it means orders, then this implies that we might be shipping and paying commissions to the rep past the 120 day time period.  I believe that Sue and JK decided we'd leave this one at 120 days to give us the flexibility to change the account responsibility more quickly in the event of poor performance.

- Section 3.9:    "...requires written notice to Motorola within ninety ( 90 ) days..." We had asked to extend to 180 days.

JK notes - I believe Sue and JK agreed to change this to 180 days.

- Section 7.1:    "...may be renewed only upon written agreement of both parties" . we had asked the agreement get automatically renewed unless terminated as provided in Par. 7.2 .

JK notes - I didn't respond to him on this one because you told me that this was a G9 requirement.   I figure I'll explain this when I send him back the updated document.

1

MOTJ 00380

A-514

- Section 3       add a paragraph covering design splits and compensation.
- Section 2.2    J2 Appointment should be exclusive.
- Section 2.7    If J2 appointment is not exclusive then J2 should be allowed to represent manufacturers that compete with MCG.
- Section 3.1    J2 commission based on distribution cost not resale. Should be based on resale.
- Section 3.1    in last paragraph, change "… for a period of 120 days" to "… for a period of 180 days".
- Section 3.4    Commissions are paid to J2 after customer has paid MCG invoice. Should be after customer has been invoiced. If not how will this apply to distribution POS sales?
- Section 3.6    change "… will be effective 90 days" to " … will be effective 180 days".
- Section 3.7    What is purpose of this paragraph?
- Section 3.9    change "…within 90 days" to "… within 180 days".
- Section 4.3    J2 will not translate documents at Motorola's request
- Section 4.9    in 2nd paragraph, 2nd line. The word "may" is used twice ( typo )
- Section 6.1    Confidentiality and Proprietary rights clause must apply for both parties.
- Section 7.1    change "…hereof and thereafter may be renewed only upon the written Agreement of both parties" to "… hereof and will automatically be renewed unless terminated in writing by either party per section 7.2".
- Section 7.2 change all "( 30 ) days" to "( 60 ) days".
- Section 7.2G    Delete paragraph
- Section 7.3    J2 wants to see a 30 days written notice prior to termination taking effect and receive full compensation for direct and distribution shipments 180 days following the date of termination.
- Section 7.3 B    clause has to apply to both parties.
- Section 7.3 D    change " …period of 120 days " to " … period of 180 days".
- Section 9.        Add " MCG and J2 can not solicit each other's employees without written approval".

MOTJ 00381

A-515

J2 CAN

85

**Claude Langlois**

| | |
|---|---|
| **From:** | Claude Langlois |
| **Sent:** | Monday, October 28, 2002 10:35 AM |
| **To:** | 'Kolasa Jeanne-MCG32018' |
| **Cc:** | Terry Larry-MCG32003; Kaczor Edwin-BLUW112; jeff Gibson; Mike Nykoluk |
| **Subject:** | RE: Open Contract Issues |

Tks Jeanne, i appreciate the follow-up. Based on my notes from our
meeting in TOR, i see a couple of points that remain outstanding. Can
you give me an understandig as to where you are with the following:

- Section 3.1:    " ...commission will be based upon the Net Sales
Prices...". I believe this had to be confirmed, you weren't sure as to
how somevof your other reps were getting paid on disti resales.

- Section 3.1, 2nd paragraph: "...on all orders received for a period
of 120 days...". By "orders", I assume we mean shipments ( pls confirm )
and we had talked about extending the period from 120 days to 180.

   Section 3.9:    "...requires written notice to Motorola within ninety (
 ) days..." We had asked to extend to 180 days.

- Section 7.1:    "...may be renewed only upon written the written
agreement of both parties" . we had asked the agreement get
automatically renewed unless terminated as provided in Par. 7.2 .

Thanks again,

Claude Langlois
Vice-President, Eastern Canada Sales
J-Squared Technologies
www.jsquared.com
514 / 747-1211 ( Office )
514 / 944-7949 ( Cellular )


-----Original Message-----
From: Kolasa Jeanne-MCG32018 [mailto:Jeanne.Kolasa@motorola.com]
Sent: Friday, October 25, 2002 4:39 PM
To: Claude Langlois
Cc: Terry Larry-MCG32003; Kaczor Edwin-BLUW112
Subject: Open Contract Issues


Bonjour Claude:

I met today with Sue Hamlett from our legal team to go through the
contract issues open with J Squared.   We made good progress and Sue
will be re-writing some portions of the contract to incorporate changes.
Her ETA for completion is COB this Wednesday.   Commission issues are
still open, but we're getting close to finalizing a proposal.

Some of the changes we'll accomodate are:

Section 2.2  Will add verbiage that states it is not MCG's intention to
engage competitive rep firms in any given territory.

Section 3.6  Will agree to hold commission rates for 180 days after
changes.

Section 4.3  Will not hold J Squared accountable for translating
documents.

1

A-516

Section 4.9  Will correct typo :-)

Section 6.1  Will add verbiage to  make confidentiality a mutual agreement.

Section 7.2  Will change verbiage to allow for a corrective action PLAN within 30 days and not necessarity a solution.

Section 7.2G  Verified that the intention of this paragraph is that the contract cannot be terminated by either party for convenience within the first 180 days after signature.

Section 7.3D  Will change verbiage to read that in the case of term by convenience, rep will be eligible for commission on direct and distribution orders for 180 days.

Section 7.3B  Will add verbiage that states either party can seek reimbersment for legal fees.

Section 9  Will add verbiage that states neither party will solicit employees without written approval.

A-517

J2 1599

J2 CA

**Claude Langlois**

86

| | |
|---|---|
| **From:** | Kolasa Jeanne-MCG32018 [Jeanne.Kolasa@motorola.com] |
| **Sent:** | Friday, November 15, 2002 5:40 PM |
| **To:** | Claude Langlois |
| **Cc:** | Terry Larry-MCG32003; Kaczor Edwin-BLUW112; jeff Gibson; Mike Nykoluk; Hamlett-Dean Sue-P25026 |
| **Subject:** | MR Agreement |



J2 Rep Agmt 14
nov.doc

        Bonjour Claude:

I am pleased to finally (!) send to you the attached Manufacturer's
Representative Agreement.  Exhibits 1 and 2 specify the commission rates
along with MCG house accounts and legacy programs.  I believe all open
contract issues are addressed, however, let me provide clarification on
two items:

~~Section 3.1~~       As the contract states, commissions are paid on net        *POS @ cost*
sales price which is defined as actual price paid to Motorola by
customers for direct orders, or the Motorola distributor for indirect
orders less any discounts, refunds, liquidated damages, etc. (for
distribution, this is list minus discount, not POS price).

~~Section~~ 7.1       Motorola's G9 policy prohibits the automatic
renewal of TPSR contracts.  Therefore, we must retain the the verbiage
stating that the agreement is in effect for a term of one year and
renewable only upon written agreement of both parties.

Thank you for sending the signed copy of the G9 agreement.  As we
discussed yesterday, Jeff Gibson is speaking to Craig Caldwell at MCG to
work out the financial data needed to close out MCG's G9 requirements.
This will need to be completed prior to final signatures of the
contract.

Have a good weekend and thanks for your patience.

Best Regards,
Jeanne Kolasa

J2 1605

A-518

From: Kolasa Jeanne-MCG32018
Sent: 10/11/2002 2:28:23 PM (Eastern Time)
To: Hamlett-Dean Sue-P25026; Terry Larry-MCG32003; Kaczor Edwin-BLUW112
Attachments: J2Motorola contract10-10.doc
Subject: Notes on J2 contract


Hi Sue/Larry and Ed:

Here are the notes i took from our contract discussion yesterday with J2.
I've put J2 comments in red and MCG considerations or actions in Blue.
Sue, please take a look and provide feedback.

Larry/Ed:

I did confirm that we pay on Net Sales so that is how J2 would be paid.....not
on the POS dollars.

I will be out all next week at an distributor meeting.    I'll follow up with
you on 10-21.

Best Regards,
JK


Jeanne M. Kolasa
Motorola Computer Group
602-438-3145

A-519

MCG012024

- Section 3      add a paragraph covering design splits and compensation.
  Proposal is that the rep gets 100% credit for the design win.  MCG to
  address what happens if design is won in Canada, but mfg moved off
  shore…eg. China.

  Split proposal was 80/20 for point of design and point of purchase(ship)
  respectively.  Will MCG pay on splits as part of rep comp plan?
- Section 2.2      J2 Appointment should be exclusive.
  J2 concern is that they will incur costs to set up infrastructure.  Don't want
  to be put in a position where MCG puts a competing firm in.  Response
  was that it is not MCG 's intention to put competing firms in place…takes
  more bandwidth to manage.  However, there may be situations where we
  sign a vertical segment firm…eg. Mil Aero focused.  MCG should address
  this in the verbiage.
- Section 2.7      If J2 appointment is not exclusive then J2 should be allowed to
  represent manufacturers that compete with MCG.
  Not an issue as long as exclusivity concern is addressed.
- Section 3.1      J2 commission based on distribution cost not resale. Should be
  based on resale.
  Paragraph 3.1, says commission will be based upon the Net Sales Price of
  Product for those orders to Motorola….Isn't MCG paying C&S on POS?
  How would MCG pay on direct?

  J2 would accept being paid on POS.

- Section 3.1      in last paragraph, change "… for a period of 120 days" to  "… for
  a period of 180 days".

  Section 3.1 paragraph 2….In cases where adjustments are made to
  territory or accounts, rep expects commission to be paid on all orders for a
  period of 180 days….not 120 as is referenced in contract.  Will MCG pay
  on 180 days.  J2 has proposed that if house accounts, territory or
  commissions change, contract would be terminated…payouts made
  against current contract agreement, and then new contract would be
  negotiated to incorporate changes.

- Section 3.4      Commissions are paid to J2 after customer has paid MCG invoice .
  Should be after customer has been invoiced. If not how will this apply to
  distribution POS sales?
  J2 proposes that it is industry standard to pay commissions when invoiced
  and credit later if customer pays partial or doesn't pay.  Their experience
  is that the longer the period between invoice and payment, the more
  difficult it is to reconcile problems.  Does MCG pay BDMs at time of
  invoice?   Can we agree to pay at time of invoice?
- Section 3.6      change "… will be effective 90 days" to " … will be effective 180
  days".

A–520

MCG012025

J2 has proposed that if house accounts, territory or commissions change, contract would be terminated...payouts made against current contract agreement, and then new contract would be negotiated to incorporate changes. Want commissions on old terms paid through 180 days. Will MCG agree to 180 days?  Will MCG agree that old contract terminates and new one is negotiated?

- Section 3.7    What is purpose of this paragraph?
  Explained. Non issue.
- Section 3.9    change "...within 90 days" to "... within 180 days".
  J2's contention is that it usually takes longer than 90 days for a problem to arise, eg. Commission payment reconciliation. They'd like to see 180 days to file written notice of claim.  Will MCG agree to 180 days?
- Section 4.3    J2 will not translate documents at Motorola's request
  J2 will not incur the cost of translating material.   How does MCG handle this in other countries?  Can we agree to provide collateral, if needed, in French, for example?
- Section 4.9    in 2nd paragraph, 2nd line. The word "may" is used twice ( typo )
  MCG correct typo.
- Section 6.1    Confidentiality and Proprietary rights clause must apply for both parties.
  MCG to change verbiage to reflect two way protection clause.
- Section 7.1    change "...hereof and thereafter may be renewed only upon the written Agreement of both parties" to "... hereof and will automatically be renewed unless terminated in writing by either party per section 7.2".
  Industry standard is that contracts auto renew for a specified time period with ability to terminate via 30 day written notice.  Why was rep contract written with this clause?  Direct contracts have auto renewal clauses. MCG to change verbiage to allow for auto renewal and specify changes will be addressed via admendments to this contract.
- Section 7.2 change all "( 30 ) days" to "( 60 ) days".
  Can we soften verbiage to say best efforts for corrective action within 30 days or response to corrective action within 30 days?  Would we agree to change this to 60 days?
- Section 7.2G  Delete paragraph
  Verify with Sue that the intention of this sentence is to say that neither MCG nor J2 can terminate within the first 180 days after agreement is signed.

  A-F references termination with cause
  G references termination without cause (eg. For convenience)


- Section 7.3    J2 wants to see a 30 days written notice prior to termination taking effect and receive full compensation for direct and distribution shipments 180 days following the date of termination.

A-521

MCG012026

Per the contract terms, J2 will get a 30 written notice prior to term (see parapgraph G).   Per paragraph 7.3.D, verify that MCG agrees to pay on all orders (backlog)....verify that our intention truly was orders and not shipments....   Also, MCG to change POS commission payments through 180 days instead of 120.

- Section 7.3 B  clause has to apply to both parties.

Will MCG agree to change verbiage to apply same terms to both parties?

- Section 7.3 D  change " ...period of 120 days " to " ... period of 180 days".

Per J2, 180 days is semiconductor industry standard.  Per paragraph 7.3.D, verify that MCG agrees to pay on all orders (backlog).... .verify that our intention truly was orders and not shipments....   Also, MCG to change POS commission payments through 180 days instead of 120.

- Section 9.      Add " MCG and J2 can not solicit each other's employees without written approval".

MCG to add section that says we won't solicit other's employees without written approval.

A–522

MCG012027

This is
Exhibit No. _132_
on the examination of:
_Claude Langlois_ in
_T Squared_ v _Motorola_
held on _Nov 22/06_
CORNELL • CATANA
PER _QW_ ( ___ )
at OTTAWA, ONTARIO
_06-0288_

Page 1 of 2

## Michelle Cole - RE: Open Contract Issues

| | |
|---|---|
| **From:** | Terry Larry-MCG32003 <larry.terry@motorola.com> |
| **To:** | Kolasa Jeanne-MCG32018 <Jeanne.Kolasa@motorola.com> |
| **Date:** | 11/5/2002 6:58 AM |
| **Subject:** | RE: Open Contract Issues |
| **CC:** | Kaczor Edwin-BLUW112 <ed.kaczor@motorola.com>, Holt Paul-LPH001 <paul.holt@motorola.com> |

Jeanne,

I plan to be on holiday next week. How can I or Ed help with getting the remainder of the contract updated, including the new rep commission structure? Can we do this by Friday?

I talked with Claude and Jeff Gibson (CEO) and they don't see any show stoppers in the agreement and although Jeff was planning on 6% for a lead line, they're OK with a flat 5%, as long as we're not excluding too much revenue and we add Oregon and Washington (NW) to the agreement.

Cheers!

LBT

-----Original Message-----
**From:** Kolasa Jeanne-MCG32018
**Sent:** Friday, October 25, 2002 4:39 PM
**To:** 'Claude Langlois'
**Cc:** Terry Larry-MCG32003; Kaczor Edwin-BLUW112
**Subject:** Open Contract Issues

Bonjour Claude:

I met today with Sue Hamlett from our legal team to go through the contract issues open with J Squared. We made good progress and Sue will be re-writing some portions of the contract to incorporate changes. Her ETA for completion is COB this Wednesday. Commission issues are still open, but we're getting close to finalizing a proposal.

Some of the changes we'll accomodate are:

Section 2.2 Will add verbiage that states it is not MCG's intention to engage competitive rep firms in any given territory.

Section 3.6 Will agree to hold commission rates for 180 days after changes.

Section 4.3 Will not hold J Squared accountable for translating documents.

Section 4.9 Will correct typo :-)

MOTJ 00560

file://C:\TEMP\GW}00001.HTM

9/30/2004

A-524

Page 2 of 2

Section 6.1  Will add verbiage to  make confidentiality a mutual agreement.

Section 7.2  Will change verbiage to allow for a corrective action PLAN within 30 days and not necessarity a solution.

Section 7.2G   Verified that the intention of this paragraph is that the contract cannot be terminated by either party for convenience within the first 180 days after signature.

Section 7.3D   Will change verbiage to read that in the case of term by convenience, rep will be eligible for commission on direct and distribution orders for 180 days.

Section 7.3B  Will add verbiage that states either party can seek reimbersment for legal fees.

Section 9   Will add verbiage that states neither party will solicit employees without written approval.

MOTJ 00561

file://C:\TEMP\GW}00001.HTM

9/30/2004

A–525

From: Terry Larry-MCG32003
Sent: 9/28/2002 12:39:24 PM (Eastern Time)
To: 'Claude Langlois'
CC: Kaczor Edwin-BLUW112; Holt Paul-LPH001; Kolasa Jeanne-MCG32018; Liston
Jay-MCX1326; Hamlett-Dean Sue-P25026
Attachments: Example rep contract.doc, June 2001 G-9 TPSR application.doc, Code
of Conduct_Web.doc
Subject: Rep Agreement - Due Diligence

Claude,

Here are the Rep agreement (sans commission rates), the Code of Conduct and the
G9 application Form, to be completed by next we meet.

Paul Holt and I will meet with you next Wednesday (still trying to confirm the
exact time - do you have any restrictions?) to meet and greet and cover off
Part one of the agenda below.  Part one, because some of the items are not
fully fleshed out yet (pre-/Post sales support) and we will do this again on
Thursday, October 10th in the morning, so I want to keep some of the material
for then.

The purpose of the Meet n' Greet is to get to meet some of the sales folks who
are going to take up the challenge, talk about their top 10 opportunities and
trends, directions, plans for growth, etc... in an informal environment.  We'll
do a high level presentation to the team to get them comfortable with who we
are and get them thinking about the opportunities they might see.

We'll want to talk a bit more about the "how do the sales teams present the
value proposition on buy vs. build".

I look forward to a good meeting

Cheers!

LBT


-----Original Message-----
From: Claude Langlois [mailto:langlois@jsquared.com]
Sent: Friday, September 27, 2002 11:40 AM
To: Larry Terry (E-mail)
Subject: RE: Next Wednesday


LArry, i forgot a very important topic: pre & post sale support available to J2.

Tks.

C.

-----Original Message-----
From: Claude Langlois
Sent: Friday, September 27, 2002 10:49 AM
To: Larry Terry (E-mail)

A-526

MCG010401

Subject: Next Wednesday

Hi Larry,

As discussed briefly yesterday, it would be appreciated if you could give us next Wednesday Motorola's perspective on life. I'd be great if you and or Paul could touch on the following:

- Corporate overview
- Product roadmap and existing portfolio
- Strategic market segments and critical success factors
- Competitors
- MCG's competitive advantages
- Pre & Post Sales Support infrastructure

This will us help greatly in better understanding the landscape and what will be required to be successful.

Let me know.

Tks

Claude Langlois
Vice-President, Eastern Canada Sales
J-Squared Technologies
www.jsquared.com
514 / 747-1211 ( Office )
514 / 944-7949 ( Cellular )

A-527

MCG010402

MANUFACTURER'S REPRESENTATIVE AGREEMENT

between

MOTOROLA COMPUTER GROUP

and

**"Representative"**

1

Rev. Date 13 December 2001

A–528

MCG010418

TABLE OF CONTENTS

Article I. Definitions.................................................................................................................. 3

Article II. Appointment and Scope........................................................................................... 3

Article III. Representative's Compensation.............................................................................. 4

Article IV. Representative Obligations..................................................................................... 7

Article V. Motorola Obligations.............................................................................................. 9

Article VI Confidentiality and Proprietary Rights................................................................. 10

Article VII. Term and Termination........................................................................................ 10

Article VIII. Dispute Resolution............................................................................................ 12

Article IX. General Provisions............................................................................................... 12

LIST OF EXHIBITS

- EXHIBIT 1: REPRESENTATIVE PRODUCT LIST/COMMISION RATES
- EXHIBIT 2: TERRITORY AND HOUSE ACCOUNT LIST

Rev. Date 13 December 2001

A-529

MCG010419

THIS AGREEMENT is made and effective on the date of the last signature below by and between Motorola Inc., a Delaware corporation, by and through its Computer Group having an office at 2900 South Diablo Way, Tempe Arizona, United States of America ("Motorola"), and Rep Firm, a Corporation organized under the laws of Place, and having an office address of ("Representative").

## Article I. Definitions

1.1    **Agreement.** "Agreement" means this document and any exhibit, attachment, schedule, addendum, or modification unless the context otherwise indicates.

1.2    **Customer.** "Customer(s)" means any purchaser of Products from Motorola for end use in the Territory.

1.3    **Products.** "Products" means those Motorola products and systems that are specifically identified at Exhibit 1.

1.4    **Confidential Information.** "Confidential Information" means all information which is disclosed in oral, written, graphic, machine recognizable, and/or sample form, and which is clearly designated, labeled or marked as confidential or its equivalent and includes all know-how, designs, drawings, specifications, catalogs, data sheets, sales and technical bulletins, service manuals, mechanical diagrams, and all other information relating to the design, manufacture, use, and service of the Products, including any other information relating to Motorola's business that may be sent to Representative during performance of this Agreement and that is not generally known in the trade.

1.5    **Territory.** "Territory" is limited to the area or specified accounts identified in Exhibit 2.

## Article II. Appointment and Scope

2.1    **Appointment.** Subject to the terms, conditions and duration of this Agreement, Motorola appoints Representative as a non-exclusive, independent manufacturer's representative of the Products for end use in the Territory at such prices and upon such terms and conditions as established by Motorola. Representative accepts this appointment and agrees to devote such time and attention to the performance of such duties as may be reasonably necessary. Representative shall not, without Motorola's written authorization, register as Motorola's representative in any country or jurisdiction other than Territory.

2.2    **Territory Exclusivity.** This appointment is nonexclusive. Motorola may appoint additional sales representatives, agents, distributors or other representative for Products in or for the Territory. Motorola may also at any time sell any Products directly, as identified in Exhibit 1 or by written notice as provided for in paragraph 3.1, or indirectly through any Motorola subsidiary or affiliate without incurring any commission or other payment obligation to Representative of any type or nature. Motorola specifically reserves the House Accounts listed in Exhibit 2 as Motorola direct accounts for which Representative will not be entitled to receive any commission.

2.3    **Distribution Outside Territory.** Representative will limit its Product sales activities to Customers within the Territory and will not market Products outside the Territory.

3

Rev. Date 13 December 2001

A-530

MCG010420

2.4     **Agents and Subrepresentatives.** Representative may not appoint any agent, subrepresentative, or other person ("Sub-Agent") to promote Product sales or to otherwise perform any of Representative's obligations without Motorola's prior written approval and compliance with Motorola's policy for obtaining such approval. Motorola's approval of any such Sub-Agent shall be based upon Motorola's review of information provided by Representative. Any such approval shall not be deemed to create any obligation between Motorola and Sub-Agent. Actions of Sub-Agents shall be the sole responsibility of Representative and Representative agrees to indemnify and hold Motorola harmless against any and all acts, whether unintentional or deliberate, on the part of the Sub-Agent. Prior to furnishing any Product to a Sub-Agent, Representative shall obtain a signed agreement from such Sub-Agent consistent with the terms of this Agreement and shall, among other things, require that the Sub-Agent comply with the United States Foreign Corrupt Practices Act and Motorola's Code of Business Conduct. Sub-Agents will in no event be allowed to describe themselves or advertise themselves as Motorola authorized representatives or distributors.

2.5     **Independent Contractor Status.** Representative is an independent contractor who will not be considered a Motorola employee, agent or legal representative for any purpose; neither Representative nor any of its directors, officers, employees or agents will be, or will be considered, a Motorola agent or employee. Representative is not granted and will not exercise any right or authority to assume or create any obligation or responsibility on behalf of, or in the name of, Motorola. Specifically, Representative does <u>not</u> have authority, on Motorola's behalf, to: a) contract or make commitments; b) change prices or terms and conditions of sales; c) make warranties, oral or written, express or implied concerning Products; or d) take any action which would result in Motorola's liability for state, federal, or local taxes or any expenses of any kind.

2.6     **Operations and Expenses.** Representative's detailed operations under this Agreement are subject to the sole control and management of Representative. Representative is responsible for all its own expenses and employees and for providing, at its own expense, such office space, facilities, and training as may be required to carry out its obligations under this Agreement. Representative will incur no expense chargeable to Motorola, except as specifically authorized in advance in writing by Motorola. Any such chargeable expense shall be documented in accordance and consistent with applicable Motorola policies.

2.7     **Noncompetition.** Representative will not sell, offer for sale, or act as sales agent for the solicitation of orders for any products that are competitive with any of the Products as defined by Motorola; nor will Representative engage in any activity that may result in a relationship with current or future customers that creates a conflict of interest as defined by Motorola.

# Article III. Representative's Compensation

3.1     **Commissions.** For services detailed in this Agreement, commissions will based upon the Net Sales Price of Product for those orders to Motorola from either Motorola's distributors or those direct Customers that are in the Territory, other than Motorola House Accounts, and registered through the Motorola registration system, whether registered by Representative, through its Motorola contact, for direct orders or Motorola's distributor for indirect orders. Net Sales Price is the actual price (i.e., original contract price adjusted by

MCG010421

change orders and termination orders) paid to Motorola by Customers for direct orders or the Motorola distributor for indirect orders less any discounts, refunds, liquidated damages, sales or other applicable taxes, C.O.D. charges, insurance, commissions and finance charges, freight or transportation costs, or other allowances from the delivery point, if any. The commission rate is identified for each Product in Exhibit 1. This agreed to commission rate is subject to subsequent reduction should as may be restricted by law, regulation or contract with the Customer.

Motorola may make adjustments to authorized Territory and direct accounts upon written notice to Representative. In such cases of adjusted Territory and/or direct accounts, Representative will be eligible for a commission, pursuant to the commission schedule included in Exhibit 1, on all orders received for a period of 120 days following the date of adjustment for orders effected by those Territory and direct accounts changes.

3.2    **Net Sales Price Changes**. If: (a) the Net Sales Price changes after acceptance of the order by Motorola; or (b) credit is granted or a refund is made to a Customer for returned Products, and such change, credit or refund results in a different commission from the commission derived from Paragraph 3.1 above, any over or underpayment will be: (i) subtracted from or added to the next commission payment payable to Representative; or (ii) refunded by or paid to Representative within 30 days of written notice by Motorola if no further commissions are to become due.

3.3    **Billing Documents**. Motorola will produce billing documentation to Customers and Representative in accordance with Motorola's standard invoicing techniques reflecting the actual term and conditions (prices, terms, commissions, etc.) of the sales transaction. Under no circumstances will a Customer be invoiced at other than the actual sales price.

3.4.    **Payments**. Commissions are earned on orders when payments of the invoices have been received from Customers, or on behalf of Customers, whether such payments are in full or in part. Where payment is less than the full amount due on an invoice, the commission earned will be limited to the applicable commission rate multiplied by the amount actually received. Commissions earned may be subject to delay based upon milestone payments to Motorola, payment holdbacks and performance bond requirements and which delay shall be agreed to in writing by the parties prior to final customer contract award. Commissions earned will accumulate monthly and be due and payable on the end of the month following the month in which Customer payments have been received. Commissions will be made payable to Representative and transmitted by mail to Representative's business address or such other means as are permissible under the laws of the Territory and the United States of America and in accordance with the internal policies of Motorola. Representative represents and warrants that it will report and disclose all commissions, fees or other types of compensation received under this Agreement as required under law.

3.5    **Refusal to Accept Orders**. Representative's entitlement to a commission depends on Motorola's acceptance of Customer orders during the term of this Agreement and Representative's efforts to secure such orders. Motorola's failure or refusal to accept any order for any reason shall not create an obligation to pay either a commission or any damages in lieu thereof, nor shall any delay or default in the performance of any accepted order create an obligation to pay a commission or any claimed damages. Motorola shall not be obligated to make any commission payments for any orders received or accepted before

5

Rev. Date 13 December 2001

A-532

MCG010422

the effective date of this Agreement, for sales from one government to another government, or for any order which is not, in Motorola's opinion, the result of Representative's efforts consistent with the terms and conditions of this Agreement.

3.6    **Commission Changes**. Commission levels may be amended by Motorola from time to time on all future business opportunities and will be effective 90 Days after written notice to Representative.

3.7    **Commission Restrictions**. MOTOROLA WILL NOT PAY A COMMISSION WHERE PROHIBITED OR TO THE EXTENT LIMITED BY UNITED STATES OR LOCAL LAW OR REGULATION, OR BY ANY CONTRACTUAL, FINANCING, OR OTHER SIMILAR PROVISION.  REPRESENTATIVE ASSUMES THE RISK THAT A COMMISSION MIGHT BE SUBJECT TO A PROHIBITION OR LIMIT AND THAT REPRESENTATIVE WILL NOT BE PAID AS A RESULT. REPRESENTATIVE IS ENCOURAGED TO REVIEW LOCAL LAW, LOCAL REGULATIONS, POTENTIAL CONTRACTS, AND FINANCING ARRANGEMENTS FOR PROHIBITIONS OR LIMITATIONS ON COMMISSIONS. IF PAYMENT OF A COMMISSION IS LIMITED, BUT NOT ENTIRELY PROHIBITED, BY APPLICABLE UNITED STATES OR LOCAL LAW OR REGULATION, CONTRACT OR FINANCING ARRANGEMENTS, MOTOROLA AND REPRESENTATIVE MAY NEGOTIATE PAYMENT OF COMMISSION ON A CASE-BY-CASE BASIS WITHOUT OBLIGATING MOTOROLA TO PAY A COMMISSION IN EXCESS OF SUCH LIMITATIONS EXCEPT TO THE EXTENT IT AGREES IN ADVANCE AND IN WRITING.

Commissions on the any sale of products or services, Foreign Military Sales/Foreign Military Financing (FMS/FMF), NATO and other sales where commissions may be otherwise restricted shall be payable in accordance with the relevant local law and United States law and regulations as follows:

1) Where there is no restriction on commissions, a commission will be paid at the agreed to rate, not to exceed 5% of Net Sales Price, as defined in Paragraph 3.1.

2) Where commissions are restricted, Motorola will pay a commission at the agreed to rate, not to exceed the amount restricted by law or regulation, or as otherwise specifically stipulated to by the Customer in writing prior to contract award.

3) Where a commission is prohibited, Motorola will pay no commission.

3.8    **Limitation of Liability.** IN NO EVENT, WHETHER FOR BREACH OF CONTRACT, WARRANTY, MOTOROLA'S NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE WILL MOTOROLA BE LIABLE FOR INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, FRUSTRATION OF ECONOMIC OR BUSINESS EXPECTATIONS, LOSS OF PROFITS, LOSS OF DATA, COST OF CAPITAL, COST OF SUBSTITUTION OF PRODUCTS, FACILITIES OR SERVICES, DOWNTIME, COSTS, OR ANY SIMILAR CLAIM OF A SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE NATURE WHATSOEVER TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

3.9    **Claims Procedures.** Any dispute or claim against Motorola related to this Agreement, or its expiration or termination, requires written notice to Motorola within

Rev. Date 13 December 2001

A–533

MCG010423

ninety (90) days of the event giving rise to the claim. Failure to give such notice will constitute a waiver of any claim against Motorola and will relieve Motorola from any and all liability on any such claim.

3.10    **Offsets.** Any credits, allowances, or other amounts payable or creditable to Representative by Motorola will be subject to offset for any claims or other amounts owed by Representative to Motorola pursuant to the provisions of this Agreement or otherwise.

3.11    **Taxes.** All taxes (including, but not limited to, income, withholding, sales, use, registration, ad valorem, excise, employment and documentary taxes), duties, excises or other such charges imposed by governmental or quasi-governmental bodies relating to the sale, shipment, acquisition, holding and disposition of Products by Representative or Representative's actions or presence in the Territory or any performance under this Agreement that are not the responsibility of the Customer will be paid by Representative, which agrees to indemnify and hold harmless Motorola or any Motorola Affiliate with respect to any such charges paid by Motorola or any Motorola Affiliate.

## Article IV. Representative Obligations

4.1    **Sales Promotion.** Representative will use best efforts to promote the sale and use of Products in Territory. Representative will immediately submit to its contact within Motorola all leads, forecasts, purchase orders, and other communications Representative develops or receives from a Customer or prospective Customer for the Products.

Representative must register all sales efforts and leads through the Motorola registration system for those opportunities that may result in direct orders to Motorola and will be eligible for a commission on only those direct orders so registered.

4.2    **Facilities and Personnel.** Representative will maintain, at its own expense, such office space and facilities, and hire and train such personnel, as may be required to carry out its obligations under this Agreement.

4.3    **Promotional Materials.** Representative will maintain an adequate inventory of Motorola's current sales material and samples for use in an efficient and effective manner to promote the sale of Products in the Territory. At Motorola's request, Representative will not use any non-Motorola advertising or promotional materials to promote the Products without Motorola's prior written approval. At Motorola's request, Representative will prepare translations of Motorola's sales literature into the languages used in the Territory and make such translations available to Motorola.

4.4    **Performance Standards**. The parties agree to establish reasonable minimum performance standards, which Representative agrees to maintain, which standards may be amended from time to time by written consent of both parties. If Representative fails to meet such minimum performance standards, Motorola may terminate this Agreement for cause in accordance with Paragraph 7.2A.

4.5    **Sales Policies.** Representative will comply, and will cause its employees and agents to comply, with all Motorola sales policies and the Motorola Code of Business Conduct.

Rev. Date 13 December 2001

A-534

MCG010424

4.6    **Service and Training**.  Representative will assist Motorola in arranging for warranty, maintenance, and repair service for all Customers.  Representative will ensure that appropriate personnel attend any local or regional training as Motorola reasonably requires.

4.7    **Local Law**. Representative will notify Motorola of the existence and content of any mandatory provision of law in the Territory or any other applicable law that conflicts with or otherwise affects any provision of this Agreement at the time of its execution or thereafter. Representative agrees to comply with all laws and regulations of the Territory.  Failure to comply with this Paragraph 4.7 will be considered a material breach of this Agreement, allowing Motorola to terminate this Agreement effective immediately upon notice to Representative under Paragraph 7. 2E hereof.

4.8    **Questionable Payments**. Representative and Motorola shall use only ethical and legitimate business practices in the activities contemplated by this Agreement. Neither party shall engage in any improper gifts or payments in connection with the marketing or sale of any Product under this Agreement nor engage in any other improper, illegal or unethical conduct.  In addition, Representative agrees to cooperate fully with Motorola in any investigation of such matters.  As used in this paragraph, the term unethical conduct shall include improper, illegal or unethical conduct and corrupt payments within the meaning of the Motorola Code of Business Conduct, the United States Foreign Corrupt Practices Act (15 United States Code Section 78dd-1 and -2) and local anti-corruption laws.  Representative certifies that neither it, nor any of its directors, officers, employees, or agents is an official, agent, or employee of any government or governmental agency or political party or a candidate for any political office as of the effective date of this Agreement. Representative represents and warrants that all information provided to Motorola during the process of qualification of Representative, is true, accurate and correct and that Representative will promptly notify Motorola of any change to that information or of any event that would or may result in an exception to the representations contained in this Agreement. Representative will require each of its directors, officers, employees, and agents to comply with the provisions of this Paragraph 4.8, and it will ensure that appropriate personnel attend any regional Motorola briefings on this topic. Motorola will make available to Representative the Motorola Code of Business Conduct and any other information requested under this Paragraph 4.8. Notwithstanding any provision of this Agreement, any breach of the provisions of this Paragraph 4.8 will be considered a material breach of this Agreement and entitle Motorola to terminate this Agreement effective immediately on notice to Representative under Paragraph 7.2E and may result in Representative's surrender of any claim for payment under this Agreement and the refund any payment received.

4.9    **Indemnification**. Representative agrees to indemnify, defend and save Motorola harmless from and against all claims, proceedings, losses, penalties, damages or actions, and all expenses incidental to any investigation, negotiation or defense thereof, based upon, arising out of, or in connection with: a) damage or injury (including death) to persons, property, reputation, or business opportunity, caused by or sustained in connection with the performance of services hereunder or by conditions created hereby, except for damage or injury resulting solely and directly from Motorola's negligence or willful misconduct; b) breach of any of the provisions of this Agreement; c) negligence or other tortious conduct; d) representations or statements not specifically authorized by Motorola in this Agreement or in writing; e) violation by Representative (or any of its directors, officers, employees or agents) of

A-535

MCG010425

any applicable law, regulation, or order in the Territory or of the United States; or f) any material misrepresentation or omission made by Representative in connection with the information supplied relative to paragraph 4.12.

Motorola will indemnify and hold Representative, its officers, directors, employees, successors, and assigns harmless against all claims and losses, that may be may sustained as a result of: a) breach of any of the material provisions of this Agreement; b) disputes between Motorola and its customers which as a result of Motorola's to the extent that such dispute is due solely to Motorola's negligence or non-performance; or c) any material misrepresentation or omission made by Motorola in connection with the Products.

4.10    **Insurance.** Both parties agree to maintain adequate financial resources or insurance to fulfill their financial responsibilities under this Agreement.

4.11    **Security.** If, during this Agreement, Representative is involved in negotiations with sovereign governments or agencies for sale or use of Motorola Products by such governments or agencies requiring security clearance of Representative's personnel, Representative agrees to cooperate fully, to undertake at Representative's expense to acquire the necessary security clearance as requested by the governments or agencies and to observe all regulations or instructions issued by such governments or agencies with respect to such security clearance and maintenance of security.

4.12    **Due Diligence Review.** Representative, prior to initial appointment as a representative hereunder and any subsequent renewals, shall provide information to Motorola in order for Motorola to perform a due diligence review to assess Representative's ability to perform its obligations under this Agreement. Representative represents and warrants and will, at the time of submission, certify that all information supplied in accordance with Motorola's request is complete and accurate and that Representative will immediate notify Motorola of any and all changes to that information.

## Article V. Motorola Obligations

5.1    **Sales Support.** Motorola will provide Representative English language sales and marketing information for Products and furnish at reasonable cost such catalogs, specifications, promotional literature, and other materials pertaining to Products as are available.

5.2    **Advertising Programs.** Motorola may advertise in the Territory, with or without consultation with Representative.

5.3    **Notification of Changes.** Motorola will advise Representative, either in writing or by electronic means, of any changes in or affecting the Products or prices, terms and conditions of sale, sales policies, projected delivery dates, schedule changes, and other matters that Motorola determines may affect the business of Representative.

5.4    **Assistance.** Motorola will provide Representative reasonable access to and assistance of its technical, sales, and service personnel as Motorola deems appropriate. Such assistance will be without charge to Representative except as otherwise mutually agreed.

5.5    **Training.** Motorola will conduct, and Representative will cause its personnel to attend, such technical and sales training sessions for Products as Motorola deems necessary to

9

Rev. Date 13 December 2001

A-536

MCG010426

allow Representative to effectively market the Products. Such training will be provided without charge to Representative. All compensation, transportation, or living expenses of Representative's personnel while in attendance at such training sessions will be borne by Representative.

## Article VI Confidentiality and Proprietary Rights

6.1    **Confidential Information.**  Representative acknowledges that Confidential Information is valuable and proprietary to Motorola. Representative will hold Confidential Information in strict confidence for five (5) years after expiration or termination of this Agreement and will not disclose it to any other person, firm, or corporation without Motorola's prior written approval. This obligation will not extend to information which is now available or becomes available to the public without breach of this Agreement, is released in writing by Motorola, is lawfully obtained from a third party or parties without confidential obligation, is known to Representative prior to such disclosure or is at any time developed by Representative independently of any such disclosure or disclosures from the Motorola.

6.2    **Use of Confidential Information.**  Representative will limit its use of Confidential Information and any patent, trademark, or other intellectual property right of Motorola to implementation of this Agreement. Representative acknowledges that Motorola's damages sustained as a consequence of any breach of Representative's obligations under this Paragraph 6.2 may be difficult to measure in monetary terms. Representative hereby agrees that as such Motorola shall be entitled to: a) have the continuation of any such breach immediately and permanently enjoined; and b) an award of exemplary damages in an appropriate amount determined by a court of competent jurisdiction in the State of Arizona.

6.3    **Trademarks and Trade Names.**  Products may bear Motorola's trademarks, which Representative will not remove or efface. Representative shall have no right under this Agreement to use the tradenames, trademarks, or logos of Motorola without Motorola's prior express written consent. All use of such trademarks will inure solely to Motorola's benefit. Representative will not directly or indirectly use any of Motorola's trademarks or part thereof, or any mark or name confusingly similar thereto, as part of its corporate or business name or in any other manner, except that: a) Representative may identify itself as an authorized Representative of Motorola in accordance with Motorola's written instructions; and b) upon Motorola's written consent, Representative may use Motorola's trademarks relating to the Products for display purposes in connection with solicitation of orders for Products. In addition, Representative will not register any of Motorola's trademarks or any mark or name closely resembling them.

6.4    **Protection of Proprietary Rights.** Representative will cooperate with and assist Motorola, at Motorola's expense, in the protection of trademarks, patents, or copyrights owned by or licensed to Motorola and will inform Motorola immediately of any infringements or other improper action with respect to such trademarks, patents, or copyrights that come to the attention of Representative.

## Article VII. Term and Termination

7.1    **Term.**  Unless terminated as provided in Paragraph 7.2 below or by mutual written consent, this Agreement will continue in full force and effect for an initial term expiring one

MCG010427

(1) year after the effective date hereof and thereafter may be renewed only upon the written Agreement of both parties.

7.2    **Termination**. This Agreement may be terminated before expiration of the initial or any renewal term, as provided in Paragraph 7.1 above, by prior written notice to the other party as follows:

A.    By either party, in the event the other party should fail to perform any of its obligations hereunder and should fail to remedy such nonperformance within thirty (30) calendar days after receiving written demand therefore or, if the nature of the default does not reasonably allow it to be remedied in thirty (30) days, the Agreement will be considered terminated if the defaulting party fails to take corrective action within thirty (30) days after receipt of a notice of default and intent to terminate from the nondefaulting party;

B.    By either party, effective immediately, if the other party should become the subject of any voluntary or involuntary bankruptcy, receivership, or other insolvency proceedings or make an assignment or other arrangement for the benefit of its creditors, or if such other party should be nationalized or have any of its material assets expropriated;

C.    By Motorola, effective immediately, if Representative should attempt to sell, assign, delegate, or transfer any of its rights and obligations under this Agreement without having obtained Motorola's prior written consent thereto, or if there should occur any material change in the management, ownership, control, sales personnel, sales and marketing capability, or financial condition of Representative;

D.    By Motorola, effective immediately, if any law or regulation should be adopted or in effect in the Territory that would restrict Motorola's termination rights or otherwise invalidate any provisions hereof;

E.    By Motorola, effective immediately, if Representative should violate the terms of Paragraph 2.7 above or otherwise in accordance with provisions of Paragraphs 4.5, 4.7 and 4.8;

F.    By Motorola, effective immediately, if Representative knowingly makes any false or untrue statements or representations to Motorola herein or in the performance of its obligations hereunder; and

G.    By either party, without cause after the initial 180 days following the effective date of this Agreement, on thirty (30) days prior written notice to the other party.

7.3    **Rights of Parties on Termination**. Upon termination or expiration of this Agreement:

A.    Representative will cease all sales and other activities on behalf of Motorola, return to Motorola and immediately cease all use of Confidential Information, turn over to Motorola Representative's current Customer mailing list and take such action as is necessary to terminate Representative's registration as Motorola's sales Representative with any government authority.

B.    All indebtedness of Representative to Motorola will become immediately due and payable without further notice or demand, which is hereby expressly waived, and

11

Rev. Date 13 December 2001

A-538

MCG010428

Motorola will be entitled to reimbursement for any reasonable attorneys' fees that it may incur in collecting or enforcing payment of such obligations.

C.    Representative will: a) remove from its property and immediately discontinue all use, directly or indirectly, of trademarks, designs, and markings owned or controlled, now or hereafter, by Motorola, or of any word, title, expression, trademark, design, or marking that, in the opinion of Motorola, is confusingly similar thereto; and b) further certify in writing that Representative has completely terminated its use of any and all such trademarks, designs, or markings, or any other word, title, or similar expression that appeared in or on any devices or other materials used in conjunction with Representative's business.

D.    Except in cases of termination by Motorola as described in Paragraphs 7.2 A through F, Representative will be eligible for a commission on 1) all orders accepted as of the date of termination or expiration, for direct orders; and 2) all net distribution POS orders for a period of 120 days following the date of termination or expiration at the rates identified in Exhibit 1.

E.    The obligations of Representative under Paragraphs 4.9, 4.10, 4.11 and Article VI will survive the termination or nonrenewal of this Agreement for any reason.

7.4    **Sole Remedy**.  Motorola's payment obligations in this Article VII shall be Representative's sole remedy for the termination or nonrenewal of this Agreement and will be in lieu of all other claims that Representative may have against Motorola as a result thereof.  Representative hereby waives its right to any termination compensation and damages it may have a right to under local law.  Motorola will not be liable to Representative by reason of termination or nonrenewal of this Agreement for compensation, reimbursement, or damages for:

A.    Loss of prospective compensation;

B.    Goodwill or loss thereof; or

C.    Expenditures, investments, leases, or any type of commitment made in connection with the business of such party or in reliance on the existence of this Agreement.

# Article VIII. Dispute Resolution

8.1    MOTOROLA and CUSTOMER agree to attempt to settle any claim or controversy arising out of this Agreement through consultation and negotiation in the spirit of mutual friendship and cooperation.  If such attempts fail, then the dispute may first be submitted to a mutually acceptable neutral advisor for initial fact finding in preparation for mediation or other form of alternate dispute resolution.  Any dispute that cannot be so resolved between the parties in good faith shall be finally determined by the Court under Arizona law

# Article IX. General Provisions

9.1    **Entire Agreement**.  This Agreement represents the entire agreement between the parties and supersedes all prior discussions, agreements, and understandings of every kind.  No modification of this Agreement will be effective unless in writing and signed by both

A-539

MCG010429

parties. Any and all side letters or supplementary agreements not specifically added to this agreement by amendment or addendum shall be of no effect whatsoever.

9.2    **Notices**. All notices under this Agreement will be in English and will be in writing and given by certified mail, overnight courier, or telefax (acknowledged by answerback) addressed to the parties at the addresses immediately below their respective signatures hereto, or to such other address of which either party may advise the other in writing. Notices will be deemed given when sent.

9.3    **Force Majeure**. Neither party will be in default hereunder by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any cause beyond the reasonable control and without the fault or negligence of such party. Such causes will include, without limitation, storms, floods, other acts of nature, fires, explosions, riots, war or civil disturbance, strikes or other labor unrest, embargoes and other governmental actions or regulations that would prohibit either party from ordering or furnishing Products or from performing any other aspects of the obligations hereunder, delays in transportation, and inability to obtain necessary labor, supplies, or manufacturing facilities.

9.4    **Severability**. Subject to the provisions of Paragraph 7.2D above, the illegality or unenforceability of any provision of this Agreement will not affect the validity and enforceability of any legal and enforceable provisions hereof.

9.5    **Nonassignment**. This Agreement will be binding on and inure to the benefit of the successors and assigns of the business interests of Motorola and may be assigned by Motorola only to the acquirer of substantially all of Motorola's assets in conjunction with such an acquisition. Representative will not sell, assign, delegate, or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Motorola.

9.6    **Language**. The English language version of this Agreement will govern and control any translations of the Agreement into any other language.

9.7    **Applicable Law**. This Agreement will be construed, enforced, and performed in accordance with the internal laws of Arizona, U.S.A. without reference to principles of conflicts of laws and specifically excluding the UN Convention of the Sale of Goods with respect to any purchases hereunder. Use of Arizona law shall apply exclusively to this Agreement.

9.8    **Waiver**. Motorola's failure to require Representative's performance of the provisions herein will not operate as a waiver of Motorola's right to request strict performance of the same or like provisions, or any other provisions hereof, at a later time.

9.9    **Headings**. Headings are for convenience of reference only and are not a part of this Agreement, nor will they in any way affect interpretation hereof.

**IN WITNESS WHEREOF,** Motorola and Representative have caused this Agreement to be executed by their duly authorized employees.

Representative:                          Motorola Inc., Motorola Computer Group

_____          _____
(Authorized Signature)                    (Authorized Signature)

13

Rev. Date 13 December 2001

A-540

MCG010430

By: _____
(Typed Name)

_____
(Title)

_____
(Date)

**ADDRESS FOR FORMAL NOTICE:**

_____

_____

_____

_____

_____

Fax No _____
ATTENTION: _____

_____
(Typed Name)

_____
(Title)

_____
(Date)

**ADDRESS FOR FORMAL NOTICE:**

Motorola Computer Group

2900 S. Diablo Way, DW103

Tempe, AZ  85282  USA

Fax No. (602) 438-3794

ATTENTION: Group Contracts

Rev. Date 13 December 2001

A-541

MCG010431

# Exhibit 1

## REPRESENTATIVE PRODUCT LIST AND COMMISSION RATES

**PRODUCT LIST**

All MCG Board and System Products.

**COMMISSION RATES**:

Commissions for the monthly distributor POS run rate business in the Territory shall be paid at a rate of (%).

Commission for all new MCG direct business in which Representative is directly involved, as evidenced by registration of the opportunity by the Representative's MCG contact, shall be paid at a rate of (%).

15

Rev. Date 13 December 2001

A-542

MCG010432

# Exhibit 2

TERRITORY AND HOUSE ACCOUNT LIST

**Territory:**
All POS Distribution Accounts orders in Canada.

All direct accounts not called out as Motorola House Accounts.

**Motorola House Accounts:**

Nortel Networks

Rev. Date 13 December 2001

A-543

MCG010433

From: Kaczor Edwin-BLUW112
Sent: 5/30/2003 6:58:24 AM (Pacific Time)
To: Holt Paul-LPH001
CC: Robinson Dennis-BLUW119
Subject: FW: MCG P&L Jan thru May 2003

Paul,

Per my voice mail message, I need to speak with you about J Squared.  They are
really pushing me regarding Harris and setting up in Western Canada.    The
basis of their interest is that the revenue flow from MCG is not as expected
and they are losing more than an acceptable amount of money.  Have a look at
the figures from Jeff Gibson below.

Jeff is clearly not pleased with the situation.  He's pulled the req. for
another hire in Toronto for now, and more changes are on the horizon (not
exactly sure what, but Claude is very uneasy about things.)

Re Western Canada, I've tried to take myself out of that loop as it's really
Dennis Robinson's ball out there, but as I speak to Claude on a daily basis,
they continue to pound me about it.

On the good side, we are turning up new opportunities in Canada and from that
perpsective J Squared is doing a good job.  I am concerned thought that this
financial crisis that they are portraying is going to take things off the rails.

Please give me a call so that we can discuss it.

Thanks,
Ed


-----Original Message-----
From: Claude Langlois [mailto:langlois@jsquared.com]
Sent: Tuesday, May 20, 2003 9:56 AM
To: Ed Kaczor (E-mail)
Subject: FW: MCG P&L Jan thru May 2003


Ed,
Not sure if I should be forwarding this to you but here goes.

Bottom line, we need to get western Canada in line ( J2 = distributor and/or
VAR ). Hopefully you can get Harris re-assigned to J2 ( even though I'm not
sure what this will bring from a short-term revenue perspective ) and I
honestly think we will have to push the envelope regarding the business model
for Eastern Canada as well. I will need to demonstrate ( I suspect shortly )
that there is a glimmer of light ( ROI ) at the end of the tunnel.

I'll call you this afternoon to discuss.

Tks

Claude.

> -----Original Message-----
> From: jeff Gibson
> Sent: Friday, May 16, 2003 3:29 PM
> To: Claude Langlois
> Cc: Mike Nykoluk
> Subject: MCG P&L Jan thru May 2003
>
> Claude,
>
> I thought after our telephone call today with Ed of MCG that you need
> to understand my viewpoint from a financial perspective of J2's efforts for
MCG in Canada from Jan.
> 2003 to May 2003.
>
> The problem that I have is that MCG don't understand who is investing
> in whom. Here is my quick assessment of the P & L numbers this calender year
to date.
>
>
>    Jan  Feb  March  April  May
>
> Revenue: $0   $0   $0.25K  $3.3K  $0.1K
>
> Costs:  $17K  $17K  $25K  $22.5K  $22.5K
>
> P & L:  (17K)  (17K)  (24.75)  (19.2K)  (22.4K)
>
>
> The accummulative loss for the privilege of selling MCG in Canada YTD is
already over $100K.
>
> MCG need to understand that it is J2 investing in them, not the other way
around.
>
> Jeff

MCG017316

A-545

From: Kolasa Jeanne-MCG32018
Sent: 7/7/2003 9:02:06 AM (Pacific Time)
To: Robinson Dennis-BLUW119; Kaczor Edwin-BLUW112; Liston Jay-MCX1326
Subject: RE: Tracan termination


Dennis...thanks so much for your vast insight :-)

Thanks Ed.   Yes, I meant Trilogic as the VAR we're engaged with currently, not
Tracan.

Your response matches my perspective as well, so I intend to move forward with
the Tracan termination document.   I'll set up a call with you both as soon as
we've got the details together..hopefully later this week.

Best Regards,
JK

-----Original Message-----
From: Robinson Dennis-BLUW119
Sent: Monday, July 07, 2003 9:53 AM
To: Kaczor Edwin-BLUW112; Kolasa Jeanne-MCG32018; Liston Jay-MCX1326
Subject: RE: Tracan termination


I'd have to agree with Ed's perspective.

-Dennis

-----Original Message-----
From: Kaczor Edwin-BLUW112
Sent: Monday, July 07, 2003 9:47 AM
To: Kolasa Jeanne-MCG32018; Robinson Dennis-BLUW119; Liston Jay-MCX1326
Subject: RE: Tracan termination


Jeanne,

J Squared has asked us several times now about setting up a stocking rep
agreement and we have said "no". Paul Holt had that conversation with Jeff
Gibson and Claude Langlois a few months ago and as far as I am concerned, that
subject is closed.  Paul did, however, offer J Squared the possiblity of
setting up a VAR business within J Squared.   This would be along the lines of
what we are doing with Suntron/Trilogic.   On that topic, the ball is squarely
in J Squared's court to put together a proposal as to how they would set up and
run such an operation.   I've had conversations with Jeff and Claude about
this and has Paul, and again, as far as I'm concerned, there's no further
dicussion to be had until they put something tangible on the table to talk
about.

I guess it's possible that Steve Blomme is mixing up the terminology and
calling this possible VAR arrangement a stocking rep arrangement.   That's just
a guess on my end.

You mention below that the only VAR we're pursuing is Tracan.   I'm guessing
that you meant Suntron/Trilogic and not Tracan ...  I've had no discussion with

A-546

Tracan about becoming a VAR nor do I see any value in doing so.

Regarding Tracan's disty contract, if the ball is rolling on that, then my opinion is to keep it rolling.   My guess is that Claude wants to switch the Tracan customers over into J Squared VAR customers, but I don't see any plans on the table from J Squared that would suggest that they are close to setting themselves up in a VAR business.  So, as you mention, we've been pushing to get this Tracan thing sorted out for months and if it's moving now, let's get it completed.  If J Squared does eventually get set up as a VAR down the road, then we'll cross that bridge when we come to it.

That's my $0.02,
Ed

-----Original Message-----
From: Kolasa Jeanne-MCG32018
Sent: Monday, July 07, 2003 11:37 AM
To: Kaczor Edwin-BLUW112; Robinson Dennis-BLUW119; Liston Jay-MCX1326
Subject: FW: Tracan termination


Ed/Dennis:

I thought we were hot to trot to terminate Tracan's contract.   Since I've received soooo much pressure to do this by the team, I've got the wheels in motion.   Please advise on Claude's email below.

Just FYI....Steve Blomme called me last week looking for advice on how to move J-Squared into a stocking rep agreement.   I told him there are no plans, as far as I know, to do this at this time.  I'm not sure where Claude is coming from with his comment on moving to a VAR role with MCG.   Have either of you had a conversation with him about this?   Just for the record, I'm not working on  activity to support this.    The only VAR that I know we're pursuing a relationship with is Tracan.  Everything else is on hold waiting for the strategy to be set by the new channel guru.

Please send an update.

Thanks,
JK

-----Original Message-----
From: Claude Langlois [mailto:langlois@jsquared.com]
Sent: Friday, July 04, 2003 1:02 PM
To: Jeanne Kolasa
Cc: Ed Kaczor (E-mail)
Subject: Tracan termination


Hi Jeanne,

You mentioned last week that Tracan should see their termination notification within a couple of weeks or so. As you know   J-Squared is positioning to move into a VAR role with MCG. Unfortunately, the process is at a standstill until the Channel Mgr position is filled. With this in mind, should we not postpone

Tracan's termination until a final decision is made regarding the Canadian market? The point being we don't want to shuffle customers around more than absolutely needed.

I will call you on monday to discuss.

Regards,

Claude Langlois
Vice-President, Embedded Systems Group
J-Squared Technologies
www.jsquared.com
514 / 747-1211 ( Office )
514 / 944-7949 ( Cellular )

MCG017067    A-548

This is
Exhibit No. _116 A_
on the examination of:
_Jeffrey Gibson_ in
_J Squared v Motorola_
held on _Nov. 20/06_
**CORNELL • CATANA**
PER _an_ (          )
at OTTAWA, ONTARIO
_06-0288_

A-549

|                     | 2003  | 2004  | 2005  | 2006    |
|---------------------|-------|-------|-------|---------|
| J2 MCG Cost of Sales | $150  | $400  | $700  | $1,000  |
| MCG Commissions      | $60   | $240  | $510  | $910    |

This is
Exhibit No. _119_
on the examination of:
_Mike NYKOLUK_                    in
_I Squared_      v.    _Motorola_
held on _Mar 21/06_
CORNELL • CATANA
PER _JW_   ( _____ )
at OTTAWA, ONTARIO
_06-0288_

**Laura Di Gennaro**

| | |
|---|---|
| **From:** | Claude Langlois |
| **Sent:** | Thursday, October 16, 2003 5:06 PM |
| **To:** | jeff Gibson; Mike Nykoluk |
| **Subject:** | MCG update |

Here are the major points from today's conversation with Steve
Machernis.

There has been multiple conversations relative to J2/Canada and overall
channel strategies @ MCG. Wendy Vitorri is now involved in these
discussions.
Kevin likes the idea of regional distributors but is apparently not
willing to implement any change until the channel Mgr is onboard.
Steve mentioned there are 4 options being presently thrown around:

1- Reseller
2- VAR
3- Change the commission structure
   Up-front design win bonus

I offered a 5th ie: a monthly retainer fee until a consensus is reached.
You could tell Machernis was trying to rap his mind around this.

They will meet again later this month to discuss channel strategies.
Whatever we decide to do I suggest we do it before they reconvene.
C.

1

J2 1656

A-552

 **MOTOROLA**

February 26, 2004

VIA OVERNIGHT DELIVERY

J-Squared Technologies, Inc.
4015 Carling Avenue, Suite 101
Kanata, Ontario
K2K 2A3, Canada

Attn: Mr. Jeff Gibson

Dear Mr. Gibson:

Motorola Computer Group ("Motorola") entered into a Manufacturer Representative Agreement (the "Agreement") with J-Squared Technologies (Oregon) Inc. ("JSO") effective May 15, 2003. The Agreement expires May 14, 2004. It is Motorola's intent to terminate that Agreement.

As part of that Agreement, JSO agreed to maintain minimum performance standards. JSO has failed to meet the minimum performance standards required by the Agreement. Accordingly, Motorola is giving notice in accordance with Paragraph 7.2A of that Agreement that the Agreement will terminate effective 30 days from the date of this letter, absent JSO's full compliance with, and satisfaction of, the performance standards.

Should JSO fully cure its noncompliance with, and otherwise satisfy, the performance standards, nothing in this letter is intended to indicate an intent by Motorola to continue the contractual relationship beyond May 14, 2004, and, in fact, Motorola does not desire to do so.

Motorola wishes JSO the best of luck in the future. Should JSO have any questions about this letter, please call Kim Crawford.

Sincerely,

Dana Huth
Vice President, Motorola Computer Group, Inc
Worldwide Sales & Market Development

**MOTJ 00167**

*Motorola, Inc.*, Motorola Computer Group
2900 South Diablo Way, Tempe, AZ 85282 U.S.A. Tel: +1 602 438 6733

A-553

-----Original Message-----
From:       Steve Blomme [mailto:sblomme@jsquared.com]
Sent: Saturday, January 10, 2004 5:39 AM
To:   VanNostrand, Rick (IndSys, GEFanuc, VMIC)
Cc:   Claude Langlois; Jeff Gibson
Subject:     RE: Our Conversation



J2intro_012004.ppt
(332 KB)

 Hi Rick:
Thanks for tracking me down via my business card. Here is our overview presentation for
your review - feel free to call me if you want me to go through it with you.
I had the chance to brief our President and VP (Jeff Gibson and Claude Langlois) about our
conversation. Let us know if you are coming up into Canada in the near future and we can
arrange to get together and discuss mutual goals.
Best regards
Steve

Steven Blomme
Business Development Manager
J-Squared Technologies Inc.
PH: 403-207-5526 x26  CELL: 403-710-0610
EMAIL: sblomme@jsquared.com
www.jsquared.com

-----Original Message-----
From: VanNostrand, Rick (IndSys, GEFanuc, VMIC)
[mailto:Rick.VanNostrand@gefanuc.com]
Sent: Tuesday, January 06, 2004 3:31 PM
To:   sblomme@jsquared.com
Subject:     Our Conversation

Steve,

Thanks for taking the time to speak with me today. I appreciate your candid remarks and
look forward to receiving your presentation. Take another look at our web site and let me
know if I can answer any questions.
Best regards,

Rick Van Nostrand
International Sales, Embedded Systems
GE Fanuc Automation Americas, Inc.
12090 S. Memorial Pkwy.

1

Huntsville, AL 35803
USA

A-555

# VMIC, Inc.

## INTERNATIONAL DISTRIBUTOR AGREEMENT

**ARTICLE 1.**      **APPOINTMENT OF DISTRIBUTOR**

*VMIC, Inc., RAMIX, Inc.* and **Computer Dynamics, Inc.**, together doing business as ***GE Fanuc Embedded Systems*** (hereinafter called the "Company"), having a place of business at 12090 South Memorial Parkway, Huntsville, AL 35803-3308, hereby appoints **J-Squared Technologies Inc.** having its principal office and place of business at 4015 Carling avenue, Suite 101, Kanata, Ontario, Canada (hereinafter called the "Distributor") as a non-exclusive authorized distributor of the Products.

**ARTICLE 3.**      **TERM AND SCOPE**

This Agreement is effective from 1May 2004_____ to 30 April 2007_____ unless sooner terminated as hereinafter provided. The provisions of this Agreement, as such Agreement may be modified consistent with Article 20, shall govern all transactions between the Company and the Distributor relating to the Products.

- 8 -

**ARTICLE 15.     TERMINATION**

A.     This Agreement may be terminated:

    1.     By an agreement in writing between the Company and the Distributor or,

    2.     By either party at will, with or without cause, upon not less than 60 days notice in writing by facsimile transmission and registered mail, or personal delivery to the other party; or

    3.     By the Company upon one (1) day's like notice in the event that the Distributor breaches any of the representations and warranties in Article 12; or

    4.     By the Company upon one (1) day's like notice in the event that the Distributor attempts to assign this Agreement or any rights hereunder without the Company's prior written consent; or there is a change in the control or management of the Distributor which is unacceptable to the Company; or the Distributor ceases to function as a going concern; or the Distributor ceases to conduct its operation in the normal course of business as a distributor; or a receiver for the Distributor is appointed, or the Distributor otherwise takes advantage of any insolvency law; or as provided in Article 12 hereof; or the Distributor breaches this Agreement or acts in any manner deemed by the Company to be detrimental to the best interests of the Company.  The foregoing events shall, without limitation, be deemed to be just cause for termination by the Company.

    5.     COMPANY may terminate this Agreement without cause at any time prior to three hundred sixty-five (365) days from its execution by giving written Notice to DISTRIBUTOR, and the effective date of termination in such case shall be the date of the Notice.

    6.     In such case of termination without cause by COMPANY, after the first 365 day period, a notice period of 60 days shall take effect during which time the COMPANY shall accept orders from DISTRIBUTOR as per existing conditions prior to the notice and shall continue to credit direct orders to Commission. Commissions will be payable after the effective date of termination for those cases where COMPANY receives payment within one hundred eighty (180) days from the effective date of termination on orders which were accepted and booked by COMPANY prior to the effective date of termination payout period.

From: Watts Marc-BLUW124
Sent: 5/30/2003 8:26:55 AM (Mountain Time)
To: Bensted David-G19500; Blair Julie-C17394; Hamlett Sue-P25026
CC: Guibor Nina-Q10503; Robinson Dennis-BLUW119; Whitfield Lisa-MCX1611;
Parslow Kevin-BLUW72; Holt Paul-LPH001
Subject: FW: Contract for J-squared Oregon


Sue/David/Julie,

Here is the information that was requested from Kevin on the intent for Payment
of J-Squared based on
the March 31st signing from J-Squared President and the May 20th signing from
Eamon with signature
authority for Wendy.

Sue,

Can you please send to the team any approvals to move forward with back pay to
J-Squared Oregon.

If there are any additional questions, please let me know.

Best Regards,
Marc Watts
Account Representative
Motorola Computer Group
2410 Luna, Suite 132
Carrollton, TX 75006
Voice: 972-277-4613
Fac: 972-277-4666
Text page: 8779700180@skytel.com
Email: marc.watts@motorola.com


   -----Original Message-----
From:  Parslow Kevin-BLUW72
Sent: Friday, May 30, 2003 9:49 AM
To: Hamlett Sue-P25026
Cc: Watts Marc-BLUW124; Guibor Nina-Q10503
Subject: Contract for J-squared

Sue

Just to confirm that the contract for J-squared should be dated effective 1st
April 2003. They have been working since that date and should receive payment
for April. The hold up was through me taking a more detailed examination of all
the Rep agreements.

Thanks

Kevin

Kevin Parslow
Director, Worldwide Sales



A-558

**Motorola Computer Group**
**Loughborough Park**
**Loughborough**
**LE11 3NE.    UK**

**Telephone +44 (0) 1509 634346**
**Mobile +44 (0) 7771 724010**
**Fax +44 (0) 1509 634333**
**Mailto:Kevin.Parslow@motorola.com**

A-559

MCG007947

1          A.  No.  It was not.

2   148.        Q.  Was it unusual for you to provide information

3        to Mr. Robinson as to the status of activities?

4          A.  I would say the answer to that was yes, that

5        it was unusual.

6   149.        Q.  You didn't generally provide it to him or he

7        generally already knew?

8          A.  Dennis never asked for a lot of reports.

9   150.        Q.  From what's here about Pacific North West can

10       you tell whether any of these are either committed or

11       design win?  Can you tell any -- tell that part?

12         A.  From looking at this spreadsheet?

13  151.        Q.  Correct?

14         A.  No, I can't.

15  152.        Q.  You believe you made another analysis maybe

16       after the contract was terminated detailing whether or

17       not J-Squared (Oregon) met the performance criteria?

18         A.  I definitely believe I did.

19  153.        Q.  Have you seen that recently?

20         A.  Yes, I have.

21  154.        Q.  Can you describe what it looks like?

22         A.  I can't remember if it's an Excel spreadsheet

23       or a word document but ---

24  155.        Q.  It's a chart of some sort?

25         A.  Yes, it's a table.  It's a table of

1    information.

2  156.        Q.  Do you have that with you?

3            A.  I do not.

4  157.        Q.  What else can you tell me about that chart?

5            MR. BELLEW:  I'm just going to give one

6    instruction here.  To the extent that a question calls

7    for the divulgence of any communications that you had

8    with your Counsel regarding that spreadsheet, you're not

9    to provide that information.  Are you clear on that?

10           THE WITNESS:  Yes, I am.

11           BY MR. PAPETTI:

12  158.        Q.  Did you prepare this Chart?

13           A.  Yes, I did.

14  159.        Q.  Roughly when do you think you prepared it?

15           A.  I think within 30 days of being terminated.

16  160.        Q.  So sometime back in 2004?

17           A.  Yes.

18  161.        Q.  You prepared it based on your own knowledge

19    about J-Squared (Oregon)'s performance under the

20    contract?

21           A.  That's correct.

22  162.        Q.  This wasn't information that Counsel provided

23    you to put in the analysis?

24           A.  That's correct.

25  163.        Q.  Sean, we have an e-mail which talks about the

1      analysis.  We don't have the analysis.  So do you know

2      whether this is on a computer still somewhere?

3                    A.  Yes.  I think it is.

4  164.              Q.  Would it be on your computer?

5                    A.  Yes, it's on my computer.  Yes.  I would have

6      thought we would explain it.

7  165.              Q.  Well, it's always possible it's been produced

8      and it's been ---

9                    MR. BELLEW:  It's been provided to us.  It may

10     not have been produced.

11                   MR. PAPETTI:  Well, I don't have it and I'd like

12     to go over it with him today so if there's a way at the

13     break if he has a computer, we could ---

14                   MR. BELLEW:  Well, if -- I mean I can get a copy

15     of it.  It's a question of whether it's something that's

16     discoverable at this point but we'll take a look at it.

17     I can make that call on a break.                          *U*

18                   MR. PAPETTI:  Okay.

19                   MR. BELLEW:  If we want to create a record as to

20     whether it would be something that you could move to

21     compel, we can do it at that point as well.

22                   BY MR. PAPETTI:

23 166.               Q.  Well, did you prepare it because Counsel

24     asked you to prepare it?

25                   A.  No, I did not.

CORNELL•CATSANS REPORTING SERVICES, 80e 705/04/2006. WP Ottawa OON K7P 5V5
Tel: (613) 231-4664        1-800-893-6272        Fax: (613) 231-4605

35

1  167.    Q.  Why did you prepare the analysis?

2        A.  I think I recall being really shocked that we

3    were being terminated so I think Jeff Gibson and I talked

4    about that and said, you know, how could we possibly be

5    terminated.  We feel we were doing really good actually

6    in the territory, so I think at that point I got -- I was

7    a little upset about being terminated.

8        I think I just decided, hey I've got to go look

9    at this and find out you know, where this is or Jeff and

10   I might have talked about that and said, you know, we

11   need to understand what our position is here.  We'd had

12   no dialogue with MCG ever about poor performance so it

13   was a very shocking experience.

14  168.    Q.  So you thought that J-Squared (Oregon) was

15   making a strong effort for both Motorola and themselves?

16       A.  I more than thought that.

17  169.    Q.  And you get a Notice of Termination that's

18   based on performance criteria?  Correct?

19       A.  Correct.

20  170.    Q.  You're surprised and upset about getting that

21   Notice of Termination?  Correct?

22       A.  For sure.  Yes, sorry.

23  171.    Q.  And so you got the contract out, maybe after

24   a conversation with Mr. Gibson and decided to try to

25   figure out with the specific performance criteria where

*O*

1        J-Squared (Oregon) stood?  Is that correct?

2               MR. BELLEW:  Objection.

3               THE WITNESS:  That's correct.

4        BY MR. PAPETTI:

5  172.       Q.  When was the last time you believe you looked

6        at that document?

7        A.  I would have looked at it last night.

8  173.       Q.  Did that sort of refresh your recollection as

9        to the status of J-Squared (Oregon)'s performance under

10       the contract?

11       A.  No, I knew the status.  I just looked to see

12      what some of the names of the accounts were in case those

13      were going to be questions.

14  174.      Q.  So to refresh your recollection as to which

15      accounts were in your view uncommitted versus committed

16      versus design wins at the time?

17      A.  Could you repeat the question, please?

18  175.      Q.  Sure.  If you hadn't looked at it last night

19      would you have recalled from memory which accounts you

20      thought back when you prepared this analysis would have

21      been uncommitted versus committed versus design wins?

22      A.  Yes, I would have had a pretty good shot at

23      getting 90 percent of them.  It's more the uncommitted

24      ones that are hard.  The committed ones I would have

25      remembered but ---

Case 1:04-cv-00968-SLR Document 129 Filed 05/04/2006 Page 52 of 57

176.        Q.  And what can you tell me -- I don't want to
spend too much time on it in case we have the document
later, we can spend more time, but what can you tell me
as the time the termination occurred which is in late
February -- late February, 2004, what can you tell me
about who the committed accounts were at that time that
J-Squared had brought?

      A.  In my mind, those committed accounts at that
time would have been a company called 888 Local Dial, and
two Boeing Programs for the F-22 Fighter Plane and two
Boeing Programs for the AWACS Surveillance Planes.  Those
five for sure.

177.        Q.  So you could recall five committed accounts?

      A.  Five committed accounts.

178.        Q.  Did you have a process when the agreement was
in place for -- I'm going to use the word "registering"
but that's too formal a word for informing Motorola or
keeping track with Motorola as to what you and Motorola
agreed were uncommitted, committed and design wins?

      A.  No, I think there was no process really.
Dennis never asked.  We rarely discussed something like
that.

179.        Q.  So there wasn't any sort of process by which
you informed Motorola, hey we've got another committed?

      A.  No, that's correct.

CORNELL CATANA REPORTING SERVICES, 800-170 Laurier Ave. W. Ottawa ON K1P 5V5
Tel: (613) 231-4664          1-800-893-6272          Fax: (613) 231-4605

56

1      use this Board?

2              A.   I have some feeling that they did, yes.

3  279.        Q.   Have you seen any documents whatsoever in

4      preparing for your deposition to show that Boeing changed

5      their mind in the next month to go ahead and use this

6      Board?

7              A.   No, I haven't.

8  280.        Q.   In your analysis that you did, did you have

9      the Boeing F-22 Project, the Test Systems Project as a

10     design win?

11             A.   In my analysis, yes I did.

12             MR. PAPETTI:  Why don't we take a break and get

13     that glass of water.

14             THE WITNESS:  Sure, okay.

15             MR. PAPETTI:  He's got to read something.

16             MR. COURVILLE:  The time is 14:35:14 and we're

17     going off the Record.

18                     ( SHORT RECESS )

19             MR. COURVILLE:  The time is 14:53:29 and we're

20     back on the Record.

21             MR. BELLEW:  During the break I have printed off

22     a copy of the analysis that Mr. Blomme had referenced

23     earlier.  I had anticipated that this was perhaps going

24     to be an issue today.  We're going to produce this in its

25     current form subject to obviously the Confidentiality

1      Agreement in place.

2             This will be marked "Confidential" and when it's

3      formally produced, we are going to produce it subject to

4      claims of Attorney - Client Privilege and Attorney - Work

5      Product but in order to avoid a situation where we'd have

6      to come back and recall Mr. Blomme for a deposition,

7      we'll produce it and we can take up the issue hereafter

8      as to whether this is protected from Production.

9             MR. PAPETTI:  Thanks.

10            BY MR. PAPETTI:

11  281.         Q.  Mr. Blomme, I'll continue to stare at this

12      and I'll ask a few questions in a minute.  I do want to

13      follow up a little more on this topic we've been talking

14      about -- the status of uncommitted, committed and design

15      win accounts.  Okay?

16            A.  Yes.

17  282.         Q.  I wanted to make sure I had your attention?

18            A.  Sorry.

19  283.         Q.  Now in Exhibit -- one of the ones you claim

20      to be a design win was the 1-888 -- excuse me, not 1-888

21      -- 888 Local Dial?  Correct?  On Line 33 on Exhibit 71?

22            A.  Correct.

23  284.         Q.  But you don't list on here any actual revenue

24      from 888 Local Dial?  Is that correct?

25            A.  That's correct.

# DECLARATION OF DENNIS ROBINSON

1.      I am currently employed by Motorola, Inc. as an Account Executive in the Pacific Northwest and the Bay Area for the Embedded Communications Computing Group, formerly known as Motorola Computer Group ("MCG"). When I first began working for MCG in July 2001, my job title was Business Development Manager. Despite the name change, my responsibilities have remained the same.

2.      From March 2003 to March 2004 I worked closely with J-Squared Technologies (Oregon), Inc. ("JSO") in the Pacific Northwest.

3.      Like JSO, I was also responsible for achieving design wins for the Pacific Northwest. In fact, I was compensated, in part, by the number of design wins achieved in that territory, whether by me or by JSO.

4.      In order for me to be compensated on a design win earned by JSO, the design win revenue baselines set forth in their contract must have been achieved. A military customer, for example, must have provided a written forecast committing to purchase $100,000 worth of Motorola products and must have actually purchased $25,000 in board level or $50,000 in system level products before an account could be categorized as a design win and before I could be compensated for a design win. For non-military accounts, a customer must have provided a written forecast committing to purchase $250,000 worth of Motorola products and must have actually purchased $25,000 in board level or $50,000 in system level products before an account could be categorized as a design win and before I could be compensated for a design win.

5.      Had JSO earned a single design win while their contract was in effect, I would have been compensated. However, I did not receive any compensation related to design wins in the Pacific Northwest from January 2003, before their contract was in place, to July 2004, several months after their contract's one year term would have expired had they not been terminated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___i May_____ 2006.

_____
Dennis Robinson

A-568

# DECLARATION OF DENNIS ROBINSON

1.    I am currently employed by Motorola, Inc. as an Account Executive in the Pacific Northwest and the Bay Area for the Embedded Communications Computing Group, formerly known as Motorola Computer Group ("MCG"). When I first began working for MCG in July 2001, my job title was Business Development Manager. Despite the name change, my responsibilities have remained the same.

2.    From March 2003 to March 2004 I worked closely with J-Squared Technologies (Oregon), Inc. ("JSO") in the Pacific Northwest.

3.    Like JSO, I was also responsible for achieving design wins for the Pacific Northwest. In fact, I was compensated, in part, by the number of design wins achieved in that territory, whether by me or by JSO.

4.    In order for me to be compensated on a design win earned by JSO, the design win revenue baselines set forth in their contract must have been achieved. A military customer, for example, must have provided a written forecast committing to purchase $100,000 worth of Motorola products and must have actually purchased $25,000 in board level or $50,000 in system level products before an account could be categorized as a design win and before I could be compensated for a design win. For non-military accounts, a customer must have provided a written forecast committing to purchase $250,000 worth of Motorola products and must have actually purchased $25,000 in board level or $50,000 in system level products before an account could be categorized as a design win and before I could be compensated for a design win.

5.    Had JSO earned a single design win while their contract was in effect, I would have been compensated. However, I did not receive any compensation related to design wins in the Pacific Northwest from January 2003, before their contract was in place, to July 2004, several months after their contract's one year term would have expired had they not been terminated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  i May          2006.

_signature_

Dennis Robinson

A-568

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., a          )
Canadian corporation, and J-SQUARE        )
TECHNOLOGIES (OREGON) INC., an           )
Oregon corporation,                                    )
                            Plaintiffs,     )
                                )
                       v.               )          C.A. No. 04-CV-960-SLR
MOTOROLA, INC., a Delaware corporation.  )
                     Defendant.   )

## CERTIFICATE OF SERVICE

       I, William W. Bowser, Esquire, hereby certify that on this 3rd day of May

2006, I electronically filed a true and correct copy of the foregoing **Motorola's**

**Appendix in Support of its Motion for Summary Judgment--REDACTED** with the

Clerk of the Court using CM/ECF, which will send notification that such filing is

available for viewing and downloading to the following counsel of record:

                  David Allan Felice
                  Cozen O'Connor
                  Chase Manhattan Centre, 1201 North Market, Suite 1400
                  Wilmington, DE 19801

       I further certify that on this 1st day of May 2006, I mailed by United States

Postal Service a copy of **Motorola's Appendix in Support of its Motion for Summary**

**Judgment--SEALED** to the following non-registered participant:

                  Kevin F. Berry
                  Cozen O'Connor
                  1900 Market Street
                  Philadelphia, PA 19103

                  YOUNG CONAWAY STARGATT & TAYLOR, LLP

                  /s/ William W. Bowser
                  William W. Bowser, Esquire (Bar I.D. 2239)
                  1000 West Street
                  Wilmington, Delaware 19801
                  Telephone: (302) 571-6601
                  Facsimile: (302) 576-3282
                  Email: wbowser@ycst.com