IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J-SQUARED TECHNOLOGIES, INC., | : | |
| J-SQUARED TECHNOLOGIES | : | |
| (OREGON) INC., | : | |
| | : | |
| Plaintiffs, | : | C.A. No. 04-960-SLR |
| | : | |
| v. | : | |
| | : | |
| MOTOROLA, INC., | : | |
| | : | |
| Defendant. | : | |

# MOTOROLA'S RESPONSE TO
# PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

William W. Bowser
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

Of Counsel:

Randy Papetti
Cory A. Talbot
Emily S. Cates
LEWIS AND ROCA LLP
40 N. Central Avenue
Phoenix, Arizona  85004
(602) 262-5311
Attorneys for Defendant

DATED:  May 11, 2006

I.      **Introduction.**

Plaintiffs are former independent sales representatives for defendant Motorola. They claim years of lost profits damages because Motorola allegedly terminated its contracts with them prematurely in February 2004. However, Motorola recently learned that, even prior to the allegedly premature terminations, plaintiffs already had begun negotiating a new sales representative agreement with a Motorola competitor, GE Fanuc Automation, Inc. ("GE Fanuc"). After receiving the termination letters from Motorola, plaintiff J-Squared Technologies, Inc., as well as one of its wholly-owned subsidiaries, J-Squared Technologies (North Carolina), Inc., finalized agreements with GE Fanuc to replace the lost agreements with Motorola.

It was on March 24, 2006, in Ottawa, Canada, that Motorola first learned of the timing of plaintiffs' negotiations with GE Fanuc. Five days later, Motorola served GE Fanuc with a subpoena. While GE Fanuc never objected to the subpoena, plaintiffs have consistently interfered with the subpoena, persuading GE Fanuc to not respond to the subpoena (beyond providing a handful of documents) and now asserting that the Court should stop GE Fanuc from producing any further documents. Plaintiffs' interference is inappropriate.

The information that Motorola seeks is highly probative and potentially eviscerates plaintiffs' lost profits damages claims. And plaintiffs' complaint that Motorola should have sought this information from them first overlooks what would seem to be an important fact: Motorola did ask plaintiffs directly for this information and plaintiffs rebuffed and then ignored Motorola's requests without ever providing a single document.

Furthermore, while plaintiffs couch their interference as an effort to avoid being prejudiced, they make no such showing. Indeed, they merely say that some of the requested documents "may" contain proprietary information, but they have

zero evidence that this is true and ignore the fact that Motorola has made clear again and again that GE Fanuc can redact any sensitive material.

Plaintiffs' Motion should be denied and the documents requested should be promptly provided.

## II.     Background.

### A.     The Parties' Relationship.

In 2002, the Motorola Computer Group ("MCG"), a Motorola business unit, began contracting with independent sales representatives to market MCG products.  By mid-2003, MCG had signed Manufacturer's Representative Agreements with nine sales representatives, including plaintiffs J-Squared Technologies, Inc. ("JST") and J-Squared Technologies (Oregon), Inc. ("JSO").

In December 2003, JST's Agreement expired by its own terms.  In this case, however, JST asserts that it continued to work as if the Agreement was ongoing, that MCG did not tell JST that the Agreement had expired, and that, therefore, the Agreement "renewed by conduct" for another full year.  But what we recently learned is that, by January 2004 at the latest, plaintiffs had, unbeknownst to MCG, entered into discussions with GE Fanuc, an MCG competitor, to replace MCG.  (Ex. A.)

At about this same time, MCG finished an evaluation of the sales representative program, concluded that the program was a financial failure, and decided to end it.  In February 2004, MCG notified JST, whose Agreement had recently expired, that its Agreement would not be renewed.  MCG also notified JSO that its contract was being terminated because JSO had not met its contractual performance standards.

Shortly after receiving these notifications, JST signed as a sales representative for GE Fanuc to "replace" MCG as J-Squared's "lead line."  (Ex. B, at 36; Ex. C.)

### B. Plaintiffs' Claims.

Plaintiffs subsequently sued Motorola. They claim that they are entitled to damages for their "expected profits" over a three year period after their relationship with MCG ended. (Ex. D, at 8-9.)

### C. Motorola Served GE Fanuc With a Subpoena.

Motorola first learned that plaintiffs had contracted with GE Fanuc to "replace" MCG and that plaintiffs had, in fact, begun talks with GE Fanuc in early 2004 in order to do so, during the March 24, 2006 deposition of Jeff Gibson, plaintiffs' owner and CEO. Motorola immediately prepared a tailored, targeted subpoena and, on March 29, 2006, served GE Fanuc with a request for the following documents:

1. All contracts between GE Fanuc Embedded Systems and J-Squared Technologies, Inc., J-Squared Technologies (Oregon), Inc., and J-Squared Technologies (North Carolina), Inc. from November 1, 2003 to the present.

2. All documents reflecting or pertaining to any communications between GE Fanuc Embedded Systems and the J-Squared entities listed above from November 1, 2003 to June 1, 2004.

3. Documents sufficient to show all amounts GE Fanuc Embedded Systems has paid the J-Squared entities from November 1, 2003 to present.

(Ex. E.)

### D. Motorola Asks Plaintiffs for the Same Documents.

On April 5, 2006, Motorola's counsel wrote to plaintiffs' counsel asking specifically for the documents requested in the GE Fanuc subpoena:

> In Ottawa we learned more about JST's relationship with GE Fanuc. We have subpoenaed documentation regarding, among other things, how much GE Fanuc has paid JST or its affiliates in order to argue that JST has not been harmed as much as it suggests as a result of its relationship ending with Motorola. We need this information in order to get complete our expert analysis, and I assume your client has it readily available. I would appreciate you providing the information sooner rather than later to avoid any delay in the schedule.

(Ex. F.) The reference to avoiding "any delay in the schedule" was due to the fact that Motorola's expert damages report was due on April 12, (subsequently extended to April 27), and Motorola needed to know how much revenue plaintiffs had obtained as a result of replacing MCG with GE Fanuc.

Plaintiffs' counsel responded six days later, but merely expressed skepticism as to the relevance of the information Motorola was seeking and, to this date, never provided a substantive response to Motorola's letter, even though Motorola's counsel explained why the information requested was relevant. (Ex. G.)

### E. Motorola Works with GE Fanuc.

Shortly after the subpoena was issued, Motorola's counsel spoke with in-house counsel for GE Fanuc, Mr. Mark Whittenburg. Whittenburg requested additional time to respond to the subpoena (which Motorola agreed to) but did not otherwise object to the subpoena. (Ex. H.)

### F. Plaintiffs Interfere with the Subpoena.

Later the same day that Motorola's counsel spoke with Whittenburg, plaintiffs' counsel wrote to Motorola's counsel indicating his intent to file a motion to quash the subpoena.[1] (Ex. I.) Whittenburg subsequently called Motorola's counsel (on the stipulated deadline for GE Fanuc to respond to the subpoena) stating that plaintiffs' counsel had told him that plaintiffs would file a motion to quash or a motion for protective order; that GE Fanuc was "stuck in the middle"; and that GE Fanuc was therefore not producing any documents. (Ex. J.) Whittenburg still did not object to the subpoena—to the contrary, he said that if

---

[1] Plaintiffs did not ultimately file a motion to quash, nor could they properly have done so. *See Oliver B. Cannon and Son, Inc., v. Fidelity and Cas. Co. of New York*, 519 F. Supp. 668, 680 (D. Del. 1981) (stating that, generally, a party has no standing to quash a subpoena directed to a non-party).

plaintiffs did not promptly file their motion he would produce the requested documents the following week. (*Id.*)

### G. GE Fanuc Provides a Limited Response.

After waiting several days, Motorola's counsel followed-up with GE Fanuc, again requested the documents, and indicated that she would seek court intervention if the documents were not produced. (Ex. K.) Thereafter, plaintiffs' counsel, Motorola's counsel, and Whittenburg participated in a conference call, during which Whittenburg (still voicing no objection to the subpoena) agreed to produce certain documents: a redacted contract; 5 or 6 e-mails reflecting initial negotiations between plaintiffs and GE Fanuc; and a spreadsheet reflecting the amount of money the GE Fanuc had paid plaintiffs in Canada (JST's territory). (Ex. L.) Not surprisingly, plaintiffs' counsel agreed to this limited production, expressed that no more should have to be produced, and subsequently filed the instant Motion in an effort to stop additional discovery.

## III. Plaintiffs' Motion is Meritless.

Plaintiffs claim that they are entitled to lost profits damages as a result of MCG's decision to end its manufacturer's representative program; however, they are stopping Motorola from a legitimate investigation into whether those damages are appropriate. Plaintiffs' arguments to stop discovery are simply fiction:

*Fiction*: The documents Motorola seeks pursuant to the GE Fanuc subpoena are "immaterial to any claim or defense presented in this litigation."

*Fact*: Plaintiffs claim they would have made commissions into the future had Motorola not prematurely terminated the Agreements; Motorola, in response, intends to argue that, due to the ending of the MCG contracts, plaintiffs were able to contract with GE Fanuc and revenue received from GE Fanuc ought to be offset against the lost profits claim. Similarly, the very fact that plaintiffs were exploring the idea of replacing MCG with GE Fanuc directly undercuts plaintiffs' current

position that the contract with MCG was viewed as very profitable to plaintiffs. In addition, Motorola does not believe that plaintiffs were truly expecting its contract with MCG to continue for an extended period, as plaintiffs now contend, and the fact that plaintiffs were interacting with GE Fanuc as of January 2004 strongly supports Motorola's position.

*Fiction*: Motorola "harass[ed]" and "unduly burdened" GE Fanuc as evidenced by the fact that Motorola did not first ask plaintiffs for this information.

*Fact*: Plaintiffs have no basis to say this. Motorola's subpoena was a legitimate effort to obtain discovery, discovery which plaintiffs have so far refused to provide. Motorola's communications with GE Fanuc were entirely professional, and, tellingly, GE Fanuc never objected or complained about the way it was being treated.

*Fiction*: Motorola seeks documents that "may, and most likely will, contain confidential and proprietary business information and protectable trade secrets." [D.I. 119 ¶ 10.]

*Fact*: Beyond the fact that this argument is sheer guesswork, plaintiffs ignore Motorola's repeated statements that GE Fanuc is free to redact sensitive, proprietary information if it wishes. The argument also conveniently ignores the existing protective order in this case, which is easily sufficient to safeguard any legitimate concerns.

In sum, plaintiffs' arguments are baseless efforts to curtail legitimate discovery efforts by Motorola. Their Motion should be denied.

### A. Motorola Requested Relevant Documents from GE Fanuc.

Plaintiffs argue that the documents Motorola has requested from GE Fanuc have "no possible bearing on Motorola's defenses as asserted in this action." [D.I. 119 ¶ 7.] Hardly.

Federal Rule of 26 provides a very broad definition of relevance and allows discovery of "any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1); *see also Cash Today of Texas, Inc. v. Greenberg*, 2002 WL 31414138, *1 (D. Del. Oct. 23, 2002) ("Relevance for discovery purposes is given very broad meaning.").[2]

To begin, the documents Motorola seeks are relevant to plaintiffs' damages. Under Arizona's[3] doctrine of avoidable consequences, plaintiffs must take reasonable efforts to mitigate their damages. *Northern Arizona Gas Service, Inc. v. Petrolane Transport, Inc.*, 702 P.2d 696, 706 (Ariz. App. 1984). And plaintiffs cannot recover damages for losses they avoided or minimized by making such efforts. *E.g.*, *West Pinal Family Health Center, Inc. v. McBryde*, 785 P.2d 66, 68 (Ariz. App. 1989). Thus, since plaintiffs admit that they signed with GE Fanuc to "replace" MCG as their "lead line," (Ex. B, at 36), Motorola is entitled to full discovery regarding the steps plaintiffs took to do so in order to determine whether plaintiffs failed to avoid damages that they are claiming in this litigation or whether plaintiffs were able to offset their alleged damages.

Plaintiffs' Agreements with Motorola contained broad non-competition provisions:

> Representative will not sell, offer for sale, or act as sales agent for the solicitation of orders for any products that are competitive with any of the Products as defined by Motorola . . . .

(Exs. N & O ¶ 2.7.) The limited production from GE Fanuc shows that plaintiffs received substantial sums from sales in the Canadian territory alone as a result of signing with GE Fanuc, sums that plaintiffs could not have received if their relationship with MCG had been ongoing. (Ex. P.)

---

[2] Pursuant to Local Rule 7.1.3, a copy of the *Greenberg* case is attached as Ex. M.
[3] The Court has determined that Arizona law governs. [D.I. 18 & 19.]

And the benefits to plaintiffs went well beyond that. Much of the work for GE Fanuc was contractually performed by JST's wholly-owned subsidiary, J-Squared Technologies (North Carolina), Inc. Yet, because of plaintiffs' interference, GE Fanuc provided no documents regarding the commissions received for that work. While plaintiffs suggested that discovery of the J-Squared North Carolina commissions was improper because it was not a party here, (Ex. I), that ignores the way that the J-Squared entities are structured and do business. These are not separately-operated or separately-owned corporate entities; rather, the J-Squared entities have a single Embedded Systems Group that performs <u>all</u> their sales work with embedded products (the type of sales that J-Squared performed for MCG and now performs for GE Fanuc) and that Group is supervised by JST's management and officers in Canada. (Ex. Q.) Thus, plaintiffs cannot simply hide behind the corporate status of the North Carolina subsidiary.[4]

Further, this information is probative because it wholly undercuts plaintiffs' claims that they would have recovered lost profits over a "long term" relationship with MCG. To the contrary, the limited discovery Motorola was allowed on this issue shows that plaintiffs were already discussing arrangements with GE Fanuc <u>before</u> they received notification from MCG regarding their Agreements in February 2004:

> Q. Do you recall roughly when the communications began between the companies?
>
> A. It was right around the same time of the Motorola termination. It was in the January -- February time-frame of that year I believe.
>
> Q. Were there some communications with GE prior to receiving the February 26th letter from Motorola?

---

[4] Motorola, of course, does not object to plaintiffs reserving their right to later argue that the evidence is inadmissible. But the subpoena plainly meets the relevance threshold for discovery purposes.

>   A.  Yes, I believe so. We'd had to have had some preliminary
>       conversations.

(Ex. B, at 37; *see also* Ex. A.) Motorola's subpoena to GE Fanuc goes directly to this issue and is thus plainly material to Motorola's defense.

### B.    Motorola Did Not Harass GE Fanuc.

Plaintiffs say that Motorola's goal in serving this subpoena is to "harass" GE Fanuc because Motorola imposed an undue burden on GE Fanuc and "failed to direct any discovery efforts towards Plaintiffs that would possibly embrace this information." [D.I. 119 ¶¶ 8 & 9.] Nonsense.

To begin, GE Fanuc never objected to Motorola's subpoena at all. Indeed, until plaintiffs stepped in, GE Fanuc was willing to produce the requested documents. The only concern GE Fanuc ever raised was that it may not have time to produce the documents, and Motorola promptly agreed to an extension of the response deadline. Thus, it is unclear where plaintiffs get the idea that GE Fanuc has been unduly burdened.[5]

Further, plaintiffs' suggestion that Motorola should have just asked plaintiffs for discovery "that would possibly embrace this information," [D.I. 119 ¶ 8], is simply astounding—Motorola <u>did</u> ask plaintiffs for this type of information and was rebuffed entirely:

- On March 1, 2006, Motorola asked plaintiffs to identify the manufacturers they "currently represent[], including the name of the manufacturer, the effective date of the manufacturer representative contract, the termination and the types of products being sold." (Ex. S nos. 17, 22.) Plaintiffs unhelpfully responded—<u>after</u> the discovery cutoff—that Motorola would have to refer to the "deposition transcripts of [plaintiffs'] employees Claude Langlois,

---

[5] Motorola also proposed that, if it was a concern, GE Fanuc could redact commercially sensitive information from its contracts before producing them. (Ex. R.) That is hardly harassment.

> Steve Blomme, Jeffrey Gibson and Mike Nykoluk" and that plaintiffs "will not further identify or produce contracts for its other clients." (Ex. T nos. 17, 22.)

- Also on March 1, 2006, Motorola also asked plaintiffs to produce copies of each of these contracts and stated that it would accept redacted copies so long as the information identified above was not redacted. (Ex. U nos. 17, 18.) Plaintiffs responded by referring Motorola to their interrogatory responses. (Ex. V nos. 17, 18.)

Additionally, Motorola only learned of plaintiffs' early 2004 discussions to "replace" MCG with GE Fanuc at the March 24, 2006 deposition of Gibson, plaintiffs' owner and CEO. Motorola not only sent a subpoena immediately to GE Fanuc, but also specifically asked plaintiffs' counsel for the documents requested in that subpoena, explaining that Motorola needed the documents promptly for their expert report. (Ex. F.) Plaintiffs' counsel, however, never gave a substantive response to this request. As a result, Motorola was left to work out (over the next several weeks) the limited production it did receive from GE Fanuc with zero assistance, and plenty of interference, from plaintiffs.

In sum, Motorola did seek discovery from plaintiffs "that would possibly embrace" the information sought in the GE Fanuc subpoena, and plaintiffs' contrary contention is flat wrong.

    **C.**    <u>**Plaintiffs Cannot Show Any Harm From the Disclosure of the Subpoenaed Documents**</u>.

Plaintiffs vaguely state that the subpoena is improper because the information Motorola seeks "may, and most likely will, contain confidential and proprietary business information and protectable trade secrets." [D.I. 119 ¶ 10.] That contention is both factually wrong and not good enough.

Under Federal Rule of Civil Procedure 26(c), "the party seeking the protective order must show good cause by demonstrating a particular need for

protection. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Cipollone v. Liggett Group, Inc.* 785 F.2d 1108, 1121 (3d Cir. 1986); *see also United States v. Dentsply Int'l, Inc.,* 187 F.R.D. 152, 158 (D. Del. 1999) ("Good cause exists when disclosure will result in a clearly defined and serious injury to the party seeking the protective order").

Plaintiffs have not even tried to do this.

While plaintiffs suggest that, because GE Fanuc competes with Motorola, they are likely to suffer harm, [D.I. 119 ¶ 12], GE Fanuc's counsel never raised such concerns. And plaintiffs have made no specific showing that the requested documents even contain confidential information. Nor have they demonstrated any injury or prejudice flowing from the production of the requested information. This is hardly surprising because Motorola told GE Fanuc (and plaintiffs) repeatedly that commercially sensitive information could be redacted. (*E.g.*, Ex. K.)

The fact is that Motorola's subpoena is directed to properly discoverable information, and plaintiffs should not be allowed to impede this discovery further with broad allegations of harm without specific examples of any expected injury.

**D.    There is a Protective Order in Place Already.**

Another reason that plaintiffs cannot show any harm is that a protective order is already in place, a fact that plaintiffs ignore entirely. That order provides that any confidential information is restricted to counsel for the parties, specifically named parties, experts, any person from whom testimony is taken, vendors retained to copy the information, and the court, its staff, and triers of fact. [D.I. 33 ¶ 2.]  Further, no party or individual given access to confidential information may use it outside of this litigation. [*Id.* ¶ 9.]

Against this backdrop, the blanket prohibition on discovery that plaintiffs seek is inappropriate: "orders forbidding any disclosure of trade secrets or confidential commercial information are rare. More commonly, the trial court will enter a protective order restricting disclosure to counsel . . . or to the parties." *See Federal Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 362 n.24 (1979); *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.*, 2004 WL 115594, *2 (D. Del. Jan. 13, 2004) (same).[6]

Because Motorola will agree to treat the documents produced by GE Fanuc as confidential under the existing protective order, plaintiffs can show no injury by the production.

### E. Plaintiffs' Motion is Untimely.

In addition to everything above, plaintiffs' motion is untimely (it was filed <u>after</u> the response deadline for the subpoena) and should be denied on that basis alone. *See Panhandle Eastern*, 118 F.R.D. at 350 (quoting 8 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2035, at 262-63 (1970 & Supp. 1987), for the proposition that "ordinarily [a protective order] must be obtained before the date set for discovery and failure to move at that time will be held to preclude objection later").

---

[6] Pursuant to Local Rule 7.1.3, a copy of the *Medtronic* case is attached as Ex. W.

## IV. Conclusion.

In light of the foregoing, the Court should deny plaintiffs' motion for a protective order. Motorola is entitled to a complete response to its subpoena from GE Fanuc, and GE Fanuc does not object to doing so. Plaintiffs' delays have already prevented Motorola from including this information in their initial expert report, and the rebuttal deadline (July 1) is rapidly approaching. The Court should put a stop to plaintiffs' improper interference with Motorola's discovery efforts.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ William W. Bowser
William W. Bowser (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601; Facsimile: (302) 576-3282
wbowser@ycst.com
OF COUNSEL:
Randy Papetti, Cory A. Talbot, Emily S. Cates
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 262-5311
Attorneys for Defendant

DATED: May 11, 2006