IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J-SQUARED TECHNOLOGIES, INC., a Canadian corporation, and J-SQUARE TECHNOLOGIES (OREGON) INC., an Oregon corporation,<br><br>         Plaintiffs,<br><br>    v.<br><br>MOTOROLA, INC., a Delaware corporation.<br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)    C.A. No. 04-CV-960-SLR<br>)<br>)<br>) |

# EXHIBIT H TO
# MOTOROLA'S RESPONSE TO PLAINTIFFS' MOTION TO AMEND

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ William W. Bowser
William W. Bowser (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601; Facsimile: (302) 576-3282
wbowser@ycst.com
OF COUNSEL:
Randy Papetti, Cory A. Talbot, Emily S. Cates
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 262-5311
Attorneys for Defendant

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664        1-800-893-6272        Fax: (613) 231-4605

Examination No. 06-0288.3        Court File No. CA 04-960-SLR

(District of Delaware)

## IN THE UNITED STATES DISTRICT COURT

B E T W E E N:

J-SQUARED TECHNOLOGIES, INC., a Canadian Corporation, and

J-SQUARED TECHNOLOGIES (OREGON) INC., an Oregon Corporation

PLAINTIFFS

- and -

MOTOROLA, INC. A DELAWARE CORPORATION

DEFENDANT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF CLAUDE LANGLOIS, pursuant to an appointment made on consent of the parties to be reported by Cornell•Catana Reporting Services, on March 22, 2006, commencing at the hour of 9:13 in the forenoon.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:        **COURT COPY**

Sean J. Bellow                                for the Plaintiffs

Randy Papetti and Emily S. Cates              for the Defendant

This Examination was taken down by sound recording by Janice West at Ottawa, Ontario, Canada.

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664          1-800-893-6272          Fax: (613) 231-4605

35

1  a main difference between Embedded and where I had been -
2  - the space I'd been for the last 17 years, Semi-
3  Conductor where there's no such thing in the Embedded
4  Space as Run Rate Business.  So it's not abnormal to have
5  -- and I see this from a revenue number as I track our
6  revenue number, we could be definitely down one quarter
7  and the next quarter pops because that's the buy cycle
8  for our customers.  So I realized that fairly early.
9  166.      Q.  As I understand what you're saying is it's
10 different to extrapolate from the first three quarters
11 number what's going to happen in the next quarter?
12           A.  Agreed.  You have to look at the last period
13 -- the last 12 months.  You know, in order to get a good
14 handle.
15 167.      Q.  What was your understanding at the time of
16 how Motorola had done in the last 12 months in this
17 territory?  Is it good or bad?
18           A.  The last -- it was not as good as it was.
19 That was a clear understanding.  That was the cornerstone
20 for Motorola's strategy changing from a channel
21 standpoint.  The Canadian number was going down the
22 tubes.
23 168.      Q.  Relatively speaking?
24           A.  Relatively speaking and that's why they
25 wanted to set up this new strategic approach from a

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664          1-800-893-6272          Fax: (613) 231-4605

71

        hadn't provided that to Mr. Nykoluk. That he had come up with that -- correct?

        A.  Again, he was privy to the same reports we would have seen early on.

337.      Q.  Which reports are you referring to?

        A.  The reports that we'd seen prior to it.

338.      Q.  Now those reports that we looked at prior to had $3.86 million roughly in 2001 and a great drop-off well below that in 2002? Correct?

        A.  That showed a drop off with three quarters into 2002.

339.      Q.  They were at about $900,000 even roughly? Correct?

        A.  Three-quarters into the year, yes. Correct.

340.      Q.  Looking at that report, was there any reason from that report to assume that Motorola would do $3 million in 2003 in sales?

        A.  Again, as I alluded to before, the Embedded Space -- there are a lot of pops where you can be flat for a quarter or half a year and based on customer buy cycles, you know, you could see a tremendous pop after, you know within a quarter. We've seen that and that seems to be the case in the Embedded Space.

341.      Q.  So it could widely fluctuate from year to year?

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664          1-800-893-6272          Fax: (613) 231-4605

72

|   |   |   |
|---|---|---|
| 1 |        | A.  Yes.  Year to year and quarter to quarter. |
| 2 | 342.   | Q.  Is it fair to say that you were aware when you entered the contract, that Motorola's numbers in 2002 appeared to be well down from what they were in 2001? |
| 5 |        | A.  The 2001 number being three something? |
| 6 | 343.   | Q.  Almost three - nine? |
| 7 |        | A.  No.  It's not fair to say. |
| 8 | 344.   | Q.  Okay.  Motorola had approximately 3.9 in sales for 2001? |
| 10 |       | A.  Yes. |
| 11 | 345.  | Q.  And through three quarters in 2002 it had $900,000 in sales? |
| 13 |       | A.  Yes. |
| 14 | 346.  | Q.  So you don't think it's fair to derive from that that Motorola sales appear to be way down in 2002 over 2001? |
| 17 |       | A.  My data point has always been that there's a two to $3 million number coming on board with Motorola.  Keeping that in mind, $900,000 in sales after three quarters is relatively feasible given what I've said as far as buy cycles.  Right?  If you go as far as look in the account base that are high-lighted in some of these reports, some of these are very palatable accounts. |
| 24 | 347.  | Q.  I understand that but putting aside that there's fluctuation and what can happen, the first three |

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664        1-800-893-6272        Fax: (613) 231-4605

173

901.  Q. What are you looking at? The 2002 year to date sales?

MR. BELLEW: He's looking at 130 and I guess 129.

MR. PAPETTI: At 130.

MR. BELLEW: 130 and 131.

THE WITNESS: Okay I want to see -- where's the $900,000 three Quarters in?

MR. PAPETTI: I think it's the last page of 131?

THE WITNESS: Okay.

BY MR. PAPETTI:

902.  Q. It's reported in the 2001 figure but I don't see it in the 2002 figures?

A. Yes. I would challenge that it was partially recorded.

903.  Q. Okay, what's that got to do with Exhibit 127?

A. I'm just saying that when we were told it was a two to $3 million number that was with Raytheon in. This $900,000 number three quarters in is without Raytheon so Raytheon is out. There are numbers missing here.

904.  Q. Okay, so the point is the $900,000 figure Motorola gave you may not have accurately represented -- the market may have actually been bigger for the territory that you were assigned?

A. Along the lines of two to $3 million.

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664           1-800-893-6272           Fax: (613) 231-4605

174

1  905.        Q.   Sure?
2              A.   Two -- $3 million dollars.
3  906.        Q.   But Motorola wasn't over-estimating the
4      market in the written data it gave you?  Is that fair?
5      If anything, they were under-estimating their sales year
6      to date?
7              A.   Which sales?  Which report are we talking
8      about?
9  907.        Q.   In any of the written reports they gave you
10     that had the $900,000 figure, they're not over-stated in
11     your view, they may be understated?
12             MR. BELLEW:  Objection.                                *O*
13             THE WITNESS:  Under-stated, over-stated -- I mean
14     the numbers -- let me think about that.  Do we have an
15     answer to that.
16             BY MR. PAPETTI:
17 908.         Q.   As I understood what you're saying, you're
18     saying Raytheon should be on the list and it's not?
19     Correct?
20             A.   Yes.
21 909.         Q.   And if Raytheon is on the list ostensibly the
22     figure would be figure for the actual POS dollars in the
23     whole market?  Correct?
24             A.   Correct.
25 910.         Q.   Okay, so what you're saying is the $900,000

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664          1-800-893-6272          Fax: (613) 231-4605

175

1  figure that I keep raising may accurately reflect what's
2  on the paper but the market itself, the sales in the
3  market itself may have actually been higher?
4         MR. BELLEW:  Objection.  Objection.              *O*
5         THE WITNESS:  Correct.  It would certainly be in
6  line with being told that the number is two to $3 million
7  because Raytheon would have been part of that two to $3
8  million.  It just so happens that in this report it
9  wasn't recorded and if I remember why, this business was
10 fulfilled through Avnet and it was shipped to Raytheon's
11 broker in New York.
12        BY MR. PAPETTI:
13 911.   Q.  I've got a total document on that we'll get
14 to in a minute?
15        A.  It just rung a bell there.
16 912.   Q.  What I'm trying to establish with you is
17 simply if anything the written document you received from
18 Motorola about the POS activity in the territory before
19 you signed the contract, if anything the written data was
20 too low, not too high is what you're trying to tell me?
21        A.  Before we signed the contract -- this is
22 before we signed the contract?  Correct?
23 913.   Q.  Yes?
24        A.  It was too low, not too high is your
25 question?

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664          1-800-893-6272          Fax: (613) 231-4605

200

```
 1        contract expired on December 5 according to its terms?
 2        Okay?
 3                MR. BELLEW:  Objection.                              *O*
 4                BY MR. PAPETTI:
 5  1071.     Q.  Do you have any reason to believe that's not
 6        correct -- December 5, 2003?
 7                MR. BELLEW:  Objection.                               *O*
 8                THE WITNESS:  Contract.  I mean, we conducted
 9        business as usual with Motorola up until termination.
10                BY MR. PAPETTI:
11  1072.     Q.  So what you're referring to is the fact that
12        for another two and a half months or so, J-Squared
13        continued to make sales efforts and so you think that the
14        180 days should run from the date of the Termination
15        Letter?  Is that what you're saying?
16                MR. BELLEW:  Objection.                               *O*
17                MR. PAPETTI:  Is that what you're saying?
18                THE WITNESS:  I agree with that.
19                BY MR. PAPETTI:
20  1073.     Q.  Okay, what I was asking you before was in
21        terms of any account in which you received a commission
22        on, do you have any reason to believe you were shorted
23        commissions -- you being J-Squared on any account that
24        you served?
25                MR. BELLEW:  During the time that the contract
```

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664          1-800-893-6272          Fax: (613) 231-4605

201

1  was in effect?  Was that ---
2          MR. PAPETTI:  Yes, yes?
3          THE WITNESS:  Other than Raytheon which was
4  corrected?
5          BY MR. PAPETTI:
6  1074.    Q.  Yes, other than Raytheon?
7          A.  No.
8          MR. PAPETTI:  Unless your Counsel has questions,
9  Mr. Langlois, I don't have any further questions so thank
10 you for coming.
11         MR. BELLEW:  I have no questions.
12         MR. COURVILLE:  This concludes the Deposition of
13 Claude Langlois.  The number of tapes used was two.  The
14 original video tapes will be retained by Baseline
15 Communications Incorporated located at 77 Auriga Drive,
16 Ottawa, Ontario, Canada.  The time is now 13:37:40 --
17 going off the Record.
18         --- WHEREUPON THE DEPOSITION ADJOURNED AT THE
19 HOUR OF 1:37 IN THE AFTERNOON.
20         THIS IS TO CERTIFY THAT the foregoing is a true
21 and accurate transcription from the Record made by sound
22 recording apparatus to the best of my skill and ability.
23
24         ..............................................
25         Janice West, Court Monitor.