IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J-SQUARED TECHNOLOGIES, INC., | : | |
| J-SQUARED TECHNOLOGIES | : | |
| (OREGON) INC., | : | |
| | : | |
| Plaintiffs, | : | C.A. No. 04-960-SLR |
| | : | |
| v. | : | |
| | : | |
| MOTOROLA, INC., | : | |
| | : | |
| Defendant. | : | |

## MOTOROLA'S MOTION TO STRIKE

William W. Bowser, Esquire (Bar I.D. 2239)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6601 (Telephone)
(302) 576-3282 (Telecopier)
wbowser@ycst.com

OF COUNSEL:
Randy Papetti, Esquire
Cory A. Talbot, Esquire
Emily S. Cates, Esquire
LEWIS AND ROCA LLP
40 N. Central Avenue
Phoenix, Arizona 85004
(602) 262-5311

Attorneys for Defendant

DATED:   May 22, 2006

**I.     Introduction.**

Plaintiffs J-Squared Technologies, Inc. ("JST"), and J-Squared Technologies (Oregon), Inc. ("JSO"), are former commission-based sales representatives for the Motorola Computer Group ("MCG"), a business unit of defendant Motorola, Inc. While they represented MCG, plaintiffs received monthly commission payments for certain sales in their territories.

On March 10, 2006, three weeks before the close of discovery, plaintiffs produced an "Expert Report" purporting to identify their damages. That Report is attached as Exhibit A. It asserts that, while plaintiffs were working for MCG, their monthly commission payments were systematically too low, "by approximately 40 percent," meaning that plaintiffs are still owed $122,535 in "Historical Commissions."

Plaintiffs did not assert this claim for systematic underpayments of commissions in their Complaint; did not even mention underpayments in their disclosure statement or responses to written discovery; and, when recently asked about these alleged underpayments in depositions, plaintiffs' officers did not have any idea what this claim was about (this last point is notable because the Report says it is primarily based on representations from plaintiffs' personnel). Indeed, when Motorola's counsel asked plaintiffs' counsel what possible basis plaintiffs had to support the 40% underpayment claim, the unhelpful response was, "Motorola is in the best position to answer the question of whether it underpaid commissions and by how much."

It is not Motorola's job to try to find support for plaintiffs' baseless damage claims, and plaintiffs should not be allowed to use the Report as a *de facto* amendment of their Complaint anyway. The Court should strike the Report's baseless references to underpayments.

The Report also includes calculations for reliance and lost profits damages. However, such damages are expressly precluded by the Manufacturer's Representative Agreements between the parties. The Court should strike any reference to reliance and lost profits damages from the Report.

## II.   Background.

### A.   The Parties' Contractual Relationship.

In 2002, MCG began contracting with independent sales representatives to market MCG products. By mid-2003, MCG had signed Agreements with nine sales representatives, including JST and JSO.

In early 2004, MCG finished an evaluation of the sales representative program, concluded that the program was a financial failure, and decided to end it. MCG then notified JST, whose Agreement had recently expired, that its Agreement would not be renewed. MCG also notified JSO that its contract was being terminated because JSO had not met its contractual performance standards.

### B.   Plaintiffs' Claims.

Unhappy with the way their Agreements ended, plaintiffs sued Motorola for promissory estoppel, negligent misrepresentation, breach of duty of good faith and fair dealing, and breach of contract.[1]

### C.   Plaintiffs' Alleged Damages.

The Agreements provided that JSO and JST could recover trailing commissions for certain sales in their territories after their Agreements ended if they were terminated "without cause." (Exs. B & C ¶¶ 7.2G & 7.3D.) Additionally, the JST Agreement provided that JST could also recover trailing commissions upon its Agreement's "expiration." (Ex. B ¶ 7.3D.) In their expert's Report, both plaintiffs claim that they are entitled to trailing commissions, totaling $116,684. (Ex. A, at 9.)

---

[1] Plaintiffs' consumer fraud and punitive damages claims have already been dismissed. [D.I. 18 & 19.]

Beyond that, the Report also calculates $474,522 in "Reliance Damages" and $688,969 in damages for "Lost Future Opportunities." (*Id.*) The Report then boosts all these alleged damages to account for the purported systematic 40% underpayment of commissions. (*Id.*)

### III. Plaintiffs' Expert Report Includes Improper Damages.

There is no factual basis, none, to support any claim of systematic underpayment. And the Agreements expressly prohibit recovery of "Reliance Damages" and damages for "Lost Future Opportunity." As a result, there is an enormous difference between the types of damages that plaintiffs' expert says they can get:

Table 2: Summary of Damages

| Type of Damage | Without 40 Percent Underreporting | Including 40 Percent Underreporting |
|---|---|---|
| Trailing Commissions | $ 116,684 | $ 163,358 |
| Underpayment Historical Commissions | | 122,535 |
| Reliance Damages | 474,522 | 474,522 |
| Lost Future Opportunity | 688,969 | 964,556 |

And the types of damages they can really get:

Table 2: Summary of Damages

| Type of Damage | Without 40 Percent Underreporting | Including 40 Percent Underreporting |
|---|---|---|
| Trailing Commissions | $ 116,684 | $ ~~163,358~~ |
| Underpayment Historical Commissions | | ~~122,535~~ |
| Reliance Damages | ~~474,522~~ | ~~474,522~~ |
| Lost Future Opportunity | ~~688,969~~ | ~~964,556~~ |

(Ex. A, at 9.) The references to reliance damages, lost profits damages, and systematic underpayments should be stricken from the Report.

### A. There Are No Allegations or Evidence of Underpayments.

Based on unspecified and unproduced "estimates" from JST and JSO, plaintiffs' expert, Mr. Pocalyko concludes that MCG's commission payments "were underreported by approximately 40 percent." (Ex. A, at 5 & 6.)

While plaintiffs' counsel had recently voiced his "suspicions" that there were underpayments, (Ex. D), plaintiffs never mentioned underpayment in their Complaint, disclosure statement, or discovery responses. And in depositions, not a single witness for JSO or JST was aware of any systematic underpayment at all. There is simply no proof for this theory.

#### 1. The Complaint does not mention underpayments.

The Complaint does not allege that MCG underpaid commissions. Instead, JST's contract claim hinges on allegations that its Agreement was renewed at the end of 2003, [D.I. 1 ¶ 44], and JSO's contract claim turns on allegations that MCG had no good faith basis to terminate JSO for failing to meet its contractual performance requirements [D.I. 1 ¶¶ 33, 69, & 70].

#### 2. Plaintiffs' disclosure statement does not mention underpayments.

Nor does plaintiffs' disclosure statement point to any underpayments. Rather, it only identified damages for (1) "projected revenues" that plaintiffs lost when their Agreements ended and (2) expenses they incurred "to design-in Motorola products with Plaintiffs' customers." (Ex. E, at 2.)

#### 3. Plaintiffs' discovery responses do not mention underpayments.

In written discovery, MCG asked plaintiffs to "[e]xplain in detail" their "computation of damages." (Ex. F at 12, no. 18; Ex. G at 10, no. 15.) In response, plaintiffs identified (1) costs, expenses, and overhead that plaintiffs incurred to perform under the Agreements; (2) lost potential revenue; and (3) trailing commissions. (Ex. F at 12, no. 18.; Ex. G at 10, no. 15.) Again, there is no

reference to any systematic underpayment of commissions, let alone one at a 40% clip.

### 4. Plaintiffs' personnel are unaware of any underpayments.

Not only was nothing pled or disclosed or produced to MCG regarding underpayment of commissions, but Mr. Pocalyko appears to have obtained plaintiffs' "estimates" of underreporting out of thin air. None of the documents Mr. Pocalyko reviewed reflect any underpayment and none of plaintiffs' personnel—whose representations Mr. Pocalyko "primarily" relied on in preparing his report—have any idea what this underreporting issue is about:

- When asked whether "J-Squared was paid was less than what J-Squared believes it was owed under the Parties' Agreement," plaintiffs' owner and CEO, Jeff Gibson, testified, "No." (Ex. H, at 152.)[2]

- When asked whether "J-Squared (Oregon) was underpaid for any commissions it earned during the time the Agreement was in effect," Steve Blomme (who negotiated the JSO Agreement) testified, "No, I don't think so." (Ex. I, at 91.)

- When asked whether J-Squared was "shorted commissions" when the Agreement was in effect, Claude Langlois (head of plaintiffs' Embedded Systems Group, which did the work under the Agreements) testified, "No." (Ex. J, at 200-201.)

- When asked whether, there were any discrepancies "between what J-Squared believes it earned and what it was paid," Mike Nykoluk (President of JST) testified that, as for commissions paid during the life of the Agreements, "No." (Ex. K, at 137-38.)

---

[2] Mr. Gibson's testimony on this point is especially relevant because it appears that he was the only person at JST or JSO actually consulted by Mr. Pocalyko in preparing the Report. (Ex. H, at 149-50.)

When MCG pointed out this testimony and asked that plaintiffs provide the evidentiary basis of their expert's theory, (Ex. L), plaintiffs' counsel did not answer but, instead, actually suggested that it was up to <u>Motorola</u> to do that: "Motorola is in the best position to answer the question of whether it underpaid commissions and by how much" (Ex. D).

### 5. <u>This is not the Raytheon issue.</u>

The only underpayment issue raised by plaintiffs was JST's very specific claim that it was entitled to commissions for sales to a company called Raytheon. Raytheon had purchased MCG products and the distributor had provided a "ship to" address in New York. Because this was outside of JST's territory (Canada), MCG did not pay JST for these sales. JST, however, asserted that these sales were properly within its territory and that it should receive commissions for these sales. MCG investigated; determined that JST was right; changed its coding to "reflect the proper Canadian ship to address"; and paid JST the outstanding commissions. (Ex. M.)

Importantly, this issue was resolved in April 2004—about four months <u>before</u> plaintiffs filed this lawsuit. There was never any suggestion that the Raytheon issue was part of any systematic underpayment of commissions. To the contrary, plaintiffs' witnesses uniformly indicated that they had no reason to disbelieve MCG's explanation of the Raytheon commission issue, *i.e.*, that it was caused by the New York "ship to" address. (Ex. H, at 151-53; Ex. I, at 81-82; Ex. J, at 197.)

### 6. <u>MCG should not have to defend an unpled, unsubstantiated claim.</u>

Against this backdrop, the Court should strike the Report's references to underpayments: Plaintiffs never pled or disclosed such a claim and there is no factual basis for it.

### a. The claim was not pled or disclosed.

Under Federal Rule of Civil Procedure 8, plaintiffs' Complaint must give MCG fair notice of what plaintiffs' claim is "'and the grounds upon which it rests.'" *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957)). And, while the pleading requirements are liberal, they certainly do "not require a district court to fabricate a claim that a plaintiff has not spelled out in his pleadings." *Holman v. Indiana*, 211 F.3d 399, 406-07 (7th Cir. 2000).

Because plaintiffs failed to plead or disclose their underreporting theory, (*see* § III(A-C), *supra*), MCG could conduct only limited discovery after receiving the Report three weeks before the close of discovery. And, as detailed in Section III(D) above, this discovery yielded no supporting evidence.[3]

MCG should not have to defend against a moving target, especially when plaintiffs are unwilling—and, it appears, unable—to provide the most basic information as to the basis of their new claim. Accordingly, the unpled under-reporting theory should be stricken from the Report and any reference to it should be excluded at trial. *See, e.g.*, *Browder v. General Motors Corp.*, 5 F. Supp. 2d 1267, 1279 (M.D. Ala. 1998) (striking unpled and undisclosed theories elicited at the deposition of plaintiff's expert); *ECLA Enters., Inc. v. Sisco Equip. Rental & Sales, Inc.*, 53 F.3d 186, 189 (8th Cir. 1995) (upholding exclusion of a damages expert whose testimony would have "switched the basis" of plaintiff's claim).[4]

---

[3] MCG's recent efforts to understand the basis of the Report's underreporting theory through deposition testimony did not relieve plaintiffs of their obligation to plead facts supporting that theory in their Complaint. *Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006) (stating that "the discussion of a potential claim in a deposition does not satisfy the requirement of Rule 8").

[4] While plaintiffs' counsel has asserted, "There is no need to amend the complaint in light of the notice requirement of the pleadings," (Ex. D), recently, on April 24, 2004—three weeks <u>after</u> the discovery cutoff—plaintiffs filed a motion to amend their Complaint to include allegations of underpayment. [D.I. 118 at 5 & ex. 1 thereto ¶¶ 25, 35, 40, 53, 81.]

### b. The Report's underreporting analysis is worthless because it lacks foundation.

This same result follows from the fact that there is zero evidence to support the Report's references to underpayment of commissions by MCG. Under Federal Rule of Evidence 702, an expert's opinion is only admissible to "assist the trier of fact" if it is "based upon sufficient facts or data." FED. R. EVID. 702. However, if an expert's opinion "is based on factual assumptions that are not supported by the evidence," then it will not "assist" anybody. 29 Charles A. Wright & Victor J. Gold, *Federal Practice & Procedure: Evidence* § 6264, at 211 (1997); *see also Tyger Constr. Co., Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."). Accordingly, if "'there is simply too great a gap between the data and the opinion proffered,'" the opinion should be excluded. *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury.").

Again, <u>none</u> of the sources relied on by Mr. Pocalyko support, allude to, or even guess about any underpayment by MCG. (*See* § III(D), *supra*.) That means that the only possible source for this information was Mr. Pocalyko's speculation or counsel's "suspicions," and "[a]n award for damages 'cannot stand when the only evidence to support it is speculative or purely conjectural.'" *In Re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1235 (5th Cir. 1986) (quoting *Marks v. Pan American Airways, Inc.*, 785 F.2d 539, 542 (5th Cir. 1986)). Given the chasm between the data provided to Mr. Pocalyko and the opinion he proffered, his

unfounded underpayment theory should be stricken from the Report. *See Montgomery County*, 320 F.3d at 448.[5]

### B. The Report's Reference to Damages Expressly Precluded by the Agreements Should be Stricken.

The Report calculates hundreds of thousands of dollars in "Reliance Damages" and "Lost Future Opportunities" for plaintiffs. But JST and JSO expressly agreed in the contracts that they would not seek reliance or lost profits damages for the "termination or nonrenewal" of the contracts. (Ex. B & C.) The contractual language is clear and binding. Accordingly, references to these purported damages should be stricken from the Report.

Both JST's and JSO's Agreements contain multiple provisions that preclude the recovery of damages for reliance or lost profits arising from the termination or nonrenewal of the Agreements:

> **7.4 Sole Remedy**. Motorola's payment obligations in this Article VII shall be Representative's sole remedy for the <u>termination or nonrenewal</u> of this Agreement and will be in lieu of all other claims that Representative may have against Motorola as a result hereof. . . . Motorola will not be liable to Representative by reason of <u>termination or nonrenewal</u> of this Agreement for compensation, reimbursement, or damages for:
>
> A. <u>Loss of prospective compensation</u>;
>
> B. Goodwill or loss thereof; or
>
> C. <u>Expenditures, investments, leases, or any type of commitment made in connection with the business of such party or in reliance</u> on the existence of this Agreement.

(Exs. B & C ¶ 7.4 (emphasis added).)

> **3.8 Limitation of Liability.** IN NO EVENT, <u>WHETHER FOR BREACH OF CONTRACT</u>, WARRANTY, <u>MOTOROLA'S NEGLIGENCE</u>, STRICT LIABILITY IN TORT <u>OR OTHERWISE</u> WILL MOTOROLA BE LIABLE FOR INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, FRUSTRATION OF ECONOMIC OR

---

[5] Similarly, under broader relevance principles, "an opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant." *Bradley v. Armstrong Rubber Co.*, 130 F.3d 168, 177 (5th Cir. 1997) (quoting *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991)). Such is the case here.

> BUSINESS EXPECTATIONS, <u>LOSS OF PROFITS</u>, LOSS OF DATA, <u>COST OF CAPITAL</u>, COST OF SUBSTITUTION OF PRODUCTS, FACILITIES OR SERVICES, DOWNTIME, COSTS, OR ANY SIMILAR CLAIM OF A SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE NATURE WHATSOEVER TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

(Exs. B & C ¶ 3.8 (emphasis added).)

Not mentioning these provisions, the Report includes estimates for both reliance and lost profits damages:

- "JST and JSO incurred project related costs," including "salaries, training, marketing, and other types of costs," to perform under the Agreements and that "JST and JSO are entitled to recover these project related costs as reliance damages" in the amount of $474,522. (Ex. A, at 7.)

- Based on J-Squared management's expectation that "the relationship would be a multi-year agreement with the potential to produce a revenue stream that was profitable in the long term," JST and JSO have suffered between $688,969 and $964,556 in lost opportunities, depending on application of the unpled forty percent underpayment theory. (Ex. A, at 8-9.)

Estimating damages for reliance and lost profits "as the result of Motorola's breach of the Agreements" and "as a result of the termination of the JST and JSO Agreements," (Ex. A, at 1 & 9), plainly contradicts the express terms of the Agreements.

Under Arizona law,[6] "[a] contract provision governing remedies or damages is generally binding on the parties." *United Dairymen of Arizona v. Schugg*, 128 P.3d 756, 761 ¶ 16 (Ariz. App. 2006); *Dixon v. City of Phoenix*, 845 P.2d 1107, 1112 (Ariz. App. 1992). The Arizona Supreme Court has stated:

> The parties to a contract may specify certain remedies which may be used in case of breach. They may in addition make such a provision

---

[6] The Court has determined that Arizona law governs. [D.I. 18.]

> the exclusive remedy or remedies, barring all others which would otherwise be available. To obtain this result, however, the intent of the parties must be . . . clear.

*Hadley v. Southwest Properties, Inc.*, 570 P.2d 190, 193 (Ariz. 1977). Delaware law is the same. *Falco v. Alpha Affiliates, Inc.*, 1999 WL 222464, *8 (D. Del. March 25, 1999) (finding that parties to a contract are governed by provisions for the calculation of damages).[7]

This Court has already enforced Paragraph 3.8 in precluding plaintiffs' claims for punitive damages. [D.I. 18 & 19.] And rightly so: Paragraphs 3.8 and 7.4 accomplish exactly what the *Hadley* court said the parties can do—specify that only certain remedies may be used in case of a breach. Accordingly, plaintiffs should be held to their bargain and the Report's references to reliance damages and lost opportunities should be stricken as contrary to the express, negotiated terms of the Agreements.[8]

---

[7] Pursuant to Local Rule 7.1.3, a copy of the *Falco* decision is attached as Exhibit N.
[8] For these same reasons, MCG has moved for summary judgment on plaintiffs' reliance and lost profits damages claims. Although summary judgment is fully appropriate on the claims, they should still be stricken from the Report for the reasons set forth in this Motion. [D.I. 120 & 121.]

**IV.    Conclusion.**

In light of the foregoing, the Court should strike any reference to underpayment of commissions or reliance and lost opportunities damages from the Report and exclude any reference to these theories at trial.

>YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
>/s/ William W. Bowser
>William W. Bowser (Bar I.D. 2239)
>The Brandywine Building, 17th Floor
>1000 West Street
>Wilmington, Delaware 19801
>(302) 571-6601 (Telephone)
>(302) 576-3282 (Telecopier)
>wbowser@ycst.com
>
>OF COUNSEL
>LEWIS AND ROCA LLP
>Randy Papetti
>Cory A. Talbot
>Emily S. Cates
>40 N. Central Avenue
>Phoenix, Arizona  85004
>(602) 262-5311
>Attorneys for Defendant

DATED:    May 22, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J-SQUARED TECHNOLOGIES, INC., a Canadian corporation, and J-SQUARE TECHNOLOGIES (OREGON) INC., an Oregon corporation,<br><br>    Plaintiffs,<br><br>  v.<br><br>MOTOROLA, INC., a Delaware corporation.<br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 04-CV-960-SLR<br>)<br>) |

## CERTIFICATE OF SERVICE

I, William W. Bowser, Esquire, hereby certify that on the 22nd day of May 2006, I electronically filed a true and correct copy of the foregoing **Motorola's Motion to Strike** with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

  David Allan Felice
  Cozen O'Connor
  Chase Manhattan Centre, 1201 North Market, Suite 1400
  Wilmington, DE 19801

I further certify that on this 22nd day of May 2006, I mailed by United States Postal Service a copy of above-mentioned document to the following non-registered participant:

  Kevin F. Berry
  Cozen O'Connor
  1900 Market Street
  Philadelphia, PA 19103

  YOUNG CONAWAY STARGATT & TAYLOR, LLP

  /s/ William W. Bowser
  ―――――――――――――――――――
  William W. Bowser, Esquire (Bar I.D. 2239)
  1000 West Street
  Wilmington, Delaware 19801
  Telephone: (302) 571-6601
  Facsimile: (302) 576-3282
  Email: wbowser@ycst.com