IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC.,          :
J-SQUARED TECHNOLOGIES (OREGON)        :
INC.,                                  :
                                       :        C.A. No. 04-960-SLR
          Plaintiffs,                  :
                                       :
     v.                                :        JURY TRIAL DEMANDED
                                       :
MOTOROLA, INC.,                        :
                                       :
          Defendant.                   :

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Dated: June 8, 2006                    Sean J. Bellew (#4072)
                                       David A. Felice (#4090)
                                       Cozen O'Connor
                                       1201 North Market Street, Suite 1400
Of Counsel:                            Wilmington, DE 19801
Kevin F. Berry                         Telephone: (302) 295-2000
Cozen O'Connor                         Facsimile: (302) 295-2013
1900 Market Street                        *Attorneys for Plaintiffs*
Philadelphia, PA 19103
Telephone: (215) 665-2000
Facsimile: (215) 665-2013

**Table of Contents**

**Page**

NATURE AND STAGE OF PROCEEDINGS .......................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

  A. The Parties ........................................................................................................ 3

  B. Motorola's Sales Model .................................................................................... 4

  C. The Manufacturer's Representative Business Model ........................................ 4

  D. Motorola's Deceptive Negotiating Tactics ...................................................... 5

    1. Motorola's Representations as to a Long-Term Business Solution .............. 6

    2. The G9 Policy Fabrication ........................................................................... 8

    3. Motorola's April 2003 Moratorium on all Additional MRAs ..................... 8

    4. Motorola's Revenue Representations ........................................................... 9

  E. The Parties' Agreements .................................................................................. 11

  F. Motorola's Backroom Efforts to Fabricate Terminations for all Representatives ............ 12

  G. Motorola Terminates all Representative on the Same Day .............................. 15

SUMMARY OF THE ARGUMENT ...................................................................................... 16

ARGUMENT ........................................................................................................................... 17

I.  PROMISSORY ESTOPPEL IS VIABLE GIVEN THAT MOTOROLA'S
    REPRESENTATIONS ARE NOT IN CONFLICT WITH THE AGREEMENTS ................ 17

  A. This Court's Prior Opinion Bars Motorola Efforts to Obtain a Different Result Through
    its Present Motion ........................................................................................... 17

  B. Motorola's False Representations are Actionable ........................................... 18

  C. The Integration Clause Does not bar a Promissory Estoppel Claim nor Eviscerate
    Reliance ........................................................................................................... 21

II.  MOTOROLA'S MISREPRESENTATIONS DURING THE NEGOTIATIONS AND
    THEREAFTER INCLUDED BOTH STATEMENTS OF FACT AND PRESENT INTENT
    NOT TO PERFORM FUTURE ACTS ............................................................................... 23

  A. Motorola Misrepresented or Purposefully Omitted Material Facts During the Parties'
    Contractual Relationship ................................................................................. 23

  B. Motorola's Durational Representations Exceed the Legal Requirements for Evidencing
    Actionable Misrepresentations ....................................................................... 25

  C. The Economic Loss Doctrine is Still Inapplicable ......................................... 27

III. GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFFS' BREACH OF
    CONTRACT CLAIMS ........................................................................................................ 28

A. Motorola Permitted the JST Agreement to Renew..............................................................28

B. Motorola Lacks a Basis to Claim JSO Breached its Performance Standards....................30

   1. JSO's Accounting Records Substantiate Compliance with Performance Standards.....30

   2. Motorola Refuses to Produce its Own Performance Data for JSO................................32

   3. Motorola Cannot Mend the Hold with After-Acquired Facts ........................................32

IV. THE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
     DEALING IS SUPPORTED BY AMPLE RECORD EVIDENCE........................................33

V. PLAINTIFFS ARE PERMITTED TO SEEK EXEMPLARY DAMAGES FOR THEIR
    EXTRA-CONTRACTUAL CLAIMS..................................................................................35

CONCLUSION ......................................................................................................................36

## TABLE OF AUTHORITIES

### CASES

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986) ...................................................................34

Apollo Group, Inc. v. Avnet, Inc.,
   58 F.3d 477 (9th Cir. 1995) .........................................................27

Arizona v. California,
   460 U.S. 605 (1983) ...................................................................17

Aventis Tech. Corp. v. Barons Finance Group, Inc.,
   2004 WL. 3019491 (D. Ariz. Apr. 14, 2004) ...................................26

Barden v. Harpercollins Publishers, Inc.,
   863 F. Supp. 41 (D. Mass. 1994)...................................................26

Carstens v. City of Phoenix,
   75 P.3d 1081 (Ariz. App. Ct. 2003)...............................................28

Christianson v. Colt Industries Operating Corp.,
   486 U.S. 800 (1988) ...................................................................18

Fogel v. Chestnutt,
   668 F.2d 100 (2d Cir. 1981) .........................................................18

Harbor Insurance Co. v. Continental Bank Corp.,
   922 F.2d 357 (7th Cir. 1990) .......................................................33

Horowitz v. Federal Kemper Life Assurance Co.,
   57 F.3d 300 (3d Cir. 1995) .........................................................17

IMX, Inc. v. LendingTree, LLC,
   405 F. Supp. 2d 479 (D. Del. 2005) .........................................17, 34

J-Squared Tech., Inc. v. Motorola, Inc.,
   364 F. Supp. 2d 449 (D. Del. 2005) .........................1, 18, 21, 22, 27,
                                                                   28

Johnson International, Inc. v. City of Phoenix,
   967 P.2d 607 (Ariz. App. 1998) ...................................................18

Lufty v. R.D. Roper & Sons Motor Co.,
   115 P.2d 161 (Ariz. 1941) ...........................................................35

Lusk Corp. v. Burgess,
    332 P.2d 493 (Ariz. 1958) ........................................................................21

Mann v. GTCR Golder Rauner, LLC,
    -- F. Supp. 2d --, 2006 WL. 851516 (A. Ariz. Mar. 28, 2006)..........................22

Matsushita Electric Industrial Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ........................................................................17

North River Insurance Co. v. Pennsylvania Reinsurance Corp.,
    63 F.3d 160 (2d Cir. 1995) ........................................................................18

Pennsylvania Coal Association v. Babbitt,
    63 F.3d 231 (3d Cir. 1995) ........................................................................17

Railway Co. v. McCarthy,
    96 U.S. 258 (1877) ........................................................................32, 33

Rawlings v. Apodaca,
    726 P.2d 565 (Ariz. 1986) ........................................................................35

Spudnuts, Inc. v. Lane,
    641 P.2d 912 (Ariz. 1982) ........................................................................26

St. Joseph's Hospital and Medical Center v. Reserve Life Insurance Co.,
    742 P.2d 808 (Ariz. 1987) ........................................................................27

Trent Partners & Associate v. Digital Equip. Corp.,
    120 F. Supp. 2d 84 (D. Mass. 1999)........................................................................20

Wagner v. Rao,
    885 P.2d 174 (Ariz. App. Ct. 1994)........................................................................21, 35

Williams v. Runyon,
    130 F.3d 568 (3d Cir. 1997) ........................................................................17

## RULES

Fed. R. Civ. P. 56(c) ........................................................................17

## MISCELLANEOUS

Restatement (Second) of Torts § 552 ........................................................................27

## NATURE AND STAGE OF PROCEEDINGS

On August 20, 2004, J-Squared Technologies, Inc. ("JST") and J-Squared Technologies (Oregon) Inc. ("JSO") (collectively "Plaintiffs") filed their complaint (the "Complaint") against defendant Motorola, Inc. ("Motorola"). (D.I. 1). JST and JSO alleged five identical causes of action for: (i) breach of contract; (ii) promissory estoppel; (iii) negligent misrepresentation; (iv) breach of implied duty of good faith and fair dealing; and (v) violation of Arizona's Consumer Fraud Act, ARIZ. REV. STAT. 44-1522. (D.I. 1). Motorola filed a motion to transfer or, in the alternative, to dismiss portions of the Complaint. (D.I. 10). On February 4, 2005, the Court denied Motorola's motion to transfer the action to the District of Arizona. (D.I. 17).

On April 13, 2005, the Court granted Motorola's motion to dismiss only as it related to Plaintiffs' claim for violation of Arizona's Consumer Fraud Act and a claim for punitive damages stemming from a breach of the implied covenant of good faith and fair dealing. (D.I. 18); *J-Squared Tech., Inc. v. Motorola, Inc.*, 364 F. Supp. 2d 449 (D. Del. 2005). In its decision, the Court specifically dismissed (after full briefing on the issues) Motorola's argument as to the application of the economic loss doctrine and parol evidence rule. *J-Squared Tech., Inc.*, 364 F. Supp. 2d at 454 & n.10.

On February 22, 2006, Plaintiffs moved to compel Motorola's production of a number of different documents and interrogatory responses relating to various issues, including performance requirements under the Agreements. (D.I. 76). Additionally, on April 24, 2006, Plaintiffs filed a motion to consolidate this action with a companion action styled: *G.L. Williams Assoc., Inc. v. Motorola, Inc.*, C.A. No. 06-116-SLR. (D.I. 117). Plaintiffs also filed a motion to amend the Complaint to add claims for fraud and deceptive trade practices. (D.I. 118). All three motions are fully briefed and before the Court.

On May 1, 2006, Motorola presented this motion for summary judgment.  (D.I. 120). This is Plaintiffs' answering brief in opposition to the motion for summary judgment.

## STATEMENT OF FACTS

A.    The Parties

Plaintiffs are leading technology sales organizations, known in their industry as manufacturer's representatives. [1]  Motorola, through its division known as the Motorola Computer Group (referred to herein as "Motorola" or "MCG"), describes itself as the world's leading provider of embedded computing technology, serving original equipment manufacturers, primarily in the telecommunications and military/aerospace industries.  (*See* Cmpt. ¶ 12). Beginning in 2001, Motorola experienced a substantial decrease in revenue resulting from the burst of the dot com bubble.  (A-318; A-338; A-372).[2]  As a result of this downturn, Motorola laid off approximately two-thirds of its direct sales employees between 2000 and 2002.  (A-318; A-338).  Following the layoffs, Motorola was left with less than ten (10) outside sales employees to cover all of North America.  (*Id.*).  As a result of the business downturn and substantial layoffs, Motorola had to re-engineer its business model, implementing an indirect sales model through which it would employ a number of manufacturer's representatives, including Plaintiffs. (Cmpt. ¶¶ 12-13).

Beginning sometime prior to May of 2002, Motorola began to approach a number of different manufacturer's representatives to fill the gap created by its layoffs and to service Motorola's present customer base and to continue to generate demand creation.  (A-339; Cmpt. ¶ 13).  Plaintiffs were two of a total of nine manufacturer's representatives that, at various times

---

[1]  In general, manufacturer's representatives tend to be very small companies, with less than 5 employees selling and servicing various product lines.  JST assigned three employees in its Canadian territory to sell and service Motorola products and JSO assigned five employees to the endeavors in its Northwest territory.  (A-298 – A-299).

[2]  Citation to "A-___" references Motorola's appendix filed with its motion for summary judgment. (D.I. 122, 126).

from May 20, 2002 through August 12, 2003, executed Manufacturer's Representative Agreements (the "MRAs") with Motorola. (A-1 – A-37).

B.    Motorola's Sales Model

Motorola had at one point maintained a robust sales force, which included dozens of outside sales professionals employed directly by Motorola in North America. (Exhibit G (Machernis dep. at p. 43); Exhibit C (Crawford dep. at p. 34:18-25)). Motorola's North American sales model focused primarily on sales through distributors and Motorola's direct sales force, with value added resellers or integrators generating some additional sales. (A-401). As a result of the burst of the dot com bubble, Motorola, like virtually all the manufacturers serving technology customers, saw a substantial decrease in its revenue beginning in 2001. (Exhibit G (Machernis dep. at p. 43); Exhibit E (Holt dep. at p. 49)). This, in turn, required Motorola to re-think entirely its sales model and to downsize significantly its direct sales force. Motorola's North American operations eventually went from employing dozens of outside sales people, or Business Development Managers ("BDMs") as Motorola titled them, to having less than ten (10) BDMs to cover the entire continent of North America. These same BDMs later served as points of contact at Motorola for the manufacturer's representatives.

This dynamic shift in the market had Motorola in a quandary as of the beginning of 2002: it needed to weather the downturn by cutting fixed costs and by substantially reducing its direct sales force. At the same time, however, it needed to serve its existing customers, attempt to grow its business and stand ready for the market to bounce back. (Exhibit E (Holt dep. at 40)). Ultimately, Motorola fashioned a solution to its problem.

C.    The Manufacturer's Representative Business Model

In light of the problems Motorola was facing, manufacturer's representatives were the perfect stopgap. Manufacturer's representatives are independent sales organizations that "represent several products usually with some synergy to promote complete business solutions."

(Exhibit A (Blair dep. at Ex. 6)). Manufacturer's representatives "maintain large contact databases and have relationships with target accounts that [their clients] may not have access to otherwise." (*Id.*). They maintain small geographic territories and "they know their neck of the woods and stay informed of new companies" that are good sales prospects for their clients. (*Id.*). Moreover, because they are paid strictly on commissions for the sales generated in their defined territory and are not direct employees, manufacturer's representatives "are an alternative source of adding Sales personnel that in many cases is less expensive than hiring direct." (*Id.*) Motorola could utilize manufacturer's representatives as "an extension of the BDM function to add feet on the street." (*Id.*). This would address the critical problem Motorola was facing: how to control costs but still service existing customers and grow the business.

      D.    <u>Motorola's Deceptive Negotiating Tactics</u>

      During the course of negotiating with the nine companies that eventually executed MRAs, Motorola engaged in a pattern of false and deceptive representations. First, Motorola responded to the representatives' "one kind of common concern" regarding the duration by expressly stating, <u>as a matter of fact</u>, that the new business model was a long-term solution. These representations were false and/or made without the present intent to perform in the future. Second, Motorola admits that its representation that its "G9 Policy" explicitly prohibited automatic renewal of the MRAs was false and misleading. Indeed, this fabricated basis for requiring a signed writing for a renewal flew in the face of everything Motorola represented to Plaintiffs both before and following execution of the MRAs. Third, Motorola continued to execute MRAs even after its Director of Worldwide Sales expressly stated in April 2003 that no further agreements were to be executed until a complete review of the model was completed. Finally, Motorola misrepresented the historical revenue generated in the territories covered by

the MRAs in an effort to drive down the commission percentage rates and, accordingly, commissions payable to Plaintiffs.

        1.     <u>Motorola's Representations as to a Long-Term Business Solution</u>

      Larry Terry, a MCG Business Development Manager for Nortel's Canadian operations and one of Motorola's negotiators for the JST Agreement, testified that he told Plaintiffs that Motorola intended the relationship to be "long-term relationship." (Exhibit J (Terry dep. at pp. 117-118, 217, 236)). Mr. Terry also testified that both parties to the negotiations understood the phrase "long-term" to mean a relationship spanning several years.

> . . . I would – I would have chosen my words very carefully then, as I do now, to imply what I was implying, whether it was a multi-year relationship or a long-term. I specifically chose the term – the words "long-term" to imply it was going to be long-term. I'm not giving any spec – a French-Canadian saying in a way – speci – specificity? Q. Specificity. A. Exactly. That's the word. I wasn't being specific as to what the term was. Q. Well, what did you mean you communicated that term? A. It's a long-term relationship. Q. Yeah. And what is a long-term relationship? If I said to you, We're going to be in a long-term relationship, what would your understanding of – of the duration in that relationship be? A. <u>It was assumed, the business that I'm in [Motorola] and the business that he's in [Plaintiffs], long-term relationship implies a few years.</u>

(Exhibit J (Terry dep. at pp. 217-18)). Indeed, Mr. Terry represented that the manufacturer's representative business model would last at least three to four years in order to rebuild the eroded business line in Canada. (Exhibit J (Terry dep. at pp. 117, 118, 236)). Plaintiffs confirmed the existence and extent of these representations through deposition testimony. "We were told a number of times that indeed it was a strategic long term relationship that Motorola wanted to put in place . . ." (A-380 (Langlois dep. at p. 44)); *see also* Exhibit D (Gibson dep. at p. 132-133, 169-170); (A-319) (Mr. Blomme testifying "it just came up over and over again, that you know, this was a long haul type of thing"). Indeed, at Motorola's "kick-off" event for its manufacturer's representatives in Boston in September of 2003, Motorola confirmed that it was

continuing to develop the manufacturer's representative business model as a long-term solution and framework for the future.  (Gibson Declaration at ¶ 9 (D.I. 13 at Ex. A)).  This statement came at a point Motorola knew it not to be true.

The fact that this issue was sure to arise during the negotiation process is confirmed by Paul Holt, Motorola's former Director of North American Sales.  Mr. Holt testified that the perspective manufacturer's representative expressed one common concern when approached by Motorola and its purported new business model.  The concern was whether this new business model was a solution that Motorola held for the long-term, such that the manufacturer representatives' up-front expenditures of capital, labor resources and lost opportunity cost would generate a stream of revenue sufficient to recoup costs and otherwise replace various opportunity costs known to the parties (e.g., termination or non-engagement of competing lines).  (Exhibit E (Holt dep. at pp. 67-8); Cmpt. ¶¶ 13-17).

When Motorola was negotiating the JSO Agreement, Mr. Holt enticed JST to hire and Steven Blomme to accept a position with JST to service the Motorola line within the JSO territory.  Indeed, Mr. Blomme testified that the only way he was going to leave his current position was based in representations from Mr. Holt that this was a long-term business solution for Motorola.

> I think probably my mind was set early on when I had my talks with Paul Holt about coming on to J-Squared and certainly would have had those conversations with Paul where he said, you know, this is the direction we need to go for the future in the company and this is a good thing for you.  I made it really clear to Paul Holt that I had just started a job with the Distributor.  If you were to look at my work record you'd see I'd never go to work for somebody for three months and you know, and then just disappear on them.  So I had made a commitment to somebody else and I certainly had to vet in my mind that this was going to be a good long-term job for me.

(Exhibit B (Blomme dep. at 22)). Turns out Motorola had no intentions of honoring Mr. Holt's representations.

2.    The G9 Policy Fabrication

Following the explicit and repeated representations made during the negotiation process, Plaintiffs asked that the language in Motorola's form agreement be changed to conform to the representations concerning duration. When presented with this request, Jeanne Kolasa – of Motorola's legal department – unequivocally stated that Motorola's internal G9 policy prohibited a change in the language of Motorola's generic contract to provide for automatic renewal of these type of agreements. (A-518). In direct contradiction to Motorola's representations, discovery revealed that the G9 policy does not prohibit automatic renewal of the agreements. Motorola readily admitted this through its responses to Plaintiffs' requests for admission. (Exhibit L (Defendant's Response to Plaintiffs' First Request for Admissions)). Ms. Kolasa's fraudulent statements during the negotiations are now plain on their face and were directed toward inducing Plaintiffs to execute the MRAs by placating the Plaintiffs regarding their biggest concern: the duration of the relationship.

3.    Motorola's April 2003 Moratorium on all Additional MRAs

Motorola negotiated and executed the JSO Agreement even after Kevin Parslow (Director of Worldwide Sales for MCG) communicated that all MRAs were to be placed on hold. (Exhibit A (Blair dep. Ex. 10)). In deposition testimony, Paul Holt confirmed that when Wendy Vittori was hired as MCG's General Manager in early 2003, "everything went on hold," including the MRAs. (Exhibit E (Holt dep. at 150-151). Despite this moratorium, Motorola executed the JSO Agreement in May 2003 and at least three additional MRAs with other representatives after this time.

Motorola did not communicate this material fact - (that the manufacturer's representation model was being questioned as a long-term strategy) to JSO during any part of the negotiations

nor did it ever advise JST of this fact as it continued to expend substantial time and resources to further Motorola's interests in Canada. In reliance on the representations Motorola made as to its long-term independent sales network strategy, JST invested more than $500,000 to support Motorola's sales objectives in Canada, and JSO invested more than $300,000 to support Motorola's sales objectives in the United States. (Cmpt. ¶ 13). Most noteworthy as to the understanding that the independent sales network relationship was a long-term strategy for Motorola, JST's total anticipated profit for sales of Motorola products for the first year was only $100,000. (Cmpt. ¶ 13). Likewise, JSO's anticipated profit for the sales of Motorola products for the first year was $200,000. (Cmpt. ¶ 13). Indeed, the out-of-pocket expenditures JST and JSO were caused to make in reliance upon Motorola's representations exceeded anticipated first-year profits by a factor of 2.7.

Nonetheless, at Motorola's "kick-off" event for its manufacturer's representatives in Boston in September of 2003, Steve Machernis, Paul Holt and others represented to Plaintiffs that Motorola was continuing to develop the manufacturer's representative business model as a long-term solution and framework for the future. (Gibson Declaration at ¶ 9 (D.I. 13 at Ex. A)).

### 4.    Motorola's Revenue Representations

Discovery in this matter demonstrates that Motorola knew at the time of the negotiations that the point of sale figures (revenues) generated in the territory covered by the JST Agreement were insufficient to drive the represented commission figures. There exists a factual dispute as to exactly how much Motorola represented the historical revenues were for the JST territory. Plaintiffs contend that Motorola represented the historical revenue figures to be between $2 million and $3 million.

> Q. So, Larry Terry told you that they're predicting -- I should say that Motorola was predicting $3 million in sales for Canada? A. Two to $3 million.
> Q. Two to $3 million for Canada in 2003? A. In sales.

> Q. In sales? Is that correct? A. That's correct.
>
> Q. Now, is that two to $3 million in all sales in Canada or two to $3 million in the sales in Canada minus certain what I'll call House Accounts that would have been excluded in the contract? A. It was implied that that was the business we would be inheriting.
>
> Q. Inheriting two to $3 million in business. Did Mr. Terry tell that to you? A. Yes.
>
> Q. When did Mr. Terry tell that to you? A. He told me that in a meeting that I believe was in July, 2002 and in a meeting that I believe was in September, 2002.

(Exhibit F (Nykoluk dep. at pp. 27-28); *see also* Exhibit D (Gibson dep. at pp. 21-22) ("I'm saying that going into it, Motorola had told us that the sales number in Canada was two to $3 million.")).

Motorola contends it would have only made revenue representations based on historical numbers. (Exhibit E (Holt dep. at pp. 43-44)). Emails indicate that Motorola represented that revenues would be at least $78,000 per month, enough to drive $5,000 per month in commissions, but still under the $10,000 per month ($2.4 million in total yearly revenue) budgeted for the Canadian territory. (Exhibit E (Holt dep. at Ex. 96)). The problem was that the business cycle was at its low point and Motorola permitted its business to suffer so terribly that the revenues (and commissions payable therefrom) where nowhere near the $78,000 figure. In fact, in the last three months prior to JST executing the Agreement, revenues for Canada averaged a paltry $9,708. (Exhibit E (Holt dep. at Ex. 97)). Whereas Motorola represented commission payments to be between $5,000 and $10,000 per month (assuming *arguendo*), the actual monthly revenue for the months immediately preceding the execution of the JST Agreement would have generated less than $500 per month in commissions payable, not the $5,000 represented.

Even accepting Motorola's contention, its own employee testified that such conduct would be questionable.

> So if you had a five percent rate based on historical yearly number,
> which we have here as 2002, and it breaks down to a monthly
> average of $78,000, is it truthful to make representations based on
> that figure in the last three data points you have for 2002, are less
> than $1,000 a month? MS. CATES: Object to form. A. I would
> hope nobody was making any representation based on that number.
> I would be disappointed in anybody that was pulling that number
> out, and showing that to a customer, and making a representative.
> That would have been a big problem for me.

(Exhibit E (Holt dep. at p. 124 (referring to Holt Ex. 97)). When the JST Agreement was finally

singed, Motorola's chief negotiators quipped "we got a deal on this one!", acknowledging that

Motorola had mislead JST. (Exhibit K (Kolasa dep. at Ex. 82)).

To add insult to injury, Motorola failed to pay certain commissions rightfully earned.

Through discovery and even in papers submitted to the Court, Motorola concedes that it did not

pay certain commissions owed to Plaintiffs until Plaintiffs challenged Motorola on the

underpayments. (D.I. 95 at p.22). The failure or refusal to fully compensate Plaintiffs and other

representatives provides both direct and circumstantial evidence of Motorola's attempt to

defraud its business partners of commissions properly payable under the Agreements.

E.    The Parties' Agreements

On May 5, 2002, Motorola entered into the first of the MRAs with non-party C&S

Technical Sales, L.L.C., to cover Texas and surrounding states. Motorola, after months of

discussions, then engaged JST, effective December 5, 2002, to cover parts of Canada. (A-14).

Thereafter, Motorola negotiated and signed MRAs with seven (7) other manufacturer's

representatives, including JSO, with the agreement becoming effective on May 15, 2004. (A-

31). Contrary to Motorola's statements in its opening brief (O.B. at p. 8), the plain language of

the JSO Agreement makes the agreement "effective on the date of the last signature below"

which was Motorola's execution on May 15, 2004. (A-20; A-31). One might surmise that the

month and a half delay in executing the JSO Agreement was attributable to Mr. Parslow's April

2003 moratorium, but that can only be conjecture as Motorola did not inform JSO of that watershed decision.[3]

F.    Motorola's Backroom Efforts to Fabricate Terminations for all Representatives

After Motorola received the benefit it wanted under the MRAs, but before Motorola would have to start sharing with the manufacturer's representatives revenue generated from the representatives' work and the upward trend of the market cycle, Motorola resorted to provisions in the MRAs dealing with performance metrics to terminate unilaterally the agreements on the basis of cause (whether it existed or not), in an effort to end the relationships without any further financial obligations to manufacturer's representatives. As late as November 2003, Motorola began this covert scheme to reestablish a direct sales force as the market cycle began to trend upwards after the dot com burst. In November 2003, Julie Blair (MCG's finance department) delivered to Motorola's legal department a manufacturer's representative summary stating "[p]erhaps you can use this to start getting an understanding for what it would take to renew contracts such a way that they all expire 12/31/2004." (Exhibit A (Blair dep. at Ex. 15)). From this point forward, Motorola's main office engaged in conduct that was singly aimed at one purpose: terminating the manufacturer's representative business model as cheaply as possible, regardless of earlier representations.[4]

On December 18, 2003, Motorola's main office sent out word that Kevin Parslow wanted an analysis completed to look at three (3) different termination options for the manufacturer's representatives.

_____

[3] Tellingly, Motorola has failed to produce any e-mails from Mr. Parslow covering this operative time period.

[4] This information is based on the discovery materials Motorola was willing to produce. As set forth in Plaintiffs' motion to compel, Motorola has refused to produce its performance metrics, its master sheet of performance and other relevant email correspondence around this time period. (D.I. 76). The adverse inference drawn from this abject refusal to produce extremely relevant information (given the affirmative defenses asserted) is cause enough to deny Motorola's motion.

> 1) For cause (need to demonstrate how they have performed against the performance standards in their contract)
> 2) For convenience (we may be obligated to pay commissions for about 6 months for most MRs)
> 3) Let the contract lapse without renewal[5]

(Exhibit A (Blair dep. at ex. 16)).  Julie Blair stated "**Please send a summary of each of your MRs and their performance by 10am Tempe time, Monday, Dec 22** – this will be used in analyzing #1."  (*Id.*) (emphasis in original).  A termination for performance issues only became available to Motorola once Kevin Parslow insisted that specific performance metrics be set in place for all MRAs executed after January 2003 where once there were none.  (Exhibit I (MOTJ01014)).  Ms. Blair instructed those receiving the December 18 email "we should only communicate it is for the purpose of an annual review and not the possibility of canceling so the word doesn't get out prematurely."  (*Id.*).

Motorola plainly identified its basis for wanting to terminate the manufacturer's representative business model.  Motorola's own finance department noted "it seems we are projecting significant POS [point of sale (Motorola's gauge of revenue)] activity in some of these territories in 2004, so #2 [option 2 above] may be an expensive option."  (*Id.*).  By December 23, Motorola knew the up tick in the market cycle would cost the company significant commission payments as the market growth and manufacturer's representatives' design wins began to take shape.  "[A]t this point, we feel there is significant exposure regardless of the way we terminate, except if we can terminate for performance."  (Exhibit A (Blair dep. at Ex. 17)).  Motorola employees went on to conspire that "we may be able to modify the contacts to exclude accounts and reduce the financial exposure if we are unable to prove nonperformance."  (*Id.*).  Three days later, Motorola again confirmed its worst fears – the manufacturer's representative business model was working.  "We suspect that the 2004 POS in some of the MR territories could be

---

[5] Despite knowing this to be an option in December 2003 for its clandestine effort to terminate all MRAs, Motorola did not get around to informing JST until late February 2004 that the JST Agreement allegedly expired by its terms on December 4, 2003.

significantly higher than in 2003 (Kim has given examples)." (Exhibit A (Blair dep. at Ex. 20)). The spreadsheet that followed the email explicitly states that "the exposure is huge POS months" for JSO. (*Id.*).

Again, Motorola expressed the opinion that the cheapest way to get out of the deal they struck was to terminate for performance reasons, but lamented the fact that "[t]here is a 30 day 'remedy' period related to this alternative." (*Id.*). Motorola then tried to put two and two together and proposed that it "notify specific or all MR's on Jan 7 (?) of a territory change per Section 3.1, in which we could remove particular POS accounts from their territory where we know they have had no involvement and we know the forecasted POS is significant. . . . Then subsequent to the notification of territory change, we could possibly proceed with termination for performance." (*Id.*).

By January 9, 2004, Motorola was estimating that its business would grow by at least 20% over calendar year 2004. Julie Blair stated in an email to Kevin Parslow:

> I took the past 12 month commission/POS revenue history, uplifted by 20% (Kim said that's what your organization was projecting), then showed the total exposure at 5, 4, 3, 2 and 1%. I think these numbers are conservative and should be considered "minimum payments".

(Exhibit A (Blair dep. at Ex. 25)) (quotations in original, emphasis added). Despite the 20% uplift projections and expected "huge" POS revenue numbers, Motorola refuses to produce its master sheet of performance and performance metrics. Plaintiffs are left to guess whether: (i) Motorola actually possessed a basis to terminate JSO for performance in February 2004 and (ii) Motorola properly compensated all the manufacturer's representatives. All we do know, through Motorola testimony, is that Motorola admits to frustrating the manufacturer's representatives' ability to cure any alleged performance issue by, among other things, failing to identify deficiencies or respond to the manufacturer's representatives' inquiries as to the perceived

deficiencies.  (Exhibit K (Kolasa dep. at pp. 128-31); Exhibit C (Crawford dep. at pp. 204-08); Exhibit M (Letter inquiries regarding terminations)).

     G.    <u>Motorola Terminates all Representative on the Same Day</u>

    Kevin Parslow testified that the decision to terminate all the MRAs was made "a few weeks" before the termination letters were delivered.  (Exhibit H (Parslow dep. at p. 30)). Without any prior notice, Motorola sent correspondence on February 26, 2004 to all nine of the manufacturer's representatives purporting to terminate all relationships with its manufacturer's representatives.  (Copies of the nine (9) termination letters are attached as Exhibit N).

## SUMMARY OF THE ARGUMENT

I.  The Court's prior decision denying Motorola's challenge to the promissory estoppel claim remains controlling under the law of the case doctrine. Further, an assessment of the facts supporting the promissory estopppel claim demonstrate actionable promises that are not barred as a matter of law by the integration clause as the promises and contract are not in conflict.

II.  Motorola's misrepresentation both before and after execution of the agreements are actionable given clear misstatements of fact and representations undertaken without the present intent to perform.

III.  The contract claims cannot be disturbed as Motorola actively and impliedly renewed the JST Agreement and Motorola fails to establish the absence of any factual dispute as to JSO's performance under its Agreement.

IV.  Breach of the implied covenant of good faith and fair dealing is clear given a consideration of Motorola's efforts over two months to terminate all the MRAs on the very same day, regardless of past representations or present interactions.

V.  The limitation of liability provisions contained in the MRAs do not preclude the recovery of exemplary damages stemming from Motorola's intentional or willful conduct.

**ARGUMENT**

A court will only grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Here, Motorola bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If Motorola has demonstrated an absence of material fact, only then must Plaintiffs "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *IMX, Inc. v. LendingTree, LLC*, 405 F. Supp. 2d 479, 484 (D. Del. 2005).

**I.    PROMISSORY ESTOPPEL IS VIABLE GIVEN THAT MOTOROLA'S REPRESENTATIONS ARE NOT IN CONFLICT WITH THE AGREEMENTS**

**A.    This Court's Prior Opinion Bars Motorola Efforts to Obtain a Different Result Through its Present Motion**

Motorola's efforts to re-litigate issues it previously was unsuccessful presenting in this action runs afoul of the law of the case doctrine and should be denied out-of-hand. The law of the case doctrine states that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same action. *Arizona v. California*, 460 U.S. 605, 618 (1983); *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997) (holding that the law of the case doctrine expresses the practice of courts generally to refuse to

reopen what has been decided). This doctrine promotes the finality and efficiency of the judicial process by "protecting against the agitation of settled issues." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816 (1988). Although a court has the power to revisit prior decisions of its own, "as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Id.* at 817 (quoting *Arizona*, 460 U.S. at 618 n.8). In fact, the law of the case should be disregarded only when the court has a clear conviction of error with respect to a point of law on which its previous decision was predicated. *North River Ins. Co. v. Pennsylvania Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) (citing *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981)).

Here, manifest injustice would occur only if this Court were to ignore the law of the case doctrine, disregard its prior ruling as to the legal propriety of a claim for promissory estoppel under the facts of this case and grant Motorola's request to re-litigate this issue. Motorola presented the same argument to this Court on its motion to dismiss. (D.I. 11 at pp. 16-17). In fact, Motorola even cites the same case law, *Johnson Int'l, Inc. v. City of Phoenix*, 967 P.2d 607 (Ariz. App. 1998), for the proposition that a promissory estoppel claim is barred as a matter of law. *Compare* (O.B. at pp. 16, 20) with (D.I. 11 at p. 16). This Court specifically addressed and declined to apply the *Johnson International* decision in its Opinion on Motorola's motion to dismiss. *J-Squared Tech., Inc.*, 364 F. Supp. 2d at 452 n.8. For these reasons, Motorola should not now be permitted to re-litigate a legal issue that was fully briefed and decided by the Court in a prior motion.

**B.    Motorola's False Representations are Actionable**

Motorola's representations are to the duration of the manufacturer's representative business model are actionable as both parties understood the clear language and intent of the

representations. Motorola seeks to defeat this claim by relying on suppositions allegedly drawn from Plaintiffs' subjective understanding of the indisputable durational representations made both during and after the contract negotiation process. (O.B. at pp. 16-18). As described below, Motorola cannot escape a trial on the merits by completely disregarding the clear and corroborated statements made by its employees by simply refusing to cite these statements in its brief.

Motorola employee and principal contact during the negotiation of the JST Agreement. Larry Terry, testified he told Plaintiffs that Motorola intended the relationship to be a "long-term relationship." (Exhibit J (Terry dep. at pp. 117-118, 217, 236)). Mr. Terry also testified that both parties to the negotiations understood the phrase "long-term" to mean a relationship spanning several years. "Q. Well, what did you mean you communicated that term? A. It's a long-term relationship. Q. Yeah. And what is a long-term relationship? If I said to you, We're going to be in a long-term relationship, what would your understanding of – of the duration in that relationship be? A. <u>It was assumed, the business that I'm in [Motorola] and the business that he's in [Plaintiffs], long-term relationship implies a few years</u>." (Exhibit J (Terry dep. at pp. 217-18)). Indeed, Mr. Terry represented that the manufacturer's representative business model would last at least three to four years in order to rebuild the eroded business line in Canada. (Exhibit J (Terry dep. at pp. 117-118, 236)). Plaintiffs confirmed the existence and extent of these representations through deposition testimony. "We were told a number of times that indeed it was a strategic long term relationship that Motorola wanted to put in place . . ." (A-380 (Langlois dep. at p. 44)); *see also* Exhibit D (Gibson dep. at pp. 133, 169)).

Motorola claims that the promissory estoppel claim is barred because JSO's Steve Blomme may have relied on body language and tone to infer that the manufacturer's representative business model was a long-term solution for Motorola. (O.B. at p. 16). Setting

aside the fact that this argument purposefully ignores the clear and indisputable representations Mr. Terry make to Plaintiffs, Motorola cites to a portion of Mr. Blomme's deposition testimony which was directed to a different issue. Motorola was questioning Mr. Blomme as to whether Motorola ever explicitly told Plaintiffs "don't worry about what's in the contract, we have a separate deal[,]" not whether Mr. Terry or anyone else made the above cited durational representations. (A-320). The fact of the matter is Mr. Blomme testified that his past experience as a Motorola employee and the representations he did receive from Motorola gave him a clear understanding that Motorola was behind this new business model for the long-term.  (A-319) (testifying that "so it just came up over and over again, that you know, this was a long haul type of thing . . . I'm an ex-Motorola employee so I was on the other side doing the contract many times, so possibly coloured by the fact that we felt the contract was something that just had to be done and then it got put in the drawer a lot of times"). At the very least, this factual dispute must be settled by the trier of fact.

Motorola cites a Massachusetts decision applying Massachusetts law for the proposition that promises of a "long-term deal" are not amenable to a claim for promissory estoppel. (O.B. at p. 17) (citing *Trent Partners & Assoc. v. Digital Equip. Corp.*, 120 F. Supp. 2d 84 (D. Mass. 1999). This argument is misplaced as a matter of fact and law. First, the MRAs contain a contractual choice of law provision applying Arizona law to all contract claims. (A-14; A-30). The *Trent Partners* decision applies Massachusetts law to the promissory estoppel claim. *Trent Partners*, 120 F. Supp. 2d at 104. Further, the *Trent Partners* decision was decided on a completely different factual scenario based on different contract language. The *Trent Partners* contract defined the term of the contract as "commencing on the date of the contract and terminating on the 'Termination Date.'" *Id.* at 92. The Termination Date was effective thirty (30) days after either party sent written notice of intent to terminate. *Id.* The facts of *Trent*

*Partners* are distinguishable from the facts of this action. The MRAs did not have such a narrowly defined term, but instead included an initial one year term that could be renewed by the parties. (A-11; A-28). Even if the *Trent Partners* decision provides persuasive authority, controlling Arizona law holds otherwise. *See infra*, I.C.

Given a consideration of the indisputable factual representations Motorola made both before and following the execution of the MRAs, it is clear there is a factual dispute to be resolved by the jury. Moreover, the Massachusetts authority Motorola cites for the legal proposition that the representations are not actionable applies the wrong law and is factually distinguishable. Accordingly, Motorola's challenge must fail.

**C.     The Integration Clause Does not bar a Promissory Estoppel Claim nor Eviscerate Reliance**

The integration clause and MRAs as a whole are not inconsistent with the representations that form a basis for Plaintiffs' promissory estoppel claim. Motorola claims that the representations of its employees were within the scope of the MRAs and are therefore not actionable. (O.B. at pp. 14-15). As this Court noted in its opinion denying Motorola's motion to dismiss predicated on this same issue, "[t]he court does not agree with defendant that, under Arizona law, a written contract can preclude **any and all** claims of promissory estoppel." *J-Squared Tech., Inc.*, 364 F. Supp. 2d at 452 & n.8 (emphasis in original). For these same reasons and as described below (for the second time), Plaintiffs are entitled to proceed to trial on their claims for promissory estoppel.

As a general proposition, Arizona law does not view a contract's integration clause as preclusive of parol evidence not inconsistent with the terms of the contract. *See Lusk Corp. v. Burgess*, 332 P.2d 493, 495 (Ariz. 1958) (noting that a party may not free itself from a false promise by incorporating an integration clause in a contract); *Wagner v. Rao*, 885 P.2d 174, 177

(Ariz. App. Ct. 1994) (declining to extend integration clause to foreclose a fraud claim).[6] As this Court noted earlier in this action:

> The contract states that it has a term of one year and can be renewed in writing upon agreement of the parties. Plaintiffs do not argue that defendant represented that the contract would last more than a year, but that defendant would agree to renew the contract when the year was up. Therefore, plaintiffs' claim would not be covered by the contract and they could not bring it in a contract action.

*J-Squared Tech., Inc.*, 364 F. Supp. 2d at 454 (addressing this issue under the heading of negligent misrepresentation). Here, the promise Motorola made was to initiate and maintain an manufacturer's representative business model on a long-term basis. (*See supra* pp. 7-9). It was reasonable for Motorola to foresee that Plaintiffs would rely on these representations. In fact, Plaintiffs did rely on these representations and dedicated funds far in excess (by a factor of 2.7) of anticipated profits for the initial one-year period. Motorola's promises (as later confirmed by the parties' fourteen (14) month relationship under the JST Agreement) did not "directly contradict" the terms of the Agreements. Both the JST and JSO Agreement could be extended by the parties after the first year. (A-11; A-28). To simply state that the Agreements stopped dead in their tracks after one year is incorrect because, as a matter of fact, the parties to the JST agreement continued to work together past the one year anniversary.

While Plaintiffs were spending in excess of $800,000 on two agreements that Motorola knew would return one year profits of a paltry sum, Motorola continued to represent that the Agreements would continue into the future. As noted above, Motorola even permitted the JST

---

[6] Motorola's citation to *Mann v. GTCR Golder Rauner, LLC*, -- F. Supp. 2d --, 2006 WL 851516 (A. Ariz. Mar. 28, 2006) is misplaced for several reasons. First, the decision applies Illinois law. *Mann*, 2006 WL 851516, at *16. Second, the integration clause at issue in *Mann* contained a specific disclaimer provision which is not present in the integration clause at issue in the MRAs. Finally, the promises at issue in *Mann* were contained in several, written Summaries of Understanding ("SOU") that were identified and disclaimed by both parties in their final written agreement. *Id.* at *20.

Agreement to continue past the initial one year term. (Cmpt. at ¶ 24). Accordingly, not only did Plaintiffs rely on pre-Agreement misrepresentations, the post-Agreement misrepresentations and conduct of Motorola falsely validated Plaintiffs' mistaken belief in the genuineness of Motorola's negotiating tactics. As such, the claims for promissory estoppel should proceed.

## II. MOTOROLA'S MISREPRESENTATIONS DURING THE NEGOTIATIONS AND THEREAFTER INCLUDED BOTH STATEMENTS OF FACT AND PRESENT INTENT NOT TO PERFORM FUTURE ACTS

### A. Motorola Misrepresented or Purposefully Omitted Material Facts During the Parties' Contractual Relationship

Plaintiffs relied upon Motorola statements of facts and continued appearance of a commitment to a long-term manufacturer's representative business model, despite Motorola's undisclosed knowledge to the contrary. Motorola claims that it is not susceptible to a claim for negligent misrepresentation because "there is no evidence, none, that Terry or anyone else at MCG falsely represented their or MCG's current intentions or expectations." (O.B. at p. 21). As described below, it was Motorola (acting through its employees) that engaged in misrepresentations of fact and failures to disclose material facts that establish the factual predicate for a claim of negligent misrepresentation.

Unequivocal statements as to the existence of a long-term business model are misstatements of fact when the established facts and the course of dealing demonstrate that those representations were false. Here, Motorola represented to Plaintiffs that the manufacturer's representative business model was a long-term business model. (Exhibit J (Terry dep. at pp. 117-118, 217, 236)); (A-380 (Langlois dep. at p. 44)); Exhibit D (Gibson dep. at p. 133, 169); (A-319. Moreover, Motorola confirmed these misstatements at its September 2003 "kick-off" event for the manufacturer's representatives in Boston, when Steve Machernis, Paul Holt and others represented to Plaintiffs that Motorola was continuing to develop the manufacturer's representative business model as a long-term solution and framework for the future. (Gibson

Declaration at ¶ 9 (D.I. 13 at Ex. A)). Not only does Motorola's action of prematurely and unilaterally terminating all the MRAs on the same day indicate that it did not possess the intent to honor its representations, internal Motorola emails indicate that it did not intend to honor its representations from the inception of the business model.

Shortly before signing the JST Agreement, Mr. Terry emailed Motorola's main office in October 2002 and insisted that "we do not have the infrastructure in place to handle the business issues that will come up from the Reps and orders, etc…, I'd like to propose . . . we develop a better scheme in Tempe for a permanent assignment." (Exhibit E (Holt dep. at Ex. 100)) (first ellipses in original). The fact of the matter is, when Motorola terminated all the MRAs on February 26, 2004, the infrastructure did not change. Paul Holt testified "I am not aware of it [the infrastructure] changing because manufacturer agreements were terminated." (Exhibit E (Holt dep. at p. 134)). One would assume that the infrastructure of a company like Motorola would have to change if it went from an indirect representative sales model to a direct sales model. However, there was no such change. This provides evidence that Motorola never maintained an intention to honor its representations as to the manufacturer's representative business model being a long-term business solution.

Motorola also failed to disclose what purports to be a complete change of heart concerning the manufacturer's representative business model in January or April 2003, despite its knowledge that the representatives were expending large sums of money service the Motorola product line. "Q. So, Motorola knew that J-Squared was making a long-term invested -- investment? MS. CATES: Object to form A. I don't know if Motorola knew. I'm sure that Jeff had shared that with me specifically." (Exhibit J (Terry dep. at p. 186)).

Motorola also misrepresented the fact that the G9 policy prohibited automatic renewal of the MRAs. (*See supra*, p. 9). Motorola readily admits this misrepresentation this through its

responses to Plaintiffs' requests for admission. (Exhibit L). Ms. Kolasa's fraudulent statements during the negotiations are now plain on their face and were directed toward inducing Plaintiffs to execute the MRAs. This is an actionable misrepresentation.

Finally, Motorola misrepresented the revenues generated within the territories covered by the MRAs. (*See supra*, pp. 10-12). Whereas Motorola represented commission payments to be between $5,000 and $10,000 per month (Plaintiffs' contend the representations were $2 million to $3 million), the actual monthly revenue for the months immediately preceding the execution of the JST Agreement would have generated less than $500 per month in commissions payable, not the $5,000 represented. This is an actionable misrepresentation.

### B. Motorola's Durational Representations Exceed the Legal Requirements for Evidencing Actionable Misrepresentations

The indisputable evidence that Motorola employees represented that the manufacturer's representative business model was a long-term solution is legally sound if Motorola lacked the present intent to perform. Motorola cites authority from Minnesota and California that representations made without the present intent to perform can only satisfy the higher standards of fraud, but not negligent misrepresentation. (O.B. at p. 22). That simply is not true. Motorola's pre-contract representations and failure to disclose its January or April 2003 (at the latest) decision to move away from the manufacturer's representative business model should proceed to trial.[7]

It seems axiomatic that if certain evidence satisfies a higher threshold showing, it necessarily satisfies the lower threshold. To the extent this issue has presented itself, courts have recognized this proposition. "Like negligent misrepresentation, 'actionable fraud cannot be predicated on unfulfilled promises, expressions of intention or statements concerning future

---

[7] The additional misrepresentations cited above (e.g., revenue and G9 representations), do not involve alleged future events, therefore these bases are not susceptible to this legal challenge.

events unless such were made with the present intent not to perform.'" *Aventis Tech. Corp. v. Barons Fin. Group, Inc.*, 2004 WL 3019491, at *2 (D. Ariz. Apr. 14, 2004) (citing *Spudnuts, Inc. v. Lane*, 641 P.2d 912, 914 (Ariz. 1982)); *see also Goodhue v. Catalina Mortgage Co.*, 76 Fed. Appx. 781, 786 (9th Cir. 2003) (remanding for further factual consideration a claim for negligent misrepresentation based on an alleged present intent not to perform); *Barden v. Harpercollins Publishers, Inc.*, 863 F. Supp. 41, 43 (D. Mass. 1994) (noting that Massachusetts recognizes that a "few rules are common" to claims for intentional, negligent or innocent misrepresentation, including the rule that a statement of future conduct is actionable where the party misrepresents his actual present intent to perform).

In addition to the above-cited authority, Motorola's efforts to overlay the negligence showing on the representation itself is misplaced. The negligence is placed at issue only with respect to a party's care when relaying information, not the information itself. *See Aventis Tech. Corp.*, 2004 WL 3019491, at *2 (noting that a claim for negligent misrepresentation requires "(1) [defendant] supplied [plaintiff] with false information for use in a business transaction; (2) [plaintiff] suffered pecuniary loss because of its justifiable reliance on the false information; (3) [defendant] <u>failed to exercise reasonable care in conveying the information</u>; and (4) [defendant] intended to supply the information for the benefit of [plaintiff] or knew that the recipient of the information would supply it to [plaintiff]") (emphasis added). Motorola's attempt to somehow graft the negligence standard on the information itself is misplaced. If Terry, Holt, Kolasa and others failed to exercise reasonable care to determine whether their employer actually intended to honor their promises, when they made their promises, then a claim for negligent misrepresentation is properly sustainable.

C.    **The Economic Loss Doctrine is Still Inapplicable**

Motorola attempts a second bite at the apple on the issue of the economic loss doctrine. Asserting the very same cases and the very same arguments this Court overruled on its motion to dismiss, Motorola again argues the most improbable of scenarios: a plaintiff may only escape the economic loss doctrine when asserting a claim for negligent misrepresentation if the plaintiff suffered a physical injury. This tortured reasoning highlights the correctness of this Court's earlier decision on the issue. Arizona's economic loss doctrine is limited to cases under the Uniform Commercial Code (the "UCC").

Motorola specifically asks the Court to reconsider its earlier decision because "[n]either MCG nor the plaintiffs briefed whether [the distinction between a contract for services versus goods] is relevant in their motion to dismiss papers, and, respectfully, [Motorola] believe[s] that the Court was mistaken." (O.B. at p. 23). As a matter of initial observation, it is disingenuous for Motorola to suggest that this matter was not fully briefed at the motion to dismiss stage, because it was. (D.I. 11 at p. 17) (opening brief); (D.I. 13 at p. 22) (answering brief); (D.I. 15 at pp. 11-12) (reply brief). Moreover, the Court's ruling did explore the distinction between a contract for services and a contract for goods under the UCC. *J-Squared Tech. Inc.*, 364 F. Supp. 2d at 454.[8] Nonetheless, Plaintiffs will again address the issue.

Arizona adopted the Restatement (Second) of Torts § 552 recognizing that a company "is subject to liability for pecuniary loss" if it supplies false information to others who justifiable rely on the false information. *St. Joseph's Hosp. and Medical Center v. Reserve Life Ins. Co.*, 742 P.2d 808, 813 (Ariz. 1987). Motorola's continued insistence that the economic loss doctrine applies outside the context of a sale of goods under the UCC and a construction liability action is unavailing. (O.B. at p. 23) (citing *Apollo Group, Inc. v. Avnet, Inc.*, 58 F.3d 477, 480 (9th Cir.

---

[8] *See supra,* I.A. (regarding the preclusive effect of the law of the case doctrine).

1995); *Carstens v. City of Phoenix*, 75 P.3d 1081 (Ariz. App. Ct. 2003)).   As this Court recognized in *J-Squared*:

> Arizona recognizes the "economic loss" doctrine with respect to contracts for the sale of goods. . . . The agreement at issue in this case, however, is one for services, thus the UCC does not apply. Furthermore, plaintiffs' claims for negligent misrepresentation are not in conflict with the parties' contract. The contract states that it has a term of one year and can be renewed in writing upon agreement of the parties.   Plaintiffs do not argue that defendant represented to them that the contract would last more than a year, but that defendant would agree to renew the contract when the year was up.   Therefore, plaintiffs' claim would not be covered by the contact and they could not bring it in a contract action.

*J-Squared Tech. Inc.*, 364 F. Supp. 2d at 454 (specifically rejecting *Apollo* and *Carstens*). Accordingly, Motorola's efforts to relitigate the Court's decision regarding the economic loss doctrine and extend that doctrine to non-UCC cases must be denied.

## III.   GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFFS' BREACH OF CONTRACT CLAIMS

### A.   Motorola Permitted the JST Agreement to Renew

Through written and oral word and conduct, Motorola permitted the JST Agreement to renew for another term.   Motorola claims that there can be no renewal because there was no signed agreement between the parties. (O.B. at p. 26).   Despite an alleged JST expiration date of December 4, 2003 and internal Motorola correspondence from November 2003 suggesting that the MRAs should be permitted to expire by their terms, Motorola instead choose to continue to work with JST under the same terms for over two months as if the Agreement was renewed "so the word does not get out prematurely."

Motorola's argument disregards the fact that it interacted with JST and their customers from December 4, 2003 through February 26, 2004 as if the JST Agreement was renewed in accordance with prior representations that this model was a long-term solution.   The fact remains that Motorola was attempting to devise plans in November and December 2003 to allow the

contracts to expire pursuant to their terms. (Exhibit A (Blair dep. at Ex. 15 and 16)). Instead of attempting to timely exercise a purported contractual right, Motorola decided to allow JST to labor under the same terms of the same Agreement for over two (2) additional months. Motorola purposefully engaged in this conduct "so the word does not get out prematurely." (Exhibit A (Blair dep. at Ex. 16)). This evidences an intentional relinquishment of a right and acquiescence to the renewal.[9]

In addition to waiver and acquiescence, there were sufficient writings between the parties to charge Motorola with a renewal term. During the course of the two and a half months between the purported expiration of the Agreement and delivery of the termination notice, Motorola continued to interact and develop business with JST as if the Agreement was renewed. The emails, purchase orders, fulfillment orders and monthly commission payments are satisfactory writings for Motorola to be charged with an additional renewal period. (*See, e.g.,* Exhibit G (Machernis dep. at Ex. 108)). Indeed, Motorola's General Manager Wendy Vittori testified that Motorola has a history of working under Agreements that have since expired. (Exhibit Q (Vittori dep. at p. 72)). It would be manifestly unjust to permit Motorola to backdate a purported expiration by two and a half months when it knew of the operative date and choose to sit on its rights in an effort to better its position.[10]

---

[9] Its worthy to note that Motorola specifically notified all other manufacturer's representatives whose MRAs purportedly expired before the expiration date. (Exhibit N (Termination Letters for West Coast Reps, Engineering Solutions – West and Max Technical Sales)).

[10] The GE Fanuc allegation is baseless and clearly is an attempt by Motorola to mend its hold concerning the termination actions in this matter. First, JST did not initially sign an agreement with GE Fanuc, it was J-Squared Technologies (North Carolina), Inc., a completely separate and distinct business entity undertaking efforts in the United States and not Canada that first signed an agreement with GE Fanuc. Second, JST only signed an agreement with GE Fanuc in the "second or third quarter of 2004[,]" well after the February termination. (Exhibit D (Gibson Dep. at 39).

**B.**    **Motorola Lacks a Basis to Claim JSO Breached its Performance Standards**

JSO met and exceeded its performance standards and therefore could not have been terminated for failure to met the performance standards. Motorola contends that based on the facts contained in a spreadsheet (A-187) created by a JST employee four days following the termination notice, Motorola was justified in its actions. (O.B. at p. 28). These allegations are insufficient to succeed at summary judgment as there are material facts in dispute as to JSO's performance under the Agreement.

The hastily created spreadsheet cannot serve as a factual predicate for Motorola's decision to terminate JSO for allegedly failing to meet its performance standards for at least three reasons. First, the spreadsheet created four days post-termination did not, and indeed could not, take into account a comprehensive accounting of all revenue figures. Second, Motorola refuses to disclose its own evidence of JSO performance, in spite of a pending motion to compel. Finally, Motorola cannot mend its hold on its decision to terminate for performance reasons with after-acquired information.[11]

1.    JSO's Accounting Records Substantiate Compliance with Performance Standards

The author of the spreadsheet, Steven Blomme, states that the numbers identified in the spreadsheet did not account for all revenue and forecasts because of the timing of its creation. The spreadsheet was created on March 1, 2004, just days after the February 26, 2004 termination notice. (Exhibit P (Blomme Declaration at ¶ 6)). The figures contained in the spreadsheet could not accurately reflect JSO's performance as of that date because: (i) Mr. Blomme did not access

---

[11] There also exists an unresolved question of whether this spreadsheet was immune from production under the work product doctrine. Plaintiffs produced the document at Mr. Blomme's deposition under a reservation of rights so as not to cause the parties an undue burden of being required to again travel to Canada should the spreadsheet indeed be discoverable. (Exhibit B (Blomme dep. at pp. 56-57)). Plaintiffs believe the spreadsheet is protected work product as it was created in anticipation of litigation. Therefore, the evidence should not be considered in this motion.

all of JSO's accounting records when he drafted the spreadsheet and (ii) certain revenues due Motorola from the various programs (during the term of the Agreement) were only reported to JSO weeks after the order was filled and well after the March 1, 2004 date the spreadsheet was completed. (*Id.* at ¶ 8). A recent review of the JSO accounting records indicate that the complete revenue numbers for the Boeing AWACS program are at least $57,937.50. (Exhibit O (Stewart Declaration at ¶ 5)). In addition, JSO records indicate that the complete revenue numbers for the Boeing F22 program are at least $45,390.30. (*Id.* at ¶ 6). Based on these numbers and the forecasted revenue figures communicated to Motorola concerning these program, Mr. Blomme states that at least these two programs met the design win criteria under the performance standards of the JSO Agreement. (Exhibit P (Blomme Declaration at ¶¶ 10 and 11); *see also* (A-36)).

Motorola cites to Mr. Blomme's deposition testimony in its opening brief for the proposition that Mr. Blomme confirmed JSO failed to meet its performance standards. Not so. Motorola's deposition tactics purposefully disregarded Mr. Blomme's responses and required him to assume responses he did not testify to in the first instance. A sample of the questioning leading to Motorola's cited portion illustrates this point.

> Q. If you go over to the notes on the side, it says $72,000 Project? Do you see that? A. Correct, yes.
> Q. What do you mean by that? A. I'm not sure.
> Q. What you meant by it was that --- A. A note to myself maybe.
> Q. Yes. What you meant by it was that it was a $72,000 total Project? A. No.
> Q. That's another reason it wouldn't qualify as a design win under the Contract? Correct? A. Yes, but I'm not sure --- MR. BELLEW: Objection. THE WITNESS: Sorry. I'm not sure if that's what it meant.
> BY MR. PAPETTI: Q. What else might it mean other than it's a $72,000 Project? A. It could have been an annual amount or ---
> Q. Let's assume it's an annual amount and not a $72,000 Project? A. Yes.

> Q. It still wouldn't qualify as a design win under the contract?
> Correct? MR. BELLEW: Objection. THE WITNESS: Yes, I
> don't recollect what it means really.
> BY MR. PAPETTI: Q. If it was a $72,000 Annual Project, it
> wouldn't qualify --- A. It probably, no -- it would not. MR.
> BELLEW: Objection. THE WITNESS: Sorry. again.

(Exhibit B (Blomme dep. at pp. 74-75)). Given a comprehensive accounting of the revenue and

forecast figures for the JSO claimed design wins, there is sufficient factual basis to conclude that

JSO met its performance standards under the Agreement.

### 2.    Motorola Refuses to Produce its Own Performance Data for JSO

Motorola, the party that should be in custody of the best evidence, does not and cannot

point to any of its own evidence to substantiate its claims that JSO breached the performance

standards because it refuses to produce this information. Plaintiffs have moved to compel the

production of this information and Motorola continues to withhold its production. (D.I. 76).

Plaintiffs believe Motorola has performance information sufficient enough to substantiate the

payment of commissions for the claimed design wins, but refuses to produce it. (*See* Exhibit O

(Declaration of Joan Stewart at ¶ 4)) (noting that JSO is paid a 5% commission on Motorola

revenue). Given Motorola's refusal to produce this information, the adverse inference drawn

from that failure is sufficient itself to preclude summary judgment. Moreover, if Motorola does

not have this information, it lacked the factual basis to terminate the JSO Agreement in the first

instance. Given these scenarios, Plaintiffs are entitled to proceed to trial.

### 3.    Motorola Cannot Mend the Hold with After-Acquired Facts

Motorola must establish a breach with information it possessed at the time of termination,

not through after-acquired information. In *Railway Co. v. McCarthy*, 96 U.S. 258 (1877), the

Supreme Court held: "Where a party gives a reason for his conduct and decision touching

anything involved in the controversy, he cannot, after litigation has begun, change his ground,

and put his conduct upon another and a different consideration. He is not permitted to thus mend

his hold." *McCarthy*, 96 U.S. at 267-68.    "Mend the hold" is a nineteenth century wrestling term meaning to improve one's grip, i.e., to improve one's position. *See Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990). Here, Motorola alleged that JSO failed to meet previously unidentified performance standards under section 7.2A of the JSO Agreement. However, the performance standards incorporating Exhibit 4 of the Agreement are identified in Section 4.4. Recognizing the errors of its ways, Motorola attempts to reverse engineer or "mend its hold" on its decision to terminate with after-acquired information.[12]

Nowhere is this seen any more plainly than in the termination letter as it has absolutely nothing identifying the alleged areas of deficiency. (Exhibit N). Why? Because there were no deficiencies. More importantly, Motorola admitted that it did not want the manufacturer's representatives to cure the purported deficiencies – an option afforded the manufacturers' representatives in the Agreements – and Motorola admitted that it frustrated the manufacturer's representatives' ability to do so by, among other things, failing to respond to the manufacturer's representatives' inquiries as to the perceived deficiencies. (Exhibit K (Kolasa dep. at pp. 128-31); Exhibit C (Crawford dep. at pp. 204-08); Exhibit M (Letter inquiries regarding terminations)).

## IV.   THE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IS SUPPORTED BY AMPLE RECORD EVIDENCE

The record evidence clearly establishes a jury question of whether Motorola breached the implied covenant of good faith and fair dealing. Motorola does not seriously challenge this claim. Instead, it attempts to distort expert testimony[13] and point to its alleged compliance with

---

[12] Even if Motorola could succeed on the performance issue, it still would owe JSO trailing commissions under the operative sections of the contract. (*See* A-24).

[13] Motorola mistakenly cites Plaintiffs' expert report for the proposition that JST was paid 180 days of trailing commissions. (O.B. at p. 24) (citing A-220). An accurate reading of Plaintiffs' expert reports discloses that JST still claims commission payments are due for "a three month shortfall according to the contract terms." (A-220).

stated contract terms in an effort to escape liability for breach of the implied covenant. These maneuvers do not hide from view the two months of jockeying Motorola undertook to fabricate an exit strategy from relationships it committed to for the long-term. (*See supra*, pp. 13-16).

As described above, Motorola knew the JST Agreement was set to expire and choose to continue to operate as if it had been renewed "so the word does not get out prematurely." (Exhibit A (Blair dep. at Ex. 16)). Only after it had gauged its options for the least expensive method to terminate the MRAs did Motorola send an expiration notice to JST, backdating the expiration by over two and a half months. This is something the parties would have found unacceptable had they thought to contract for such a situation.

The same holds true for JSO. Motorola claims it did not act in bad faith when it terminated JSO. (O.B. at p. 25). Given Motorola's refusal to produce its master sheet of performance and performance metrics, Plaintiffs are left to guess whether: (i) Motorola actually possessed a basis to terminate JSO for performance in February 2004 and (ii) Motorola properly compensated all the manufacturer's representatives. All we do know, through Motorola testimony, is that it admits to frustrating the manufacturer's representatives' ability to cure any alleged performance issues. (Exhibit K (Kolasa dep. at pp. 128-31); Exhibit C (Crawford dep. at pp. 204-08); Exhibit M (Letter inquiries regarding terminations)). Couple this evidence with Motorola's backroom efforts to fabricate bases to terminate all the MRAs on the very same day and there exists a sufficient factual predicate to submit this claim to the jury. *See IMX, Inc. v. LendingTree, LLC*, 405 F. Supp. 2d 479, 484 (D. Del. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)) (noting "there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue").

## V. PLAINTIFFS ARE PERMITTED TO SEEK EXEMPLARY DAMAGES FOR THEIR EXTRA-CONTRACTUAL CLAIMS

The limitation of liability provisions contained in the MRAs do not preclude the recovery of exemplary damages stemming from intentional or willful conduct. Motorola claims that the MRA's sole remedy provision precludes Plaintiffs from even requesting the recovery of exemplary damages. (O.B. at p. 29). As identified below, Motorola is not immune from an award of exemplary damages merely because the parties sought to define the extent and amount of contractual damages.

As a general proposition, "any provision in a contract making it possible for a party thereto to free himself from the consequences of his own fraud in procuring its execution is invalid and necessarily constitutes no defense." *Lufty v. R.D. Roper & Sons Motor Co.*, 115 P.2d 161, 166 (Ariz. 1941); *Wagner v. Rao*, 885 P.2d 174, 177 (Ariz. 1994) (quoting *Lufty*). The Arizona Supreme Court noted that when tort damages are recoverable, a plaintiff is not limited to the economic damages within the contemplation of the parties at the time the contract was made. *Rawlings v. Apodaca*, 726 P.2d 565, 577 (Ariz. 1986). In *Dixon v. City of Phoenix*, the court reasoned that a plaintiff was entitled to extra-contractual (right of entry agreement) damages for a defendant's negligence and trespass when the defendant damaged vegetation on the plaintiff's land. *See Dixon*, 845 P.2d 1107, 1117 (Ariz. App. 1992). These decisions demonstrate that Arizona law recognizes that a plaintiff is not held to a damages estimate at the time of contracting when it seeks redress for tortious conduct. Accordingly, Motorola's efforts to present itself as being immune from a claim for exemplary damages must be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Motorola's Motion for Summary Judgment be denied.


Dated: June 8, 2006

_David A. Felice_
Sean J. Bellew (#4072)
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE  19801
Telephone:  (302) 295-2000
Facsimile:  (302) 295-2013
*Attorneys for Plaintiffs*

Of Counsel:
Kevin F. Berry
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103
Telephone:  (215) 665-2000
Facsimile:  (215) 665-2013

## CERTIFICATE OF SERVICE

I, David A. Felice, do hereby certify that on June 8, 2006, I electronically filed a notation of the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing to the following counsel of record:

William W. Bowser
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

Cory Talbot
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, AZ  85004


David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE  19801
Telephone:  (302) 295-2000
Facsimile:  (302) 295-2013
Email: dfelice@cozen.com