IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J-SQUARED TECHNOLOGIES, INC., J-SQUARED TECHNOLOGIES (OREGON) INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 04-960-SLR |
| v. | ) ) ) | |
| MOTOROLA, INC., | ) ) | |
| Defendant. | ) ) ) | |

## MOTOROLA'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

William W. Bowser
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

Of Counsel:

Randy Papetti
Cory A. Talbot
Emily S. Cates
LEWIS AND ROCA LLP
40 N. Central Avenue
Phoenix, Arizona  85004
(602) 262-5311

Attorneys for Defendant

Dated:  June 29, 2006.

# TABLE OF CONTENTS

I.      Introduction ................................................................................................. 1

II.     Plaintiffs Cannot Avoid the Merits of Motorola's Motion ................................. 2

        A.      Plaintiffs' Discovery Complaints ................................................. 2

        B.      The Law of The Case Doctrine Is Inapplicable ........................... 3

III.    Plaintiffs' Promissory Estoppel Claim Fails ..................................................... 4

        A.      Plaintiffs' Failure To Respond Is Fatal ...................................... 5

        B.      The Claim Is Barred By the Agreements' Integration Clauses ............... 5

        C.      Plaintiffs Fail to Show Any Actionable Representations ....................... 7

        D.      Plaintiffs Misstate the Basis for Their "Promise" Allegations ................ 7

IV.     Plaintiffs' Negligent Misrepresentation Claims Fail ........................................... 9

        A.      The Alleged Misrepresentations ................................................. 9

                1. The G-9 Policy ................................................................ 9

                2. The "Moratorium" ......................................................... 10

                3. The Revenue Issue ........................................................ 11

        B.      Plaintiffs' Negligent Misrepresentation Claims Fail Legally ................... 12

        C.      The Economic Loss Doctrine Bars Plaintiffs' Negligent
                Misrepresentation Claims ......................................................... 13

V.      Plaintiffs' Cannot Prove Their Breach of Contract Claims ................................ 14

        A.      JST's Agreement Was Not "Renewed By Conduct" ......................... 14

        B.      JSO Did Not Meet Its Performance Requirements ....................... 15

VI.     The Bad Faith Claim Must Be Dismissed ........................................................ 18

VII.    Plaintiffs Do Not Contest Motorola's Arguments on Lost Profits or Reliance
        Damages. ........................................................................................... 19

VIII.   Plaintiffs Are Not Entitled to Exemplary Damages ............................................. 19

IX.     Conclusion ..................................................................................................... 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ankele v. Hambrick,*
    286 F. Supp. 2d 485 (E.D. Pa. 2003) ................................................................5

*Aventis Technologies Corp. v. The Barons Financial Group, Inc.,*
    2004 WL 3019491 (D. Ariz. April 14, 2004) ...............................................12, 13

*Carr v. Castle,*
    337 F.3d 1221 (10th Cir. 2003) ....................................................................3

*City of Rome v. Glanton,*
    958 F. Supp. 1026 (E.D. Pa. 1997) ................................................................3

*Drs. Bethea, Moustoukas & Weaver, LLC v. St. Paul Guardian Ins.,*
    376 F.3d 399 (5th Cir. 2004) ......................................................................5

*Goodhue v. Catalina Mortgage, Inc.,*
    6 Fed. Appx. 781 (9th Cir. 2003) ................................................................13

*Hamilton v. Leavy,*
    2005 WL 475442 (D. Del. Mar. 1, 2005) .........................................................4

*Lewis v. Bank of America NA,*
    343 F.3d 540 (5th Cir. 2003) ....................................................................10

*Magana v. Sacramento County Main Jail,*
    2006 WL 314486 (E.D. Cal. Feb. 9, 2006) ...................................................16-17

*Mann v. GTCR Golder Rauner, LLC,*
    425 F. Supp. 2d 1015 (D. Ariz. 2006) ...........................................................6

*Pastore v. Bell Telephone Co. of Penn.,*
    24 F.3d 508 (3d Cir. 1994) .......................................................................2

*Peterson v. U.S.,*
    694 F.2d 943 (3d Cir. 1982) ....................................................................16

*QC Constr. Prods., LLC v. Cohill's Building Specialties, Inc.*
    423 F. Supp. 2d 1008 (D. Ariz. 2006) ..........................................................13

*Radich v. Goode*,
  886 F.2d 1391 (3d Cir. 1989) ...............................................................................2

*The Council of Alternative Political Parties v. Hooks*,
  179 F.3d 64 (3d Cir. 1999) ...................................................................................4

*Trent Partners & Assoc. v. Digital Equip. Corp.*,
  120 F. Supp. 2d 84 (D. Mass. 1999) ......................................................................7

*Tse v. Ventana Med. Sys., Inc.*,
  126 F. Supp. 2d 213 (D. Del. 2000) .......................................................................3

*Vintilla v. U.S.*,
  931 F.2d 1444 (11th Cir. 1991) .............................................................................3

## STATE CASES

*Carstens v. City of Phoenix*,
  75 P.3d 1081 (Ariz. App. 2003) ..........................................................................13

*Dixon v. City of Phoenix*,
  845 P.2d 1107 (Ariz. App. 1992) .........................................................................20

*Lufty v. R.D. Roper & Sons Motor Co.*,
  115 P.2d 161 (Ariz. 1941) ...................................................................................20

*Lusk Corp. v. Burgess*,
  332 P.2d 493 (Ariz. 1958) .....................................................................................6

*Rawlings v. Apadoca*,
  726 P.2d 565 (Ariz. 1986) ...................................................................................20

*Southwest Savings & Loan Ass'n v. SunAmp Sys.*,
  838 P.2d 1314 (Ariz. App. 1992) .........................................................................19

*Wagner v. Rao*,
  885 P.2d 174 (Ariz. 1994) ...............................................................................6, 20

## FEDERAL RULES OF CIVIL PROCEDURE

Federal Rule of Civil Procedure 56(e) .................................................................16, 17

Federal Rule of Civil Procedure 56(f) ...................................................................1, 2, 3

## MISCELLANEOUS

Restatement (Second) of Contracts §§ 209, 210, 213, & 214 ....................................5, 6

## I.    Introduction

Notwithstanding its bulk, its misstatements, and its many tangents, plaintiffs' response actually succeeds in making it easy for the Court to grant most of Motorola's motion. This is because the response conspicuously fails to even address, let alone rebut, two critical arguments.

First, Motorola argued that the promissory estoppel claim should be dismissed because there is no way J-Squared could have reasonably relied on any assurances that Motorola would continue the rep program on a "long-term" basis in light of the contracts' one-year terms and express allowance for termination, without cause, after 180 days. (D.I. 121 at 2, 18-19). The response does not offer a word in opposition.

Second, Motorola argued that most of the damages plaintiffs seek are precluded by express terms in the parties' contracts. (D.I. 121 at 4, 29-31). The response, while arguing that punitive damages are recoverable, makes no effort to oppose Motorola's argument that the lost profits and reliance damages plaintiffs seek are barred by plaintiffs' Agreements.

With respect to the remaining claims and issues, plaintiffs repeatedly make the defensive (and totally baseless) argument that Motorola has wrongfully failed to produce documents, so the summary judgment motion should be denied and/or postponed. (*See, e.g.*, D.I. 145 at 1, 3, 4, 14, 30, 32, 34). But plaintiffs make it easy for the Court to grant Motorola's motion by failing to move for relief under Federal Rule of Civil Procedure 56(f). Circuit law is clear that, absent a non-movant strictly adhering to the requirements of that Rule, relief is to be denied and the summary judgment motion is to be decided.

We will address plaintiffs' many misstatements about the factual record, but think it important to re-emphasize at the outset that this case stems from two heavily negotiated, fully integrated contracts that were honored by Motorola, but which plaintiffs seek to avoid and expand via arguments about alleged pre-contractual

1

assurances about Motorola's "long-term" business plans. Plaintiffs' claims fail for multiple reasons, and summary judgment is appropriate.

## II.    Plaintiffs Cannot Avoid the Merits of Motorola's Motion

### A.    Plaintiffs' Discovery Complaints

Discovery in this case has been closed for months. Before it closed, Motorola produced over 16,000 pages of documents and responded to 45 interrogatories. (*See* Mot. Resp. to Pls. Mot. to Compel [D.I. 95 at 5]). Furthermore, plaintiffs deposed 12 Motorola witnesses for more than 65 hours combined.

Plaintiffs nevertheless say they cannot yet respond to Motorola's motion because Motorola is improperly withholding documents. The most polite thing that can be said about these accusations is that they are meritless. (*See* D.I. 95).

But more fundamentally for present purposes, plaintiffs' discovery complaints are immaterial to the Court's analysis of the summary judgment motion. Rule 56(f) specifies a procedure for requesting additional time to obtain and present countering evidence in responding to a summary judgment motion, *Pastore v. Bell Tel. Co. of Penn.*, 24 F.3d 508, 510-11 (3d Cir. 1994), and plaintiffs did not even try to comply with this procedure.

Under Rule 56(f), a party must, among other things, file an affidavit explaining why additional discovery is needed. *Pastore*, 24 F.3d at 510-11. Plaintiffs did not, and their failure is, in the words of *Pastore*, "fatal." *Id.* at 11; *accord Radich v. Goode*, 886 F.2d 1391, 1394-95 (3d Cir. 1989) ( "Rule 56(f) clearly requires that an affidavit be filed" and "an unsworn memorandum opposing a party's motion for summary judgment" is no substitute).

Moreover, plaintiffs' generalized speculation that the information withheld is helpful to them fails to satisfy the requirements that they set forth "specifically how a continuance for further discovery will enable [them] to rebut the assertions contained in [Motorola's] summary judgment motion" and state "with precision the material

2

sought and exactly how those materials will help in opposing [Motorola's] summary judgment." *City of Rome v. Glanton*, 958 F. Supp. 1026, 1039 (E.D. Pa. 1997).

Finally, while plaintiffs perhaps believe the pendency of their discovery motion will suffice, (D.I. 145, at 12 n.4), the law is contrary: plaintiffs are not excused from the requirements of Rule 56(f) simply because they have a pending motion to compel. *See Carr v. Castle*, 337 F.3d 1221, 1232-33 (10th Cir. 2003) (absent a Rule 56(f) motion and affidavit, it is irrelevant "whether the added discovery sought by the motion to compel was or was not itself relevant to the resolution of the City's Rule 56 motion").

### B.    The Law of The Case Doctrine Is Inapplicable

In its Opening Brief, Motorola asked the Court to revisit two issues that had been raised at the motion to dismiss stage. (*See* D.I. 121 at 19-20, 23). Plaintiffs argue that this Court's rulings at the motion to dismiss stage on these issues are now "law of the case" and, therefore, should not be considered. (D.I. 145, at 17-18, 27-28). Plaintiffs are wrong for at least three reasons.

First, the law of the case doctrine does not preclude a subsequent motion for summary judgment on issues previously addressed by the court in denying a motion to dismiss. *See Tse v. Ventana Med. Sys., Inc.*, 126 F. Supp. 2d 213, 222 (D. Del. 2000) ("The law of the case doctrine does not preclude a grant of summary judgment in favor of a defendant whose motion to dismiss had been previously denied."); *see also Vintilla v. U.S.*, 931 F.2d 1444, 1447 (11th Cir. 1991) (stating that because an "initial motion to dismiss was not a final judgment," the court was "free to reconsider its ruling . . . at the summary judgment stage").

Second, since this Court's motion to dismiss ruling, Arizona has clarified key issues regarding the promissory estoppel and economic loss doctrines. (*See* D.I. 121, at 19-20, 23). Consequently, it is proper for the Court to revisit these issues. *See, e.g., The Council of Alternative Political Parties v. Hooks*, 179 F.3d

3

64, 69 (3d Cir. 1999) (stating that, when "presented with an intervening change in the law," the court is not "bound by law-of-the-case principles").

Finally, regarding the economic loss rule: the issue of whether this rule applies only to UCC cases was not fully briefed at the motion to dismiss stage—it was arguably raised in a single footnote of plaintiffs' response to the motion to dismiss[1]—and Arizona case law does not, in fact, limit the economic loss rule to UCC cases. In such circumstances, the law of the case doctrine is inapplicable. *Hamilton v. Leavy*, 2005 WL 475442, at *2 (D. Del. 2005) ("It would be strange to require the court to move forward with an unprecedented interpretation of state law, when it seems the issue was not fully explicated before because of the press of the other issues in the case. Thus, the law of the case doctrine does not prevent consideration of this new information and argument.").

In sum, the law of the case doctrine is inapplicable and the Court is in no way precluded from addressing Motorola's summary judgment motion.

## III.    Plaintiffs' Promissory Estoppel Claim Fails

Motorola's summary judgment motion argued that plaintiffs' promissory estoppel claim fails for four reasons: (1) the parties' fully-integrated Agreements explicitly prohibit these claims; (2) the alleged representations are not actionable promises; (3) plaintiffs did not reasonably rely on Motorola's "promises"; and (4) promissory estoppel is entirely inapplicable when the parties, as here, have entered into an express contract governing their relationship. (D.I. 121 at 14-20). Plaintiffs either gloss over or ignore these arguments.

---

[1] Motorola's Opening Brief indicates that the issue had not been raised. To be clear, plaintiffs did say in a footnote that "Motorola's reliance on decisions applying the economic loss doctrine in the context of a sale of goods under the UCC and a construction liability action is unavailing." (D.I. 13, at 22 n.3).

4

### A.    Plaintiffs' Failure To Respond Is Fatal

As explained more fully in Motorola's Opening Brief, given that the Agreements contain terms stating that they were (a) the parties' entire agreement and superseded all prior negotiations, (b) were for one year only, and (c) could be terminated, without cause, after 180 days, it was unreasonable for plaintiffs to rely on any alleged representations to the effect that Motorola was contractually binding itself to plaintiffs for "several years" or on a "long-term" basis. (D.I. 121 at 2, 18-19).[2] Plaintiffs' response does not respond <u>at all</u> to this contention.

By failing to respond, plaintiffs failed to demonstrate a genuine issue of fact on the point. *See, e.g., Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) (granting summary judgment because plaintiff failed to respond to argument for dismissal of particular claim "and thus has waived his opportunity to contest it").

### B.    The Claim Is Barred by the Agreements' Integration Clauses

Plaintiffs assert that they are not bound by the integration clauses in their Agreements because those clauses are not "preclusive of parol evidence not inconsistent with the terms of the contract." (D.I. 145, at 21). Putting aside whether a claim that the parties agreed their relationship would last several years is inconsistent with a contract providing for a one-year term and termination without cause after 180 days, plaintiffs' description of the law is simply incorrect.

Under Arizona law, a completely integrated agreement "supersedes even consistent additional terms," RESTATEMENT (SECOND) OF CONTRACTS § 209 cmt. a (1981), and more broadly precludes claims based on prior understandings "to the extent they are within [the agreement's] scope." *Id.* § 213(2); *see also id.* § 210 cmt. a

---

[2] In addition to the authorities cited in Motorola's Opening Brief, *see also Drs. Bethea, Moustoukas & Weaver, LLC v. St. Paul Guardian Ins.*, 376 F.3d 399, 404 (5th Cir. 2004) (upholding dismissal of claim of detrimental reliance on promises made subsequent to contract because reliance on such promises was unreasonable as a matter of law due to contract language stating that any change had to be in writing).

(stating that "evidence of the alleged making of consistent additional terms must be kept from the trier of fact"). Here, the additional terms plaintiffs allege regarding term and renewal are easily "within the scope" of the parties' agreements, which purport to define the parties' relationship and facially state that they are, in fact, the parties' "entire agreement." Indeed, plaintiffs do not even try to argue that the terms they allege are outside the scope of the parties' contracts, choosing instead to stick with the irrelevant consistent/inconsistent distinction.

The cases plaintiffs cite are obviously distinguishable. Neither *Lusk Corp. v. Burgess*, 332 P.2d 493 (Ariz. 1958) nor *Wagner v. Rao*, 885 P.2d 174 (Ariz. App. 1994) have anything to do with promissory estoppel. Both involve claims of intentional fraud, which is governed by different principles than a quasi-contractual claim of promissory estoppel. *See* RESTATEMENT, *supra*, § 214(d) (stating that evidence of prior negotiations may be shown to establish "illegality, fraud, . . . or other invalidating cause").

By contrast, plaintiffs demote to a footnote a case very nearly on point and which was decided after this Court's decision on the motion to dismiss. Their effort to distinguish *Mann v. GTCR Golder Rauner, LLC*, 425 F. Supp. 2d 1015 (D. Ariz. 2006), is unavailing. Plaintiffs merely say that because the promissory estoppel claim in *Mann* was brought under Illinois, not Arizona, law, it somehow is distinguishable from this case. (D.I. 145, at 22 n.6). But the *Mann* court cited and relied solely on Arizona authority—even quoting the Arizona Supreme Court! *Id.* at 1032-36. Plaintiffs also suggest that dinky differences between the integration provision in *Mann* and the integration clauses here, make *Mann* inapplicable. But they do not explain how these differences make any difference. The nuances of the integration clause in *Mann* were not integral to its holding that a promissory estoppel claim failed, for reasons that apply here. *Id.* at 1035-36.

6

### C.    Plaintiffs Fail to Show Any Actionable Representations

Plaintiffs do not meaningfully respond to Motorola's argument that the representations plaintiffs allege do not constitute actionable promises. Instead, they misstate the evidence as to what representations were made, which will be discussed in the next subsection, and they weakly try to distinguish *Trent Partners & Assoc. v. Digital Equip. Corp.*, 120 F. Supp. 2d 84 (D. Mass. 1999).

Plaintiffs say *Trent* "was decided on a completely different factual scenario based on different contract language" because the parties in *Trent* could terminate their agreements "effective thirty (30) days after either party sent written notice of intent to terminate." (D.I. 145, at 20-21). This is a weird fact for plaintiffs to highlight given that the Agreements here similarly provide that they "may be terminated before expiration . . . [b]y either party, without cause, after the initial 180 days following the effective date of this Agreement, on thirty (30) days prior written notice." (A-12, A-28). *Trent* is remarkably similar to this case and its result – dismissal of the promissory estoppel claims – should be as well.

### D.    Plaintiffs Misstate the Basis for Their "Promise" Allegations

Plaintiffs say that "the promise Motorola made was to initiate and maintain an (sic) manufacturer's representative business model on a long-term basis." (D.I. 145 at 22). They further state that Motorola's Larry Terry "told Plaintiffs that Motorola intended the relationship to be a 'long-term relationship.'" (*Id.* at 19). Again, these alleged representations are not the type that can be reasonably relied upon in light of the subsequently entered-into, integrated agreements; nor are they sufficiently concrete to support a promissory estoppel claim. But for clarity, we note that plaintiffs distort the evidence regarding such alleged allegations.

First, the response is simply inaccurate in its statement that Terry was the "principal contact during the negotiations of the JST Agreement." (*Id.*) That is a false premise used in the response because plaintiffs want to leverage Terry's

7

statements that, during early discussions about a possible deal, he stated that he believed Motorola was looking at the rep program as a "long-term" distribution strategy. Both primary JST negotiators concede that Terry's involvement was early in the process and that he was barely involved in the actual negotiation of the agreement, a process that lasted for months and was spearheaded for Motorola by Jeanne Kolasa. (A-378, C-27, C-35 to C-36). And Terry had nothing whatsoever to do with the negotiation of the JSO agreement months later. (C-1A).

Second, JST implies, though never actually says, that Terry testified the agreement would last "several years." Actually, although admitting that he stated early in discussions that he expected the relationship to be long-term, Terry adamantly denied that he ever made any specific promises regarding duration:

> Q: Did you have any conversations with anybody at – J-Squared regarding your expectation of the duration of the manufacturer's rep agreement?
>
> A: No.
>
> Q: How would you characterize the representations that you put on the record earlier today, what did they speak to?
>
> A: They spoke to discussions, they spoke to hope and intention of what we would do as a relationship. Not an Agreement.

(C-37 to C-38 (objection omitted)).

While Terry said he believes "long term" would imply more than a year, "[n]o specific period or interval, one year, six months, two years. None of that was discussed." (Ans. Ex. J at 217). Indeed, Claude Langlois, JST's lead negotiator, testified that in response to Terry's statements, "he [Langlois] never stopped to think, what does long term mean" and that he would only be "speculating" as to what Terry meant when he said he hoped the relationship would be long term. (A-378; A-388). Thus, the record is clear that Motorola never made any promise regarding specific duration other than what is in the contracts.

In sum, Motorola entered into the agreement with JST, JSO and the other reps with the hope and perhaps even expectation that the relationship would last more than

8

a year. BUT, in each case, Motorola insisted, and the reps (and certainly JST) each agreed, that the parties' contracts would only bind the parties for an initial one-year period, with each side reserving the right to get out after just six months, without cause, upon 30 days' notice. (A-11 to A-12). When the program did not work out, Motorola exercised its rights not to continue the parties' relationship. Contrary to plaintiffs' unsupported arguments, there is nothing "actionable" about that scenario.

## IV.    Plaintiffs' Negligent Misrepresentation Claims Fail

### A.    The Alleged Misrepresentations

Plaintiffs try to supplement their negligent misrepresentation claim by alleging new misrepresentations that were not alleged in their complaint. The entire claim fails on legal grounds, but identifying the representations and their evidentiary basis at the outset may be helpful to avoid confusion.

In addition to claiming that Motorola falsely represented that the manufacturer representative model was a long-term solution, plaintiffs now claim that Motorola engaged in three other deceptive negotiating tactics: 1) falsely rejecting a request for an auto-renewal provision by "fabricating" the requirements of an internal "G9 policy"; 2) executing agreements after calling for a "moratorium"; and 3) misrepresenting historic revenues. (D.I. 145, at 5-6).[3]

### 1. The G-9 Policy

During negotiations, JST asked Motorola to have the contract automatically renew, rather than have it expire after one year. (A-516 to A-517). Motorola rejected

---

[3] JST also briefly asserts that "Motorola failed to pay certain commissions." (D.I. 145 at 11). This is misleading: Motorola paid every cent in commissions owed. The only underpayment issue involved a coding discrepancy between "ship to" and "pay to" addresses for a company called Raytheon. When JST was not paid on a sale to Raytheon, it brought the issue to MCG's attention, and MCG investigated, determined that JST was right, and paid JST the outstanding commissions. (C-39 to C-44). This all was raised and resolved long prior to this litigation! Aside from this issue, plaintiffs' personnel all testified they are unaware of <u>any</u> underpayments. (C-2, C-4, C-22 to C-25, C-28 to C-29).

JST's request, and in an email Motorola's Jeanne Kolasa explained that Motorola's internal G-9 policy prohibited such automatic renewals. (A-518). The reality is that, while Motorola's legal and contract departments did have such an internal policy, it was not set forth in the G-9 policy.

In its response, JST claims that Kolasa's mistake was "fraudulent." (D.I. 145 at 8 (ignoring that this is a negligent misrepresentation and not a fraud claim)). Again, although there is no dispute that the G-9 policy does not itself prohibit automatic renewal, there also is no genuine dispute that "there was a specific corporate driven requirement not to include . . . what sometimes is known as an evergreen clause . . . we had a corporate directive to put a situation in place that . . . upon a year into the contract, a mutual agreement to move forward would be required." (C-15; *see also id.* at C-17 to C-19 ("I know it's a corporate policy.")).

JST unsurprisingly cites no authority for the proposition that this mistake is somehow grounds for suing Motorola. A mistake during negotiations in relaying the precise internal reason why Motorola would not agree to a contract provision JST wanted is insufficient to justify JST's negligent misrepresentation claim. What matters is that Motorola refused to allow automatic renewal and instead insisted that renewal not happen except upon execution of a written Agreement – Motorola's precise reasons for doing so are immaterial. *See, e.g., Lewis v. Bank of America NA*, 343 F.3d 540, 545 (5th Cir. 2003) (bank's alleged misrepresentation that it would place plaintiff's funds into an IRA CD versus a regular CD failed because the tax consequences were identical).[4] JST cites no contrary authority.

### 2. The "Moratorium"

Plaintiffs assert that Motorola imposed a "moratorium" on the execution of manufacturer rep agreements in April 2003 and that Motorola failed to advise JSO

---

[4] JST cannot and does not claim any damage flowing from Kolasa's mistake.

10

that "the manufacturer's representation [sic] was being questioned as a long-term strategy." (D.I. 145, at 8 (no citation to the record)). This statement is without any basis or relevance.

Motorola's Kevin Parslow testified that soon after he became the Director of Worldwide Sales in January 2003, he called for a due diligence review of MCG's contract approval process for **all** contracts, not just manufacturer rep contracts. (C-31 to C-32). After Parslow finished his review, Motorola subsequently executed an agreement with JSO as well as agreements with seven other manufacturer reps. (A-18 to A-37). That is all there is to this issue.

The only other evidence plaintiffs cite for this befuddling conspiracy theory is that Motorola's Paul Holt testified he was not surprised when MCG's new general manager put "everything . . on hold, never mind just manufacturer's reps." (D.I. 145, at 8). But Holt explained (and plaintiffs ignore) that by simply placing things on hold "he wouldn't have assumed that . . . that whole strategy had changed" or that the rep program "was going to end." (C-10 to C-11). Plaintiffs also ignored Holt's testimony that: "Kevin [Parslow] putting something on hold is not surprising, based on what was going on. Certainly, there was no . . . you wouldn't logically conclude from that that there was going to be a change in the channel strategy." (C-12 to C-13).

### 3. The Revenue Issue

JST grotesquely misstates the facts when asserting that "Motorola represented that revenues [sales, not commissions] would be at least $78,000 per month." (D.I. 145, at 10). For support, JST cites two exhibits that reflect internal Motorola discussions about budgeting, and plaintiffs cite no evidence, nor could they, that these exhibits were ever shared with JST. (Ans. Ex. E, at Ex. 96-97.)

More important, however, while JST complains that "Motorola represented commission payments to be between $5,000 and 10,000 per month," (D.I. 145 at 10), plaintiffs' own expert in this case calculated that the commissions Motorola paid JST

11

under the Agreement averaged $10,562,21 per month - more than what JST says Motorola purportedly represented! (A-235).

**B.    Plaintiffs' Negligent Misrepresentation Claims Fail Legally**

As set out in Motorola's Opening Brief, case law makes plain that the alleged assurances about the duration of the rep program are statements of intent regarding future conduct, not of existing fact. (D.I. 121 at 22-23). In response, plaintiffs merely state over and over again that these are representations of fact. For the reasons set out in Motorola's Opening Brief, this is not sufficient.

Plaintiffs' only specific argument is to say that Motorola lacked the "present intent to perform" when making the purported representations regarding duration. (D.I. 145 at 25). Not so.

Plaintiffs' argument is built upon *Aventis Techs. Corp. v. The Barons Fin. Group,* 2004 WL 3019491 (D. Ariz. April 14, 2004). Carefully omitting the facts of *Aventis,* plaintiffs simply throw out the following quote from that case: "Like negligent misrepresentation, 'actionable fraud cannot be predicated on unfulfilled promises, expressions of intention or statements concerning future events unless such were made with the present intent not to perform.'" (D.I. 145 at 25-26). This is extremely misleading because *Aventis* involved two claims: negligent misrepresentation <u>and</u> fraud. *Id.,* at * 2. Consistent with the authorities cited in Motorola's Opening Brief, (D.I. 121 at 22-23), the *Aventis* court only applied the "present intent not to perform" exception to the fraud claim. *Id.*

By contrast, the *Aventis* court **rejected** the plaintiff's negligent misrepresentation claim because the alleged representation was a promise of "future conduct, and is not actionable." *Id.* The court then turned to the fraud claim and only then described the "present intent not to perform" exception. *Id.* Thus, when the *Aventis* court said that the negligent and fraudulent misrepresentation claims were alike, it was only referring to the fact that each claim requires a representation of

12

existing fact. Accordingly, *Aventis* is entirely consistent with the authorities cited by Motorola in its Opening Brief, (D.I. 121 at 22-23), which plaintiffs simply ignore. As such, plaintiffs' negligent misrepresentation claims fail.[5]

### C.    The Economic Loss Doctrine Bars Plaintiffs' Negligent Misrepresentation Claims

In addition, plaintiffs' negligent misrepresentation claims are barred by Arizona's economic loss doctrine, which provides that no economic damages flowing from alleged tortious conduct can be recovered "unless accompanied by physical harm." *Carstens v. City of Phoenix*, 75 P.3d 1081, 1083 (Ariz. App. 2003). This is reality, not "tortured reasoning," as plaintiffs assert. (D.I. 145, at 27). "'Simply, [u]nder the economic loss rule, a contracting party who suffers monetary harm (as opposed to personal injury or injury to property other than that governed by the contract) cannot recover tort damages from the other contracting party but, rather, is limited to contract remedies.'" *QC Constr. Prods., LLC v. Cohill's Building Specialties,* 423 F. Supp. 2d 1008, 1015 (D. Ariz. 2006).

Plaintiffs allege no physical harm, but argue that the doctrine is limited to cases governed by the UCC. (D.I. 145 at 27). Ironically, in doing so, plaintiffs sheepishly concede that Arizona has applied the doctrine both in "the context of a sale of goods under the UCC <u>and a construction liability action</u>," (*id.* (emphasis added)), which plainly is <u>not</u> governed by the UCC. Accordingly, we urge the Court to evaluate the Arizona authorities and arguments cited in the Opening Brief. (D.I. 121 at 23-24).

---

[5] Plaintiffs' citation to *Goodhue v. Catalina Mortg., Inc.*, 76 Fed. Appx. 781 (9th Cir. 2003), is improper. *Goodhue* is unpublished and states right on the face of the opinion that it cannot be cited as precedent under Ninth Circuit Rule 36-3. Furthermore, *Goodhue* cites no Arizona authority and appears to simply overlook the distinction between fraudulent and negligent misrepresentation claims.

V.    **Plaintiffs' Cannot Prove Their Breach of Contract Claims**

    A.    **JST's Agreement Was Not "Renewed By Conduct"**

The term of JST's relationship with Motorola was plainly spelled out in the parties' Agreement: "this Agreement will continue in full force and effect for an initial term expiring one (1) year after the effective date hereof and thereafter may be renewed <u>only upon the written Agreement of both parties</u>." (A-11). Plaintiffs say that Motorola waived this provision and renewed the Agreement by "interact[ing] with JST and their customers from December 4, 2003 through February 26, 2004 as if the JST Agreement was renewed in accordance with prior representations that this model was a long-term solution." (D.I. 145 at 28).

Plaintiffs do not cite a single piece of evidence to show that they continued working on MCG sales after the expiration date. Even more important, such evidence would not be inconsistent with the expiration of the Agreement: upon expiration, JST was entitled to six months trailing commissions. (A-220). Thus, it was in JST's interest to continue to follow up on certain opportunities in the months immediately following expiration of its Agreement as doing so had the potential to increase the commissions JST would receive over the next several months.

JST also suggests, without identifying any, that "emails, purchase orders, fulfillment orders and monthly commission payments are satisfactory writings for Motorola to be charged with an additional renewal period." (D.I. 145 at 29). But JST only cites a single e-mail following expiration and that e-mail only discusses JST's performance over the past year and does not discuss the parties' relationship going forward, let alone an intent to renew by Motorola. (Ans. Ex. G. at Ex. 10).

Finally, ignoring the fact that they promptly engaged in "preliminary conversations" with a Motorola competitor, GE Fanuc, right after expiration and before receiving Motorola's intent-not-to-renew letter, (A-335 to A-336; A-554), plaintiffs simply argue that JST did not actually sign an agreement with GE Fanuc

until the "second or third quarter of 2004." (D.I. 145 at 29 n.10). This is misleading, as the effective date of the GE Fanuc contract was May 1, 2004, only two months after receipt of Motorola's letter. (A-556). Furthermore, plaintiffs suggest that the January 2004 discussions involved its North Carolina subsidiary. (D.I. 145 at 29 n.10). The e-mails, however, reflect that GE Fanuc was engaged in discussions with JST personnel - Jeff Gibson, Claude Langlois, and Steve Blomme! (A-554).

In any event, whatever minimal claim JST might have asserted (but did not) to be compensated (which it was) for any minimal work it allegedly did after the expiration, JST has no legal basis for claiming that Motorola "waived" the requirement that renewals be in writing and so the agreement renewed for another full year. (See D.I. 121 at 26-27 (discussing waiver principles)).

## B.    JSO Did Not Meet Its Performance Requirements

Motorola demonstrated that even JSO's own internal analysis confirms JSO did not meet its performance obligations. So, JSO argues that Steve Blomme's written analysis of JSO's performance, (A-187), should be disregarded because 1) it was "hastily created," 2) is protected by the work product doctrine,[6] and 3) Motorola counsel's "tactics" in questioning Blomme about it were confusing.[7] (D.I. 145 at 30-32). After claiming four design wins in discovery, (C-52 to C-54), then admitting

---

[6] This analysis does not appear on plaintiffs' privilege log, (C-45), and Blomme's testimony shows that the doctrine does not apply. (A-560 to A-567).

[7] The testimony quoted turns on Blomme's written analysis, in which he described a specific JSO **Design Win** as a "$72,000 project." (A-187). Motorola's counsel simply asked Blomme whether a project worth only $72,000 would meet the $100,000 revenue threshold to qualify as a design win. After conceding that it would not, Blomme indicated that the figure may have referred not to the total value of the project, but to "an annual amount." Counsel for Motorola then pointed out that, even assuming that was the case, it still would not meet the design win revenue threshold, and Blomme agreed. (Ans. Ex. B at 74-75). Thus, it is unclear how plaintiffs can fairly characterize this as "purposefully disregard[ing] Blomme's responses" or "require[ing] him to assume responses he did not testify to in the first instance." (D.I. 145 at 31-32).

063528 1001

there were none, (A-324), JSO now asserts that it achieved two design wins: (1) the Boeing AWACS program and (2) the Boeing F-22 program. (D.I. 145 at 31).

The contract provided clear criteria for measuring design wins. (A-36). Whether a design win occurred or not is a verifiable, largely quantifiable analysis, not left to JSO's subjective whims. To qualify as a design win, a program must meet a specific revenue threshold. (A-36). Plaintiffs attempt to prove that they met this threshold through the Declaration of Joan Stewart, which states:

> 5.    JSO's accounting records for the Boeing AWACS program indicate that Motorola received revenue of at least $57,937.50.
>
> 6.    JSO's accounting records for the Boeing F22 program indicate that Motorola received revenue of at least $45,390.30.

The Court should not consider this testimony. These JSO "accounting records"—the basis for Stewart's declaration—were never produced and were not submitted to the Court with plaintiffs' response. That violates Rule 56(e): "Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." FED. R. CIV. P. 56(e).

Plaintiffs' failure to provide these documents is fatal. *See Peterson v. U.S.*, 694 F.2d 943 (3d Cir. 1982) (the "unambiguous language" of Rule 56(e) requires submission of documents whether or not requested and failing to submit them constitutes a failure to "meet the burden imposed" by the Rule). This is no mere technicality: Motorola has no idea whether JSO's undisclosed "accounting records" are accurate; whether they correctly segregate payments by client programs; whether they provide any indication of what revenue Motorola was actually paid; or even whether they were created after the fact to aid in plaintiffs' lawsuit. Accordingly, Stewart's declaration is not competent evidence and should be disregarded by the Court. *E.g.*, *Magana v. Sacramento City Main Jail*, 2006 WL 314486, at *3 (E.D. Cal. Feb. 9, 2006) (concluding that physician's "declaration is not competent

16

evidence in support of defendants' motion for summary judgment" because she does not "attach the medical records upon which she bases her conclusions").[8]

But even accepting Stewart's declaration, plaintiffs' arguments still fall short. Regarding the Boeing F-22 program, JSO contends that this program met the actual purchase thresholds to qualify as a design win. (D.I. 145, at 30-31). However, beyond the purchase requirement, "[t]o qualify as a design win, a project or account must have the intent to transition the development products into run rate business (in other words released to production)," with an expressed commitment ("customer's expectation (forecast) of market demand for the product once it is in full production") to purchase at least $100,000 in product. (A-36).

With the Boeing F-22 program, that *never* occurred. Indeed, plaintiffs' Answering Brief attaches an email dated February 18, 2004 from Motorola's Ken Sullivan that states as much: "As it stands, this project is still waiting for a green light." (Ans. Ex. P at Ex. 2). While Sullivan went on to prophesy that this approval would come, (*see id.*), it in fact never did. (A-568). Accordingly, the Boeing F-22 program was not a design win. The same is true for the Boeing AWACS program. E-mail correspondence attached to plaintiffs' Answering Brief demonstrates that Boeing was still trying to decide which board it was going to "select" for use in its product, *i.e.*, Motorola's board or another manufacturer's. (Ans. Ex. P at Ex. 1).

Furthermore, plaintiffs' argument completely ignores the Agreement's forecast requirement – that beyond actually using a Motorola board, Boeing intended to buy the requisite annual amount of $100,000. (A-36). This requirement, as Steve Blomme testified, was the most important: "What's important at the end is that a customer is going to buy enough Motorola product to meet these bars of you know, 100K annual or 250K annual that are in this Agreement." (C-1D).

---

[8] To the extent necessary, Motorola moves that the Court strike Stewart's declaration. We further note that she was never disclosed as a potential witness.

Moreover, Steve Blomme testified that JSO had zero design wins. (A-324). Blomme also said that the definition of a design win is "in the hands of the Regional BDM" and it is the "BDM's decision as to whether he accepts it as a design win or not." Indeed, Dennis Robinson, the BDM for JSO's territory, testified that JSO was short on design wins and that "had JSO earned a single design win while their contract was in effect I would have been compensated." (C-1B to C-1C).

## VI.    The Bad Faith Claim Must Be Dismissed

JST asserts that Motorola acted in bad faith by operating as if the agreement had renewed while evaluating the program; determining the "least expensive method to terminate the MRAs"; and then sending "an expiration notice to JST, backdating the expiration by over two and a half months." (D.I. 145, at 34). This grand conspiracy theory is without support or legal relevance.

Motorola had no obligation to notify JST of expiration. Under the terms of the Agreement, the opposite is true—Motorola only had to act affirmatively to renew the Agreement. Expiration, by contrast, happened automatically. (A-11).

Furthermore, again relying heavily and improperly on alleged discovery failures, JSO says that it is "left to guess" whether MCG had a basis to terminate it." (D.I. 145 at 34). JSO is wrong for several reasons:

- JSO's Blomme testified that JSO had zero design wins under the contract's definition of design wins. (*See* D.I. 121 at 28).
- Motorola's Dennis Robinson did not receive any credit for JSO design wins and testified that JSO did not meet its design win goals. (*Id.*)
- Motorola has provided documentation demonstrating that JSO did not achieve any design wins. (C-46 to C-51).

Finally, JSO suggests that MCG was "frustrating" its ability to cure its non-performance under the Agreement. (D.I. 145 at 34). This is a baseless contention given that JSO previously conceded that it never tried to cure, instead stopping all

18

Motorola work the very next day after being notified that its Agreement would be terminated in 30 days unless JSO cured its non-performance. (A-362 to A-363).

Accordingly, Motorola had an objective business reason to terminate JSO's contract. By doing so, it did not act in bad faith. *See Southwest Savings & Loan Ass'n v. SunAmp Sys., Inc.*, 838 P.2d 1314, 1319-20 (Ariz. App. 1992).

## VII.    Plaintiffs Do Not Contest Motorola's Arguments on Lost Profits or Reliance Damages

Plaintiffs do not respond <u>at all</u> to the assertion that they cannot recover lost profits or reliance damages. (D.I. 121 at 29-31). Plaintiffs' only discussion is about its alleged right to recover exemplary damages (discussed next). Accordingly, the Court should grant summary judgment in favor of Motorola on these issues.

## VIII.   Plaintiffs Are Not Entitled to Exemplary Damages

In its original motion to dismiss, Motorola requested that the Court eliminate plaintiffs' claim for punitive damages pursuant to section 3.8 of the parties' Agreements. In response, plaintiffs stated that they "**asserted a claim for punitive damages <u>only</u> for the counts alleging a violation of the [Consumer Fraud] Act and a breach of the implied covenant of good faith and fair dealing.**" (D.I. 13, at 23 (emphasis added)). The Court dismissed the Consumer Fraud Act claim and dismissed the punitive damages claim based on the bad faith count because (1) Arizona law prohibits punitive damages for bad faith claims that sound in contract and (2) section 3.8 of the parties' Agreements "precludes claims for punitive damages under the JST and JSO Agreements." (D.I. 185 at 5, 12).

Now, plaintiffs apparently are trying to use their Answering Brief to re-insert claims for punitive damages that it previously disavowed, not even identifying which claims could conceivably justify such damages and simply cutting and pasting their argument from their response to another motion to dismiss. (D.I. 12, *G.L. Williams, et al.* C.A. No. 1:06-CV-00114-SLR). In any event, plaintiffs agreed in their

19

contracts that they could not recover punitive damages. In their Answering Brief,
plaintiffs claim that this provision applies only to "the extent and amount of
contractual damages." (D.I. 145, at 35). This is contrary to the plain text of the
Agreements, which provides that the prohibition on punitive damages applies whether
for "breach of contract, warranty, Motorola's negligence, strict liability in tort or
otherwise." (A-7, A-23 to A-24).[9]

     Under Arizona law, "a contract provision governing remedies or damages is
generally binding on the parties." *Dixon v. City of Phoenix*, 845 P.2d 1107, 1113
(Ariz. App. 1992);[10] *see also* [D.I. 121 at 30-31]. Plaintiffs cite *Lufty v. R.D. Roper &
Sons Motor Co.*, 115 P.2d 161, 166 (Ariz. 1941), and *Wagner v. Rao*, 885 P.2d 174,
177 (Ariz. App. 1994), but *Lufty* and *Wagner* merely held that a party cannot disclaim
its right to bring certain fraud claims and did not in any way address parties' ability to
contractually limit remedies vis-à-vis one another.[11] Arizona cases that <u>have</u>
addressed such provisions have uniformly upheld them, and there is no fraud claim
extant in this case.

## IX.    Conclusion

     For the reasons the set forth above and in Motorola's Opening Brief, summary
judgment in favor of Motorola is appropriate.

---

[9] To the extent plaintiffs are seeking to also avoid not only section 3.8 but also section
7.4, which also limits plaintiffs' remedies, that provision likewise is not linked solely to
"contractual" claims, but rather limits damages on any claims "by reason of termination
or nonrenewal of this Agreement." (A-12; A-29). Plaintiffs' claims all flow from the
allegedly wrongful termination or nonrenewal of their agreements. (*See* A-217; A-225).

[10] Plaintiffs suggest that *Dixon* permitted a plaintiff to receive "extra-contractual . . .
damages" and that, "a plaintiff is not held to a damages estimate at the time of
contracting when it seeks redress for tortious conduct." (D.I. 145 at 35). But the contract
in *Dixon* did not limit the plaintiffs' ability to recover such damages and plaintiffs'
suggestion that it did is misleading. To the contrary, *Dixon*'s holding—that parties are
bound by their agreed-upon remedies—counsels that plaintiffs here should be held to
their Agreements and not allowed to recover punitive damages.

[11] *Rawlings v. Apadoca*, 726 P.2d 565 (Ariz. 1986) similarly did not involve a limitation
of remedies provision.

     

YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ William W. Bowser
William W. Bowser (No. 2239)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Telephone:  (302) 571-6601
Facsimile:  (302) 576-3282
Email:  wbowser@ycst.com

Of Counsel:

LEWIS AND ROCA LLP
Randy Papetti
Cory A. Talbot
Emily S. Cates
40 N. Central Avenue
Phoenix, Arizona  85004
(602) 262-5311

Attorneys for Defendant


DATED:  June 29, 2006

21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., a    )
Canadian corporation, and J-SQUARE    )
TECHNOLOGIES (OREGON) INC., an    )
Oregon corporation,    )
                  Plaintiffs,    )
                  v.    )      C.A. No. 04-CV-960-SLR
MOTOROLA, INC., a Delaware corporation.    )
                  Defendant.    )

## CERTIFICATE OF SERVICE

       I, William W. Bowser, Esquire, hereby certify that on the 29th of June

2006, I electronically filed a true and correct copy of the foregoing **Motorola's Reply**

**Brief in Support of its Motion for Summary Judgment**, with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

                  David Allan Felice
                  Sean J. Bellew
                  Cozen O'Connor
                  Chase Manhattan Centre, 1201 North Market, Suite 1400
                  Wilmington, DE 19801

       I further certify that on this 29th day of June 2006, I mailed by United

States Postal Service a copy of  above-mentioned document to the following non-

registered participant:

                  Kevin F. Berry
                  Cozen O'Connor
                  1900 Market Street
                  Philadelphia, PA 19103

                  YOUNG CONAWAY STARGATT & TAYLOR, LLP

                  /s/ William W. Bowser
                  William W. Bowser, Esquire (Bar I.D. 2239)
                  1000 West Street
                  Wilmington, Delaware 19801
                  Telephone: (302) 571-6601
                  Facsimile: (302) 576-3282
                  Email: wbowser@ycst.com