IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., a )
Canadian corporation, and J-SQUARE )
TECHNOLOGIES (OREGON) INC., an )
Oregon corporation, )
                                )   C.A. No. 04-CV-960-SLR
               Plaintiffs, )
                                )
           v. )
                                )
MOTOROLA, INC., a Delaware )
corporation. )
                                )
            Defendant. )

**APPENDIX TO MOTOROLA'S REPLY BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

# REDACTED

YOUNG CONAWAY STARGATT & TAYLOR, LLP
/s/ William W. Bowser
_____
William W. Bowser (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601; Facsimile: (302) 576-3282
wbowser@ycst.com
OF COUNSEL:
Randy Papetti, Cory A. Talbot, Emily S. Cates
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 262-5311
Attorneys for Defendant

DATED:      July 5, 2006

## <u>TABLE OF CONTENTS</u>

Steven Blomme deposition excerpts ................................................................. C-1

Jeffrey Gibson deposition excerpts ................................................................. C-3

Paul Holt deposition excerpts ......................................................................... C-5

Jeanne Kolasa deposition excerpts.................................................................. C-14

Claude Langlois deposition excerpts .............................................................. C-20

Michael Nykoluk deposition excerpts............................................................. C-26

Kevin Parslow deposition excerpts ................................................................. C-30

Larry Terry deposition excerpts...................................................................... C-34

**Redacted – Entirety of Document Confidential** ........................................ C-39

J-Squared Technologies, Inc. Privilege Log .................................................. C-45

**Redacted – Entirety of Document Confidential** ........................................ C-46

J-Squared (Oregon)'s Response to First Set of Interrogs..………….................C-52

**CORNELL•CATANA REPORTING SERVICES,** 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax: (613) 231-4605

Examination No. 06-0288.2          Court File No. CA 04-960-SLR

(District of Delaware)

## IN THE UNITED STATES DISTRICT COURT

B E T W E E N :

    J-SQUARED TECHNOLOGIES, INC., a Canadian Corporation, and

    J-SQUARED TECHNOLOGIES (OREGON) INC., an Oregon Corporation

PLAINTIFFS

- and -


      MOTOROLA, INC. A DELAWARE CORPORATION

DEFENDANT


             **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

DEPOSITION OF STEVEN BLOMME, pursuant to an appointment

made on consent of the parties to be reported by

Cornell•Catana Reporting Services, on March 21, 2006,

commencing at the hour of 1:34 in the afternoon.

             **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***


APPEARANCES:

Sean J. Bellow                              for the Plaintiffs

Randy Papetti and Emily S. Cates            for the Defendant


    This Examination was taken down by sound recording

        by Janice West at Ottawa, Ontario, Canada.

1        Robinson and Mark Watts.

2   61.          Q.  Did you know either Mr. Robinson or Mr. Watts
3        from your time at Motorola?

4                A.  I did not know Dennis Robinson.  I barely
5        would have known Mark Watts.

6   62.          Q.  Did you ever have any face-to-face meetings
7        with them?

8                A.  Prior to the contract being signed?

9   63.          Q.  That's what I meant, yes?

10               A.  I would say no.

11  64.          Q.  So, the negotiations would have been done via
12       phone call and e-mails?

13               A.  Primarily, yes.

14  65.          Q.  Do you recall Mr. Watts or Mr. Robinson --
15       well, let me back up a question.  Did you negotiate this
16       Agreement at all with Mr. Terry?

17               A.  The Pacific North West Agreement?

18  66.          Q.  Correct?

19               A.  No.

20  67.          Q.  Well, you didn't play any role in negotiating
21       the Motorola and J-Squared Canada ---

22               A.  I did not.

23  68.          Q.  We're coming real close to violating my rule
24       about not talking at the same time?

25               A.  Okay.

122.      Q.  Would it have been your practice to recommend that the Agreement be signed if you thought that they were unreasonable?

          A.  No, it would not.

123.      Q.  It would not have been your practice?

          A.  It would not have been my -- sorry.

          MR. BELLEW:  I'm going to put in an objection and maybe we can get the question in a phrase where it's not going to ---                                                     *O*

          BY MR. PAPETTI:

124.      Q.  Would you have recommended to Mr. Gibson that J-Squared go ahead and sign this Agreement if the performance metrics in your mind were unreasonable?

          A.  I would not have recommended it.

125.      Q.  Would it be fair to say that you must have thought that they were reasonable at the time?

          A.  That's correct.

126.      Q.  Even though you don't recall specifically negotiating?

          A.  Yes.  I would have looked at them.

127.      Q.  Do you know who, at Motorola, was primarily responsible for coming up with these performance metrics? Did you have an impression at the time?

          A.  My impression would have been that Dennis Robinson would have input into the process but that's

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664          800-896-6271          Fax: (613) 231-4605

Case 1:04-cv-00960-SLR     Document 183     Filed 07/05/2006     Page 6 of 51

29

1     only an impression.

2  128.          Q.  What was Dennis Robinson's position at the

3     time?

4               A.  He was a Regional Sales Manager.

5  129.          Q.  Sometimes called a BDM -- is that correct?

6               A.  That's correct.

7  130.          Q.  What does BDM stand for?

8               A.  Business Development Manager.

9  131.          Q.  So he was already working for Motorola in

10     this territory?

11              A.  That's correct.

12  132.          Q.  The same question with respect to the

13     territory revenue -- at the bottom, you had mentioned in

14     your last e-mail that they had snuck in a higher figure

15     than you had seen in a prior draft?  Is that fair?

16              A.  That's correct.

17  133.          Q.  Would you have recommended to Mr. Gibson to

18     sign this if you thought that was an unreasonably high

19     figure?

20              A.  I would not have -- I would have -- I'm

21     having trouble with that form of question but if the

22     number was unreasonable I would have recommended we

23     didn't.

24  134.          Q.  Have you ever sat down and tried to figure

25     out, say after the contract got terminated, whether J-

practice because, as you can see, there's not a lot of e-mails going back and forth between Dennis and myself about, you know, do we hit this bar, you know, or have we got a design win, right? So it -- in my view this is a pretty flexible process.

What's important at the end is that a customer is going to buy enough Motorola product to meet these bars of you know, 100K annual or 250K annual that are in this Agreement.

So really that was -- that's the focus that Dennis and I would have had is, is, you know, is this customer potentially going to buy a quarter million dollars worth of product and if it is, he can -- he has his own process for claiming a design win inside his part of the company.

198.     Q.  Right, but under this definition, do you agree it would be provable or do you think it's a matter of opinion as to whether something's a design win or not?

A.  Under this definition I think -- I think it's really in the hands of the Regional BDM. The BDM's decision as to whether he accepts it as a design win or not.

199.     Q.  Is there times in general practice not only under this contract but under any of your contracts where there's a disagreement whether a commitment is firm

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax: (613) 231-4605

91

476.      Q.   Where did you get then the revenue year to
date figures for the design wins on here?

          A.   I probably would have looked at Point of Sale
Reports.

477.      Q.   So you've got Point of Sale Reports?

          A.   I had access to Point of Sale Reports, yes.

478.      Q.   Access to where?

          A.   Sorry?

479.      Q.   I mean, who had the reports that you were
given access to?

          A.   They would have come from the Head Office,
from the Main Office -- yes, Julie Blair was copying me
for a while but I'm not sure she copied me every time, so
I would have ---

480.      Q.   So Julie Blair provided you on a regular
basis -- or a roughly regular basis the POS Reports for
your territory?

          A.   Correct, correct.

481.      Q.   Do you have any reason to believe that J-
Squared (Oregon) was underpaid for any commissions it
earned during the time the Agreement was in effect?

          A.   Underpaid for commissions that were due and
during the term of the Agreement?

482.      Q.   Correct?

          A.   No, I don't think so.

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                                    1-800-893-6272                    Fax: (613) 231-4605

Examination No. 06-0288.4                    Court File No. CA 04-960-SLR

                                                              (District of Delaware)

### IN THE UNITED STATES DISTRICT COURT

B E T W E E N:

    J-SQUARED TECHNOLOGIES, INC., a Canadian Corporation, and

    J-SQUARED TECHNOLOGIES (OREGON) INC., an Oregon Corporation

                                                              PLAINTIFFS

                                    - and -

        MOTOROLA, INC. A DELAWARE CORPORATION

                                                              DEFENDANT

                        **********************

DEPOSITION OF JEFFREY GIBSON, pursuant to an appointment

made on consent of the parties to be reported by

Cornell•Catana Reporting Services, on March 23, 2006,

commencing at the hour of 9:14 in the forenoon.

                       **********************

# COURT COPY

APPEARANCES:

Sean J. Bellow                                    for the Plaintiffs

Randy Papetti and Emily S. Cates          for the Defendant

    This Examination was taken down by sound recording

       by Janice West at Ottawa, Ontario, Canada.

152

1    figured out was that it was the result of receiving a

2    New York Shipping Address on the activity from

3    Motorola's Distributor and she apologized for the length

4    of time it took to resolve it.

5            A.  Well, we're the ones that actually pointed

6    that out to Motorola.  That's what was happening.

7  757.       Q.  Right and Motorola investigated it and it

8    took awhile to figure out?

9            A.  Right.

10 758.       Q.  When she figured out what happened, she cut

11   J-Squared a cheque?  Correct?

12           A.  Correct.

13 759.       Q.  Are you aware of any other accounts covered

14   by the Agreement between J-Squared and Motorola that J-

15   Squared earned a commission on under the Agreement that

16   J-Squared wasn't paid for?

17           A.  Am I aware -- no.

18 760.       Q.  You can't point to any particular account

19   that you believe the commission that J-Squared was paid

20   was less than what J-Squared believes it was owed under

21   the Parties Agreement?

22           A.  No.

23 761.       Q.  Do you have any reason to believe Ms Blair

24   wasn't sincere as to what the confusion was at Motorola

25   as to why they didn't pay this commission properly?

VICTORY
VERBATIM REPORTING SERVICES

---

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

---

RD/sp

| | |
|---|---|
| J-SQUARED TECHNOLOGIES, INC.,) | |
| a Canadian corporation, and ) | |
| ) | |
| J-SQUARED TECHNOLOGIES ) | |
| (OREGON) INC., an Oregon ) | C.A. No. 04-960-SLR |
| corporation ) | |
| ) | |
| Plaintiffs ) | |
| v. ) | |
| ) | |
| MOTOROLA, INC., a Delaware ) | JURY TRIAL DEMANDED |
| corporation ) | |
| ) | |
| Defendant ) | |
| ) | |
| ) | |

     This is the Deposition of WILLIAM PAUL HOLT, taken
at the offices of VICTORY VERBATIM REPORTING SERVICES,
Suite 900, Ernst & Young Tower, Toronto-Dominion Centre,
Toronto, Ontario, on the 8th day of December, 2005.

------------------------

*CERTIFIED & COMMISSIONED REPORTERS FOR:*
* *BOARDS OF INQUIRY * CONVENTIONS * CONFERENCES * ARBITRATIONS *
* *VIDEO TAPING * AMERICAN DEPOSITIONS * EXAMINATIONS FOR DISCOVERY * FEDERAL COURT DISCOVERY *
* *DAILY COPY A SPECIALTY *

C-5

W.P. Holt - 120

1    five percent number to say what the total

2    commission would be.

3        Now, that is at a time where we have

4    not signed them, right.  So it is the time

5    trying to calculate how much would it cost,

6    so it is 39.  So if you are saying the

7    10,000 is a number you don't want to go

8    more than, that is well under the 10,000.

9        So internally, the accounting people

10    are happy because now they are not spending

11    more than what they wanted to spend, and...

12

13    BY MR. FELICE:

14    308.        Q.    Was it truthful to represent

15        anything other than...was it truthful to represent

16        that the monthly average point of sale revenue was

17        approximately $78,000 as identified in Exhibit 97,

18        when in fact, the data points for the last three

19        months were less than $1,000 a month?

20            MS. CATES:    Objection to form.  I don't

21        think you have established that any

22        representations have been made as to POS

23        data or historical revenue.

24    309.    MR. FELICE:    Noted.

25            THE DEPONENT:    Yes, I don't see what

W.P. Holt - 121

1    representatives you are talking about.

2    These are all internal planning documents

3    from what I can tell.  So an internal

4    planning document...yes, if you look at the

5    point of sales number themselves, you have

6    a few POPs.  You have got a POP in March, a

7    POP in January, a POP in June, and then you

8    don't have any Tracan numbers in November

9    and December.  I mean, that is what I see.

10

11   BY MR. FELICE:

12   310.          Q.    You told me that you would have made

13        representations to J-Squared concerning commission

14        payments, correct?

15             MS. CATES:    Object to form.

16   311.          MR. FELICE:    Basis?

17             THE DEPONENT:    We would have...

18             MS. CATES:    I believe that you are

19        mischaracterizing his testimony.  I think

20        he said someone may have given historical

21        data.  That is not...

22   312.          MR. FELICE:    That wasn't my question.

23        What is your basis for your objection to my

24        question?

25             MS. CATES:    My objection is that you are

CERTIFIED & COMMISSIONED REPORTERS FOR:
* BOARDS OF INQUIRY * CONVENTIONS * CONFERENCES * ARBITRATIONS *
* VIDEO TAPING * AMERICAN DEPOSITIONS * EXAMINATIONS FOR DISCOVERY * FEDERAL COURT DISCOVERY *
* DAILY COPY A SPECIALTY *

**V**ICTORY
**V**ERBATIM REPORTING SERVICES

W.P. Holt - 122

1     unfairly characterizing his previous

2     testimony.

3

4     BY MR. FELICE:

5     313.          Q.     You can answer the question.

6                   A.     The question again was?

7     314.          Q.     Isn't it true that you answered in a

8     prior...to a prior question, that you have made

9     representations to J-Squared about commission

10    payments that would be earned under the agreement?

11                  A.     I said they would have five percent

12    of sales.  That is a percentage.

13    315.          Q.     Those commission payments would be

14    based on historical numbers.  Is that correct?

15                  A.     No, those commission payments would

16    be based on the year that they were in.

17    316.          Q.     But the commission payments that you

18    are applying the five percent number to, you were

19    representing based on historical numbers, they could

20    expect a certain amount based on historical numbers?

21                  MS. CATES:    Object to form.

22                  THE DEPONENT:    Yes, I think you got this

23    confused.  So you have got two things

24    happening.  One thing is you have an

25    internal exercise, saying...looking at a

*CERTIFIED & COMMISSIONED REPORTERS FOR:*
* BOARDS OF INQUIRY * CONVENTIONS * CONFERENCES * ARBITRATIONS *
* VIDEO TAPING * AMERICAN DEPOSITIONS * EXAMINATIONS FOR DISCOVERY * FEDERAL COURT DISCOVERY *
* DAILY COPY A SPECIALTY *

C-8

# VICTORY
## VERBATIM REPORTING SERVICES

W.P. Holt - 123

1    2002 number, saying, "Okay, if this

2    business is the same next year, here is

3    what commission we would have to pay this

4    company."

5         Then there is an internal exercise

6    saying, "Okay, there is a $10,000 budget

7    that I guess Kevin put on, saying, 'Hey, we

8    shouldn't be paying more than 10,000, or

9    else, flag me, this is...you know, that is

10   too much to pay.  We should probably be

11   hiring our own people'."

12        So J-Squared would know that they

13   had a five percent commission rate.  That

14   would have been on the table.  J-Squared

15   would know...probably would know, and I

16   don't know if anybody told them...probably

17   would know about what the territory did

18   annually.

19        Like, I would never have got into a

20   monthly discussion about dollars, and

21   certainly would never, ever represent what

22   a customer is going to do the following

23   year, but I think, you know, a good

24   businessman like J-Squared would be, they

25   probably...they are probably speculating as

CERTIFIED & COMMISSIONED REPORTERS FOR:
* BOARDS OF INQUIRY * CONVENTIONS * CONFERENCES * ARBITRATIONS *
* VIDEO TAPING * AMERICAN DEPOSITIONS * EXAMINATIONS FOR DISCOVERY * FEDERAL COURT DISCOVERY *
* DAILY COPY A SPECIALTY *

C-9

W.P. Holt - 152

1    May, that I was going to be doing this Nortel thing.

2    It wasn't official.  It is not official, but, like,

3    Kevin was, you know, whispering in my ear, "You are

4    going to go to do this Nortel thing.  Go do that."

5         So at that time, I was doing less and less

6    North American stuff, and this doesn't surprise me

7    that Kevin would have put a hold on all

8    manufacturer's reps, because everything, the whole

9    company, was getting turned upside down and

10   restructuring.

11   385.        Q.    Do you think it would have been fair

12   or reasonable to let J-Squared (Oregon) know that

13   the company was putting the manufacturer rep

14   agreements on hold before they had executed the

15   agreements?

16        A.      Probably not, because I think what

17   is happening here is that, like I said, the context

18   would have been that Wendy was changing everything

19   in the organization, and we wouldn't have assumed

20   that that meant she...that there was going to

21   be...you know, that that whole strategy had changed.

22        I mean, everything changed, right.  I mean,

23   the product groups changed.  Everybody's jobs

24   changed.  People got a new structure.  So a lot of

25   things got put on hold.

CERTIFIED & COMMISSIONED REPORTERS FOR:
* BOARDS OF INQUIRY * CONVENTIONS * CONFERENCES * ARBITRATIONS *
* VIDEO TAPING * AMERICAN DEPOSITIONS * EXAMINATIONS FOR DISCOVERY * FEDERAL COURT DISCOVERY *
* DAILY COPY A SPECIALTY *

W.P. Holt - 155

1   the context is everything was on hold.  So you know,

2   we have been through this before, where a lot of

3   things get put on hold, and then as soon as the

4   strategy is set, it kind of continues.

5         So I don't think just because of the fact

6   that it was put on hold at that time that you would

7   have made the assumption that it was going to end.

8   You would have just said, "Hey, everything is on..."

9   The whole company was on hold.

10        People didn't know what their job was going

11  to be.  People said...like, this was when Jeanne

12  went from doing channels to going to work for me

13  under this other.

14        The whole place changed.  Like, she called

15  it the transformation.  So we were getting a bunch

16  of town halls around that time, where Wendy got up

17  in front and said, "We are going to transform this

18  business.  Here is the big picture of how this is

19  going to transform," but a lot of people...sorry,

20  can I just take a quick break?

21

22  ---   A BRIEF RECESS

23

24  WILLIAM PAUL HOLT, resumed

25  CONTINUED EXAMINATION BY MR. FELICE:

W.P. Holt - 164

1      were losing money on the J-Squared Canada account?

2              A.      No, I think back to Kevin on hold, I

3      didn't recall that, but like I said, everything was

4      being put on hold those days, and we were just

5      trying to get business done.

6              So I wouldn't have correlated that to too

7      much, except that, you know...no, I wouldn't have

8      put those two together.

9   414.        Q.      So when you looked at the fact that

10     they were spending in excess of $17,000 a month to

11     develop Motorola products in Canada, and the fact

12     that Wendy Vittori came in and said, "Everything is

13     on hold," you didn't feel it encumbent upon yourself

14     to say, "Wait, guys, don't keep on spending money

15     because we don't know if this is going to continue

16     in the future"?

17             MS. CATES:     Object to form.

18

19  BY MR. FELICE:

20  415.        Q.      Is that true?

21             A.      Yes, I really think you are

22     putting...you are trying to put words in my mouth

23     here.  I guess that is what you guys do in these

24     cross-examines (sic), but Kevin putting something on

25     hold is not surprising, based on what was going on.

CERTIFIED & COMMISSIONED REPORTERS FOR:
* BOARDS OF INQUIRY * CONVENTIONS * CONFERENCES * ARBITRATIONS *
* VIDEO TAPING * AMERICAN DEPOSITIONS * EXAMINATIONS FOR DISCOVERY * FEDERAL COURT DISCOVERY *
* DAILY COPY A SPECIALTY *

C-12

W.P. Holt - 165

Certainly, there was no...you wouldn't logically conclude from that that there was going to be a change in the channel strategy. That is not a logical...like, "Hey, we are going to go change the world because some stuff has been put on hold."

Wendy put everything on hold. So you know, we put product development on hold. Did we still continue to develop products after? Did we still try to get products out the door while things were on hold? Did we work around that?

Yes, we did all those things because you have got a senior executive saying, "Hey, you know, we are rethinking everything," but you know, the business is the business. It doesn't tend to change that fast, as much as executives think it is.

So I think what your question...the answer is no, because I wouldn't have put those two together. I think I was concerned that there wasn't the revenue coming into Canada. I was concerned that a point of sale number is down like that. That would be, from a sales management perspective, be something I would be concerned about.

I believe there was actually one big account that did start buying later, that probably had...you know, had done less business than normal,

*CERTIFIED & COMMISSIONED REPORTERS FOR:*
*\* BOARDS OF INQUIRY \* CONVENTIONS \* CONFERENCES \* ARBITRATIONS \**
*\* VIDEO TAPING \* AMERICAN DEPOSITIONS \* EXAMINATIONS FOR DISCOVERY \* FEDERAL COURT DISCOVERY \**
*\* DAILY COPY A SPECIALTY \**

C-13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC.,           )
a Canadian corporation, and             )
J-SQUARED TECHNOLOGIES                  )
(OREGON),  INC., an Oregon              )
corporation,,                           )      DEC 2 0 2005
                                        )
                 Plaintiffs,            )
                                        )
         vs.                            )
                                        )C..A. No.
                                        )04-960-SLR
MOTOROLA, INC., a Delaware              )
corporation,                            )
                                        )
                 Defendant.             )
                                        )
                                        )

                    DEPOSITION OF JEANNE KOLASA


                         Phoenix, Arizona
                         December 7, 2005
                            9:30 A.M.


              .
REPORTED BY:
JUDI SCHNEIDER
Certified Reporter
Certificate No. 50735

PREPARED FOR:
SEAN J. BELLEW
Attorney at Law                                 COPY

Page 77

1 what do you think their reaction would've been had they been

2 notified at some point in November of '03 that Motorola's

3 long term strategy no longer involved reps?

4          MR. TALBOT:  Object to form.

5     A.    I don't know.

6     Q.    Okay.  Flashing back to the beginning of your

7 negotiations with C&S and J-Squared Canada.  What was

8 Motorola's contemplation at that time as to how long these

9 rep relationships would last?

10     A.    I don't know.  I know that -- I know that we --

11 that there was a specific corporate driven requirement not

12 to include what we -- what sometimes is known as an

13 evergreen clause.  That we have -- that we had a corporate

14 directive to put a situation in place that upon a year's --

15 upon a year into the contract, a mutual agreement to move

16 forward would be required.

17     Q.    Okay.  We'll get to that.  That's G-9 policy, is

18 it?

19     A.    No, that's not the G-9 policy.

20     Q.    Okay.  What's the G-9 policy?

21     A.    G-9 policy is a due diligence review of

22 anybody -- any third party we partner with to make sure

23 they're financially viable.  That we're not entering into a

24 situation with a company that has legal issues, liability

25 issues, bankruptcy issues, things like that.

Page 158

1 the existing email that was first drafted by Claude?

2    A.   Yes.

3    Q.   And you set those off by what you call JK notes?

4    A.   Yes.

5    Q.   Jeanne Kolasa notes?

6    A.   Yes.

7    Q.   Okay.  At the bottom there it deals with section

8 7.1.  And it states, "May be renewed upon written request."

9    A.   Right.

10    Q.   Right?

11    A.   Right.

12    Q.   And Claude inquires, he had asked whether the

13 agreement could be automatically renewed unless terminated?

14    A.   Right.

15    Q.   And this is what you wrote as a note?

16    (I didn't respond to him on this because -- I'm

17 sorry, let me backup.

18    "I didn't respond to him on this one because you

19 told me this was a G-9 requirement.  I figure I'll explain

20 this when I send him back the updated document."

21    A.   Right.

22    Q.   We had discussed the G-9 policy earlier?

23    A.   Right.

24    Q.   And I had asked you whether or not this evergreen

25 prohibition, this prohibition against evergreen renewals,

Page 159

1 was a G-9 policy and you had stated no?

2      A.    I was mistaken.

3            MR. TALBOT:  Object to form.

4      Q.    Were you mistaken earlier or is this email

5 inaccurate?

6      A.    Honestly, I don't -- I have to assume here that

7 if this is what I wrote, that Sue had advised me somehow.

8      Q.    Okay.

9      A.    I don't know clearly.  I know it's a corporate

10 policy.  I don't know clearly where it comes from.

11     Q.    Okay.  Because we had discussed that?

12     A.    Okay.

13     Q.    I was just trying to determine exactly where this

14 policy against automatic renewal came from?

15     A.    Okay.

16     Q.    And you said it was a company policy.

17     A.    Right.

18     Q.    And I said well, is that the G-9 policy?

19     A.    Right.

20     Q.    And I think you had said no?

21     A.    Right.

22     Q.    But it may be actually?

23     A.    It may be, yes.  It might be.

24     Q.    You can take a hold of those and then Mr. Talbot.

25 (Handing.)

1    A.    That states that we would not do an evergreen

2 renewal because our G-9 policy prohibits that from

3 happening.

4    **Q.    Okay.**

5         MR. BELLEW:  Counsel, have we been provided a

6 copy with the G-9 policy?

7         MR. TALBOT:  Yes.

8         MR. BELLEW:  We have?  At this point we have?

9 There was a point earlier that we did not have it.

10        MR. TALBOT:  Right.  And then you sent -- David

11 sent me an email and asked for it and we provided it.

12        MR. BELLEW:  Okay.  To sort of -- not to go off

13 the record, but -- I don't think it's worthwhile at this

14 point.

15        Have you reviewed it?

16        MR. TALBOT:  Not recently.

17        MR. BELLEW:  Okay.  It may avoid a whole line of

18 questioning.  Is that a component part --

19        MR. TALBOT:  I don't recall whether this is.

20 Yeah, I just don't remember if it is.

21        MR. BELLEW:  Okay.

22 BY MR. BELLEW

23    **Q.    We've obviously raised an issue in your testimony**

24 **today as to whether this prohibition against the evergreen**

25 **is actually contained in the G-9 policy.  Based on what**

Page 169

1 you've seen now, have you been able to refresh your

2 recollection?  Are you confident that it's in that G-9

3 policy?

4      A.    No -- I mean I don't know.  I'm confident that

5 that's what the legal team has told me --

6      Q.    Okay.

7      A.    -- but I've never personally found that -- you

8 know, gone and looked for that clause in the G-9 policy.

9      Q.    Okay.  Have you seen that document before, we're

10 going to mark that as Exhibit 87.

11               (Whereupon, Bates document MOT001245-46 was

12               marked as Kolasa Exhibit 87 for

13               identification, as of this date.)

14      A.    Maybe.  I don't specifically remember it, but

15 I've seen the format before.

16      Q.    It's actually two pages, I've only given you one.

17 (Handing.)

18               These appear to be numbers related to the point

19 of sale revenue in J-Squared Canada?

20      A.    Right.  Estimates, right.

21      Q.    No, I don't think these are estimates.

22      A.    Yes, this one is an estimate.

23      Q.    I'm referring to the second page.

24      A.    I'm sorry.

25      Q.    They look like they're historical numbers, right?

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                1-800-893-6272                Fax: (613) 231-4605

Examination No. 06-0288.3                Court File No. CA 04-960-SLR

(District of Delaware)

### IN THE UNITED STATES DISTRICT COURT

B E T W E E N:

J-SQUARED TECHNOLOGIES, INC., a Canadian Corporation, and

J-SQUARED TECHNOLOGIES (OREGON) INC., an Oregon Corporation

PLAINTIFFS

- and -

MOTOROLA, INC. A DELAWARE CORPORATION

DEFENDANT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF CLAUDE LANGLOIS, pursuant to an appointment

made on consent of the parties to be reported by

Cornell•Catana Reporting Services, on March 22, 2006,

commencing at the hour of 9:13 in the forenoon.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:                **COURT COPY**

Sean J. Bellow                              for the Plaintiffs

Randy Papetti and Emily S. Cates            for the Defendant

This Examination was taken down by sound recording

by Janice West at Ottawa, Ontario, Canada.

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                  1-800-893-6272                  Fax: (613) 231-4605

57

263.        Q.  Did J-Squared give thought to not continuing

this relationship further with Motorola?

            A.  In the Rep's face, that is an on-going

discussion on whether it be Embedded Systems Software or

whatever -- how can we better align the current meaning

whether the relationship is financially stable or not.

That is always something you look at and that is always

something the Manufacturers look at with regard to the,

you know, can we change our channel or change our

strategy and so forth so it's a give and take situation

there.

264.        Q.  So, as I understand what you said, both

Manufacturers on the one side, and Reps such as J-Squared

on the other side are constantly reviewing whether or not

their contractual relationships are profitable or need to

be adjusted?  Correct?

            A.  I wouldn't say constantly.  I mean, there is

business to be taken care of.

265.        Q.  I want to explore what business to be taken

care of is.  You're aware that J-Squared was losing money

during the life of the Motorola contract?  Correct?

            A.  Correct.

266.        Q.  And was unhappy about the fact that it was

losing money during the life of that contract?

            A.  I will say that there were certain pressures

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax:  (613) 231-4605

197

1      say.

2  1054.        Q.   The last document.  Exhibit 126 please?  This

3      is on that Raytheon issue we mentioned a couple of times.

4      Could you read the e-mail quickly please?

5              A.   Okay.

6  1055.        Q.   This involves that Raytheon issue we were

7      discussing about a perceived underpayment under the

8      contract with Motorola?

9              MR. BELLEW:  Objection.                                    *O*

10             THE WITNESS:  Correct.

11             BY MR. PAPETTI:

12 1056.        Q.   And Ms Blair looks into it and says we have

13     finally determined that it was the result of receiving a

14     New York Shipping Address on this activity from our

15     Distributor and apologize for the length of time it has

16     taken to resolve it?  Correct?

17             A.   That is correct.

18 1057.        Q.   Okay and then she says, one cheque for $1,843

19     is coming and then another cheque for 66K should be

20     coming in the next couple of weeks?

21             A.   That is correct.

22 1058.        Q.   Did J-Squared receive those cheques to the

23     best of your knowledge?

24             A.   To the best of my knowledge, it did.

25 1059.        Q.   Then she gives sort of an excuse about what

198

1    the problem was here -- that it was the result of

2    receiving a New York Shipping Address on the activity

3    from the Distributor?  Do you see that in the first

4    paragraph?

5              A.  Yes.

6  1060.        Q.  Do you have any reason to believe that the

7    excuse she gives is either not accurate or not sincere?

8              A.  I don't have any reason to believe that.

9  1061.        Q.  Are you aware of any other account that ESG -

10   - excuse me, not ESG -- that J-Squared Canada should have

11   been paid on, either more commission than it received

12   during the life of the contract?

13             A.  No.

14 1062.        Q.  You can't name any commission cheque that you

15   should have received or any commission cheque that should

16   have been greater related to any account during the life

17   of the contract?

18             A.  Not that I can recall at this time.

19 1063.        Q.  So as far as you know, Motorola paid what it

20   was supposed to pay under the commission terms of the

21   contract?

22             MR. BELLEW:  Objection.                              *O*

23             MR. PAPETTI:  As far as you know?

24             MR. BELLEW:  Are we talking about the J-Squared

25   Canada Contract.

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                        1-800-893-6272                        Fax:  (613) 231-4605

200

1      contract expired on December 5 according to its terms?

2      Okay?

3                    MR. BELLEW:  Objection.                                    *O*

4                    BY MR. PAPETTI:

5  1071.             Q.  Do you have any reason to believe that's not

6      correct -- December 5, 2003?

7                    MR. BELLEW:  Objection.                                    *O*

8                    THE WITNESS:  Contract.  I mean, we conducted

9      business as usual with Motorola up until termination.

10                   BY MR. PAPETTI:

11 1072.             Q.  So what you're referring to is the fact that

12     for another two and a half months or so, J-Squared

13     continued to make sales efforts and so you think that the

14     180 days should run from the date of the Termination

15     Letter?  Is that what you're saying?

16                   MR. BELLEW:  Objection.                                    *O*

17                   MR. PAPETTI:  Is that what you're saying?

18                   THE WITNESS:  I agree with that.

19                   BY MR. PAPETTI:

20 1073.             Q.  Okay, what I was asking you before was in

21     terms of any account in which you received a commission

22     on, do you have any reason to believe you were shorted

23     commissions -- you being J-Squared on any account that

24     you served?

25                   MR. BELLEW:  During the time that the contract

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                     1-800-893-6272                     Fax:  (613) 231-4605

201

1      was in effect?  Was that ---

2               MR. PAPETTI:  Yes, yes?

3               THE WITNESS:  Other than Raytheon which was

4      corrected?

5               BY MR. PAPETTI:

6   1074.       Q.  Yes, other than Raytheon?

7               A.  No.

8               MR. PAPETTI:  Unless your Counsel has questions,

9      Mr. Langlois, I don't have any further questions so thank

10     you for coming.

11              MR. BELLEW:  I have no questions.

12              MR. COURVILLE:  This concludes the Deposition of

13     Claude Langlois.  The number of tapes used was two.  The

14     original video tapes will be retained by Baseline

15     Communications Incorporated located at 77 Auriga Drive,

16     Ottawa, Ontario, Canada.  The time is now 13:37:40 --

17     going off the Record.

18              --- WHEREUPON THE DEPOSITION ADJOURNED AT THE

19     HOUR OF 1:37 IN THE AFTERNOON.

20              THIS IS TO CERTIFY THAT the foregoing is a true

21     and accurate transcription from the Record made by sound

22     recording apparatus to the best of my skill and ability.

23

24     .............................................

25              Janice West, Court Monitor.

C-25

CORNELL•CATANA REPORTING SERVICES, 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664
1-800-893-6272
Fax: (613) 231-4605

Examination No. 06-0288.1

Court File No. CA 04-960-SLR

(District of Delaware)

## IN THE UNITED STATES DISTRICT COURT

B E T W E E N:

J-SQUARED TECHNOLOGIES, INC., a Canadian Corporation, and

J-SQUARED TECHNOLOGIES (OREGON) INC., an Oregon Corporation

PLAINTIFFS

- and -

MOTOROLA, INC. A DELAWARE CORPORATION

DEFENDANT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF MICHAEL NYKOLUK, pursuant to an appointment
made on consent of the parties to be reported by
Cornell•Catana Reporting Services, on March 21, 2006,
commencing at the hour of 8:44 in the forenoon.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

APPEARANCES:

Sean J. Bellow

Randy Papetti and Emily S. Cates

for the Plaintiffs

for the Defendant

This Examination was taken down by sound recording
by Janice West at Ottawa, Ontario, Canada.

**CORNELL•CATANA REPORTING SERVICES,** 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax: (613) 231-4605

88

492.          Q.  But you're not close friends?  You haven't
known him a long time?

          A.  No, no.  If I met him, it would have been in
1992 and the next time I saw him to the best of my
knowledge is July of 2002, so 10 years.

493.          Q.  What did you understand when you were part
of negotiating this contract with Mr. Terry, what his
title or role at Motorola was?

          MR. BELLEW:  Objection.               *O*

          THE WITNESS:  I don't think we were negotiating
the contract with Larry Terry.

          BY MR. PAPETTI:

494.          Q.  Okay, what were you doing with Larry Terry?

          A.  I think we had -- we were talking to him
about possibly representing Motorola in the market.

495.          Q.  Okay, so you were talking to him about
possibly representing Motorola in the market and then
later J-Squared negotiated a contract with others at
Motorola?  Is that fair?

          A.  I believe that's the way it went, yes.

496.          Q.  What did you recall about what Mr. Terry's
role or title was at Motorola?

          A.  I believe he was the Nortel Key Account
Manager and maybe was a Regional Manager.  It was kind
of a blurry -- I think he was the only sales guy in

137

1        on?

2                A.  Yes.  There was one account and I'm not sure

3        if it was cleaned up but there was one account -- I

4        think it was Rathion.

5    764.        Q.  There's an issue with Rathion and the

6        parties had discussions about that a couple of years

7        ago?

8                A.  That's correct, yes.

9    765.        Q.  Are you aware of any other discrepancy

10       between what J-Squared believes it earned under the

11       Agreement with Motorola and what J-Squared was paid?

12               A.  Yes.

13   766.        Q.  What else?

14               A.  I believe that we earned revenue in a period

15       of time from when our contract was terminated prior to

16       when the renewal should have been put in place.

17   767.        Q.  You're talking about the two and a half

18       months between December 5 when the contract expired on

19       its terms and the Termination Letter that we've been

20       calling it was received in late February?  Is that

21       correct?

22               MR. BELLEW:  Objection.                          *O*

23               MR. PAPETTI:  Is that what you're referring to?

24               MR. BELLEW:  Objection.                          *O*

25               THE WITNESS:  Yes.

**CORNELL•CATANA REPORTING SERVICES,** 800-170 Laurier Ave. W., Ottawa, ON K1P 5V5
Tel: (613) 231-4664                    1-800-893-6272                    Fax:  (613) 231-4605

138

```
 1                BY MR. PAPETTI:
 2    768.        Q.   Any other discrepancies that you're aware of
 3           between what J-Squared believes it earned and what it
 4           was paid?
 5                A.   No.
 6    769.        Q.   No other accounts that you can think of that
 7           J-Squared believes it was entitled to be paid on?
 8                A.   No.
 9    770.        Q.   The same answers with respect to J-Squared
10           (Oregon)?
11                A.   Yes, I haven't heard of anything.
12    771.        Q.   I asked you some questions on whether J-
13           Squared had ever terminated any lines -- product lines
14           that -- because it didn't believe it was profitable to
15           continue representing those lines?  Do you remember
16           that?
17                A.   Yes.
18    772.        Q.   Have any manufacturers ever terminated J-
19           Squared or Suppliers ever terminated J-Squared?
20                A.   Yes.
21    773.        Q.   Who?
22                A.   Zilog.  I believe that's pretty much it.
23    774.        Q.   So over the years when we've seen -- in some
24           of the documents we're looking at some Product Lines
25           coming and going those are generally because J-Squared
```

Page 1

1                    Volume:    I

2                    Pages:    1 - 268

3                    Exhibits: 110

4    IN THE UNITED STATES DISTRICT COURT

5       FOR THE DISTRICT OF DELAWARE

6    -------------------------------------x

7    J-SQUARED TECHNOLOGIES, INC.,

8    a Canadian corporation and

9

10   J-SQUARED TECHNOLOGIES (OREGON)

11   INC., an Oregon corporation,

12           Plaintiffs,

13       v.

14   MOTOROLA, INC., a Delaware corporation,

15           Defendant.

16   -------------------------------------x

17       VIDEOTAPED DEPOSITION of KEVIN PARSLOW, a

18   witness called for examination by the

19   Plaintiffs, taken pursuant to the Applicable

20   Provisions of the Delaware Rules of Civil

21   Procedure, before Laurie K. Langer, Registered

22   Professional Reporter and Notary Public in and

23   for the Commonwealth of Massachusetts, at the

24   offices of Bingham McCutchen, LLP, 150 Federal

1      either?

2   A.   Well, as you can see I'm not copied on it.

3   Q.   We've established that doesn't necessarily mean

4        you didn't get a copy of it, though.

5   A.   No, you're right.  It doesn't.

6   Q.   Okay.  Do you recall what your mindset was in

7        April of '03 regarding these contracts?

8   A.   No, I don't.  I'm just trying to see, place into

9        context with the following one with David

10       Bensted and I'm suspecting, and this is a

11       supposition, okay, that actually I was a little

12       uncomfortable trying to call back in the control

13       mechanism for the contract signing that actually

14       contracts were being generated, put together,

15       issued, between Jeanne, Paul Holt and others.

16       And Sue Hamlett without me and other senior

17       managers having signed off on them.  Because

18       each contract has a certain level of commitment

19       from Motorola in it.  And I would think if I'm

20       recalling correctly I was unhappy that the

21       approval process, the sign off of contracts was

22       not vigorous enough at the time.

23   Q.   Do you recall whether there were any performance

24       issues that you had come to learn of at this

Page 151

```
 1        point?

 2   A.   No.  No.  This, I believe, from trying to recall

 3        it, was related to the approvals and sign off of

 4        contracts, and at the time I was trying to

 5        tighten up on all of the contract signatories

 6        and how these were issued with approval sheets.

 7        So this is not related just to the manufacturer

 8        reps, I was doing the same thing with our direct

 9        OEM contracts and stuff as well.

10   Q.   Okay, you had said that the rep, the rep idea

11        was your idea?

12   A.   Well, it was my idea.  If I did I didn't mean to

13        imply it was just my great idea; but I had

14        experience in the past and believed it was a

15        productive way of growing business.

16   Q.   Was this a concept that you had raised as a

17        possibility within Motorola?

18   A.   Well, as you know they already had some rep

19        agreements in place, so it was not my great

20        idea, but I did look to expand the coverage that

21        we had that way and had done in previous

22        companies.

23   Q.   Well, whose vision was this?  Whose idea was it

24        then?
```

Page 152

```
 1   A.   Which?

 2   Q.   To engage manufacturers reps.

 3   A.   I don't know.  Because it's prior to me doing

 4        North America.  So I don't know.

 5   Q.   What was your vision for this rep relationship

 6        as of January '03?

 7   A.   Well, I can't, I can't recall exactly what my

 8        thought process in January of '03, but my

 9        thought process generally has been and continues

10        to be that manufacturer reps are a valuable

11        adjunct to the efforts of a direct selling team

12        and I had that as I came into the organization

13        and I had it as I left the organization.

14   Q.   Did you communicate that at any point to the

15        reps themselves?

16   A.   I don't know.  Well, the values of the

17        organizations?

18   Q.   (Nods in the affirmative.)

19   A.   I don't know.  I can't recall.

20   Q.   Do you recall a, maybe a speech or a

21        presentation that you gave to the reps in Boston

22        sometime in September of '03 on that?

23   A.   No.  When I read some through some of the

24        material related to this I kept seeing this
```

 **COPY**

1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
2
3    J-SQUARED TECHNOLOGIES,          :
     INC., a Canadian Corp., and   :   No. 04-960-SLR
4    J-SQUARED TECHNOLOGIES          :
     (OREGON) INC., an Oregon       :   JURY TRIAL DEMANDED
5    Corp.,                          :
6              Plaintiffs,           :
                                     :
7       vs.                          :
                                     :
8    MOTOROLA, INC., a Delaware      :
     Corp.,                          :
9                                    :
               Defendant.            :
10                        -   -   -
11                     March 16, 2006
12                        -   -   -
13              Video deposition of LARRY B. TERRY,
14        held at COZEN O'CONNOR, P.C., 1201 North Market
15        Street, Suite 1400, Wilmington, Delaware
16        19801, on the above date, commencing at 11:00
17        a.m., before Gwen D. Davenport, Registered
18        Professional Reporter, Notary Public.
19
20
21              LOVE COURT REPORTING, INC.
                  1500 Market Street
                12th Floor, East Tower
22            Philadelphia, Pennsylvania  19102
                  (215) 568-5599
23
24

Larry B. Terry

1    A    Which meeting to be exact?

2    Q    She says she's going up to Toronto for a

3  meeting with this rep firm on Wednesday.  So, that

4  would have been Wednesday, October 9, 2002.

5    A    I can't recall exactly.  It is possible.

6  Toronto is not exactly close to Ottawa, so ...

7    Q    It's not exactly close?

8    A    Yeah.  It's not exactly close.  It's five

9  hours away.

10    Q    By car?

11    A    Yeah.

12    Q    You could have flown there; right?

13    A    Well -- I could have.  So, I can't recall.  It

14  is possible I was there.  I don't know.

15    Q    Okay.  Were you ever in a meeting with Jeanne

16  Kolassa with representatives of J-Squared (Canada)?

17    A    I can't recall specifically.  That -- there is

18  a possibility that that was -- that that did happen.

19    Q    And at this point, in October of '02, you were

20  still an integral part of what was being discussed

21  between J-Squared and Motorola; correct?

22    A    I was still involved.  I'm not sure if I was a

23  an integral part.

24    Q    Okay.  When then did you -- when did your

Love Court Reporting, Inc.

Larry B. Terry

1  participation diminish?

2      A    Pretty much as Jeanne became involved with the

3  agreement.  After I had sent out the initial

4  agreement, and Claude started reviewing the agreement

5  and started providing that feedback, it was in that

6  transition for working through that contract to stay

7  with Jeanne.

8      Q    Can I get you to look at Exhibit 79?

9      A    79.  It's an E-Mail from Jeanne.

10     Q    It is.  And it has an attachment to it.  This

11 is an E-Mail that's -- it seemed like -- well, it

12 would be two days after that Wednesday meeting.  So,

13 this would appear to be Friday, October 11, 2002.

14     A    Is there anything in the text following that

15 E-Mail that you wanted me to focus on?

16     Q    I just first wanted to get you to confirm that

17 this appears to be two days after that meeting.

18     A    Okay.  That appears to be consistent.

19     Q    And then Jeanne sent in an E-Mail to you, Ed

20 Kaser and Sue Hamlet Dean?

21     A    Yeah.

22     Q    And she's -- she's taking some notes on,

23 obviously, her discussions with J-Squared; is that

24 accurate?

Larry B. Terry

1      A      There's nothing in that response that

2   indicates that there's any confusion as to what a

3   business plan is.

4      Q      Okay.  And in order to come up with an answer

5   to a -- to this question, or a response to this

6   statement, "Admit that Larry Terry made

7   representations to potential manufacturer

8   representatives concerning the expected duration of

9   the manufacturer representative business plan", they

10  would have to discuss it with Larry Terry?

11     A      Yes.  And I believe the answer was "Denied."

12  I did not make any representations to a manufacturer

13  representative business plan.

14     Q      Now, what is -- what is your understanding of

15  what the manufacturer's representative business plan

16  is then?

17     A      A business plan would indicate to me some

18  formal document that says, This is my business plan.

19  And did I set expectations according to that?  The

20  answer is no.

21     Q      Did you have any conversations regarding

22  anybody at -- at J-Squared regarding your expectation

23  of the duration of the manufacturer's rep agreement?

24     MS. CATES:  Object to form.

Larry B. Terry

```
 1              THE WITNESS:  No.
 2   BY MR. BELLEW:
 3        Q    How would you characterize the representations
 4   that you put on the record earlier today, what did
 5   they speak to?
 6        A    They spoke to discussions, they spoke to hope
 7   and intention of what we would do as a relationship.
 8   Not an agreement.
 9        Q    Okay.  Did you make any representations prior
10   to the execution of the agreement regarding your
11   expectation of the duration of that agreement?
12              MS. CATES:  Object to form.
13              THE WITNESS:  No.  Agreement as in?
14   BY MR. BELLEW:
15        Q    Okay.  Did you make any statements prior to
16   the execution of the agreement as to how long it would
17   take to rebuild the Canadian business?
18        A    No.
19        Q    Do you recall your testimony of earlier today
20   when you said that you were specific in your
21   statements that this was "our long-term plan", do you
22   remember that statement?
23        A    Our long-term plan.  I remember that
24   statement.
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., a )
Canadian corporation, and J-SQUARE )
TECHNOLOGIES (OREGON) INC., an )
Oregon corporation, )
                      Plaintiffs, )
                      v. )      C.A. No. 04-CV-960-SLR
MOTOROLA, INC., a Delaware corporation. )
                  Defendant. )

## APPENDIX PAGES C-39 THROUGH C-44 TO MOTOROLA'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# REDACTED
# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

YOUNG CONAWAY STARGATT & TAYLOR, LLP

William W. Bowser (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601; Facsimile: (302) 576-3282
wbowser@ycst.com
OF COUNSEL:
Randy Papetti, Cory A. Talbot, Emily S. Cates
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 262-5311
Attorneys for Defendant

DATED:     July 5, 2006

J-Squared Technologies, Inc., *et al.* v. Motorola, Inc.
C.A. No. 04-960-SLR

**PRIVILEGE LOG**

| Bates No. | Date | Description | Privilege | Status |
|---|---|---|---|---|
| J2 1579 – 1596 | Unknown | Draft manufacturer representative agreement between Motorola Computer Group and J-Squared Technologies with handwritten notes of J-Squared employees following consultation with its attorneys. | Attorney-client | Withheld |
| J2 1597 | Unknown | Handwritten notes of J-Squared employees concerning proposed changes to MRA following consultation with its attorneys. | Attorney-client | Withheld |
| J2 1102 | February 9, 2005 | Email from Jeff Gibson to Steve Bloome regarding litigation timeline and process. | Work product | Withheld |
| J2 1103 – 1105 | June 13, 2005 | Email from Steve Bloome to Jeff Gibson, cc Clode Langlios regarding JSO Exhibit 4 analysis. | Work product | Withheld |
| J2 1106 | June 15, 2005 | Email from Steve Bloome to Jeff Gibson regarding final email from Dennis Robinson prior to Motorola's termination of the MRAs. | Work product | Withheld |
| J2 1110 – 1111 | June 15, 2005 | Email from Steve Bloome to Jeff Gibson regarding April 2nd email from Dennis Robinson still asking for help from its manufacturers' representatives. | Work product | Withheld |

Dated: January 25, 2006

WILM\134051 00005.000\000153771.000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J-SQUARED TECHNOLOGIES, INC., a | ) | |
| Canadian corporation, and J-SQUARE | ) | |
| TECHNOLOGIES (OREGON) INC., an | ) | |
| Oregon corporation, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 04-CV-960-SLR |
| MOTOROLA, INC., a Delaware corporation. | ) | |
| Defendant. | ) | |

**APPENDIX PAGES C-46 THROUGH C-51 TO
MOTOROLA'S REPLY BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

# REDACTED
# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

YOUNG CONAWAY STARGATT & TAYLOR, LLP

William W. Bowser (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601; Facsimile: (302) 576-3282
wbowser@ycst.com
OF COUNSEL:
Randy Papetti, Cory A. Talbot, Emily S. Cates
Lewis and Roca LLP
40 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 262-5311
Attorneys for Defendant

DATED:     July 5, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J-SQUARED TECHNOLOGIES, INC., <br> a Canadian corporation, and | ) <br> ) <br> ) | |
| J-SQUARED TECHNOLOGIES (OREGON) INC., <br> an Oregon corporation, | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | C.A. No. 04-960-SLR |
| v. | ) <br> ) <br> ) | JURY TRIAL DEMANDED |
| MOTOROLA, INC., <br> a Delaware corporation | ) <br> ) <br> ) | |
| Defendant. | ) <br> ) | |

**PLAINTIFF J-SQUARED TECHNOLOGIES (OREGON), INC.'S
RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION**

Pursuant to Federal Civil Rules 26, 33 and 34, Plaintiff J-Squared Technologies

(Oregon), Inc. ("Plaintiff"), by its undersigned counsel, hereby responds to Defendant Motorola,

Inc.'s ("Defendant") First Set of Interrogatories and Requests for Production as follows:

**GENERAL OBJECTIONS**

1.      Plaintiff objects to the overall number of interrogatories propounded, including

subparts, as exceeding the 25 permitted under the Federal Rules and the Court's scheduling

order.  In the spirit of cooperation, Plaintiff will respond to all interrogatories set forth in this,

Defendant's First Set of Interrogatories.  Plaintiff does not, however, waive the right to object to

the service of any additional interrogatories.

2.      Plaintiff objects to Defendant's First Set of Interrogatories and Requests for

Production (collectively, the "Discovery Requests") to the extent that the interrogatories

contained therein seek information or documents that are protected by any privilege, including

but not limited to the attorney work-product or attorney-client privileges.  The inadvertent

13.    Identify and describe with specificity the total number of committed accounts/programs (as that term is used in Exhibit 4 to the Agreement) that JSO brought o Motorola beginning May 15, 2003 and all facts and documents that support your answer, including but not limited to the name of the customer or customers, the program or project that the customer was developing, the Motorola product that the customer purchased, the quarter in which the committed account/program was acquired, the efforts that JSO made to secure each committed account/program, and all other facts and documents that support your answer.

**RESPONSE:**    Plaintiff objects to this interrogatory to the extent this information is

equally accessible to Defendant.    Notwithstanding this objection, as of the termination of

Agreement, Plaintiff brought a total of five (5) committed accounts/programs to Motorola.

These included: (i) Boeing FCS; (ii) Boeing F22 Simulator; (iii) Boeing F22 Instrumentation;

(iv) Boeing AWACS-Data 1; (v) Boeing AWACS-Data 2.    In the days and weeks following

termination, Plaintiff brought an additional three (3) committed accounts/programs to Motorola.

The total number of committed accounts was eight (8).

Motorola did not have a basis at the time of termination (even if valid) to terminate based

on failure to achieve the specified threshold of committed accounts/programs.    *See* MOTJ01617-

22; MCG015712-16; MCG015588-93.    Motorola's purported basis for termination on this

ground was willful, wanton, fraudulent and intended to deprive JSO of its rights under the

Agreement.

14.    Identify and describe with specificity the total number of design wins (as that term is used in Exhibit 4 to the Agreement) that JSO brought to Motorola beginning May 15, 2003 and all facts and documents that support your answer, including but not limited to the name of the customer or customers, whether the customer was a military/aerospace entity, a description of the product that the customer was building, a description of the Motorola product that the customer purchased for inclusion in its product, whether the customer wanted a Motorola board product or system product, the customer's annual revenue forecast, how the customer evidence its intent to purchase Motorola products, the total dollar amount purchased by the customer at the date of termination of the Agreement, the quarter in which the design win was acquired, the efforts JSO made to secure each design win, and all other facts and documents that support your answer.

**RESPONSE:** Plaintiff objects to this interrogatory to the extent this information is equally accessible to Defendant. Notwithstanding this objection, as of the termination of Agreement, Plaintiff brought a total of four (4) design wins to Motorola. The design wins included: (i) Boeing AWACS-Data 1; (ii) Boeing AWACS-Data 2; (iii) Boeing F22-Simulator; and (iv) 888 LocalDial.

Motorola did not have a basis at the time of termination (even if valid) to terminate based on failure to achieve the specified threshold of design wins. *See* MOTJ01617-22; MCG015712-16; MCG015588-93. Motorola's purported basis for termination on this ground was willful, wanton, fraudulent and intended to deprive JSO of its rights under the Agreement.

15.    Identify (as defined in Instruction D) the JSO sales representative or representatives that sold products for Motorola and fully explain the sales representatives' responsibilities with regard to Motorola, whether the sales representative also sold products for other companies, and what percentage of the sales representative's time was spent selling Motorola products.

**RESPONSE:** Steve Blomme (80%), John Mitchell (70%), David Roth (20%) and Ken Sullivan (20%) worked to solicit customers, design product solutions and service demand fulfillment responsibilities under the Agreement, amongst other responsibilities. The approximate percentage of each individual's professional time spent on Motorola product lines is noted parenthetically. Messrs. Blomme, Roth and Sullivan are current employees of JSO and may be contacted through counsel. Mr. Mitchell resigned his position with JSO to continue his career elsewhere. Counsel will facilitate any communications with Mr. Mitchell that are necessary.

16.    Identify (as defined in Instruction D) all JSO employees that had a duty or responsibility in connection with meeting JSO's obligations under the Agreement and describe each such employee's job title and job duties during the time the Agreement was in effect. If the employee no longer works for JSO, indicate date of termination.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J-SQUARED TECHNOLOGIES, INC., a )
Canadian corporation, and J-SQUARE )
TECHNOLOGIES (OREGON) INC., an )
Oregon corporation, )
               Plaintiffs, )
                v. )      C.A. No. 04-CV-960-SLR
MOTOROLA, INC., a Delaware corporation. )
               Defendant. )

## CERTIFICATE OF SERVICE

     I, William W. Bowser, Esquire, hereby certify that on the 5th of July 2006,

I electronically filed a true and correct copy of the foregoing **Redacted Appendix to**

**Motorola's Reply Brief in Support of its Motion for Summary Judgment**, with the

Clerk of the Court using CM/ECF, which will send notification that such filing is

available for viewing and downloading to the following counsel of record:

          David Allan Felice
          Sean J. Bellew
          Cozen O'Connor
          Chase Manhattan Centre, 1201 North Market, Suite 1400
          Wilmington, DE 19801

     I further certify that on this 5th day of July 2006, I mailed by United States

Postal Service a copy of  above-mentioned document to the following non-registered

participant:

          Kevin F. Berry
          Cozen O'Connor
          1900 Market Street
          Philadelphia, PA 19103

          YOUNG CONAWAY STARGATT & TAYLOR, LLP

          /s/ William W. Bowser
          William W. Bowser, Esquire (Bar I.D. 2239)
          1000 West Street
          Wilmington, Delaware 19801
          Telephone: (302) 571-6601
          Facsimile: (302) 576-3282
          Email: wbowser@ycst.com